## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | )<br>)<br>) |
| *Plaintiffs,* | )<br>) |
| v. | )<br>)<br>) |
| AIR & LIQUID SYSTEMS CORP., *successor by merger to* BUFFALO PUMPS, INC., <br>ALFA LAVAL INC., *individually and as successor-in-interest to* DELAVAL PURIFIERS, <br>AMTROL INC., *successor-in-interest to* THRUSH COMPANY and H.A. THRUSH COMPANY, <br>CARRIER CORPOARTION, <br>CARRIER GLOBAL CORPORATION. <br>CATERPILLAR, INC., <br>CLEAVER-BROOKS, *INC., f/k/a* CLEAVER-BROOKS, a *division of* AQUA-CHEM, INC., *and successor for* DAVIS HEATERS, <br>CRANE CO., *Individually and as successor-in-interest to* CHAPMAN VALVE MANUFACTURING COMPANY, DEMING PUMPS and SWARTOUT VALVES, <br>CROWN, CORK AND SEAL COMPANY, INC., *successor-in-interest to* MUNDET CORK COMPANY, <br>FLOWSERVE US, INC., *solely as successor in interest to* EDWARD VALVES, INC., <br>FOSTER WHEELER ENERGY CORPORATION, <br>FMC CORPORATION, *on behalf of its former* NORTHERN PUMP business, <br>GARDNER DENVER, INC., <br>GENERAL ELECTRIC COMPANY, <br>GOULDS PUMPS, LLC, *f/k/a* GOULDS PUMPS, INC., <br>GREENE, TWEED & CO., <br>GRINNELL, LLC, d/b/a GRINNELL CORPORATION, <br>HILL BROTHERS CHEMICAL COMPANY, <br>HONEYWELL INTERNATIONAL, *INC.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) CIVIL ACTION NO.: 21 L 006906 |

| | |
|---|---|
| *f/k/a* ALLIED SIGNAL INC., *successor-in-interest to* THE BENDIX CORPORATION, | ) ) |
| IMO INDUSTRIES INC., *individually and as successor-in-interest to* DELAVAL TURBINE, INC., and C.H. WHEELER MANUFACTURING COMPANY, | ) ) ) ) |
| J AND H MARINE & INDUSTRIAL ENGINEERING COMPANY, | ) ) |
| JOHN CRANE, INC., | ) |
| THE J.R. CLARKSON COMPANY, *successor to the* KUNKLE VALVE COMPANY, and *successor to* J.E. LONERGAN COMPANY, | ) ) ) |
| MCNALLY INDUSTRIES, LLC *successor to* NORTHERN FIRE APPARATUS, | ) ) |
| METALCLAD INSULATION, LLC, | ) |
| METROPOLITAN LIFE INSURANCE COMPANY, | ) ) |
| THE NASH ENGINEERING COMPANY, | ) |
| PNEUMO ABEX, LLC, | ) |
| QUINCY COMPRESSOR LLC, *a/k/a* QUINCY COMPRESSOR CO., | ) ) |
| ROBERTSHAW CONTROLS CO., | ) |
| SPIRAX SARCO, INC., | ) |
| SYD CARPENTER MARINE CONTRACTORS, | ) ) |
| TACO, INC., | ) |
| TATE ANDALE, INC., | ) |
| THOMAS DEE ENGINEERING COMPANY, | ) |
| THRUSH CO., INC., | ) |
| TRIPLE A MACHINE SHOP, INC., | ) |
| UNION CARBIDE CORPORATION, | ) |
| VELAN VALVE CORP., *a/k/a* VELAN VALVE CORPORATION, | ) ) |
| Viacom CBS INC., *f/k/a* CBS CORPORATION (a Delaware Corporation *f/k/a* Viacom, Inc.) *is a successor by merger to* CBS CORPORATION (a Pennsylvania corporation *f/k/a* Westinghouse Electric Corporation) *and also successor-in-interest to* BF STURTEVANT, | ) ) ) ) ) ) ) |
| WARREN PUMPS, LLC, and | ) |
| WEIR-VALVES & CONTROLS USA, INC., *d/b/a* ATWOOD & MORRILL CO., | ) ) |
| | ) |
| *Defendants.* | ) |

## NOTICE OF REMOVAL OF ACTION

Pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, Defendant John Crane Inc. ("JCI") hereby removes this action from the Circuit Court of Cook County, Illinois to the United States District Court for the Northern District of Illinois. JCI provides the following short and plain statement of the grounds for removal:

### I. BACKGROUND FACTS

1. JCI was served with the Summons and Complaint on July 14, 2021 for the civil action pending before the Circuit Court of Cook County, Illinois: Case Number 2021L006906. (Summons and Complaint attached as **Exhibit A**.)

2. Plaintiffs allege that Plaintiff Chloyde Pelton's mesothelioma was caused by his work with and/or around a variety of asbestos-containing products (including JCI products) from his work in the U.S. Navy as a pipefitter/shipfitter from approximately 1959 through 1963. (**Exhibit A** ¶ 1.) Plaintiffs' causes of action sound in negligence and strict liability, based on design defect and failure to warn theories. Specifically, Plaintiffs seek to hold JCI (and others) liable for including asbestos in products supplied for use aboard Navy vessels, for failing to include warnings on the products supplied, and for failing to test products supplied for use aboard Navy vessels. (*Id.* ¶¶ 8(a)-(f).)

### II. U.S. NAVY SPECIFICATIONS GOVERNING GASKETS AND PACKING

3. At all times relevant to Plaintiffs' claims, the U.S. Navy observed a very particular process that had to be followed by product suppliers and manufacturers like JCI in order to sell products to the U.S. Navy for use on U.S. Navy ships. The U.S. Navy required that any product it purchased be qualified and approved before it purchased it. Accordingly, to sell a product to the U.S. Navy, JCI would have to go through certain steps to have the product placed on the U.S.

3

Navy's Qualified Products List ("QPL"), a list designating products eligible for bidding on the Navy's contracts.

4. At all times relevant to Plaintiffs' claims, to place a bid to sell a product to the U.S. Navy, JCI would first obtain the Navy's applicable Military Specification ("Mil-Spec"). Then, JCI would inform the Navy of its intention to bid on that specification.

5. At all times relevant to Plaintiffs' claims, once JCI had a product that conformed to the Navy's specifications, the Navy required JCI to test the product using an independent laboratory and submit those results to the Navy. The Navy also required that the product be submitted to the Navy for the Navy's own testing of it. Only after the product had satisfied the required testing could it be placed on the Navy's QPL. Once a product won a bid, it could then be sold to the Navy.

## A. *Specifications Regarding Gaskets Used on Navy Ships*

6. At all times relevant to Plaintiffs' claim, any JCI compressed asbestos-containing sheet gasket material sold to the United States Navy (supplied in only very small quantities) conformed with reasonably precise military specifications covering every aspect of the composition, marking and labeling of the product, appearance, technical performance and testing requirements. The only JCI sheet gasket material ever appearing on the Navy's QPL – but not during the years at issue here – was style 2150.

7. During the period at issue, compressed asbestos-containing sheet gasket material was governed by Military Specification Mil-A-17472. (Attached as **Exhibit B**.) This specification expressly required – based on decades of research by the Navy itself dating back to the first score of the twentieth century – the asbestos sheet to contain a minimum amount ("not less than 70 percent") of chrysotile asbestos. (*Id.* ¶¶ 3.2.1, 3.4.)

4

8. Included in this Mil-Spec was a requirement for all writings and markings required to appear on the face of the product. Specifically, Paragraph 3.10, entitled "Branding," in Mil-A-17472 provided that the face of the gasket was to be "plainly marked" with the "manufacturer's brand name." (*Id.* ¶ 3.10.) No other writings or markings – including warnings of any kind – were permitted.

9. Likewise, Paragraph 5.2 set forth requirements for all writings and markings that were permitted on shipping containers for gasket material. The documents incorporated by reference into Paragraph 5.2 did not include warnings for asbestos-containing products. Because the Navy assumed responsibility for promulgation of all warnings, and because one of the Navy's objectives was ensuring uniformity in labeling across the same products, the absence of any warning for asbestos incorporated into these paragraphs meant that such a warning was not permitted on the shipping containers for compressed asbestos sheet gasket material.

10. This Mil-Spec likewise defined and delimited mandatory detailed and comprehensive testing procedures in Section 4.5. (**Exhibit B** ¶ 4.5). The Navy's qualification process for inclusion of asbestos-containing gaskets on the applicable QPL, which included these mandatory testing procedures, is reflected in paragraphs 3.1 and 4.2 of Mil-Spec MIL-A-17472. The gaskets JCI sold to the Navy were required to – and did – conform to this Mil-Spec.

**B. *Specifications Regarding Packing Used on Navy Ships***

11. The level of oversight, control, testing, and detailed specifications described above for gasket material applied with equal force to the packing products sold by JCI to the Navy. Indeed, Mil-Specs for packing during the relevant time period contained precise language covering every aspect of the composition (expressly including asbestos), construction, size, performance testing, temperature rating, pressure rating, packaging, marking, and other characteristics of the

5

particular style of packing at issue. (*See* MIL-P-17303C, including amendments, collectively attached as **Exhibit C**).

12. For example, MIL-P-17303C strictly governed the composition of the packing supplied to the Navy. Paragraph 3.2 provided that the "composition" of the packing "shall conform to that of the sample submitted for qualification." When it was promulgated by the Navy in 1952, MIL-P-17303 replaced what had been a Navy Department Specification ("ND-SPEC") 33-P-25, which had been in place since 1931. The replacement of ND-SPECs with Mil-Specs was a function of a post-war movement away from branch-specific specifications to specifications that could be used across the various military branches.

13. ND-SPEC 33-P-25 expressly required that all packings contain chrysotile asbestos. (1 Sept. 1931 ND-SPEC 32-P-25 at Sections D and E, attached as **Exhibit D**). As such, the packing supplied by JCI that were approved for use by the Navy under ND-SPEC 33-P-25 were required to contain asbestos.

14. When MIL-P-17303C was promulgated, the products that had previously been approved by the Navy under ND-SPEC 33-P-25 were carried forward as the "approved" products under MIL-P-17303C. This is reflected in the QPL for MIL-P-17303C from 1983, reflecting dates of approved product testing (in the 1930s) that tied back to ND-SPEC 33-P-25. (6/20/83 QPL, identifying "EES" test results from the 1930s, attached as **Exhibit E**).

15. Thus, in promulgating MIL-P-17303C, the Navy required the continued use of the same asbestos-containing packings that had been required for decades under ND-SPEC 33-P-25. JCI was not free to use a non-asbestos packing under MIL-P-17303C. Before such a product could be used, it would have to be subjected to the testing required in the Mil-Spec. Only after such

testing would the Navy then have decided whether to approve use of the product, a decision that was completely within the Navy's discretion.

16. Further, Mil-Spec MIL-P-17303C included requirements for all writings and markings (which were only permitted on containers and not on the spools themselves) that were to appear on the product. (**Ex. C** ¶ 5.3). No other writings or markings (including warnings of any kind) were permitted. During the relevant time, these writings and markings never included an asbestos warning. For the same reasons described above for gaskets, warnings on packing containers were strictly controlled by the Navy. JCI provided warnings as strictly prescribed by the Navy.

17. Like MIL-A-17472 for gaskets, Mil-Spec MIL-P-17303C set forth mandatory detailed and comprehensive testing procedures for packing in the paragraph entitled "4.4 Inspection and tests." (**Ex. C**).

18. At all times relevant to Plaintiffs' claims, JCI complied with all of the reasonably precise specifications, including all design, labeling, and testing requirements, set forth in the Mil-Specs available to the gasket and packing products it sold to the U.S. Navy.

19. The U.S. Navy inspected goods supplied by JCI both at JCI's facilities and at the point of receipt by the Navy. These inspections specifically included review for compliance with marking and labeling requirements. The Navy never rejected or returned any shipment of products from JCI for failure to include an asbestos warning label. JCI never received any correspondence or other communication from the Navy instructing it that its shipments of products were required to include such warnings. There was never a cessation of the business relationship between the Navy and JCI over failure to include asbestos warnings on products.

20. At all times relevant to Plaintiffs' claims in this lawsuit, the United States Government, including the United States Navy – as one of the world's largest consumers of asbestos containing products – possessed knowledge regarding the dangers of asbestos that was superior to that of its equipment and product suppliers, including JCI. In fact, the Navy's knowledge of asbestos hazards dates back to the early 1920s, before JCI was even selling products to the Navy.

### III. FEDERAL OFFICER REMOVAL (28 U.S.C. § 1442(a)(1))

21. Removal is proper under 28 U.S.C. § 1442(a)(1) when facts are disclosed establishing that: (1) the removing defendant is a person within the meaning of the statute; (2) it performed the complained of action at the direction of a federal officer and under color of federal office; (3) there is a causal nexus between the defendant's actions and the plaintiff's claims; and (4) the defendant asserts a "colorable federal defense." *Mesa v. California*, 489 U.S. 121, 123-135 (1989); *Ruppel v. CBS Corp.,* 701 F.3d 1176, 1182 (7th Cir. 2012); 28 U.S.C. § 1442(a)(1). JCI meets all four elements and is therefore entitled to remove this action pursuant to the federal officer removal statute.

22. First, as a corporation, JCI is a "person" for purposes of 28 U.S.C. § 1442(a)(1). *Ruppel,* 701 F.3d at 1181.

23. Second, to the extent JCI supplied asbestos-containing gasket and packing material, it was at the direction of a federal officer, the United States Government, and under color of federal office. The materials at issue were supplied pursuant to military procurement contracts with the United States Government and in compliance with detailed design, testing, and labeling specifications issued and approved by the Government. These specifications dictated the performance testing and material composition of the materials – including the requirement that

such material contain asbestos fibers. (Mil-Spec MIL-A-17472 ¶¶3.1-3.4 (gaskets); Mil-Spec MIL-P-17303C ¶3.9.2 (packing)).

24. These specifications also dictated the writings and markings required and allowed to be placed on the materials. (Mil-Spec MIL-A-17472 at 3.11 and 5.2 (gaskets); Mil-Spec MIL-P-17303C at 5.3 (packing)). The design, manufacture, testing, labeling, and shipment of such materials were subject to close, detailed, and ongoing supervision and control of the United States Government and its officers. The Government exercised discretion and approval authority over the products supplied by JCI; JCI complied with all of the United States Government's specifications; and, to the extent of any alleged hazards associated with gasket and packing materials, there were no dangers known to JCI that were not known to the United States. *See Ruppel,* 701 F.3d at 1188; *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 666 (2016) (derivative sovereign immunity defense applies so long as the contractor can demonstrate that it complied with the Government's specifications regardless of the subject matter of the contract).

25. JCI's supply of gasket and packing materials under the control, direction, specification, and supervision of the Government thus satisfies the "acting under" requirement. The "acting under" requirement, like federal officer removal generally, "is 'broad' and is to be 'liberally construe[d]' in favor of the entity seeking removal.'" *Watson v. Philip Morris Cos., Inc*., 551 U.S. 142, 147 (2007). For the purposes of federal officer removal, the Seventh Circuit holds that military contractors were "acting under a federal officer" in relation to the design, manufacture, and supply of equipment to the United States Government. *See, e.g., Ruppel,* 701 F.3d at 1184-1186. Indeed, JCI could not change the design or provide additional language – including warning labels – on the gaskets and packing without prior Government authorization. Moreover, not only did JCI's acquisition of Government approval for any design change require

9

strict compliance with the Government's formal and detailed change process procedures, but the Government retained absolute authority at all times to accept, reject, or modify any aspect of a military government contractor's requested change proposal. Similarly, JCI could not change the testing protocol that the gasket and packing material was subjected to because, pursuant to the clear language of the specifications, the testing was to be conducted in facilities approved by the Government and done in accordance with the Government's protocol.

26. Third, there is a causal nexus between JCI's alleged actions in supplying the gaskets and packing and Plaintiffs' claim that Mr. Pelton's mesothelioma was caused by the asbestos-containing gaskets and packing JCI supplied to the U.S. Navy pursuant to and in strict adherence to applicable government specifications. In assessing whether a causal nexus exists, the Court credits the defendant's theory of the case. *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999); *Leite v. Crane Co.,* 749 F.3d 1117, 1124 (9th Cir. 2014); *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2nd Cir. 2008). In other words, a defendant must demonstrate that the acts for which it is being sued occurred because of what it was asked to do by the government. *See Id*. (*citing Isaacson v. Dow Chem. Co*., 517 F.3d 129, 137 (2nd Cir. 2008)). Here a nexus exists because the very acts that form the basis of Plaintiffs' claims – JCI's supply of asbestos-containing products to the U.S. Navy for use on Navy ships, its testing of those products, and its alleged failure to warn about asbestos hazards – are acts that JCI performed in accordance and compliance with directions from the Navy. *Ruppel,* 701 F.3d at 1184-1186; *Winters v. Diamond Shamrock Chem. Co*., 149 F.3d 387, 396-397 (5th Cir. 1998) (government contractor who supplied dangerous herbicide Government used to conduct war could remove product liability actions pursuant to federal officer removal statute).

27. Fourth, JCI asserts a colorable federal defense, namely the "government contractor" defense set forth in *Boyle v. United Technologies, Inc.*, 487 U.S. 500 (1988) and its progeny. To establish that defense in the context of the design defect/failure to test claims alleged against it, JCI will ultimately have to prove that (1) the United States approved reasonably precise specifications; (2) JCI's products conformed to those specifications; and (3) JCI warned the United States about the dangers in the use of the products that were known to JCI but not to the United States. *Id*. at 512-513. To establish that defense in the context of the failure to warn/failure to test claims alleged against it, JCI will ultimately have to prove that (1) the Navy exercised its discretion and approved certain warnings for JCI's products, (2) JCI provided the warnings required by the Navy, and (3) JCI warned the Navy about any asbestos hazards that were known to JCI but not to the Navy. *See Ruppel,* 701 F.3d at 1188.

28. The government contractor defense applies to Plaintiffs' failure-to-warn, failure to test, and design defect claims in that: (1) the Government approved specifications for the design and labeling of gaskets and packing; (2) JCI complied with these specifications, and (3) there were no health hazards associated with asbestos generally, or asbestos-containing gaskets and packing material specifically, of which JCI was aware and the Government was not. *See Ruppel,* 701 F.3d at 1188; *Boyle*, 487 U.S. at 512-513.

29. JCI is also entitled to federal officer removal under 28 U.S.C. § 1442(a)(1) based on the separate defense of derivative sovereign immunity set forth in *Yearsley v. W. A. Ross Constr. Co.*, 309 U.S. 18, 20-21 (1940), clarified most recently by *Campbell-Ewald Co.*, *supra*. In *Yearsley*, the Court established that a government contractor acting at the direction and authorization of a government officer is immune from suit based on performance of the government contract. Thus, to establish that defense, JCI will ultimately have to prove that it

supplied its asbestos-containing products to the Navy as authorized and directed by the Government. *Campbell-Ewald Co.*, 136 S. Ct. at 666; *Yearsley*, 309 U.S. at 20-21. *Yearsley* is satisfied here because the acts complained of were performed at the direction of government officers acting under government authorization, and if the Government had performed those acts directly, it would be immune from suit.

30. At this stage, to assert a colorable defense, a defendant is required only to identify facts which, viewed in the light most favorable to the defendant, would establish a defense under *Boyle*, *Leite*, or *Yearsley/Campbell-Ewald* at trial, and "need not win his case before he can have it removed." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). "Just as requiring a clearly sustainable defense rather than a colorable defense would defeat the purpose of the removal statute, so would demanding an airtight case on the merits in order to show the required causal connection." *Jefferson County v. Acker*, 527 U.S. 423, 432 (1999). To be "colorable," the defense need not be "clearly sustainable," as the purpose of the statute is to secure that the validity of the defense will be tried in federal court. *Willingham*, 395 U.S. at 407. Under identified facts similar to those here, federal courts consistently have denied motions to remand state law claims removed under the government contractor defense. *See Ruppel,* 701 F.3d at 1178.

31. Pursuant to 28 U.S.C. § 1446(b)(1), JCI has filed a notice of removal within 30 days of service of the summons upon JCI.

### IV. JURISDICTION

32. Removal of this action is proper under 28 U.S.C. § 1442. Consistent with the short and plain statement of the law and facts set forth above, the federal district courts have original jurisdiction over the subject matter of this suit under 28 U.S.C. § 1442(a)(1) because JCI was acting under an officer or agency of the United States Government in relation to any claims

asserted against JCI and JCI can state at least a colorable defense under federal law to any such claims. *See Ruppel,* 701 F.3d at 1178.

33. Section 1442(a)(1) authorizes removal of the entire case even if only one of the controversies it raises involves a federal officer or agency.

34. The Circuit Court for Cook County, Illinois is located within the judicial district overseen by the United States District Court for the Northern District of Illinois, making venue proper in the Northern District. *See* 28 U.S.C. §§ 1332(a)(3) and 1441(a).

## V. PROCEDURAL COMPLIANCE

35. JCI is not required to obtain the consent of any other defendants to remove this action in its entirety under 1442(a)(1). *Alsup v. 3-Day Blinds, Inc.*, 435 F. Supp. 2d 838, 842-843 (S.D. Ill. 2006) (*citing Akin v. Ashland Chem. Co.*, 156 F.3d 1030,1034 (10th Cir. 1998); *Ely Valley Mines, Inc. v. Hartford Accident & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981); *Fowler v. Southern Bell Tel. & Tel. Co.*, 343 F.2d 150, 152 (5th Cir. 1965); *County of Wayne v. Bank of Bloomfield Hills*, 2002 U.S. Dist. LEXIS 22775, No. 02 72766, 2002 WL 31777581, at *1 n.2 (E.D. Mich. Oct. 18, 2002); *Torres v. CBS News*, 854 F. Supp. 245, 246 n.2 (S.D.N.Y. 1994); *Bottos v. Avakian*, 477 F. Supp. 610, 611 n.3 (N.D. Ind. 1979)).

36. As required by 1446(a), true and correct copies of all process, pleadings, and orders served upon JCI are being filed and are attached here as grouped **Exhibit F**.

37. Pursuant to 28 USC 1446(d), JCI is filing written notice of this Notice of Removal with the Circuit Court of Cook County, Illinois concurrently with the filing of this Notice of Removal and will serve the same on counsel of record. A copy of the Notice of Filing Notice of Removal (without exhibits) is attached as **Exhibit G**.

38. A court cannot remand a properly removed case for discretionary or policy reasons, such as allegedly related state court cases or a contention that judicial economy compels remand.

28 U.S.C. § 1447(c); *Thermitron Prods., Inc. v. Hermansdorfer* (1976) 423 U.S. 336. The federal officer removal statute, 28 U.S.C. § 1442(a)(1), is not narrow nor limited, and it should not be frustrated by a narrow or grudging interpretation. *Willingham v. Morgan*, 395 U.S. 402, 405 (1969).

39. If Plaintiffs file a motion to remand this action, JCI respectfully requests an opportunity to respond more fully in writing, including submission of additional affidavits and authority.

40. JCI reserves all of its defenses.

**WHEREFORE**, Defendant JCI requests that this Court assume jurisdiction over this matter on removal from the Circuit Court for Cook County, Illinois.

Dated: August 12, 2021

    Respectfully submitted,

    MANNING GROSS + MASSENBURG LLP

By: */s/ Pamela R. Gamble*
Mark I. Tivin, #6210281
mtivin@mgmlaw.com
Pamela R. Gamble, #6282922
pgamble@mgmlaw.com
55 W. Monroe Street, Suite 3360
Chicago, IL 60603
Telephone: (312) 625-4995
Facsimile: (312) 291-9396
ATTORNEYS FOR DEFENDANT
JOHN CRANE INC.

**CERTIFICATE OF SERVICE**

    I hereby certify that on August 12, 2021, I electronically filed the foregoing Notice of Removal with the Clerk of Court using the CM/ECF system.

                                            */s/ Pamela R. Gamble*
                                            **Pamela R. Gamble**