CT Corporation

**Service of Process Transmittal**
07/14/2021
CT Log Number 539900204

**TO:** John Crane Asbestos .
Smiths Group
227 W Monroe St Ste 1800
Chicago, IL 60606-5053

**RE:** **Process Served in Illinois**

**FOR:** John Crane Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | CHLOYDE PELTON and SHIRLEY PELTON, PLTFS. vs. AIR & LIQUID SYSTEMS CORPORATION, ETC., ET AL., DFTS. // TO: John Crane, Inc. *Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | -- |
| **COURT/AGENCY:** | None Specified Case # 2021L006906 |
| **NATURE OF ACTION:** | Asbestos Litigation - Personal Injury |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Chicago, IL |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 07/14/2021 at 14:10 |
| **JURISDICTION SERVED :** | Illinois |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 07/14/2021, Expected Purge Date: 07/19/2021 |
| | Image SOP |
| | Email Notification, John Crane Asbestos . legal-service@johncrane.com |
| | Email Notification, Christopher S. Doherty cdoherty@mgmlaw.com |
| | Email Notification, Christopher Doherty CDoherty@mgmlaw.com |
| | Email Notification, Lindsay Whalen lwhalen@mgmlaw.com |
| | Email Notification, Callie Dougherty cdougherty@mgmlaw.com |
| **REGISTERED AGENT ADDRESS:** | C T Corporation System 208 South LaSalle Street Suite 814 Chicago, IL 60604 |
| | 866-331-2303 CentralTeam1@wolterskluwer.com |

Page 1 of 2 / MS

**EXHIBIT A**

 CT Corporation

**Service of Process Transmittal**
07/14/2021
CT Log Number 539900204

**TO:**     John Crane Asbestos .
Smiths Group
227 W Monroe St Ste 1800
Chicago, IL 60606-5053

**RE:**     **Process Served in Illinois**

**FOR:**    John Crane Inc.  (Domestic State: DE)

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



## PROCESS SERVER DELIVERY DETAILS

**Date:** Wed, Jul 14, 2021

**Server Name:** Heidi Berna

| | |
|---|---|
| Entity Served | JOHN CRANE INC. |
| Case Number | 21 L 006906 |
| Jurisdiction | IL |



**IN THE CIRCUIT COURT**
**COOK COUNTY, ILLINOIS**

FILED
7/8/2021 3:33 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L006906

13968006

CHLOYDE PELTON and SHIRLEY PELTON,                )
                                                            )

               Plaintiff,                                            )

-vs.-                                                               )   No. 21-L-006906

                                                   )

AIR & LIQUID SYSTEMS CORPORATION, *successor*   )
*by merger to* BUFFALO PUMPS, INC., et. al.,               )
                                                   )

               Defendants.                                         )   **SUMMONS**

**DEFENDANT:**   **JOHN CRANE, INC.**
**SERVE:**        **C.T. Corporation System**
                 **208 S. LaSalle Street, Suite 814**
                 **Chicago, IL 60604**

       You are summoned and required to file an answer in this case, or otherwise file your appearance, in the office of the clerk of this court, within 30 days after service of this summons, exclusive of the day of service. If you fail to do so, a judgment or decree by default may be taken against you for the relief prayed in the complaint.

       This summons must be returned by the officer or other person to whom it was given for service, with endorsement thereon of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed.

       This summons may not be served later than 30 days after its date.

Witness: IRIS MARTINEZ, the Clerk of the Circuit Court and the seal thereof at Cook County,

Illinois, this _____ day of _____, 2021.

                                       IRIS MARTINEZ
                              (Clerk of the Circuit Court)

                       BY:   7/8/2021 3:33 PM IRIS Y. MARTINEZ
                                  (Deputy Clerk)

(Plaintiff's attorney or plaintiff if he is not represented by an attorney)
FLINT LAW FIRM, LLC
Attorneys for Plaintiff
222 E. Park St., Suite 500
P.O. Box 189
Edwardsville, Illinois 62025
(618) 288-4777

             Date of Service: _____, 2021.
        (To be inserted by officer on the copy left with the defendant or other person)

FILED DATE: 7/8/2021 3:33 PM   2021L006906

**12-Person Jury**

FILED
7/8/2021 9:23 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L006906

**IN THE CIRCUIT COURT**
**COOK COUNTY, ILLINOIS**

FILED DATE: 7/8/2021 9:23 AM   2021L006906

| | |
|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| -vs.- | ) No. 21-L-__ |
| | ) J1 |
| | ) |
| AIR & LIQUID SYSTEMS CORPORATION, *successor by* | )JURY TRIAL DEMANDED |
| merger to BUFFALO PUMPS, INC., | ) |
| ALFA LAVAL INC., *individually and as successor-in-interest to* | ) |
| DELAVAL PURIFIERS, | ) |
| AMTROL INC., *successor-in-interest to* THRUSH COMPANY | ) |
| and H.A. THRUSH COMPANY, | ) |
| CARRIER CORPORATION, | ) |
| CARRIER GLOBAL CORPORATION, | ) |
| CATERPILLAR, INC., | ) |
| CLEAVER-BROOKS, INC., *f/k/a* CLEAVER-BROOKS, a | ) |
| *division of* AQUA-CHEM, INC., *and successor for* DAVIS | ) |
| HEATERS, | ) |
| CRANE CO., *Individually and as successor-in-interest to* | ) |
| CHAPMAN VALVE MANUFACTURING COMPANY, | ) |
| DEMING PUMPS and SWARTOUT VALVES, | ) |
| CROWN, CORK AND SEAL COMPANY, INC., *successor-in-* | ) |
| *interest to* MUNDET CORK COMPANY, | ) |
| FLOWSERVE US, INC., *solely as successor in interest to* | ) |
| EDWARD VALVES, INC., | ) |
| FOSTER WHEELER ENERGY CORPORATION, | ) |
| FMC CORPORATION, *on behalf of its former* NORTHERN | ) |
| PUMP business, | ) |
| GARDNER DENVER, INC., | ) |
| GENERAL ELECTRIC COMPANY, | ) |
| GOULDS PUMPS, LLC, *f/k/a* GOULDS PUMPS, INC., | ) |
| GREENE, TWEED & CO., | ) |
| GRINNELL, LLC, d/b/a GRINNELL CORPORATION, | ) |
| HILL BROTHERS CHEMICAL COMPANY, | ) |
| HONEYWELL INTERNATIONAL, INC., *f/k/a* ALLIED | ) |
| SIGNAL INC., *successor-in-interest to* THE BENDIX | ) |
| CORPORATION, | ) |
| IMO INDUSTRIES INC., *individually and as successor-in-interest* | ) |
| *to* DELAVAL TURBINE, INC., and C.H. WHEELER | ) |
| MANUFACTURING COMPANY, | ) |
| J AND H MARINE & INDUSTRIAL ENGINEERING | ) |
| COMPANY; | ) |

FILED DATE: 7/8/2021 9:23 AM   2021L006906

JOHN CRANE, INC.,                                                              )
THE J.R. CLARKSON COMPANY, *successor to the* KUNKLE          )
   VALVE COMPANY, *and successor to* J.E. LONERGAN             )
   COMPANY,                                                    )
MCNALLY INDUSTRIES, LLC *successor to* NORTHERN              )
   FIRE APPARATUS,                                             )
METALCLAD INSULATION, LLC,                                     )
METROPOLITAN LIFE INSURANCE COMPANY,                          )
THE NASH ENGINEERING COMPANY,                                 )
PNEUMO ABEX, LLC,                                             )
QUINCY COMPRESSOR LLC, *a/k/a* QUINCY                         )
   COMPRESSOR CO.,                                             )
ROBERTSHAW CONTROLS CO.,                                       )
SPIRAX SARCO, INC.,                                           )
SYD CARPENTER MARINE CONTRACTORS,                             )
TACO, INC.,                                                   )
TATE ANDALE, INC.,                                           )
THOMAS DEE ENGINEERING COMPANY,                              )
THRUSH CO., INC.,                                            )
TRIPLE A MACHINE SHOP, INC.,                                 )
UNION CARBIDE CORPORATION,                                    )
VELAN VALVE CORP., *a/k/a* VELAN VALVE                        )
   CORPORATION,                                                )
ViacomCBS INC., *f/k/a* CBS CORPORATION (a Delaware          )
   Corporation *f/k/a* Viacom, Inc.) *is a successor by merger to*   )
   CBS CORPORATION (a Pennsylvania corporation *f/k/a*          )
   Westinghouse Electric Corporation) *and also successor-in-*  )
   *interest to* BF STURTEVANT,                                )
WARREN PUMPS, LLC, and                                       )
WEIR-VALVES & CONTROLS USA, INC., *d/b/a* ATWOOD &           )
   MORRILL CO.,                                                )
                                                               )
          Defendants.                                            )

## **COMPLAINT**

## **COUNT I**

NEGLIGENCE COUNT AS TO MANUFACTURERS OF ASBESTOS PRODUCTS

     COME NOW the Plaintiffs, CHLOYDE PELTON and SHIRLEY PELTON, by their

attorneys, Flint Law Firm, LLC, and for their cause of action against the Defendants, state:

     1.    The Plaintiff, CHLOYDE PELTON, served in the U.S. Navy as a

FILED DATE: 7/8/2021 9:23 AM   2021L006906

pipefitter/shipfitter from approximately 1959 through 1963 on various ships including, but not limited to the U.S.S. Lyman K. Swenson (DD-729), U.S.S. Pritchett (DD-561) and the U.S.S. Frontier (AD-25).

2.     During the course of the Plaintiff CHLOYDE PELTON's employment,  during non-occupational work projects (including, but not limited to, automotive repairs, while laundering clothes, maintenance and remodeling) and/or in other ways, the Plaintiff, CHLOYDE PELTON, was exposed to and inhaled asbestos fibers emanating from certain products he was working with and around, which were manufactured, sold, distributed or installed by the Defendants: AIR & LIQUID SYSTEMS CORPORATION, *successor by merger to* BUFFALO PUMPS, INC., ALFA LAVAL INC., *individually and as successor-in-interest to* DELAVAL PURIFIERS, AMTROL INC., *successor-in-interest to* THRUSH COMPANY and H.A. THRUSH COMPANY, CARRIER CORPORATION, CARRIER GLOBAL CORPORATION, CATERPILLAR, INC., CLEAVER-BROOKS, INC., *f/k/a* CLEAVER-BROOKS, a *division of* AQUA-CHEM, INC., *and successor for* DAVIS HEATERS, CRANE CO., *Individually and as successor-in-interest to* CHAPMAN VALVE MANUFACTURING COMPANY, DEMING PUMPS and SWARTOUT VALVES, CROWN, CORK AND SEAL COMPANY, INC., *successor-in-interest to* MUNDET CORK COMPANY, FLOWSERVE US, INC., *solely as successor in interest to* EDWARD VALVES, INC., FOSTER WHEELER ENERGY CORPORATION, FMC CORPORATION, *on behalf of its former* NORTHER PUMP business, GARDNER DENVER, INC., GENERAL ELECTRIC COMPANY, GOULDS PUMPS, LLC, *f/k/a* GOULDS PUMPS, INC., GREENE, TWEED & CO., GRINNELL, LLC, d/b/a GRINNELL CORPORATION, HILL BROTHERS CHEMICAL COMPANY, HONEYWELL INTERNATIONAL, INC., *f/k/a* ALLIED SIGNAL INC., *successor-in-interest to* THE BENDIX

FILED DATE: 7/8/2021 9:23 AM 2021L006906

CORPORATION, IMO INDUSTRIEINC., *individually and as successor-in-interest to* DELAVAL TURBINE, INC., and C.H.WHEELER MANUFACTURING COMPANY, J AND H MARINE & INDUSTRIAL ENGINEERING COMPANY; JOHN CRANE, INC., THE J.R. CLARKSON COMPANY *successor to the* KUNKLE VALVE COMPANY, *and successor to* J.E. LONERGAN COMPANY, MCNALLY INDUSTRIES, LLC *successor to* NORTHERN FIRE APPARATUS, METALCLAD INSULATION, LLC, METROPOLITAN LIFE INSURANCE COMPANY, THE NASH ENGINEERING COMPANY, PNEUMO ABEX, LLC, QUINCY COMPRESSOR, LLC, *a/k/a* QUINCY COMPRESSOR CO., ROBERTSHAW CONTROLS CO., SPIRAX SARCO, INC., SYD CARPENTER MARINE CONTRACTORS, TACO, INC., TATE ANDALE, INC., THOMAS DEE ENGINEERING COMPANY, THRUSH CO., INC., TRIPLE A MACHINE SHOP, INC., UNION CARBIDE CORPORATION,VELAN VALV CORP., *a/k/a* VELAN VALVE CORPORATION, ViacomCBS INC., *f/k/a* CBS CORPORATION (a Delaware Corporation *f/k/a* Viacom, Inc.) *is a successor by merger to* CBS CORPORATION (a Pennsylvania corporation *f/k/a* Westinghouse Electric Corporation) *and also successor-in-interest to* BF STURTEVANT,WARREN PUMPS, LLC, and WEIR-VALVES & CONTROLS USA, INC., *d/b/a* ATWOOD & MORRILL CO.

3.     At all times herein set forth, the Defendants' products were being employed in the manner and for the purposes for which they were intended.

4.     CHLOYDE PELTON's exposure to and inhalation of the asbestos fibers emanating from the above-mentioned products were completely foreseeable and could or should have been anticipated by the Defendants.

5.     The Defendants knew or should have known that the asbestos fibers contained in their products had a toxic, poisonous, and highly deleterious effect upon the health of persons

inhaling them.

6.     That on or about June 11, 2021, the Plaintiff first became aware that he had developed mesothelioma and, at a later date, learned that said disease was wrongfully caused.

7.     At all times herein relevant, the Defendants had a duty to exercise reasonable care and caution for the safety of the Plaintiff and others working with and around the products of the Defendants containing asbestos.

8.     The Defendants failed to exercise ordinary care and caution for the safety of the Plaintiff in one or more of the following respects:

> (a)   Included asbestos in their products, even though it was completely foreseeable and could or should have been anticipated that persons working with or around them would inhale asbestos fibers;
>
> (b)  Included asbestos in their products when the Defendants knew or should have known that said asbestos fibers would have a toxic, poisonous and highly deleterious effect upon the health of persons inhaling them;
>
> (c)  Included asbestos in their products when adequate substitutes for the asbestos in them was available;
>
> (d)  Failed to provide any or adequate warnings to persons working with and around the products of the dangers of inhaling the asbestos fibers contained in them;
>
> (e)   Failed to provide any or adequate instructions concerning the safe methods of working with and around the products, including specific instructions on how to avoid inhaling the asbestos fibers in them; and
>
> (f)   Failed to conduct tests on the asbestos-containing products manufactured, sold, delivered or installed by the Defendants in order to determine the hazards to which workers might be exposed while working with the products.
>
> (g)   Designed, manufactured and sold equipment, vehicles, machinery, technologies and systems that included asbestos-containing components and required and/or specified the use of

FILED DATE: 7/8/2021 9:23 AM   2021L006906

FILED DATE: 7/8/2021 9:23 AM    2021L006906

asbestos-containing replacement components.

(h) Designed respiratory protection systems, including masks and/or respirators, which failed to protect the Plaintiff from inhaling asbestos fibers and/or asbestiform fibers.

9.      That as a direct and proximate result of one or more of the foregoing acts or omissions on the part of the Defendants mentioned above, the Plaintiff was exposed to and inhaled, ingested or otherwise absorbed asbestos fibers causing Plaintiff to develop mesothelioma, which will ultimately lead to his death; Plaintiffs have been compelled to expend and become liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of Plaintiff's asbestos-induced disease and conditions; Plaintiff has experienced, and will continue to experience now and in the future, great physical pain and mental anguish as a result of the inhalation, ingestion and absorption of said asbestos fibers; that as a further result of his asbestos-induced disease and conditions, the Plaintiff has been hindered, and will continue to be hindered now and in the future, from pursuing his normal course of employment, thereby losing large sums of monies which otherwise would have accrued to him and his estate; further, by reason of the sickness of the Plaintiff, his family has been deprived, and will continue to be deprived, of his means of support and society.

WHEREFORE, Plaintiffs pray judgment be entered against the Defendants for a sum in excess of FIFTY THOUSAND ($50,000.00) DOLLARS which will fairly and reasonably compensate for the Plaintiffs' injuries.

## COUNT II

## WILLFUL AND WANTON

COMES NOW the Plaintiffs, CHLOYDE PELTON and SHIRLEY PELTON, by their attorneys, Flint Law Firm, LLC, and for their cause of action against the Defendants, state:

FILED DATE: 7/8/2021 9:23 AM    2021L006906

1. - 8.  Plaintiffs repeat and reallege Paragraphs 1 - 8 of Count I as and for Paragraphs 1 - 8 of this Count II.

9.    Defendants are guilty of one or more of the following acts or omissions amounting to willful and wanton misconduct:

(a)  Intentionally or with a reckless disregard for the safety of Plaintiff, included asbestos in their products, even though it was completely foreseeable and could or should have been anticipated that persons working with or around them would inhale asbestos fibers;

(b)  Intentionally or with a reckless disregard for the safety of Plaintiff, included asbestos in their products when the Defendants knew or should have known that said asbestos fibers would have a toxic, poisonous and highly deleterious effect upon the health of persons inhaling them;

(c)  Intentionally or with a reckless disregard for the safety of Plaintiff, included asbestos in the products when adequate substitutes for the asbestos in them was available;

(d)  Intentionally or with a reckless disregard for the safety of the Plaintiff, failed to provide any or adequate warnings to persons working with and around the products of the dangers of inhaling the asbestos fibers in them;

(e)  Intentionally or with a reckless disregard for the safety of the Plaintiff, failed to provide any or adequate instructions concerning the safe methods of working with and around the products, including specific instructions on how to avoid inhaling the asbestos fibers in them; and

(f)  Intentionally or with a reckless disregard for the safety of the Plaintiff, failed to conduct tests on the asbestos-containing products manufactured, sold or delivered by the Defendants in order to determine the hazards to which workers might be exposed while working with the products and/or conspired with others to conceal the results of such tests.

(g)  Intentionally or with a reckless disregard for the safety of the Plaintiff, designed, manufactured and sold equipment, vehicles, machinery, technologies and systems that included asbestos-containing components and required and/or specified the use of

FILED DATE: 7/8/2021 9:23 AM 2021L006906

asbestos-containing replacement components.

10.    Plaintiffs repeat and reallege Paragraph 9 of Count I as and for Paragraphs 10 of this Count II.

WHEREFORE, Plaintiffs prays judgment be entered against the Defendants for a sum in excess of FIFTY THOUSAND ($50,000.00) DOLLARS which will fairly and reasonably compensate for the Plaintiffs' injuries.

## COUNT III

### CONSPIRACY

COMES NOW the Plaintiffs, CHLOYDE PELTON and SHIRLEY PELTON, by their attorneys, Flint Law Firm, LLC, and for their cause of action against the Defendants, state:

1– 8.    Plaintiffs repeat and reallege Paragraphs 1 - 8 of Count I as and for Paragraphs 1-8 of this Count III.

9.    During the course of his employment, Plaintiff was exposed to and inhaled, ingested or otherwise absorbed large amounts of asbestos fibers emanating from certain products he was working with and around which were manufactured, sold or distributed by the Defendants named in Count I above.

10.    The Defendants, including METROPOLITAN LIFE INSURANCE COMPANY, PNEUMO ABEX, LLC and HONEYWELL INTERNATIONAL INC., and/or their predecessors-in-interest in Madison County, Illinois, Cook County, Illinois, Cicero, Illinois, Chicago, Illinois, Libertyville, Illinois and Waukegan, Illinois as well as other locations, knowingly agreed, contrived, combined, confederated and conspired among themselves and with other entities, including Johns-Manville Corporation, Union Asbestos & Rubber Company,

FILED DATE: 7/8/2021 9:23 AM  2021L006906

Pittsburgh-Corning Corporation and United States Gypsum, to cause Plaintiff's injury, disease and illness by exposing Plaintiff to harmful and dangerous asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products. Defendants and other entities further knowingly agreed, contrived, combined, confederated and conspired to deprive Plaintiff of the opportunity of informed free choice as to whether to use said asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products or to expose himself to said dangers. In this connection, Plaintiffs have sued METROPOLITAN LIFE INSURANCE COMPANY, PNEUMO ABEX LLC and HONEYWELL INTERNATIONAL INC., in their capacities as co-conspirators. Defendants committed the above-described wrongs, some of which wrongful conduct occurred at the locations above, by willfully misrepresenting and suppressing the truth as to the risks and dangers associated with the use of and exposure to Defendants' asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products.

11.     In furtherance of said conspiracy, Defendants, METROPOLITAN LIFE INSURANCE COMPANY, PNEUMO ABEX, LLC and HONEYWELL INTERNATIONAL INC., performed the following overt acts:

(a)     for many decades, Defendants METROPOLITAN LIFE INSURANCE COMPANY, PNEUMO ABEX, LLC and HONEYWELL INTERNATIONAL INC., individually, jointly, and in conspiracy with each other and other entities, have been in possession of medical and scientific data, literature and test reports which clearly indicated that the inhalation of asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products were unreasonably dangerous, hazardous, deleterious to human health, carcinogenic and potentially deadly;

(b)     despite the medical and scientific data, literature and test reports possessed by and available to Defendants, Defendants individually, jointly, and in conspiracy with

FILED DATE: 7/8/2021 9:23 AM    2021L006906

each other and other entities, fraudulently, willfully and maliciously:

(1)    withheld, concealed and suppressed said medical and scientific data, literature and test reports regarding the risks of asbestosis, cancer, mesothelioma and other illnesses and diseases from Plaintiff who was using and being exposed to Defendants' asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products;

(2)    caused to be released, published and disseminated medical and scientific data, literature and test reports containing information and statements regarding the risks of asbestosis, cancer, mesothelioma and other illnesses and diseases, which Defendants knew were incorrect, incomplete, outdated and misleading; and

(3)    distorted the results of medical examinations conducted upon Plaintiff and workers such as Plaintiff who were using asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products and being exposed to the inhalation of asbestos dust and fibers by falsely stating and/or concealing the nature and extent of the harm to which Plaintiff and workers such as Plaintiff have suffered.

(c)    In addition, certain of the Defendants, including but not limited to METROPOLITAN LIFE INSURANCE COMPANY, PNEUMO ABEX, LLC and HONEYWELL INTERNATIONAL INC., contrived, combined, confederated and conspired through a series of industry trade meetings and the creation of organizations such as the Air Hygiene Foundation (later the Industrial Hygiene Foundation) to establish authoritative standards for the control of industrial dusts which would act as a defense in personal injury lawsuits, despite knowing that compliance with such standards would not protect workers such as Plaintiff from contracting an asbestos disease or cancer.

(d)    In furtherance of said conspiracies, Defendants and/or their co-conspirators contributed to cause the establishment of a Threshold Limit Value for asbestos exposure, and contributed to the maintenance of such Threshold Limit Value despite evidence that this supposed "safe" level of exposure to asbestos would not protect the health of workers such as Plaintiff even if complied with.

(e)    As the direct and proximate result of the false and fraudulent representations, omissions and concealments set forth above, Defendants, individually, jointly, and in conspiracy with each other, intended to induce the Plaintiff to rely upon said false and fraudulent representations, omissions and concealments, to continue to expose himself to the dangers inherent in the use of and exposure to Defendants' asbestos-containing products, and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products and/or products which

FILED DATE: 7/8/2021 9:23 AM   2021L006906

caused the release of respirable asbestos fibers.

12.     Defendants individually, and as members of a conspiracy, and as agents of other co-conspirators were in a position of superior knowledge regarding the health hazards of asbestos and therefore the Plaintiff and others deciding to use said asbestos-containing products to which Plaintiff was exposed had a right to rely and did rely on the published reports commissioned by the Defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products.

13.     As a direct and proximate result of Defendants' intentional publication of deceptive and misleading medical data and information, as described in the preceding paragraphs, upon which data the Plaintiff reasonably relied, the Defendants caused asbestos and asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products to be used by Plaintiff and Plaintiff inhaled or otherwise ingested hazardous asbestos dust, and/or will inhale or ingest hazardous asbestos dust, resulting in injuries.

14.     Additionally and alternatively, as a direct and proximate result of Defendants' actions and omissions as described above, the Plaintiff was caused to remain ignorant concerning the danger of human exposure to asbestos, resulting in damage to the Plaintiff by depriving the Plaintiff and workers such as Plaintiff, of opportunities to be aware of the hazards of asbestos exposure, and thus the opportunity to take proper safety precautions and/or avoid exposure to asbestos dust.  Because of this ignorance on the part of the Plaintiff, Defendants' failure to warn, Defendants' concealment from the Plaintiff of the alteration of their published test results, and

FILED DATE: 7/8/2021 9:23 AM 2021L006906

the actions and omissions and concerted design and conspiracy of METROPOLITAN LIFE INSURANCE COMPANY, PNEUMO ABEX, LLC and HONEYWELL INTERNATIONAL INC., some of which wrongful conduct occurred in Madison County, Illinois, McLean County, Illinois and Cook County, Illinois and others, all as described above, the Plaintiff was exposed to asbestos and asbestos-containing products and/or machinery containing or calling for the use of asbestos and/or asbestos-containing products used at his places of employment and/or his family members' place employment and has inhaled or otherwise ingested hazardous asbestos dust resulting in his developing mesothelioma.

15.     As a direct and proximate result of one or more of the foregoing acts or omissions on the part of the Defendants mentioned above, the Plaintiff was exposed to and inhaled, ingested or otherwise absorbed asbestos fibers causing Plaintiff to develop mesothelioma, which will ultimately lead to his death; Plaintiffs have been compelled to expend and become liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of Plaintiff's asbestos-induced disease and conditions; Plaintiff has experienced, and will continue to experience now and in the future, great physical pain and mental anguish as a result of the inhalation, ingestion and absorption of said asbestos fibers; that as a further result of his asbestos-induced disease and conditions, the Plaintiff has been hindered, and will continue to be hindered now and in the future, from pursuing his normal course of employment, thereby losing large sums of monies which otherwise would have accrued to him and his estate; further, by reason of the sickness of the Plaintiff, his family has been deprived, and will continue to be deprived, of his means of support and society.

WHEREFORE, Plaintiffs pray judgment be entered against the Defendants for a sum in excess of FIFTY THOUSAND ($50,000.00) DOLLARS which will fairly and reasonably

FILED DATE: 7/8/2021 9:23 AM   2021L006906

compensate for the Plaintiffs' injuries.

## COUNT IV

### NEGLIGENT SPOLIATION OF EVIDENCE

COMES NOW the Plaintiffs, CHLOYDE PELTON and SHIRLEY PELTON, by their attorneys, Flint Law Firm, LLC, and for their cause of action against the Defendants, state:

1.     Prior to the commencement of this case, Defendants had in their respective possession, custody and control documents and information relating to issues in this case.

2.     Upon information and belief, said issues include, but are not limited to:  the identification of asbestos-containing products to which Plaintiff was exposed, the locations to, and at, which Defendants sold, distributed and applied asbestos-containing products; the identity of the manufacturers and others in the distribution chain of said products; and, Defendants' knowledge, notice and information regarding the hazards of asbestos and whether or not they were negligent.

3.     It was foreseeable to a reasonable person/entity in the respective positions of Defendants, that said documents and information constituted evidence, which was material to potential civil litigation-namely, asbestos litigation.  Said Defendants had a duty to maintain and preserve said documents and information because they knew or should have known that said documents and information were material evidence in potential asbestos litigation.

4.     Plaintiffs have sought, but been unable to obtain, full disclosure of relevant documents and information from Defendants, leading to the inference that Defendants destroyed and otherwise disposed of said documents and information.

5.     Said Defendants and each of them breached their duty to preserve said material evidence by destroying and otherwise disposing of said documents and information, at a time

FILED DATE: 7/8/2021 9:23 AM   2021L006906

when they and each of them knew or should have known that the same constituted material evidence in potential civil litigation.

6.     As a direct and proximate result of said destruction and disposal of material evidence, Plaintiffs have been prejudiced and impaired in proving claims against all potentially liable parties, including, but not limited to, said Defendants and, as a further result thereof, has been compelled to dismiss and/or unfavorably compromise said claims against other Defendants.

7.     As a result of this prejudice and impairment, Plaintiffs have been caused to suffer damages in the form of impaired ability to recover against Defendants and lost or reduced compensation from other potentially liable parties in this litigation.

WHEREFORE, Plaintiffs pray this Court to enter judgment against Defendants and to award compensatory damages in an amount to be proved at trial, but believed to exceed FIFTY THOUSAND ($50,000.00) DOLLARS and for such other and further relief that this Court deems appropriate.

## COUNT V

### WILLFUL AND WANTON SPOLIATION OF EVIDENCE

COMES NOW the Plaintiffs, CHLOYDE PELTON and SHIRLEY PELTON, by their attorneys, Flint Law Firm, LLC, and for their cause of action against the Defendants, state:

1.     Plaintiffs herein incorporate by reference paragraphs 1-5 of Count IV.

2.     In destroying and disposing of said material evidence, said Defendants and each of them acted intentionally and/or in reckless disregard of their duty to preserve the same.

3.     As a direct and proximate result of said destruction and disposal of material evidence, Plaintiffs have been prejudiced and impaired in proving claims against all potentially liable parties, including, but not limited to, said Defendants and, as a further result thereof, has

FILED DATE: 7/8/2021 9:23 AM 2021L006906

been compelled to dismiss and/or unfavorably compromise said claims against other Defendants.

4.      As a result of this prejudice and impairment, Plaintiffs have been caused to suffer damages in the form of impaired ability to recover against Defendants and lost or reduced compensation from other potentially liable parties in this litigation.

WHEREFORE, Plaintiffs prays this Court to enter judgment against Defendants and to award: compensatory damages in an amount to be proved at trial, but believed to exceed $50,000 and punitive damages in an amount sufficient to punish Defendants for their misconduct and to deter similarly situated parties from committing like acts of misconduct in the future; and for such other and further relief that this Court deems appropriate.

## COUNT VI

## LOSS OF CONSORTIUM

Plaintiff SHIRLEY PELTON, wife of CHLOYDE PELTON, for Count VI of this Complaint against all Defendants states:

1.      Plaintiff incorporates by reference all paragraphs of Counts I – V.

2.      At all relevant times, and particularly prior to his diagnosis of mesothelioma, SHIRLEY PELTON has been and remains the wife of CHLOYDE PELTON.

3.      As a direct and proximate result of Defendants' conduct set forth in Counts I -V and the injury suffered by her husband CHLOYDE PELTON, Plaintiff SHIRLEY PELTON has suffered, and will suffer in the future, interference with and impairment of their marital relationship and all those elements of married life Plaintiff was accustomed to receiving, including, but not limited to, support, devotion, care, society and consortium.

WHEREFORE, Plaintiff, SHIRLEY PELTON, prays this Court enter judgment in her favor and against these Defendants, jointly and severally, to award compensatory damages in

excess of FIFTY THOUSAND ($50,000.00) DOLLARS and costs incurred prosecuting this matter, and to grant such other and further relief as this Court deems appropriate.

**PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY.**

Respectfully submitted,

FLINT LAW FIRM, LLC

By:     _/s/ Lawrence K. Holcomb_
Lawrence K. Holcomb #6328944
Ethan A. Flint, #6286170
Laci M. Whitley, #6314263
222 East Park Street, Suite 500
P.O. Box 189
Edwardsville, Illinois 62025
(618) 288-4777:  telephone
(618) 288-2864:  facsimile
service@flintlaw.com
**ATTORNEYS FOR PLAINTIFFS**
Cook County Firm No. 61062

FILED DATE: 7/8/2021 9:23 AM  2021L006906

FILED
7/8/2021 9:23 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L006906

FILED DATE: 7/8/2021 9:23 AM   2021L006906

## IN THE CIRCUIT COURT
## COOK COUNTY, ILLINOIS

CHLOYDE PELTON and SHIRLY PELTON,      )

      Plaintiffs,      )

                         )   No. 21-L-_____

-vs.-                        )   J1

                         )

AIR & LIQUID SYSTEMS CORPORATION, *successor by*
  *merger to* BUFFALO PUMPS, INC.,      )

                         )

      Defendants.      )

## AFFIDAVIT REGARDING DAMAGES SOUGHT

COMES NOW Ethan A. Flint and Laci M. Whitley of Flint Law Firm, LLC, pursuant to Illinois Supreme Court Rule 222(b), and states on their oath that the damages sought in the above captioned matter exceed $50,000.

Respectfully submitted,

FLINT LAW FIRM, LLC

By:    */s/ Lawrence K. Holcomb*
        Lawrence K. Holcomb #6328944
        Ethan A. Flint, #6286170
        Laci M. Whitley, #6314263
        222 East Park Street, Suite 500
        P.O. Box 189
        Edwardsville, Illinois 62025
        (618) 288-4777:  telephone
        (618) 288-2864:  facsimile
        service@flintlaw.com
        **ATTORNEYS FOR PLAINTIFFS**
        Cook County Firm No. 61062

FILED DATE: 7/8/2021 9:23 AM    2021L006906

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

*/s/ Lawrence K. Holcomb*

Civil Action Cover Sheet - Case Initiation        (05/27/16) CCL 0520

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

CHLOYDE PELTON and SHIRLEY PELTON

v.

Air & Liquid Systems Corporation, a/k/a Buffalo Pumps, Inc., et al.,

No. _____

FILED
7/8/2021 9:23 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L006906

FILED DATE: 7/8/2021 9:23 AM  2021L006906

### CIVIL ACTION COVER SHEET - CASE INITIATION

A Civil Action Cover Sheet - Case Initiation shall be filed with the complaint in all civil actions. The information contained herein is for administrative purposes only and cannot be introduced into evidence. Please check the box in front of the appropriate case type which best characterizes your action. Only one (1) case type may be checked with this cover sheet.

Jury Demand   ☐ Yes   ☑ No

(FILE STAMP)

### PERSONAL INJURY/WRONGFUL DEATH
CASE TYPES:
- ☐ 027 Motor Vehicle
- ☐ 040 Medical Malpractice
- ☑ 047 Asbestos
- ☐ 048 Dram Shop
- ☐ 049 Product Liability
- ☐ 051 Construction Injuries
  (including Structural Work Act, Road Construction Injuries Act and negligence)
- ☐ 052 Railroad/FELA
- ☐ 053 Pediatric Lead Exposure
- ☐ 061 Other Personal Injury/Wrongful Death
- ☐ 063 Intentional Tort
- ☐ 064 Miscellaneous Statutory Action
  (Please Specify Below**)
- ☐ 065 Premises Liability
- ☐ 078 Fen-phen/Redux Litigation
- ☐ 199 Silicone Implant

### TAX & MISCELLANEOUS REMEDIES
CASE TYPES:
- ☐ 007 Confessions of Judgment
- ☐ 008 Replevin
- ☐ 009 Tax
- ☐ 015 Condemnation
- ☐ 017 Detinue
- ☐ 029 Unemployment Compensation
- ☐ 031 Foreign Transcript
- ☐ 036 Administrative Review Action
- ☐ 085 Petition to Register Foreign Judgment
- ☐ 099 All Other Extraordinary Remedies

By: Lawrence K. Holcomb, # 6328944

     (Attorney)                 (Pro Se)

### COMMERCIAL LITIGATION
CASE TYPES:
- ☐ 002 Breach of Contract
- ☐ 070 Professional Malpractice
  (other than legal or medical)
- ☐ 071 Fraud (other than legal or medical)
- ☐ 072 Consumer Fraud
- ☐ 073 Breach of Warranty
- ☐ 074 Statutory Action
  (Please specify below.**)
- ☐ 075 Other Commercial Litigation
  (Please specify below.**)
- ☐ 076 Retaliatory Discharge

### OTHER ACTIONS
CASE TYPES:
- ☐ 062 Property Damage
- ☐ 066 Legal Malpractice
- ☐ 077 Libel/Slander
- ☐ 079 Petition for Qualified Orders
- ☐ 084 Petition to Issue Subpoena
- ☐ 100 Petition for Discovery

** _____
_____

Primary Email: lholcomb@flintlaw.com

Secondary Email: _____

Tertiary Email: service@flintlaw.com

**Pro Se Only:** ☐ I have read and agree to the terms of the *Clerk's Office Electronic Notice Policy* and choose to opt in to electronic notice form the **Clerk's Office** for this case at this email address: _____

## DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
Page 1 of 1

FILED
7/8/2021 9:23 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L006906

**IN THE CIRCUIT COURT**
**COOK COUNTY, ILLINOIS**

|  |  |  |
|---|---|---|
| CHLOYDE PELTON and SHIRLY PELTON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 21-L-_____ |
| -vs.- | ) | J1 |
| | ) | |
| AIR & LIQUID SYSTEMS CORPORATION, *successor by* | ) | |
| *merger to* BUFFALO PUMPS, INC.,  | ) | |
| | ) | |
| Defendants. | ) | |

FILED DATE: 7/8/2021 9:23 AM   2021L006906

## ENTRY OF APPEARANCE

COME NOW Flint Law Firm, LLC, Ethan A. Flint, and Laci M. Whitley as counsel for

the Plaintiffs CHLOYDE PELTON and SHIRLY PELTON, and enter their appearance in the

above numbered cause of action.

Respectfully submitted,

FLINT LAW FIRM, LLC


By:  /s/ Lawrence K. Holcomb
Lawrence K. Holcomb #6328944
Ethan A. Flint, #6286170
Laci M. Whitley, #6314263
222 East Park Street, Suite 500
P.O. Box 189
Edwardsville, Illinois 62025
(618) 288-4777:  telephone
(618) 288-2864:  facsimile
service@flintlaw.com
**ATTORNEYS FOR PLAINTIFFS**
Cook County Firm No. 61062

FILED DATE: 7/8/2021 9:23 AM   2021L006906

## **CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing instrument was served upon Defendants with a copy of the complaint and summons as of the date noted on the return summons.

*/s/ Lawrence K. Holcomb*

FILED
7/8/2021 9:23 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L006906

**IN THE CIRCUIT COURT**
**COOK COUNTY, ILLINOIS**

CHLOYDE PELTON and SHIRLY PELTON,            )
                                             )
        Plaintiffs,                          )
                                             )   No. 21-L-_____
-vs.-                                        )   J1
                                             )
AIR & LIQUID SYSTEMS CORPORATION, *successor by* )
    *merger to* BUFFALO PUMPS, INC.,         )
                                             )
        Defendants.                          )

<u>**NOTICE OF ATTORNEY'S LIEN**</u>

TAKE NOTICE that, pursuant to 770 ILCS 5/1, Plaintiff's attorneys Flint Law Firm, LLC,

have a statutory lien upon any and all proceeds recovered in the above-numbered cause of action.

Pursuant to Illinois law, 770 ILCS 5/1, this lien shall attach to any verdict, judgment or order

entered and to any money or property which may be recovered, on account of such suits, claims,

demands or causes of action, from and after the time of service of this notice.

Respectfully submitted,

FLINT LAW FIRM, LLC

By:     */s/ Lawrence K. Holcomb*
        Lawrence K. Holcomb #6328944
        Ethan A. Flint, #6286170
        Laci M. Whitley, #6314263
        222 East Park Street, Suite 500
        P.O. Box 189
        Edwardsville, Illinois 62025
        (618) 288-4777: telephone
        (618) 288-2864: facsimile
        service@flintlaw.com
        **ATTORNEYS FOR PLAINTIFFS**
        Cook County Firm No. 61062

FILED DATE: 7/8/2021 9:23 AM   2021L006906

FILED DATE: 7/8/2021 9:23 AM   2021L006906

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon Defendants with a copy of the complaint and summons as of the date noted on the return summons.

*/s/ Lawrence K. Holcomb*

MIL-A-17472(NAVY)
12 February 1953
SUPERSEDING
HH-P-0046(NAVY SHIPS)
1 May 1952

## MILITARY SPECIFICATION

## ASBESTOS SHEET COMPRESSED (PACKING MATERIAL)

(All interested bureaus of the Navy Department have concurred in the use of this specification for purchase.)

1. SCOPE

1.1 This specification covers symbol 2150 compressed asbestos sheet packing material used as a gasket joint sealing material for steam, hot and cold water or brine, air and gases, and oils.

2. APPLICABLE SPECIFICATIONS, STANDARDS, DRAWINGS, AND PUBLICATIONS

2.1 The following specifications and standards, of the issue in effect on date of invitation for bids, form a part of this specification:

SPECIFICATIONS

FEDERAL
NN-B-591 - Boxes; Fiberboard, Wood-Cleated (for Domestic Shipment).
NN-B-601 - Boxes; Wood-Cleated-Plywood, for Domestic Shipment.
NN-B-621 - Boxes; Wood, Nailed and Lock-Corner.
ZZ-R-601 - Rubber Goods; General Specification (Methods of Physical Tests and Chemical Analyses).
LLL-B-631 - Boxes; Fiber, Corrugated (for Domestic Shipment).
LLL-B-636 - Boxes; Fiber, Solid, (for Domestic Shipment).

MILITARY
JAN-P-105 - Packaging and Packing for Overseas Shipment - Boxes, Wood, Cleated-Plywood.
JAN-P-106 - Packaging and Packing for Overseas Shipment - Boxes, Wood, Nailed.
JAN-P-125 - Packaging and Packing for Overseas Shipment - Barrier-Materials, Waterproof, Flexible.
JAN-P-132 - Packaging and Packing for Overseas Shipment - Crates; Unsheathed, Wood Nailed (for Maximum Net Load of 2,500 Pounds).
MIL-A-140 - Adhesive, Water-Resistant, Waterproof Barrier-Material.
MIL-L-10547 - Liners, Case, Waterproof.

NAVY DEPARTMENT
General Specifications for Inspection of Material.

STANDARDS

MILITARY
MIL-STD-129 - Marking of Shipments.

(Copies of specifications, standards, and drawings required by contractors in connection with specific procurement functions should be obtained from the procuring agency or as directed by the contracting officer.)

GPO—O—NAV—K—322

**EXHIBIT B**

MIL-A-17472(NAVY)

2.2. <u>Other publications</u>. - The follo▮▮▮▮▮▮▮ o▮ ▮▮▮ ▮▮ ▮▮▮▮▮t on date of invitation for bids, unless otherwise stated, form a part of this specification.

CONSOLIDATED FREIGHT CLASSIFICATION COMMITTEE
Consolidated Freight Classification - Ratings, Rules and Regulations.

(Application for copies should be addressed to the Consolidated Freight Classification Committee, 202 Chicago Union Station, Chicago 6, Ill.)

AMERICAN TRUCKING ASSOCIATION, INC.
Motor Freight Classification Rules.

(Application for copies should be addressed to the Issuing Officer, American Trucking Association, Inc. 1424 16th St., N. W., Washington 6, D. C.)

3. REQUIREMENTS.

3.1 <u>Qualification</u>. - Compressed asbestos sheet furnished under this specification shall be a product which has been tested and has passed the qualification tests specified in section 4 (see 6.2).

3.2 <u>Material</u>. - The compressed asbestos sheet shall be made of asbestos fiber, natural or synthetic rubber, or a mixture of the two, sulphur, and suitable mineral fillers.

3.2.1 <u>Asbestos fiber</u>. - The asbestos fiber shall be chrysotile and shall contain not less than 12 percent water of crystallization.

3.2.2 <u>Rubber compound</u>. - The rubber compound shall be free from substances which may injuriously affect the quality.

3.3 <u>Construction</u>. - The asbestos sheet shall be thoroughly and evenly mixed to the required consistency and compressed into a sheet of compact and uniform texture either cross-laminated or single-ply.

3.4 <u>Asbestos fiber and rubber content</u>. - The compressed asbestos sheet shall contain not less than 70 percent by weight, of asbestos fiber, and not less than 10 percent by weight, of rubber.

3.5 <u>Thickness and weight</u>. - The thickness and weight of the finished compressed asbestos sheet shall be as shown in table I as specified (see 6.1).

Table I - Thickness and weight

| Thickness | Weight, minimum |
|---|---|
| Inch | Pounds per square yard |
| 1/64 | 0.8 |
| 1/32 | 2.0 |
| 1/16 | 4.0 |
| 3/32 | 6.0 |
| 1/8 | 8.0 |
| 3/16 | 12.0 |
| 1/4 | 16.0 |

2

MIL-A-17472(NAVY)

3.5.1 <u>Thickness tolerances.</u> - The permissible tolerances in thickness shall be as shown in table II.

Table II - Thickness tolerances.

| Thickness | Tolerance |
|---|---|
| Inch | |
| 1/64 | +0.005 inch; -0.002 inch |
| 1/32 | +0.005 inch |
| 1/16 and over | ±10 percent |

3.6 <u>Tensile strength.</u> - The average tensile strength of sheets 1/32 inch and thicker shall not be less than 3500 pounds per square inch (p.s.i.). Single ply sheets 1/64 inch thick shall have a minimum average tensile strength of 1200 p.s.i. in the weakest direction and an average tensile strength of both the longitudinal and transverse directions of not less than 2,000 p.s.i. (see 4.5.1).

3.7 <u>Solvents.</u> - The finished sheet shall be free of gasoline or other solvents used in the process of manufacture.

3.8 <u>Graphite.</u> - Unless otherwise specified (see 6.1), the finished sheets shall not be lubricated or graphited.

3.9 <u>Simulated performance.</u> - The compressed asbestos sheet shall pass the simulated performance test specified in 4.5.3. The compressed asbestos sheet upon completion of the test shall be in satisfactory condition.

3.10 <u>Branding.</u> - Every square foot, or less, of the asbestos sheet shall be plainly marked with the manufacturer's brand name.

3.11 <u>Workmanship.</u> - Workmanship shall be first class in every respect. The asbestos sheet shall have smooth surfaces and shall be free from imperfections.

4. SAMPLING, INSPECTION, AND TEST PROCEDURES

4.1 <u>Inspection procedures.</u> - For Naval purchases, the general inspection procedures shall be in accordance with General Specifications for Inspection of Material.

4.2 <u>Qualification tests at a Government laboratory.</u> - Qualification tests shall be conducted at a Government laboratory designated by the Bureau of Ships. These tests shall consist of the tests specified in 4.5.

4.3 <u>Sampling.</u> - Three pieces of finished compressed asbestos sheet, 12 inches square, shall be taken at random from each lot of 2,000 pounds or less of each thickness offered for delivery for inspection and tests as specified in 4.4 and 4.5.1 to 4.5.2.5.

4.4 <u>Inspection.</u> - Compressed asbestos sheet shall be inspected with respect to workmanship, construction, dimensions, branding, packing, and marking.

4.5 <u>Tests.</u> - Unless otherwise specified hereinafter, tests shall be in accordance with the applicable methods specified in Specification ZZ-R-601.

4.5.1 <u>Tensile strength.</u> - Specimens 1/2 inch wide by 6 inches long shall be used, with a 3-inch length of specimen between the jaws. The testing machine shall be operated at a rate of separation of the grips of 12 ± 1 inches per minute. Three specimens shall be cut lengthwise of the sheet (longitudinal) and three specimens at right angles thereto (transverse). All specimens shall be conditioned at 212°F. for

3

MIL-A-17472(NAVY)

1 hour and cooled to room temperature in a desiccator before testing. The average of the results of six specimens shall be used to determine the average tensile strength. The average of the results of three specimens from one direction of the asbestos sheet shall be the average tensile strength of the asbestos sheet in that direction.

4.5.2 <u>Chemical analysis.-</u>

4.5.2.1 <u>Preparation of sample for analysis.-</u> Small strips or cross-sections shall be cut from various parts of the sample so as to be representative of the sample. The specimen shall be split with the aid of a knife to produce relatively thin layers of material in order to increase the surface area.

4.5.2.2 <u>Lubricant (graphite) when specified.-</u>

4.5.2.2.1 A 1 to 3 gram specimen shall be weighed accurately and placed in a siphon cup without a filter thimble. If graphite is present, a few milliliters of chloroform shall be added to the cup and agitated gently to dislodge the bulk of the graphite, which shall be removed by decanting into the extraction flask. This is done to prevent the siphon cup from becoming plugged. Two or three treatments are usually sufficient to remove most of the graphite which shall be collected in the extraction flask along with the chloroform soluble material. The siphon cup shall then be assembled in the extraction flask, sufficient chloroform added to bring the volume up to about 50 milliliters, and the extraction shall be continued in the usual manner for a period of 2 hours.

4.5.2.2.2 The extracted material shall then be transferred to a watch glass and permitted to air dry. When dry, the fibers shall be carefully separated, and the remaining graphite carefully brushed off and collected on the watch glass, then added to the extraction flask. The residue shall be reserved for subsequent determinations.

4.5.2.2.3 The chloroform shall be distilled from the extraction flask on a steam bath, using a gentle stream of filtered air to prevent boiling. The flask shall then be dried for 1 hour at 105° Centigrade (C.), cooled in a desiccator and weighed.

4.5.2.2.4 <u>Calculation.-</u>

$$\text{Lubricant, percent} = \frac{L}{S} \times 100$$

$$\text{Where L = weight of graphite and soluble material}$$
$$S = \text{weight of specimen}$$

4.5.2.3 <u>Rubber.-</u>

4.5.2.3.1 After removal of the lubricant, the specimen shall be placed in a 125 milliliter (mℓ.) lipped assay flask or a 250 mℓ. Erlenmeyer flask fitted with a standard taper and an air condenser. Ten grams of paranitrotoluene and 25 mℓ. of orthodichlorobenzene shall be added, and the mixture heated to 180 to 190°C. on a hot plate under a hood with occasional stirring until the rubber dissolves. From 4 to 10 hours are usually sufficient to effect solution.

4.5.2.3.2 The flask and contents shall be cooled, 10 mℓ. of chloroform added, and the mixture decanted through a 100 mesh screen. The residue shall be washed with chloroform until the insoluble fillers are removed as indicated by a clear filtrate. If undissolved rubber remains, the fibers shall be returned to the digestion flask and the treatment with paranitrotoluene and orthodichlorobenzene repeated.

4.5.2.3.3 The filtrates and wash solutions shall be combined and poured through a portion of the sieve that is free of fibers in order to collect any fibers that may have passed through previously. The fibers shall then be transferred to a siphon cup and extracted for 1 hour with chloroform, dried at 105°C. for 1 hour, cooled and weighed.

4

MIL-A-17472(NAVY)

4.5.2.3.4  Calculation. -

Asbestos fibers, percent = $\dfrac{F}{S}$ x 100

Rubber content, percent = 100-A-B

Where F = weight of fibers
S = weight of specimen
A = percent fibers
B = percent lubricant

4.5.2.4  Chemically combined water. -  A specimen of approximately 1 gram shall be taken from the fibrous material which has been treated as required in 4.5.2.3.3.  It shall be dried for 1 hour in a platinum crucible at a temperature of 105 to 110°C., cooled in a desiccator and again weighed.  The specimen and crucible shall be ignited in an electric furnace at a temperature of 800 to 825°C., or over a blast lamp, to a constant weight.

4.5.2.4.1  Calculation. -

Chemically combined water, percent = $\dfrac{S-R}{S}$ x 100

Where R = weight of specimen after ignition
S = weight of specimen before ignition

4.5.2.4.2  Two specimens shall be tested.  The average of the results obtained from the two specimens shall be the chemically combined water of the sample.

4.5.2.5  Cotton, asbestos and chemically combined water. -  If the fibrous material contains cotton or other organic materials as indicated by nonconformance to 3.2.1, it may be determined as follows:  The asbestos content of the fibrous material which has been treated as specified in 4.5.2.3 shall be determined by the combustion procedure for cotton and asbestos.  If graphite, carbon black, or other material insoluble in the paranitrotoluene - orthodichlorobenzene mixture remains on the fibers, the combustion method will not give reliable results, and in such cases the results obtained shall be considered to be approximations.

4.5.2.5.1  A specimen weighing approximately 1 gram shall be taken from the fibrous material (see 4.5.2.3).  It shall be placed in a porcelain or platinum combustion boat, dried for 1 hour at a temperature of 105° to 110°C., cooled in a desiccator and weighed.  The dried specimen in the boat shall be inserted in the combustion tube of an electric combustion furnace.  The specimen shall be maintained at a temperature of 900 + 50°C. for approximately 30 minutes or until combustion of the cotton is complete.  During the combustion period a current of oxygen (carbon dioxide free) shall be passed through the combustion tube at a rate of approximately 200 milliliters per minute.  The combustion gases shall be passed through either two U-tubes containing calcium chloride or through a drying tube containing anhydrous magnesium perchlorate or calcium sulphate to remove the moisture; and finally the gases shall be passed into either a weighed Vanier or similar absorption bulb containing a strong solution of caustic potash, or in a weighed carbon dioxide absorption bulb containing a sodium hydroxide impregnated base (the absorbent having the trade name "ascarite" is of this type) to absorb the carbon dioxide.  Three-elevenths of the increase in weight of the Vanier or other carbon dioxide absorption bulb shall represent the weight of the carbon in the asbestos.  This shall be 44.40 percent of the cotton.  These factors may be combined to give a constant of 0.614.  When the combustion has been completed, the absorption tube shall be weighed, and the combustion boat containing the ignited residue shall be removed from the furnace, cooled in a desiccator and weighed.

5

MIL-A-17472(NAVY)

4.5.2 5.2 <u>Calculation.</u> -

Cotton, percent = $\frac{61.4}{E}$ x C

Asbestos in fiber, percent = 100 - percent cotton

Ignited asbestos, percent = $\frac{R}{E}$ x 100

Chemically combined water of asbestos, percent = $\frac{D-B}{D}$ x 100

Asbestos in sample, percent = $\frac{F \times D}{S}$ x 100

Where E = weight of specimen of fiber
C = weight of carbon dioxide absorbed
R = weight of residue after ignition
B = ignited asbestos, percent
D = asbestos in fiber, percent
F = weight of fiber in specimen (see 4.5.2.3.3).
S = weight of specimen

4.5.2.5.3 Two specimens shall be tested. The average of the results obtained from the two specimens shall be the asbestos content of the sample.

4.5.3 <u>Simulated performance.</u> - The test shall be conducted in a pipe flange gasket test apparatus consisting of 6 inch piping made up of 30 inch lengths, fitted with raised face flanges in such a manner to provide seven joints. A small steam line extending through the center of the entire length of the apparatus affords a means of obtaining the desired temperatures within the apparatus. Calibrated mercury glass thermometers are placed in thermometer wells and pressure gages connected to the apparatus to measure the temperature and pressure within the apparatus. Readings of the thermometers and pressure gages shall be recorded three times a day. Gaskets shall be cut from the packing sheet to fit the flanges. In order to prevent adherence of the packing to the flange faces, the gaskets shall be coated with powdered graphite prior to their installation for the test. Any leakage of steam, oil or water occurring from any joint during the test shall be noted and, if possible, checked and stopped. The gaskets shall be subjected to the following conditions:

    (a) Saturated steam, 300 p.s.i. gage pressure for 2 weeks.
    (b) Fuel, oil, 300 p.s.i. gage, hydrostatic pressure, 150°F. temperature for 2 weeks.
    (c) Salt water, 300 p.s.i. gage, hydrostatic pressure, 150°F. temperature for 2 weeks.
    (d) Open all vents and allow air to circulate through the apparatus at 110° to 120°F. for 3 days.
    (e) The above steps shall be repeated until four cycles of each condition have been completed.

5.   PREPARATION FOR DELIVERY

5.1 <u>Packing.</u> -

5.1.1 <u>For domestic shipment - immediate known use.</u> - When specified in the contract or order, compressed asbestos sheet shall be packed in accordance with the Consolidated Freight Classification Ratings, Rules and Regulations or Motor Freight Classification Rules, whichever may be applicable. When fiberboard is used for container construction, the Mullen test shall be no less than 275 pounds.

5.1.2 <u>For domestic shipment and storage.</u> - Unless otherwise specified, (see 6.1), compressed asbestos sheet shall be packed as follows:

5.1.2.1 Compressed asbestos sheet, in thicknesses up to and including 1/16 inch thick, shall be furnished in rolls and packed in wood-cleated-fiberboard, wood-cleated plywood, nailed wood, corrugated or solid fiberboard boxes conforming to Specification NN-B-591, NN-B-601, NN-B-621, LLL-B-631 or LLL-B-636, respectively. The gross weight of wood boxes shall not exceed 200 pounds, of fiberboard boxes 70 pounds.

6

MIL-A-17472(NAVY)

5.1.2.2 Compressed asbestos sheet in thicknesses exceeding 1/16 inch shall be furnished in flat sheets and packed in unsheathed crates conforming to Specification JAN-P-132, and shrouded in accordance with the appendix thereto. The gross weight shall not exceed 500 pounds.

5.1.3 For overseas shipment. - When specified (see 6.1), compressed asbestos sheet shall be packed as follows:

5.1.3.1 Compressed asbestos sheet, in thicknesses up to and including 1/16 inch thick, shall be furnished in rolls and packed in wood cleated plywood or nailed wood boxes conforming to style A or B of Specification JAN-P-105, or style 2 or 4 of Specification JAN-P-106, respectively. Each box shall be lined with a liner conforming to Specification MIL-L-10547 and sealed in accordance with the appendix thereto. The gross weight shall not exceed 150 pounds.

5.1.3.2 Compressed asbestos sheet, in thicknesses exceeding 1/16 inch shall be furnished in flat sheets and packed in unsheathed crates conforming to Specification JAN-P-132. Contents shall be wrapped within a waterproof bag made of material conforming to Specification JAN-P-125. Seams and closure shall be sealed with an adhesive conforming to Specification MIL-A-140, and shall have water-resistance equal to that of the body material. The gross weight shall not exceed 500 pounds.

5.2 Marking. - In addition to any special marking required by the contract or order, shipments shall be marked in accordance with Standard MIL-STD-129.

6. NOTES

6.1 Ordering data. - Procurement documents should specify the following:

    (a) Title, number, and date of the specification.
    (b) Thickness required (see 3.5).
    (c) Whether finished sheet should be lubricated or graphited (see 3.8).
    (d) Whether domestic or overseas shipment is required; if domestic type required (5.1).

6.2 In the procurement of products requiring qualification, the right is reserved to reject bids on products that have not been subjected to the required tests and found satisfactory for inclusion on the Military Qualified Products List. The attention of suppliers is called to this requirement, and manufacturers are urged to communicate with the Bureau of Ships, Navy Department, Washington 25, D. C., and arrange to have the products that they propose to offer to the Army, the Navy, or the Air Force, tested for qualification in order that they may be eligible to be awarded contracts or orders, for the products covered by this specification. Information pertaining to qualification of products covered by this specification may be obtained from the Chief of the Bureau of Ships, Navy Department, Washington 25, D. C.

6.3 By using a number of rings of 1/16-inch asbestos sheet sufficient to fill the packing space in boiler blow-off valves, the individual rings will vulcanize into one solid ring and serve the same purpose as special-molded rings.

6.4 Superseding data. - This specification supersedes Specification HH-P-0046. The latter superseded Navy Specification 33P13c.

Notice.- When Government drawings, specifications, or other data are used for any purpose other than in connection with a definitely related Government procurement operation, the United States Government thereby incurs no responsibility nor any obligation whatsoever; and the fact that the Government may have formulated, furnished, or in any way supplied the said drawings, specifications, or other data, is not to be regarded by implication or otherwise as in any manner licensing the holder or any other person or corporation, or conveying any rights or permission to manufacture, use, or sell any patented invention that may in any way be related thereto.

Custodian:
    Bureau of Ships
Other Interest:
    NAVY - ShAOrSY

7

MIL-P-17303C(NAVY)
14 October 1955
SUPERSEDING
MIL-P-17303B(NAVY)
9 March 1953

# MILITARY SPECIFICATION

## PACKING MATERIALS,

### PLASTIC METALLIC AND PLASTIC NONMETALLIC

All interested Bureaus of the Department of the Navy have concurred in the use of this specification.

1.1 **Scope.** - This specification covers plastic metallic packings for rotary and reciprocating pumps handling steam, water, gas and oil; and plastic nonmetallic packings for high and low pressure valve stem and reciprocating rod saturated and superheated stem service for machinery on Naval vessels.

1.2 **Classification.** - The packing shall be of the following classes and types, as specified (see 6.1):

Class I - Plastic metallic, lead base:
    Type A - Bulk form, symbol 1431.
    Type B - Coil form, with or without cotton jacket, symbol 1433.
    Type C - Coil form, metal foil jacket, symbol 1434.
    Type D - Coil form, braided metal jacket, symbol 1432.
    Type E - Coil form, with or without cotton jacket, (gasoline
        service), symbol 1437.
Class II - Plastic nonmetallic:
    Type B - Coil form, cotton jacket, symbol 1106.
    Type C - Coil form, asbestos and nickel-copper wire jacket,
        symbol 1108.
    Type D - Coil form, with or without cotton jacket, (gasoline
        service), symbol 1109.
    Type E - Coil form, asbestos and nickel-chromium-iron
        alloy wire jacket, symbol 1111.
Class III - Plastic metallic, copper base:
    Type B - Coil form, cotton jacket, symbol 1439.

GPO—O—NAV—38

FED. SUP. CLASS
5330

01851

EXHIBIT C

MIL-P-17303C(NAVY)

2. APPLICABLE DOCUMENTS

2.1 The following specifications and standards, of the issue in effect on date of invitation for bids, form a part of this specification:

SPECIFICATIONS

FEDERAL
NN-B-591 - Boxes, Fiberboard, Wood-Cleated (for Domestic Shipment).
NN-B-621 - Boxes, Wood, Nailed and Lock-Corner.
LLL-B-631 - Boxes, Fiber, Corrugated (for Domestic Shipment).
LLL-B-636 - Boxes, Fiber, Solid (for Domestic Shipment).
PPP-B-566 - Boxes, Folding, Paperboard.
PPP-B-601 - Boxes, Wood, Cleated-Plywood.
PPP-B-676 - Boxes, Set-up, Paperboard.

MILITARY
JAN-P-103 - Packaging and Packing for Overseas Shipment - Boxes, Wood Cleated; Solid Fiberboard.
JAN-P-106 - Packaging and Packing for Overseas Shipment - Boxes, Wood, Nailed.
JAN-P-108 - Packaging and Packing for Overseas Shipment - Boxes, Fiberboard (V-Board and W-Board), Exterior and Interior.
MIL-L-10547 - Liners, Case, Waterproof.

NAVY DEPARTMENT
General Specifications for Inspection of Material.

STANDARDS

MILITARY
MIL-STD-129 - Marking for Shipment and Storage.

(Copies of specifications, standards, drawings, and publications required by contractors in connection with specific procurement functions should be obtained from the procuring agency or as directed by the contracting officer.)

2.2 Other publications. - The following documents form a part of this specification. Unless otherwise indicated, the issue in effect on date of invitation for bids shall apply.

AMERICAN SOCIETY FOR TESTING MATERIALS STANDARD
D471-46T - Methods of Tests for Rubber Products.

(Application for copies should be addressed to the American Society for Testing Materials, 1916 Race Street, Philadelphia 3, Pa.)

2

01852

MIL-P-17305(d.

CONSOLIDATED CLASSIFICATION COMMITTEE
Consolidated Freight Classification Rules.

(Application for copies should be addressed to the Consolidated Classification
Committee, 202 Chicago Union Station, Chicago 6, Ill.)

3. REQUIREMENTS

3.1 Qualification.– Packing material furnished under this specification shall
be a product which has been tested and has passed the qualification tests specified
in section 4 (see 6.2).

3.2 Composition and construction.– The composition and construction shall
conform to that of the sample submitted for qualification (see 4.2).

3.3 Size.– Packing shall be furnished in the sizes specified (see 6.1).

3.4 Binder.– The different components of type A and of the core of types B, C,
D, and E shall be thoroughly mixed with a binder suitable for the temperature
conditions for which the packing is required and shall be so held together by the binder
as to prevent separation of the various parts.

3.5 Graphite.– Graphite, when used for lubrication, shall be a pure lubrica-
ting graphite.

3.6 Flexibility.– The packing shall be sufficiently flexible to be readily formed
into coils to fit a rod of the diameter shown in table I (see 4.6, 2).

Table I – Size of coils.

| Size of packing | Rod diameter |
|---|---|
| Inches | Inches |
| 1/8 to 1/4 | 2 |
| 5/16 to 5/8 | 3 |
| 11/16 to 13/16 | 4 |
| 7/8 and 1 | 8 |
| 1-1/8 | 9 |
| 1-1/4 | 10 |

3

01853

MIL-P-17303C(NAVY)

3.7 Simulated performance.- The packaging under initial conditions and during the progress of the simulated service tests specified in 4.5.3 shall respond readily to gland adjustment for the control of leakages from the stuffing box. The packing shall be in satisfactory condition upon completion of the tests.

3.8 Class I, plastic metallic, lead base.- The metal used for lead base packing shall not melt nor disintegrate at or below a temperature of 550° F. (see 4.5.4).

3.8.1 Type A, symbol 1431.- The packing shall be in bulk form.

3.8.2 Type B, symbol 1433.- The packing shall be continuous strips of approximately uniform cross section, partially compressed to prevent disintegration during application. It may be enclosed in a latticed cotton thread or knit cotton covering or may be furnished without a covering.

3.8.3 Type C, symbol 1434.- The packing shall be continuous strips of uniform cross section, completely enclosed in a metal covering consisting of not less than two ribbons. The metal ribbon shall be not less than 0.0023 inch thick.

3.8.4 Type D, symbol 1432.- The packing shall be continuous strips of uniform cross section, extruded into a braided wire jacket. The jacket shall be of copper wire not more than 0.008 inch in diameter.

3.8.5 Type E, symbol 1437.- The packing shall be continuous strips of approximately uniform cross section, partially compressed to prevent disintegration during application. It may be enclosed in a latticed cotton thread or knit cotton covering or may be furnished without a covering.

3.9 Class II, plastic nonmetallic.-

3.9.1 Type B, symbol 1106.- The packing shall be continuous strips of approximately uniform cross section, partially compressed to prevent disintegration during application, and enclosed in a latticed cotton thread or knit cotton covering.

3.9.2 Type C, symbol 1108.- The packing shall be continuous strips of uniform cross section, completely enclosed in a braided jacket composed of asbestos and nickel-copper wire. The packing shall contain two corrosion inhibitors.

3.9.2.1 Corrosion resistance.- Symbol 1108 packing shall not corrode 13 percent chrome steel valve stem when tested as specified in 4.5.5.

4

01854

MIL-P-17303C(NAVY)

3.9.3 Type D, symbol 1109.- The packing shall be continuous strips of approximately uniform cross section partially compressed to prevent disintegration during application. It may be enclosed in a latticed cotton thread or knit cotton covering or may be furnished without a covering.

3.9.4 Type E, symbol 1111.- The packing shall be continuous strips of uniform cross section, completely enclosed in a braided jacket composed of asbestos and nickel-chromium-iron alloy wire. The core of the packing shall contain not more than 20 percent, by weight, of corrosion inhibitor.

3.9.4.1 Pressure and temperature tests.- When the packing is installed in a stuffing box and tested as specified in 4.5.6, there shall be no leakage from the stuffing. The packing and the valve stem shall be in satisfactory condition upon conclusion of the tests.

3.9.4.2 Corrosion resistance.- Symbol 1111 packing shall not corrode 13 percent chrome steel valve stem when tested as specified in 4.5.5.

3.10 Class III, plastic metallic, copper base.- The metal for class III packing shall not melt nor disintegrate at or below a temperature of 1200° F. (see 4.5.4).

3.10.1 Type B, symbol 1439.- The packing shall be in continuous strips of approximately uniform cross section, partially compressed to prevent disintegration during application, and enclosed in a latticed cotton thread or knit cotton covering.

3.11 Workmanship.- The workmanship shall be first class in every respect.

4. QUALITY ASSURANCE PROVISIONS

4.1 Inspection procedures.- For Naval purchases, the general inspection procedures shall be in accordance with General Specifications for Inspection of Material.

4.2 Qualification tests at a Government laboratory.- Qualification tests shall be conducted at a Government laboratory designated by the Bureau of Ships. These tests shall consist of the tests specified in 4.5.

4.3 Sampling.-

4.3.1 Lot.- For purpose of sampling, a lot shall consist of all packing of one class, type, and size produced in one plant under essentially the same conditions and offered for delivery at one time.

5

MIL-P-17303C(NAVY)

4.3.2 Sampling procedure for lot acceptance inspection. - For the inspection specified in 4.4.1.1, the Government inspector shall select representative lengths of packing from each lot in accordance with table II.

Table II - Sampling procedure for lot
acceptance inspection.

| Number of lengths of packing in the lot | Number of sample lengths to be selected |
|---|---|
| 8 or under | 2 |
| 9 to 15 | 3 |
| 16 to 25 | 5 |
| 26 to 40 | 7 |
| Over 40 | 10 |

4.3.3 Sampling procedure for lot acceptance tests. - For the test specified in 4.4.1.2 the Government inspector shall take a 36-inch sample from each sample length of finished packing selected in accordance with table II.

4.3.4 Sampling procedure for production check tests. - From the first lot of packing of each class and type offered for delivery under a contract or order, the Government inspector shall select from each of two lengths of packing a 36-inch sample for the purpose of the production check tests specified in 4.4.2. Thenceforth, two such sample pieces of packing shall be selected from one of every 10 lots which have passed inspection and test at the place of manufacture.

4.4 Inspection and tests. -

4.4.1 Lot acceptance inspection and tests at place of manufacture. -

4.4.1.1 Inspection. - Each of the samples selected in accordance with 4.3.2 shall be subjected by the Government inspector to surface inspection for workmanship and dimensions. Minor surface defects not affecting the serviceability of the packing shall not be cause for rejection.

4.4.1.2 Tests. - The samples selected in accordance with 4.3.3 shall be subjected to the tests specified in 4.5.2 and 4.5.4.

6

MIL-P-17303C(NAVY)

4.4.1.3 **Action in case of failure.** - If any one of the samples tested is found to be not in conformance with this specification, the lot which it represents shall be rejected. A rejected lot may be resubmitted for Government inspection only after the manufacturer, after being informed of the reasons for rejection, has so reworked the entire lot as to remove or correct all nonconforming material.

4.4.2 **Production check tests at a Government laboratory.** - The samples selected in accordance with 4.3.4 shall be subjected to the tests specified in 4.5.2 and 4.5.4. If found not to conform as to construction with that given qualification, the sample need not be subjected to other tests before reporting the lot as unsatisfactory.

4.4.2.1 **Place of tests.** - Unless otherwise specified in the contract or order, production check tests shall be conducted at the Naval Engineering Experiment Station, Annapolis, Md.

4.4.2.2 **Action in case of failure.** - Acceptance of the first lot offered for delivery under a contract or order shall be withheld until a satisfactory report is received on the production check test sample. Thenceforth, except as hereinafter specified, acceptance and rejection of lots shall normally be on the basis of the sampling and inspection specified in 4.3.2, 4.3.3, and 4.4.1 and acceptance shall not be withheld pending receipt of test reports on production check test samples. However, upon receipt of an unsatisfactory test report on a production check test sample, the Government inspector shall select additional samples from every subsequent lot offered for delivery. The samples so selected shall be submitted to Naval Engineering Experiment Station, Annapolis, Md., and shall there be subjected to test or tests wherein failure was observed. Lots shall then be accepted only upon receipt of a satisfactory test report on the samples so selected. Additional testing shall be discontinued and lot acceptance returned to the normal basis when three successive lots have been accepted.

4.5 **Test procedures.** -

4.5.1 **Chemical analysis.** - Chemical analysis shall be made using standardized procedures.

4.5.2 **Flexibility.** - Packing shall be coiled by hand around a rod of a diameter as shown in table I (see 3.6). Only sufficient packing to make one complete turn around the rod shall be used.

4.5.3 **Simulated performance.** - Performance tests shall be made under simulated operating conditions in a machine designed for the purpose.

7

01857

MIL-P-17303C(NAVY)

4.5.3.1 Type C, symbol 1108, and type B, symbol 1439.- The packing shall be tested for the following service:

Valve stem service at 600 pounds per square inch (p.s.i.) and 750° F. Test shall be concluded after 3500 hours of operation.

4.5.3.2 Type D, symbol 1432.- The packing shall be tested for the following service:

Reciprocating rod service steam at 300 p.s.i. and 720° F., and a rod speed of 170 feet per minute. The test shall be concluded after 1,500 hours operation.

4.5.3.3 Type A, symbol 1431, symbol 1106 and type B, symbol 1433.- The packing shall be tested for the following services:

Reciprocating rod service with saturated steam at 300 p.s.i. and a rod speed of 100 feet per minute. Test shall be concluded after 3000 hours of operation.
Rotary rod service with feed water at 100 p.s.i. gage and 250° F., and a rod speed of 4,000 feet per minute. The test shall be concluded after 3,000 hours of operation.

4.5.3.4 Type C, symbol 1434.- The packing shall be tested for the following services:

Rotary rod service with feed water at 100 p.s.i. gage and 250° F., and a rod speed of 4000 feet per minute. Test shall be concluded after 3,000 hours of operation.

4.5.3.5 Rotary rod service.- During the rotary rod service tests specified in 4.5.3.3 and 4.5.3.4 in order to simulate conditions occasionally encountered in the service, the packing shall be subjected to cycles of sudden changes in pressure from 100 p.s.i. to 10 p.s.i. twice daily. The lower pressure shall be maintained for approximately 30 seconds and then suddenly raised to 100 p.s.i.

4.5.3.6 Type E, symbol 1437, and type D, symbol 1109.- The packing shall be tested for rotary rod service with a sequence of fluids at 50 p.s.i. gage and a rod speed of 1,375 feet per minute. The sequence of the fluids shall be as follows:

(a) Aromatic fuel (reference fuel No. 2 in accordance with A.S.T.M. D471-46T) for 200 hours.
(b) Alkylate fuel (115/145 base stock) for 200 hours.
(c) Sea water for 200 hours.
(d) Aromatic fuel (reference fuel No. 2 in accordance with A.S.T.M. D471-46T) for 200 hours.

8

01858

MIL-P-17303C(NAVY)

4.5.3.7 Type E, symbol 1111.- The packing shall be tested for the following service:

Valve stem service with steam at 600 p.s.i. and 750°F. During test there shall be a protracted series of simulated valve openings and closings. Tests shall be concluded after 2,000 hours of operation.

4.5.4 Heat resistance.- Specimens cut from each sample of packing shall be subjected for 2 hours to the temperature in 3.8 and 3.10.

4.5.5 Corrosion resistance, type C, symbol 1108 and type E, symbol 1111.- The packing shall be installed in the stuffing box of 1-inch size, 600 p.s.i. valve, equipped with a 13 percent chrome steel valve stem. The packing gland shall be adjusted to allow slight leakage under 300 p.s.i. valve test water. The condition shall be maintained for 24 hours to insure the wetting of the packing. The valve shall then be drained and stored at ambient temperature. The valve stem shall be inspected after 6 and 12 months of storage.

4.5.6 Pressure and temperature.- The packing shall be installed in the stuffing box of 1-inch size, 1500 series valve, equipped with a 13 percent chrome steel valve stem, and subjected successively to the following conditions:

(a) Superheated steam at 600 p.s.i. gage and 750°F. for twenty-four hours.
(b) Air pressure of 2000 p.s.i. gage.
(c) Temperature of 1100°F. for six hours.
(d) Air pressure of 2000 p.s.i. gage.

5. PREPARATION FOR DELIVERY

5.1 Preservation and packaging.-

5.1.1 For domestic shipment - immediate use.- Packing material shall be packaged in accordance with manufacturer's commercial practice.

5.1.2 For domestic shipment involving storage and overseas shipment.- Unless otherwise specified in the contract or order, packing material shall be wound on spools or coiled and packaged in folding cartons, set-up boxes, corrugated or solid fiberboard boxes conforming to Specification PPP-B-566, PPP-B-676, LLL-B-631 or LLL-B-636, respectively.

9

01859

MIL-P-17303C(NAVY)

5.2 Packing. -

5.2.1 For domestic shipment - immediate use. - The packing material shall be packed to insure carrier acceptance and safe delivery to destination at the lowest applicable rate. Containers shall comply with the Consolidated Freight Classification Rules or other regulations applicable to the mode of transportation.

5.2.2 For domestic shipment and storage. - The packing material, packaged as specified in 5.1.2, shall be packed in snug-fitting wood cleated fiberboard, cleated plywood, nailed wood, corrugated or solid fiberboard boxes conforming to Specification NN-B-591, PPP-B-601 (overseas type), NN-B-621, LLL-B-631, or LLL-B-636, respectively. Fiberboard boxes shall conform to the special requirements of the applicable box specification. Closure of the shipping container shall conform to the applicable container specification. The gross weight of wood boxes shall not exceed 200 pounds, and fiberboard boxes shall not exceed 90 pounds.

5.2.3 For overseas shipment. - The packing material, packaged as specified in 5.1.2, shall be packed in snug-fitting wood cleated fiberboard, wood cleated plywood, nailed wood, or fiberboard boxes conforming to Specification JAN-P-103, PPP-B-601 (overseas type), JAN-P-106, or JAN-P-108, respectively. Boxes shall be lined with a sealed waterproof caseliner conforming to type I, grade B, class 2 of Specification MIL-L-10547. Shipping containers shall be closed and strapped in accordance with the appendix of the applicable container specification. The gross weight of wood boxes shall not exceed 200 pounds, and fiberboard boxes shall not exceed 70 pounds.

5.3 Marking. - In addition to any special marking required by the contract or order, unit packages and intermediate and exterior shipping containers shall be marked in accordance with Standard MIL-STD-129.

6. NOTES

6.1 Ordering data. - Procurement documents should specify the following:

    (a) Title, number, and date of this specification.
    (b) Class, type, and size required (see 1.2 and 3.3).
    (c) Whether domestic or overseas shipment will be required; if domestic, the type required (see 5.1 and 5.2).

10

01860

MIL-P-17303C(NAVY)

6.2 In the procurement of products requiring qualification, the right is reserved to reject bids on products that have not been subjected to the required tests and found satisfactory for inclusion on the Military Qualified Products List. The attention of suppliers is called to this requirement, and manufacturers are urged to communicate with the Bureau of Ships, Navy Department, Washington 25, D.C., and arrange to have the products that they propose to offer to the Army, the Navy, or Air Force, tested for qualification in order that they may be eligible to be awarded contracts or orders for the products covered by this specification. Information pertaining to qualification of products covered by this specification may be obtained from the Chief of Bureau of Ships, Department of the Navy, Washington 25, D.C.

6.3 The packaging, packing, and marking specified herein apply only to direct shipment to the Government and are not intended to apply to contracts or orders between the manufacturer and the prime contractor.

Patent notice.- When Government drawings, specifications, or other data are used for any purpose other than in connection with a definitely related Government procurement operation, the United States Government thereby incurs no responsibility nor any obligation whatsoever; and the fact that the Government may have formulated, furnished, or in any way supplied the said drawings, specifications, or other data is not to be regarded by implication or otherwise as in any manner licensing the holder or any other person or corporation, or conveying any rights or permission to manufacture, use, or sell any patented invention that may in any way be related thereto.

Custodian:
    Navy-Bureau of Ships
Other interest:
    Navy-Or

11

01861

## DOCUMENT CERTIFICATION

I, Thomas F. McCaffery, do swear under the penalties of perjury that the documents (141 pages and initialed) in Volume II of the binder entitled, "Dana Corporation, General Information, Gasket-Related QPLs" are to the best of my knowledge and belief, true and accurate copies of original U.S. Government documents.

Thomas F. McCaffery

I, MARISA A. TRASATTI , a commissioned Notary Public in and for the County of HARFORD , State of MD , do certify that Thomas F. McCaffery appeared before me on this date in the City of Baltimore, State of Maryland and that I took his oath aforesaid.

SEAL

Date: 5/30/03

My commission expires: 8/29/06

REPRODUCED AT THE NATIONAL ARCHIVES

33P25
SEPT. 1,
1931

N2062

SEP 1 1 1931

NAVY DEPARTMENT SPECIFICATION

# PACKING, METALLIC AND NONMETALLIC, PLASTIC, SYMBOL 1431

Technical requirements conform in detail to Federal Specification HH-P-131, officially revised by the Federal Specifications Board August 19, 1930. Copies of the Federal specification are therefore unnecessary and are not available for distribution by the Navy Department.

## A. GENERAL SPECIFICATIONS.

General Specifications for Inspection of Material, issued by the Navy Department, and Federal Specification ZZ-R-601, Rubber Goods: General Specifications (Methods of Physical Tests and Chemical Analyses), in effect on date of invitation for bids, shall form part of this specification.

## B. TYPES AND GRADES.

B-1. *Types.*—There are two types, as follows; to be furnished as specified.

Type A, metallic.
Type B, nonmetallic.

B-2. *Grade.*—The packing shall be of but one grade.

## C. MATERIAL AND WORKMANSHIP, ETC.

C-1. *Material.*—Packing shall be composed of soft metal in small particles, or of asbestos fiber, in combination with graphite and a binder.

C-2. *Workmanship.*—Packing shall show no evidence of poor workmanship.

## D. GENERAL REQUIREMENTS.

D-1. *Construction.*—The different components shall be thoroughly mixed and the binder shall prevent separation of the parts. It shall ordinarily be furnished in bulk form. It may be furnished, when so specified, within a fabric tubing, or be extruded and held together by means of a number of cotton threads braided about the strip.

D-2. *Asbestos fiber.*—The asbestos fiber shall be Chrysotile and shall contain not less than 12 per cent water of composition.

D-3. *Graphite.*—The graphite shall be that known as "lubrication flake" and shall contain not less than 90 per cent of graphite-carbon. It shall not contain grit, dirt, or any deleterious substance.

D-4. *Binder.*—The binder shall be rubber or heavy mineral oil or wax.

59941—31

**EXHIBIT D**

REPRODUCED AT THE NATIONAL ARCHIVES

2

## E. DETAIL REQUIREMENTS.

E-1. *Composition, Type A.*—Type A packing shall be of the following composition:

|  | Per cent |
|---|---|
| Metal particles, minimum | 40 |
| Asbestos fiber, maximum | 15 |
| Graphite, maximum | 30 |
| Binder, maximum | 20 |

E-2. *Metal.*—The metal shall be such as will not score the rod, break up and work back into the system, or disintegrate at a temperature below 550° F. It shall be of one or more of the following forms; finely ground, small pellets, small strands, or small shreds.

E-3. *Composition, Type B.*—Type B packing shall be of the following composition:

|  | Per cent |
|---|---|
| Asbestos fiber, minimum | 45 |
| Graphite, maximum | 50 |
| Binder, maximum | 10 |

## F. METHOD OF INSPECTION, TESTS, ETC.

F-1. *Sampling.*—A 1-pound sample of packing shall be taken at random from each lot of 1,000 pounds or less. When practicable, the inspector shall witness the mixing of the packing, at which time 6-ounce samples of the various components shall be obtained.

F-2. *Inspection.*—Packing shall be inspected to determine compliance with this specification.

F-3. *Tests.*—Tests shall be made in accordance with Federal Specification ZZ-R-601, Rubber Goods: General Specifications.

## G. PACKING AND MARKING.

G-1. *Packing.*—Unless otherwise specified, the packing shall be delivered in standard commercial containers, so constructed as to insure acceptance by common or other carriers, for safe transportation at the lowest rate, to the point of delivery.

G-2. *Marking.*—Unless otherwise specified, shipping containers shall be marked with the name of the material and the quantity contained therein, as defined by the contract or order under which shipment is made, the name of the contractor, and the number of the contract or order.

## H. NOTES.

H-1. Packing is intended for rods and valve stems under the following conditions:

Steam to 300 pounds pressure and 700° F. temperature.
Water to 300 pounds pressure.
Brine to 100 pounds pressure.
Air to 3,000 pounds pressure.
Gas to 75 pounds pressure.
Fuel oil to 500 pounds pressure and 250° F.

H-2. The right is reserved to reject any bids on makes of plastic packing which have not been subjected to the required tests and found satisfactory. The attention of the manufacturers is called

[33P26]

3

to this requirement, and they are urged to forward samples of the plastic packing which they propose to offer to the Navy in the future in order that tests may be made. These tests will be conducted at the expense of the manufacturers. Information with reference to the expense involved and as to where the samples should be sent will be supplied upon application to the Bureau of Supplies and Accounts. It is to be understood that the manufacturers shall pay all transportation charges to and from the point where tests are made. In the case of failure of the sample or samples submitted to prove satisfactory, consideration will be given to requests of the manufacturers for additional tests only after it has been clearly shown that changes have been made in the product with reference to design, method of manufacture, etc., which the bureau concerned considers sufficient to warrant conducting such additional tests.

H-3. When specified, award of contract for the subject packing will be made to the bidder whose packing shows the lowest cost per hour of service when tested as described above, when evaluated by the following formula:

Service cost per hour= Bid price per pound X no. of pounds used for test / Total endurance, in hours.

H-4. Copies of Navy Department specifications and any other specifications forming a part thereof may be obtained upon application to the Bureau of Supplies and Accounts, Navy Department, Washington, D. C. When requesting, refer to specification by both title and number.

REFERENCES:
Eng. 1,2-A. (6-12-20), Mar. 13 and May 13, 1931.
Navy Department Specifications Board 1st end., Mar. 17, 1931; 33-P-25, May 18, 1931.
C. & R. L2JJJ-5(FS861) (S) N/O, Mar. 25, 1931.
C. & M. L2(Js) (Hms-A) Apr. 2, 1931.
Y. & D. L2-1, Apr. 8, 1931.
Aero, Aer-D-158-ELJH, JJ32P17(NDS), May 2, 1931.
S. & A. L2JJ-33P25.
[33P26]

U. S. GOVERNMENT PRINTING OFFICE: 1931

## SUPERSEDED



```
QPL-17303-38
20 June 1983
SUPERSEDING
QPL-17303-37
17 November 1980
```

QUALIFICATIONS CERTIFIED
JUNE 1983

QUALIFIED PRODUCTS LIST

OF

FSC 5330

PRODUCTS QUALIFIED UNDER MILITARY SPECIFICATION

MIL-P-17303

PACKING MATERIALS, PLASTIC METALLIC AND PLASTIC NONMETALLIC

This list has been prepared for use by or for the Government in the acquisition of products covered by the subject specification and such listing of a product is not intended to and does not connote indorsement of the product by the Department of Defense. All products listed herein have been qualified under the requirements for the product as specified in the latest effective issue of the applicable specification. This list is subject to change without notice; revision or amendment of this list will be issued as necessary. The listing of a product does not release the contractor from compliance with the specification requirements.

THE ACTIVITY RESPONSIBLE FOR THIS QUALIFIED PRODUCTS LIST IS THE NAVAL SEA SYSTEMS COMMAND, SEA 55Z3, DEPARTMENT OF THE NAVY, WASHINGTON, DC 20362.

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| **Class I** | | | |
| Type B | Allpax No. 1 | EES 9834-B | The Allpax Company, Inc. 160 Jefferson Ave. Mamaroneck, NY 10543 Plant: Same address |

THIS DOCUMENT CONTAINS _7_ PAGES.

1 of 7

00555

**EXHIBIT E**

00556

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| **Class 1** | | | |
| Type B | Anchor Style 808C, Type 5 | EES IBDI458 | The Anchor Packing Co. One Buttonwood Square Philadelphia, PA 19130 (Distributor) RM Industrial Products Company, Inc. P. O. Box 5205 N. Charleston, SC 29406 Plant: Garco & O'Heat Sta. N. Charleston, SC 29406 (Manufacturer) |
| Type B | John Crane Supersesal No. 1 | EES 5001-F and EES B-942 | John Crane-Houdaille 6400 Oakton St. Morton Grove, IL 60053 Plant: Same address |
| Type B | Dura Plastic B-77 | EES IADI436 | Durametallic Corp. 2104 Factory St. Kalamazoo, MI 49001 Plant: Same address |
| Type B | Garlock Style 909 | EES 010073 | Garlock, Inc. Compression Packings 300 Alling Dr. Sodus, NY 14551 Plants: Division St. Palmyra, NY 14522 300 Alling Dr. Sodus, NY 14551 |
| Type B | R/M 1840-B | EES IBDI458 | RM Industrial Products Company, Inc. P. O. Box 5205 N. Charleston, SC 29406 Plant: Garco & O'Heat Sta. N. Charleston, SC 29406 |



QPL-17303-38

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Class I | | | |
| Type C | John Crane, Style 150 | EES 3907 | John Crane-Houdaille<br>6400 Oakton St.<br>Morton Grove, IL 60053<br>Plant: Same address |
| Type C | Garlock Style 8890 | EES 010074 | Garlock, Inc.<br>Compression Packings<br>300 Alling Dr.<br>Sodus, NY 14551<br>Plants:<br>Division St.<br>Palmyra, NY 14522<br>300 Alling Dr.<br>Sodus, NY 14551 |
| Type D | John Crane, Style 250 | EES C-522 | John Crane-Houdaille<br>6400 Oakton St.<br>Morton Grove, IL 60053<br>Plant: Same address |
| Type F | Anchor Style 808C, Type 5 | EES 1BDT458 | The Anchor Packing Co.<br>One Buttonwood Square<br>Philadelphia, PA 19130<br>(Distributor)<br>RM Industrial Products<br>Company, Inc.<br>P. O. Box 5205<br>N. Charleston, SC 29406<br>Plant:<br>Garco & O'Hear Sts.<br>N. Charleston, SC 29406<br>(Manufacturer) |
| Type F | John Crane Super Seal #1 | EES 5001-F & EES-B-942 | John Crane-Houdaille<br>6400 Oakton St.<br>Morton Grove, IL 60053<br>Plant: Same address |
| Type F | Dura Plastic B-77 | EES 1ADT436 | Durametallic Corp.<br>2104 Factory St.<br>Kalamazoo, MI 49001<br>Plant: Same address |

00557



00568

4 of 7

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Class I | | | |
| Type F | Garlock Style 909 | EES 010073 | Garlock, Inc. Compression Packings 300 Alling Dr. Sodus, NY 14551 Plants: Division St. Palmyra, NY 14522 300 Alling Dr. Sodus, NY 14551 |
| Type F | R/M 1840-B | EES 1BDT458 | RM Industrial Products Company, Inc. P. O. Box 5205 N. Charleston, SC 29406 Plant: Garco & O'Heat Sta. N. Charleston, SC 29406 |
| Class II | | | |
| Type C | Ankorite Style 804 | EES 610033A | The Anchor Packing Co. One Buttonwood Square Philadelphia, PA 19130 (Distributor) RM Industrial Products Company, Inc. P. O. Box 5205 N. Charleston, SC 29406 Plant: Garco & O'Heat Sta. N. Charleston, SC 29406 (Manufacturer) |
| Type C | John Crane Style No. 6 AM CR | EES 010033A | John Crane-Houdaille 6400 Oakton St. Morton Grove, IL 60053 Plant: Same address |





QPL-17303-38

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Class II | | | |
| Type C | Garlock Style 5855 | EES 010073 | Garlock, Inc. Compression Packings 300 Alling Dr. Sodus, NY 14551 Plants: Division St. Palmyra, NY 14522 300 Alling Dr. Sodus, NY 14551 |
| Type C | R/M Style LS8842 | EES 610033A | RM Industrial Products Company, Inc. P. O. Box 5205 N. Charleston, SC 29406 Plant: Garco & O'Hear Sts. N. Charleston, SC 29406 |
| Type D | Style 820-NJ | EES 1P(4)066749 | The Anchor Packing Co. One Buttonwood Square Philadelphia, PA 19130 (Distributor) RM Industrial Products Company, Inc. P. O. Box 5205 N. Charleston, SC 29406 Plant: Garco & O'Hear Sts. N. Charleston, SC 29406 (Manufacturer) |
| Type D | "Style #1845" | EES 1P(4)066749 | RM Industrial Products Company, Inc. P. O. Box 5205 N. Charleston, SC 29406 Plant: Garco & O'Hear Sts. N. Charleston, SC 29406 |



00559

00560

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Class II | | | |
| Type E | Style No. 809 | EES 010033 | The Anchor Packing Co. One Buttonwood Square Philadelphia, PA 19130 (Distributor) RM Industrial Products Company, Inc. P. O. Box 5205 N. Charleston, SC 29406 Plant: Garco & O'Hear Sts. N. Charleston, SC 29406 (Manufacturer) |
| Type E | Style 1871 John Crane | EES 010033 | John Crane-Houdaille 6400 Oakton St. Morton Grove, IL 60053 Plant: Same address |
| Type E | Style 127 | NAVSECPHILADIV Proj. Rpt. B-792 Garlock Inc. Lab. Rpts. 8849-B & 8764-B | Garlock, Inc. Compression Packings 300 Alling Dr. Sodus, NY 14551 Plants: Division St. Palmyra, NY 14522 300 Alling Dr. Sodus, NY 14551 |
| Type E | Garlock Style 5901 | EES 010033D | Garlock, Inc. Compression Packings 300 Alling Dr. Sodus, NY 14551 Plants: Division St. Palmyra, NY 14522 300 Alling Dr. Sodus, NY 14551 |



QPL-17303-38

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Class II | | | |
| Type E | R/M 325 | EES 010033 | RM Industrial Products Company, Inc. P. O. Box 5205 N. Charleston, SC 29406 Plant: Garco & O'Hear Sts. N. Charleston, SC 29406 |
| Type F | Anchor Style 858-CWB | EES 610423 | The Anchor Packing Co. One Buttonwood Square Philadelphia, PA 19130 (Distributor) RM Industrial Products Company, Inc. P. O. Box 5205 N. Charleston, SC 29406 Plant: Garco & O'Hear Sts. N. Charleston, SC 29406 (Manufacturer) |

NOTE: As of 20 June 1983, no Class I, Type A or Type E, or Class III, Type B, plastic metallic packing materials have been tested and qualified under Military Specification MIL-P-17303C(NAVY). Pending the inclusion of these classes and types on the Qualified Products List, the qualification requirements (paragraphs 3.1 and 6.2) of MIL-P-17303C(NAVY) shall be waived for acquisition of the Class I, Type A and Type E, and Class III, Type B plastic metallic packing materials. However, contracting agencies should require first article inspection invoking tests of paragraph 4.5 of MIL-P-17303C(NAVY). A copy of the first article test data, as certified to by the responsible government inspector, shall be forwarded to the applicable qualifying activity.

00561

1010325
Firm No. 15683



## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) | **IN RE: ASBESTOS LITIGATION** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | LAW NO.  21 L 006906 |
| | ) | |
| AIR & LIQUID SYSTEMS CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### ENTRY OF APPEARANCE

NOW COMES HEYL, ROYSTER, VOELKER & ALLEN, Attorneys at Law, and hereby enters their appearance on behalf of Defendant, AIR & LIQUID SYSTEMS CORPORATION, as successor by merger to BUFFALO PUMPS, INC., and in the above-captioned matter.

### THIS DEFENDANT DEMANDS TRIAL BY JURY

AIR & LIQUID SYSTEMS CORPORATION, as
Successor by Merger to BUFFALO PUMPS, INC.

By: _____/s/*Tobin J. Taylor*_____

HEYL, ROYSTER, VOELKER & ALLEN
Tobin J. Taylor #6238227

Firm I.D. No. 15683
HEYL, ROYSTER, VOELKER & ALLEN
300 Hamilton Boulevard, P.O. Box 6199
Peoria, IL 61601-6199
Telephone:  309.676.0400
Facsimile: 309.420.0402
E-mail:  peoecf@heylroyster.com
*and*
HEYL, ROYSTER, VOELKER & ALLEN
33 N. Dearborn St., 7th Fl.
Chicago, Illinois 60602
Telephone: 312.853.8700
Facsimile: 309.420.0402
E-mail: chiecf@heylroyster.com

**EXHIBIT F**

1010325
Firm No. 15683

## CERTIFICATE OF FILING AND PROOF OF SERVICE

I certify that on August 3, 2021, at approximately 2:00 p.m., I electronically filed and transmitted the foregoing **ENTRY OF APPEARANCE** with the Clerk of the Court for Cook County by using the Odyssey eFileIL system.

I further certify that all counsel of record will be served via File & ServeXpress.

Under penalties as provided by law pursuant to section 1-109 of the Illinois Code of Civil Procedure [735 ILCS 5/1-109], I certify that the statements set forth in this **Certificate of Filing and Proof of Service** are true and correct, except as to matters therein stated to be on information and belief and as to such matters I certify as aforesaid that I verily believe the same to be true.

/s/ Dionne McCray

HEYL, ROYSTER, VOELKER & ALLEN
300 Hamilton Blvd. ▪ P.O. Box 6199
Peoria, IL 61601-6199
Telephone: 309.676.0400
Facsimile: 309.420.0402
*and*
HEYL, ROYSTER, VOELKER & ALLEN
33 N. Dearborn St., 7th Floor
Chicago, IL 60602
Telephone: 312.853.8700
Facsimile: 309.420.0402
Primary e-service:      peoecf@heylroyster.com
Secondary e-service #1: ttaylor@heylroyster.com
Secondary e-service #2: chiecf@heylroyster.com

2

1010325
Firm #15683

E-SERVICE
66818857
Aug 03 2021
02:46PM
File & ServeXpress

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) | **IN RE: ASBESTOS LITIGATION** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | LAW NO.        21 L 006906 |
| | ) | |
| AIR & LIQUID SYSTEMS CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## 2-615 MOTION TO DISMISS PRODUCT SPOLIATION COUNTS OF PLAINTIFFS' COMPLAINT

NOW COMES Defendant, AIR & LIQUID SYSTEMS CORPORATION, as successor by merger to BUFFALO PUMPS, INC. ("AIR & LIQUID SYSTEMS CORPORATION"), by its attorneys, HEYL, ROYSTER, pursuant to 735 ILCS 5/2-615, and moves to dismiss Counts IV (Negligent Spoliation) and V (Willful and Wanton Spoliation) of Plaintiffs' Complaint, and states as follows:

1.      Count IV of Plaintiffs' Complaint purports to set forth a cause of action for negligent spoliation of evidence and is directed to "Asbestos Product Defendants."  Count V of Plaintiffs' Complaint purports to set forth a cause of action for willful and wanton spoliation of evidence and is, likewise, directed to "Asbestos Product Defendants."

2.      A motion brought pursuant to Section 2-615 attacks the legal sufficiency of plaintiffs' complaint and the motion is properly granted where the allegations are not sufficient to state a cause of action upon which relief can be granted.  *Vernon v. Shuster*, 179 Ill. 2d 338, 343 (1997). Illinois requires "fact-pleading" and a plaintiff "must allege facts sufficient to bring his or her claim within the scope of the cause of action asserted. " *Id*.

1010325
Firm #15683

3.      Plaintiffs' allegations are <u>devoid of facts specific to Air & Liquid Systems</u> which would give rise to any duty owed and any proximate cause as to a cause of action for spoliation based upon negligent or willful and wanton conduct.

4.      The Illinois Supreme Court has recognized that a claim for negligent spoliation could be brought under existing negligence principles, but is otherwise not a separate or independent cause of action. *Dardeen v. Kuehling*, 213 Ill. 2d 329, 821 N.E.2d 227 (2004); *Boyd v. Travelers Ins. Co.*, 166 Ill. 2d 188, 652 N.E.2d 267 (1995). To state a cause of action for negligent spoliation of evidence, a plaintiff must plead: (1) the existence of a duty to preserve evidence owed by the defendant to the plaintiff; (2) a breach of that duty; (3) and injury or damages proximately caused by the breach of duty; and (4) damages. *Boyd,* 116 Ill. 2d at 194-95; 652 N.E.2d at 270.

5.      In *Boyd*, the Supreme Court determined that as a general rule there was no duty to preserve evidence, but that a duty may otherwise arise through an agreement, contract, statute or "special circumstance." *Id*. As further analyzed in *Dardeen*, the Supreme Court in Boyd set forth two prongs to consider in the duty analysis: the relationship prong and the foreseeability prong. *Dardeen*, 213 Ill.2d at 336. A contract, agreement, statute or special circumstance could establish the "relationship prong" but then the "foreseeability prong" needs to analyze whether the duty to preserve extends to the evidence at issue and whether a reasonable person in defendant's position should have foreseen the evidence as material to a potential civil suit. *Id*.

6.      For a duty to be created by an agreement or contract, the agreement or contract must be between the parties to the spoliation claim. *Dardeen*, 213 Ill. 2d at 336-37. There are no allegations in the Complaint in this case of an agreement or contract between plaintiff and the moving defendant.

1010325
Firm #15683

7.      A duty to preserve evidence may also be created by a statute.  Rodgers. v. St. Mary's Hosp., 149 Ill. 2d 302, 308, 597 N.E.2d 616, 619 (1992).  There are no allegations in the Complaint in this case that there was a statue that created a duty owed by the moving defendant.

8.      The courts have not provided a clear indication of what constitutes a "special circumstance" that would give rise to a duty; however, a Complaint should provide some specific allegations of facts that might support such a conclusion.  For instance, the Illinois Supreme Court suggests that allegations against a physician for spoliation of evidence in the destruction of x-rays might support a finding of a special circumstance where the doctor following a request for the x-rays from plaintiff, obtained the x-rays and placed them on the floor of his office three feet from a waste basket, where a housekeeper had previously regularly disposed of x-ray jackets located in or near to the trash, which resulted in the x-rays being disposed and incinerated.  *Miller v. Gutpa*, 174 Ill. 2d 123, 128-29, 672 N.E. 1229, 1231 (1996).  In the instant case, Plaintiffs' Complaint alleges no specific facts upon which any such reasonable finding of the existence of a special circumstance might occur.  There are no specific allegations directed specifically as to each defendant related to the following:  what specific evidence is missing; what specific action or omission of each defendant is alleged to have occurred with respect to the unidentified evidence; what knowledge each defendant is alleged to have had with respect to the unidentified evidence; and what relationship the evidence may have to Plaintiff and any potential claims.

9.      If the "relationship prong" is established by facts alleged, the Plaintiff must also allege facts to support the "foreseeability prong" that might lead to a conclusion that a reasonable person in defendant's position would have foreseen the evidence as material to a potential civil suit.  *Dardeen*, 213 Ill.2d. at 336.   Both the relationship prong and the foreseeability prong must

1010325
Firm #15683

be satisfied.  *Id*.  Here, Plaintiffs' Complaint alleges no facts that would support what the moving

defendant knew or should have known, at what point in time the moving defendant knew or

should have known something, what unidentified evidence related to that knowledge, and

specifically what unidentified evidence related to any claims brought by Plaintiff in 2021.  Without

any of these facts, Plaintiffs' Complaint is insufficient as a matter of law and should be dismissed.

10.     Moreover, Count V contains an alleged action for willful and wanton conduct.  The

allegations of the Complaint are completely devoid of facts giving rise to a cause of action based

on negligence and certainly don't allege any specific facts that might give rise to a heightened

standard of conduct beyond negligent conduct.  Count V should be dismissed as well.

11.     Because the allegations of Plaintiffs' Complaint are entirely insufficient as a matter

of law to give rise to a cause of action as alleged in Counts IV and V, this Court should dismiss

those counts pursuant to Section 2-615.

WHEREFORE, the Defendant, AIR & LIQUID SYSTEMS CORPORATION, as successor by

merger to BUFFALO PUMPS, INC. ("AIR & LIQUID SYSTEMS CORPORATION"), respectfully requests

this court to dismiss Counts IV and V of Plaintiffs' Complaint pursuant to Section 2-615 of the

Illinois Code of Civil Procedure, and further that said dismissal be entered with prejudice in bar of

further action and for any and other such relief the court deems necessary and proper.

AIR & LIQUID SYSTEMS CORPORATION


By: _____/s/ Tobin J. Taylor_____
HEYL, ROYSTER, VOELKER & ALLEN
Tobin J. Taylor #6238227

1010325
Firm #15683

## CERTIFICATE OF FILING AND PROOF OF SERVICE

I certify that on August 3, 2021, at approximately 2:00 p.m., I electronically filed and transmitted the foregoing **2-615 MOTION TO DISMISS PRODUCT SPOLIATION COUNTS OF PLAINTIFF'S COMPLAINT** with the Clerk of the Court for Cook County by using the Odyssey eFileIL system.

I further certify that all counsel of record have been served via File & ServeXpress.

Under penalties as provided by law pursuant to section 1-109 of the Illinois Code of Civil Procedure [735 ILCS 5/1-109], I certify that the statements set forth in this **Certificate of Filing and Proof of Service** are true and correct, except as to matters therein stated to be on information and belief and as to such matters I certify as aforesaid that I verily believe the same to be true.

/s/ Dionne McCray

HEYL, ROYSTER, VOELKER & ALLEN
300 Hamilton Blvd. ▪ P.O. Box 6199
Peoria, IL 61601-6199
Telephone: 309.676.0400
Facsimile: 309.420.0402
*and*
HEYL, ROYSTER, VOELKER & ALLEN
33 N. Dearborn St., 7th Floor
Chicago, IL 60602
Telephone: 312.853.8700
Facsimile: 309.420.0402
Primary e-service:       peoecf@heylroyster.com
Secondary e-service #1: ttaylor@heylroyster.com
Secondary e-service #2: chiecf@heylroyster.com

1010325
Firm #15683

E-SERVICE
66818857
Aug 03 2021
02:46PM
File & ServeXpress

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) | **IN RE: ASBESTOS LITIGATION** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | LAW NO.        21 L 006906 |
| | ) | |
| AIR & LIQUID SYSTEMS CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### MOTION TO STRIKE PRAYER FOR PUNITIVE DAMAGES

NOW COMES the Defendant, AIR & LIQUID SYSTEMS CORPORATION, as successor by merger to BUFFALO PUMPS, INC. ("AIR & LIQUID SYSTEMS CORPORATION"), by its Attorneys, HEYL, ROYSTER, VOELKER & ALLEN, and for its Motion to Strike Plaintiffs' Prayer for Punitive Damages, states as follows:

1.      Plaintiffs have filed their Complaint directed against moving defendant as well as other defendants.  Count V includes a prayer for punitive damages against these Defendants.  *See* attached Exhibit A, Complaint.

2.      Count I is brought by Plaintiffs against moving Defendant alleging a cause of action for negligence resulting in bodily injury.

3.      The Illinois Code of Civil Procedure provides at 735 ILCS 5/2-604.1 for the pleading of punitive damages. That section reads in pertinent part as follows:

> "§2-604.1. Pleading of Punitive Damages. In all actions on account of bodily injury or physical damage to property, based on negligence, or product liability based on any theory or doctrine, where punitive damages are permitted, no complaint shall be filed containing a prayer for relief seeking punitive damages. However, a plaintiff may, pursuant to a pretrial motion and after a hearing before the court, amend the complaint to include a prayer for relief seeking punitive damages. . . "

735 ILCS 5/2-604.1.

1010325
Firm #15683

4. Whether the circumstances in a particular case justify an award of punitive damages is a question of law to be decided by the trial judge. *Stojkovich v. Monadnock Building*, 281 Ill.App.3d 733, 742 (1st Dist. 1996). Because of their penal nature, Illinois courts must be cautious in seeing that punitive damages are not improperly or unwisely awarded. *Deal v. Byford*, 127 Ill.2d 192 (1989).

5. Plaintiff's claim in Count I seeks damages for bodily injury for conduct based on negligence. Section 2-604.1 precludes Plaintiffs from requesting punitive damages on the face of any complaint based, even in part, on a negligence theory. *McCann v. Presswood*, 308 Ill.App.3d 1068, 1072, 721 N.E. 2d 811, 242 Ill. Dec. 532 (4th Dist. 1999). Thus, it is improper for Plaintiffs' complaint to contain a prayer for punitive damages while also, on its face, stating a cause of action based upon negligence.

WHEREFORE, Defendant, AIR & LIQUID SYSTEMS CORPORATION, as successor by merger to BUFFALO PUMPS, INC. ("AIR & LIQUID SYSTEMS CORPORATION"), requests this Court to strike Plaintiffs' requests for punitive damages in their prayer for relief in Count V.

AIR & LIQUID SYSTEMS CORPORATION

By: _____/s/ Tobin J. Taylor_____
HEYL, ROYSTER, VOELKER & ALLEN
Tobin J. Taylor #6238227

HEYL, ROYSTER, VOELKER & ALLEN
300 Hamilton Blvd. ▪ P.O. Box 6199
Peoria, IL 61601-6199
Telephone: 309.676.0400
Facsimile: 309.420.0402
*and*
HEYL, ROYSTER, VOELKER & ALLEN
33 N. Dearborn St., 7th Floor
Chicago, IL 60602
Telephone: 312.853.8700
Facsimile: 309.420.0402
Primary e-service:     peoecf@heylroyster.com
Secondary e-service #1: ttaylor@heylroyster.com
Secondary e-service #2: chiecf@heylroyster.com

1010325
Firm #15683

## **CERTIFICATE OF FILING AND PROOF OF SERVICE**

I certify that on August 3, 2021, at approximately 2:00 p.m., I electronically filed and transmitted the foregoing **MOTION TO STRIKE PRAYER FOR PUNITIVE DAMAGES** with the Clerk of the Court for Cook County by using the Odyssey eFileIL system.

I further certify that all counsel of record have been served via File & ServeXpress.

Under penalties as provided by law pursuant to section 1-109 of the Illinois Code of Civil Procedure [735 ILCS 5/1-109], I certify that the statements set forth in this **Certificate of Filing and Proof of Service** are true and correct, except as to matters therein stated to be on information and belief and as to such matters I certify as aforesaid that I verily believe the same to be true.

/s/ Dionne McCray

HEYL, ROYSTER, VOELKER & ALLEN
300 Hamilton Blvd. ▪ P.O. Box 6199
Peoria, IL 61601-6199
Telephone: 309.676.0400
Facsimile: 309.420.0402
*and*
HEYL, ROYSTER, VOELKER & ALLEN
33 N. Dearborn St., 7th Floor
Chicago, IL 60602
Telephone: 312.853.8700
Facsimile: 309.420.0402
Primary e-service:     peoecf@heylroyster.com
Secondary e-service #1: ttaylor@heylroyster.com
Secondary e-service #2: chiecf@heylroyster.com

1010325
Firm #15683

E-SERVICE
66818896
Aug 03 2021
02:48PM
File & ServeXpress

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) | **IN RE: ASBESTOS LITIGATION** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | LAW NO.    21 L 006906 |
| | ) | |
| AIR & LIQUID SYSTEMS CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ANSWER TO COMPLAINT**

NOW COMES the Defendant, AIR & LIQUID SYSTEMS CORPORATION, as successor by merger to BUFFALO PUMPS, INC., ("AIR & LIQUID SYSTEMS CORPORATION"), by its attorneys, HEYL, ROYSTER, VOELKER & ALLEN, and for its Answer to Plaintiffs' Complaint at Law, states as follows:

**COUNT I**

**NEGLIGENCE COUNT AS TO MANUFACTURERS OF ASBESTOS PRODUCTS**

1.      This Defendant has insufficient knowledge to form a belief as to the truth of the allegations contained in Paragraph 1 and therefore demands strict proof thereof.

2.      Defendant, AIR & LIQUID SYSTEMS CORPORATION, denies the allegations that are directed against it in paragraph 2 and further makes no answer as to the allegations directed to other defendants.

3.      This Defendant has insufficient knowledge to form a belief as to the truth of the allegations contained in Paragraph 3 and therefore demands strict proof thereof.

4.      This Defendant denies the allegations contained in Paragraph 4.

5.      This Defendant denies the allegations contained in Paragraph 5.

1

1010325
Firm #15683

6.      This Defendant denies the allegations contained in Paragraph 6.

7.      This Defendant admits all duties imposed by law but denies it owed or breached any alleged duties to Plaintiff.

8.      This Defendant denies the allegations contained in Paragraph 8, including each and every allegation contained in subparagraphs 8(a) through 8(h).

9.      This Defendant denies the allegations contained in Paragraph 9.

WHEREFORE, Defendant, AIR & LIQUID SYSTEMS CORPORATION, prays for judgment in its favor and against Plaintiff, for its costs and for such other and further relief as the Court deems necessary and proper.

## COUNT II

## WILLFUL AND WANTON

1-8.      Plaintiffs repeat and reallege paragraphs 1-8 of of Count I of the Complaint and this Defendant repeats and adopts its responses to paragraphs 1-8 Count I as and for its response to paragraphs 1-8 of Count II as though more fully set forth herein.

9.      This Defendant denies the allegations contained in Paragraph 9, including each and every allegation contained in subparagraphs 9(a) through 9(g).

10.      Plaintiffs repeat and reallege paragraph 9 of Count I as and for Paragraph 10 of Count II and this Defendant repeats and adopts its response to Paragraphs 9 of Count I as and for its response to paragraph 10 of Count II as though more fully set forth herein.

WHEREFORE, Defendant, AIR & LIQUID SYSTEMS CORPORATION, prays for judgment in its favor and against Plaintiff, for its costs and for such other and further relief as the Court deems necessary and proper.

1010325
Firm #15683

## COUNT III

## CONSPIRACY

The allegations of Count III are not directed toward this Defendant and therefore no response is required. To the extent any allegation in Count III can be construed against this Defendant, it is denied.

WHEREFORE, Defendant, AIR & LIQUID SYSTEMS CORPORATION, prays for judgment in its favor and against Plaintiff, for its costs and for such other and further relief as the Court deems necessary and proper.

## COUNT IV

## NEGLIGENT SPOLIATION OF EVIDENCE

1. This Defendant denies the allegations contained in Paragraph 1.

2. This Defendant denies the allegations contained in Paragraph 2.

3. This Defendant denies the allegations contained in Paragraph 3.

4. This Defendant denies the allegations contained in Paragraph 4.

5. This Defendant denies the allegations contained in Paragraph 5.

6. This Defendant denies the allegations contained in Paragraph 6.

7. This Defendant denies the allegations contained in Paragraph 7.

WHEREFORE, Defendant, AIR & LIQUID SYSTEMS CORPORATION, prays for judgment in its favor and against Plaintiff, for its costs and for such other and further relief as the Court deems necessary and proper.

1010325
Firm #15683

## COUNT V

## WILLFUL AND WANTON SPOLIATION OF EVIDENCE

1.      Plaintiffs incorporate paragraphs 1-5 of of Count IV of the Complaint and this Defendant repeats and adopts its responses to paragraphs 1-5 Count IV as though more fully set forth herein.

2.      This Defendant denies the allegations contained in Paragraph 2.

3.      This Defendant denies the allegations contained in Paragraph 3.

4.      This Defendant denies the allegations contained in Paragraph 4.

WHEREFORE, Defendant, AIR & LIQUID SYSTEMS CORPORATION, prays for judgment in its favor and against Plaintiff, for its costs and for such other and further relief as the Court deems necessary and proper.

## COUNT VI

## LOSS OF CONSORTIUM

1.      Plaintiffs incorporate by reference all paragraphs of Counts I-V of the Complaint and this Defendant repeats and adopts its responses thereto as though more fully set forth herein.

2.      This Defendant has insufficient knowledge to form a belief as to the truth of the allegations contained in Paragraph 2 and therefore demands strict proof thereof.

3.      This Defendant denies the allegations contained in Paragraph 3.

WHEREFORE, Defendant, AIR & LIQUID SYSTEMS CORPORATION, prays for judgment in its favor and against Plaintiff, for its costs and for such other and further relief as the Court deems necessary and proper.

1010325
Firm #15683

## DEFENDANT DEMANDS TRIAL BY JURY

## <u>AFFIRMATIVE DEFENSES</u>

### <u>First Affirmative Defense</u>

Plaintiffs' Complaint at Law fails to state a claim against this Defendant upon which relief may be granted.

### <u>Second Affirmative Defense</u>

The Court lacks personal jurisdiction over this answering Defendant.

### <u>Third Affirmative Defense</u>

Each and every cause of action which Plaintiff attempts to plead is barred by the statute of limitations and the statute of repose applicable under Illinois law to causes of action sounding in negligence and products liability.

### <u>Fourth Affirmative Defense</u>

The injuries allegedly sustained by the Plaintiff, if any, were proximately caused by his free and voluntary acts of knowing and voluntarily placing himself in a position of danger and thus assuming the risks ordinarily incident to such acts. The risks incident to the Plaintiffs' actions were open, obvious, apparent, and actually known to him and the conditions described in the Complaint at Law and the injury and damage, if any, sustained by the Plaintiff were proximately caused by his assumption of such risks and such conduct bars Plaintiffs' causes of action and any recovery by reason of Plaintiffs' Complaint at Law.

### <u>Fifth Affirmative Defense</u>

The negligent acts and/or omissions of the Plaintiff were the sole proximate cause or a proximate contributing cause of the injuries and damages complained of. Plaintiffs' contributory

1010325
Firm #15683

negligence in this instance exceeds 50% of the proximate cause of his alleged injuries for which he seeks recovery, and Plaintiff is therefore barred from recovering any damages herein.

## Sixth Affirmative Defense

Plaintiffs' alleged damages were negligently caused in whole or in part by persons, firms, corporations, or entities other than those parties before this Court and such negligence either bars or comparatively reduces any possible recovery by the Plaintiff.

## Seventh Affirmative Defense

This Defendant is not jointly and severally liable in that the fault of it, if any, was less than 25% of the total fault attributable to all parties. Illinois Code of Civil Procedure, Article 2-1117.

## Eighth Affirmative Defense

If the Plaintiff suffered damages as a result of the allegations set forth in the Complaint at Law, then those damages are not sustained by any conduct of any of this Defendant, but rather were the result of the intervening or superseding acts or omission of others for which acts or omissions this Defendant can in no way be held liable.

## Ninth Affirmative Defense

If any of the allegations of the Plaintiff with respect to the defective condition of asbestos or asbestos products are proven, then the Plaintiff is barred from any recovery due to the fact that there was no known substitute for asbestos or asbestos products.

## Tenth Affirmative Defense

The state of the medical and scientific knowledge and the published literature and other materials reflecting said state of the medical art at all times pertinent hereto was such that this Defendant neither knew nor could have known that its asbestos-containing insulation products,

1010325
Firm #15683

if any, presented a foreseeable risk of harm to Plaintiff in the normal and expected use of these products according to the law in full force and effect at the time of the transactions complained of. The methods, standards and techniques of designing, manufacturing, or selling any asbestos-containing products sold, manufactured or designed by this Defendant, if any, were performed in conformity with the generally recognized state of the art existing at the time such products were manufactured, designed, and/or sold, if any, by this Defendant and placed in the stream of commerce.

## Eleventh Affirmative Defense

If Plaintiff sustained injuries and damages as a result of his exposure to any product manufactured by this Defendant, as alleged in the Complaint at Law, which this Defendant denies, the amount of any such exposure and any attributable to Plaintiffs' alleged injuries and damages was and is negligible in degree and amount, and, hence, *de minimis*; therefore, this Court should give no cognisance thereto and should deny Plaintiff any recovery against said Defendant.

## Twelfth Affirmative Defense

This Defendant is not liable for any product complained of which was manufactured pursuant to specifications issued by the United States Government.

## Thirteenth Affirmative Defense

If the Plaintiff suffered damages as a proximate result of any condition of a product manufactured, distributed or sold by this Defendants, which this Defendant denies, then any such product would have been supplied to an employer of such Plaintiff which employer was knowledgeable and a sophisticated user of said products with adequate warnings or

7

1010325
Firm #15683

instructions, or with the knowledge of such information contained in said warnings, and thus this Defendant had no further legal duty to warn or instruct Plaintiff.

## Fourteenth Affirmative Defense

Plaintiff seeks to recover for the construction or design of AIR & LIQUID SYSTEMS CORPORATION products or equipment when said construction or design took place more than 10 years prior to the filing of this lawsuit. Those claims are barred by the 735 ILCS 5/13-214, known generally as the Illinois Construction Statute of Repose.

AIR & LIQUID SYSTEMS CORPORATION

BY: _____/s/ Tobin J. Taylor_____
HEYL, ROYSTER, VOELKER & ALLEN
Tobin J. Taylor #6238227


## AFFIDAVIT

I, Tobin J. Taylor, being first duly sworn on oath, depose and state that I am an attorney for AIR & LIQUID SYSTEMS CORPORATION in the above-entitled case; that I am informed as to the allegations for which AIR & LIQUID SYSTEMS CORPORATION has answered that there is insufficient knowledge to form a belief as to the truth or falsity of the allegations of the Complaint; that AIR & LIQUID SYSTEMS CORPORATION in fact lacks such information; and that I believe said assertions of insufficient knowledge are true.

_____/s/ Tobin J. Taylor_____
Tobin J. Taylor

8

1010325
Firm #15683

## **VERIFICATION BY CERTIFICATION**

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil

Procedure, the undersigned certifies that the statements set forth in this instrument are true and

correct, except as to matters therein stated to be on information and belief and as to such

matters the undersigned certifies as aforesaid that he verily believes the same to be true.

/s/ Tobin J. Taylor
(signature)

August 3, 2021
(date)

## **CERTIFICATE OF FILING AND PROOF OF SERVICE**

I certify that on August 3, 2021, at approximately 2:00 p.m., I electronically filed and transmitted the foregoing **Answer and Affirmative Defenses to Plaintiff's Complaint** with the Clerk of the Court for Cook County by using the Odyssey eFileIL system.

I further certify that all counsel of record have been served via File & ServeXpress.

Under penalties as provided by law pursuant to section 1-109 of the Illinois Code of Civil Procedure [735 ILCS 5/1-109], I certify that the statements set forth in this **Certificate of Filing and Proof of Service** are true and correct, except as to matters therein stated to be on information and belief and as to such matters I certify as aforesaid that I verily believe the same to be true.

/s/ Dionne McCray

HEYL, ROYSTER, VOELKER & ALLEN
300 Hamilton Blvd. ▪ P.O. Box 6199
Peoria, IL 61601-6199
Telephone: 309.676.0400
Facsimile: 309.420.0402
*and*
HEYL, ROYSTER, VOELKER & ALLEN
33 N. Dearborn St., 7th Floor
Chicago, IL 60602
Telephone: 312.853.8700
Facsimile: 309.420.0402
Primary e-service:      peoecf@heylroyster.com
Secondary e-service #1: ttaylor@heylroyster.com
Secondary e-service #2: chiecf@heylroyster.com

9



1010325
Firm No. 15683

66818896
Aug 03 2021
02:48PM
E-SERVICE
File & ServeXpress

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) | **IN RE: ASBESTOS LITIGATION** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | LAW NO.    21 L 006906 |
| | ) | |
| AIR & LIQUID SYSTEMS CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### AIR & LIQUID SYSTEMS CORPORATION as successor by merger to
### BUFFALO PUMPS, INC.'S LIST OF POTENTIAL FACT / EXPERT WITNESSES

The following statements of expected testimony have been prepared by counsel to comply with the fact and expert witness disclosure requirements under state law.  The words and language used in this statement are the words and language of counsel who prepared the statement, and not of the witness.

Defendants are not aware of all of the areas of testimony or proof that plaintiff intends to produce at trial and, therefore defendants cannot proffer all expected testimony until they have had the benefit of reviewing all of the plaintiff's experts' reports and opinions. To the extent that a witness expresses an opinion at trial or in discovery that has not been divulged prior to the time that this statement was served on counsel, and which creates a need for rebuttal testimony or proof, defendants reserve the right to supplement this statement.

### FACT WITNESS

1.      Martin K. Kraft
        Buffalo Pumps, Inc.
        874 Oliver St.
        North Tonawanda, NY

Mr. Kraft has been employed by Buffalo Pumps since 1980. During that time, he has served as a Quality Control Technician, Order Processor Engineering Technician, Quality Assurance Manager, Regional Manager, Marine Sales and Director of Quality Control. He currently serves as Director of Quality Control/Production. Mr. Kraft may testify regarding Buffalo Pumps' products, practices and procedures from the standpoint of design, testing, production and delivery. He is familiar with and may testify regarding the characteristics and performance of Buffalo Pumps products, and as to the standards and specifications governing the design, manufacture and other aspects of those products and Buffalo Pumps' compliance

1010325
Firm No. 15683

with those standards and specifications. Mr. Kraft may also testify regarding Buffalo Pumps' interaction with various customers and/or their representatives, including the United States Navy. Mr. Kraft may also testify regarding the use of asbestos-containing products at or by Buffalo Pumps. Mr. Kraft may also discuss evidence introduced by plaintiff. His background and experience are detailed in his January 20, 2004 deposition in *Petersen v. Ashland Oil, et al.*

## **EXPERT WITNESSES**

1.      Dr. Philip T. Cagle
        Department of Pathology
        Baylor College of Medicine
        Suite 220 E, One Baylor Plaza
        Houston, Texas 77030
        (713) 798-4951

Dr. Cagle is a board certified pathologist who may give testimony regarding the pathological diagnosis of the medical condition of any plaintiff and, in the case of a deceased plaintiff, may give testimony as to the cause of death. He will further testify as to whether plaintiff or plaintiff's decedent had a condition or illness caused by asbestos exposure. He may also testify on the latency period related to each type of asbestos-related diseases and the carcinogenic properties of each different type of asbestos fiber.

Dr. Cagle will generally testify concerning asbestos-related diseases and the effects of exposure to various asbestos-containing products upon persons in occupational settings. He will further testify regarding the epidemiology of asbestos diseases, the criteria for diagnosis of asbestos-related disease, as well as the existence of a dose response relationship between exposure to asbestos and asbestos-related diseases. He may also testify regarding asbestos-containing products generally, including their asbestos fiber content, manufacture, use and their respective ability to cause or contribute to disease, including quantification of exposures to asbestos thermal system insulation products and other friable asbestos products generally used by plaintiffs. He may testify specifically regarding the content and fiber type of the asbestos-containing products to which plaintiffs were exposed. He may further testify regarding the propensity of various asbestos fiber types to contribute to mesothelioma or other asbestos-related disease. He may also testify regarding the determination of the relative risks of suffering personal injury or death as a result of exposure to various asbestos-containing products in occupational settings. He will explain the dose response relationship between exposure to asbestos and asbestos-related disease for each type or disease alleged. Dr. Cagle's opinion is that the foreseeable use of gaskets and packing products during a human life span cannot produce an appreciable risk of any asbestos-related disease and cannot be a producing cause of any asbestos-related disease. In addition to the above, Dr. Cagle will be prepared to testify with regards to case specific matters included in his deposition. Dr. Cagle will review all depositions and other discovery and be prepared to offer his opinions regarding plaintiffs' exposure to

1010325
Firm No. 15683

asbestos-containing products. Dr. Cagle will also be prepared to testify regarding any matters included in any reports he prepares for this case if such report is completed.

Dr. Cagle may also testify regarding the existence or non-existence of any alleged asbestos-related disease in the plaintiff, including but not limited to pleural changes, asbestosis, lung cancer, mesothelioma, laryngeal cancer, esophageal cancer, and gastrointestinal cancer, where applicable. He will also testify on general medicine issues regarding asbestos-related diseases including, but not limited to, lung physiology, lung function, lung defense mechanisms and the mechanisms by which asbestos fibers do or do not cause a particular disease. He may also testify that background levels of asbestos fibers in human tissue do not represent disease and background or ambient air exposures do not cause disease. He will further testify that any asbestos-related disease allegedly suffered by plaintiff was not proximately caused by exposure to Buffalo Pumps' asbestos-containing products.

He may also testify regarding government regulations applicable to Buffalo Pumps' products and whether these products are unreasonably dangerous. Dr. Cagle's opinion is that gaskets and packing products are not unreasonably dangerous. He may also testify on increased risk of cancer issues and whether plaintiff has a reasonable fear of cancer due to exposure to asbestos. He may also testify on the health consequences of smoking and the relationship between smoking and alleged asbestos-related diseases generally and with respect to plaintiff. He will testify regarding the contribution if any, of smoking and asbestos, if any, to plaintiff's disease.

Generally and with respect to plaintiff, he may testify as to his review and interpretation of x-ray films, review and interpretation of pulmonary function testing, the nature and extent of any impairment or disability, whether a condition is progressive and whether other diseases or conditions are present in plaintiff. He will give an opinion that plaintiff's use, installation, removal or contact, if any, with Buffalo Pumps' products cannot and did not cause or contribute and were not a substantial factor or producing cause of plaintiff's asbestos-related disease.

Dr. Cagle's testimony will be based on his training, experience, education, publications and review of the medical, governmental and scientific literature and various air sampling studies, work facility inspections and documents, where applicable, as well as review of medical records, fiber burden or digestion studies performed by him or another doctor, chest films, and all pathology materials.

Dr. Cagle will also give the following opinions: There is a dose-response relationship for development of any asbestos-related disease, and the dose is the most significant factor in causation of an asbestos-related disease. The risk is proportional to the dose: the greater the accumulated dose, the greater the risk. The dose is produced by various exposures accumulating over time. The dose is measured in fiber years, i.e., the product of exposure (f/cc) over time (years). As an example, an individual exposed at a continuous level of 1 f/cc for 20 years will have amassed 20 fiber years of exposure. There are threshold levels of dose necessary before

1010325
Firm No. 15683

asbestos diseases will develop. As an example, at least 20 fiber years of dose is required for the development of clinically and radiologically evident asbestosis. At the current OSHA PEL of 0.1 f/cc, it would take 200 years of exposure to accumulate 20 fiber years.

It is also his opinion that the non-occupationally exposed general public is not at risk for the development of an asbestos-related condition or disease, even though there is asbestos in the ambient air. Thus, because of the large dose needed to cause an asbestos-related disease, a single asbestos fiber does not substantially contribute to disease.

Dr. Cagle believes to a reasonable degree of medical and scientific probability that the level of exposure, if any, to asbestos resulting from the use, handling, installation, and removal of asbestos-containing gaskets and packing is insufficient to provide a dose adequate to create risk of an asbestos-related disease, does not pose a risk to human health, and does not cause or substantially contribute to the cause of asbestos-related conditions or diseases.

      2.      Dr. George L. Delclos
            6550 Fannin #2403 - Smith Tower
            Houston, Texas 77030
            (713) 790-6250

Dr. Delclos is a specialist in the area of respiratory disease. He will testify as to all matters pertaining to his examination of the plaintiff and plaintiff's medical records; any communication with the plaintiff or plaintiff's family; review of x-rays of the plaintiff; the diagnostic criteria used to diagnose asbestosis; his opinion as to whether plaintiff suffers from asbestos-related diseases and the basis for such opinion; the plaintiff's current medical condition and prognosis.

      3.      Dr. Elliott Hinkes
            301 North Prairie Avenue, Suite 311
            Inglewood, California 90301-4574
            (310) 674-0050

Dr. Hinkes is a specialist in the areas of oncology and hematology. If called, he may testify as to all matters pertaining to his examination of the plaintiff and plaintiff's medical records; any communication with the plaintiff or plaintiff's family; review of x-rays of the plaintiff; the diagnostic criteria used to diagnose asbestosis; his opinion as to whether plaintiff suffers from asbestos-related diseases and the basis for such opinion; the plaintiff's current medical condition and prognosis. He may offer testimony, either live or by deposition, in the area of general medicine, cancer and asbestos-related disease.

Dr. Hinkes also may describe mechanisms and causes of carcinogenesis in general and with respect to asbestos, including such fundamental concepts as dose response and thresholds and the role of cigarette smoking. He will also discuss and compare the epidemiology and risk assessments relating to the principal causes of cancer death, relating to asbestos cancers and

1010325
Firm No. 15683

relating to other risks routinely encountered by individuals in their daily lives. Dr. Hinkes will also discuss concepts of exposure to various types of carcinogens and risk assessment and their applicability of these concepts in determining the cause(s) of a particular cancer.

Dr. Hinkes may also testify concerning strengths and weaknesses of various studies in the medical literature on asbestos, carcinogenesis and related topics, as well as strengths and weaknesses of medical assumptions relied upon by regulatory agencies and other policy making bodies.

It is also anticipated that Dr. Hinkes will provide testimony in rebuttal to that of fact and/or expert witnesses called by the plaintiff(s) who offer testimony in these or in related fields.

Dr. Hinkes will base his testimony on his education, experience, research and review of relevant medical, scientific and technical literature concerning the above topics.

    4.      Russell P. Sherwin, M.D.
             2011 Zonal Avenue, HMR-201
             Los Angeles, California 90033
             (323) 257-3599

Dr. Russell P. Sherwin is a specialist in pulmonary pathology. He may testify as to all matters pertaining to his review/examination of plaintiff's pathological tissue samples, autopsy results, and medical records to offer medical opinion regarding asbestosis diagnosis and cancer.

    5.      Dr. William Lee Eschenbacher
             Pulmonary Function Laboratory
             The Methodist Hospital
             6565 Fannin
             Houston, Texas 77030
             (713) 790-2076

Dr. Eschenbacher is a specialist in the area of-pulmonary disease. He may testify as to all matters pertaining to his examination of the plaintiff and plaintiff's medical records; any communication with the plaintiff or plaintiff's family; review of x-rays of the plaintiff; the diagnostic criteria used to diagnose asbestosis; his opinion as to whether plaintiff suffers from an asbestos-related disease and the basis for such opinion; the plaintiff's current medical condition and prognosis.

1010325
Firm No. 15683

6.     Jon H. Ritter, M.D., F.C.A.P., F.A.S.C.P.
       Division of Surgical Pathology
       Suite 300 Peters Building
       Washington University Medical Center
       One Barnes Hospital Plaza
       St. Louis, Missouri 63110
       (314) 362-0101

Dr. Ritter is a specialist in pulmonary pathology. He may testify as to all matters pertaining to his review/examination of the plaintiff's pathological tissue samples, autopsy results, and medical records to offer medical opinion regarding asbestosis diagnosis and cancer.

7.     Dr. Mark Wick
       University of Virginia Health Science System
       Pathology Department, Room 3900
       Jefferson Park Avenue, Box 214
       Charlottesville, VA 22908
       (804) 982-4403

Dr. Wick may testify, live or by deposition, regarding his opinions relating to the merits of plaintiff's claims and the defenses offered by Buffalo Pumps, including opinions on liability, damages, and causation issues in this case. The witness is expected to testify that any asbestos exposure of plaintiff allegedly attributable to Buffalo Pumps was not the cause, nor did it contribute to cause plaintiff's alleged injuries. The witness may testify that some other exposures to asbestos at other plants were the cause of the cancer, injuries, damages and/or death alleged herein. The witness may gather facts, conduct research and perform tests in formulating opinions regarding causation in this case. The witness will need to gather additional facts before being able to formulate his final opinions and impressions on these several issues. He will testify regarding pathology, the effect of asbestos on humans, and the relationship of alleged asbestos exposure to disease generally and particularly how the exposures alleged in this case may have been the medical and/or legal cause of the injuries, damages and/or death alleged by plaintiff. He may further testify about his review of the medical records, pathology and/or work history of plaintiff and plaintiff's medical condition, and the cause of plaintiff's medical condition. His testimony may also include discussion of asbestos and its effect on human health generally and plaintiff specifically, and the effect that other substances have on human health generally and plaintiff's condition specifically. He may also testify regarding the medical conditions of each plaintiff based on review of medical records, x-rays, plaintiff's experts' reports and supplemental reports, and his training, experience and other special expertise. Further, he may testify concerning the increased risk, if any, of cancer faced by asbestos exposed workers and the prognosis of such individuals. He may testify as to any other matter raised by experts called by plaintiffs, any co-defendant, or any other matter which he may be so qualified to testify.

1010325
Firm No. 15683

    8.      Horton Corwin Hinshaw, Sr., M.D., Deceased.

    By deposition taken November 19, 20, and 21 and December 10 and 11, 1984 in Cause No. C83-6251-RFP, *In Re: Related Asbestos Cases* In the United States District Court In and For the Northern District of California; and *In Re: Related Shipyard and Applicator Cases: Alameda County Asbestos Litigation,* In the Superior Court of The State of California In and For the County of Alameda; and *In Re: Shipyard and Applicator Cases (Clapper & Brayton) Consolidated for Discovery;* In the Superior Court of The State of California In and For the County of Solano. Dr. Hinshaw is unavailable to testify live in the referenced case. His prior deposition and/or trial testimony may include but is not limited to possible state of the art testimony.

    9.      Dr. Thomas Wheeler
             Department of Pathology
             Baylor College of Medicine
             One Baylor Plaza
             Houston, Texas 77030
             (713) 790-2370

    Dr. Thomas Wheeler is an Assistant Professor at the Baylor College of Medicine, Department of Pathology, and is a specialist in pulmonary pathology. He may testify as to all matters pertaining to his review/examination of the plaintiff's pathological tissue samples, autopsy results, and medical records to offer medical opinion regarding asbestosis diagnosis and cancer.

    10.     James H. Yeager, Jr., Ph.D.
             Yeager Economics, Inc.
             14 Westpoint Drive
             Missouri City, Texas 77459
             (281) 431-6200

    Mr. Yeager is an economist. He may testify regarding his review of a report generated by the plaintiff's economist and testify to motions concerning the loss of earnings/income/earning capacity claimed by the plaintiff and/or plaintiff's spouse or family.

1010325
Firm No. 15683

11.     Dr. Victor Roggli and/or Custodian of Records
        Department of Pathology
        Duke University Medical Center
        P. O. Box 3712
        Durham, North Carolina 27710
        (919) 648-8111

Dr. Victor Roggli is a specialist in pulmonary pathology. He may testify as to all matters pertaining to his review/examination of the plaintiff's pathological tissue samples, autopsy results, and medical records to offer medical opinion regarding asbestosis diagnosis and cancer. He may also testify as to the physiological design and function of the lungs, the effect of asbestos on the lungs and other parts of the body, and on the body's defense mechanisms. He may also testify concerning the scientific literature on the biological and toxicological effects of asbestos. He may also testify about the body's biologic responses to asbestos and all types of cancer risks from asbestos exposure. Dr. Roggli may further testify as to the facts and circumstances regarding the nature of the injuries and damages that are the subject of this action. He may also testify about the contribution of smoking or other exposures to the plaintiff's condition. Dr. Roggli may testify about the medical literature.

12.     Dr. I.A. Feingold
        South Miami Hospital
        6200 Southwest 73rd Street
        Miami, Florida 33143
        (305) 661-4611

Dr. Feingold is Chief of Pulmonary Medicine at South Miami Hospital and is a specialist in pulmonary pathology. He may testify as to all matters pertaining to his review/examination of the plaintiff's pathological tissue samples, autopsy results, and medical records to offer medical opinion regarding asbestosis diagnosis and cancer. He may also testify as to the physiological design and function of the lungs, the effect of asbestos on the lungs and other parts of the body, and on the body's defense mechanisms. He may also testify concerning the scientific literature on the biological and toxicological effects of asbestos. He may also testify about the body's biologic responses to asbestos and all types of cancer risks from asbestos exposure. Dr. Feingold may further testify as to the facts and circumstances regarding the nature of the injuries and damages that are the subject of this action. He may also testify about the contribution of smoking or other exposures to the plaintiff's condition. Dr. Feingold may testify about the medical literature.

1010325
Firm No. 15683

13.     Bruce A. Werness
        Department of Pathology
        Inova Fair Oaks Hospital
        3600 Joseph Siewick Drive
        Fairfax, VA 22033

Dr. Werness is a pathologist who may testify concerning the diagnosis or lack thereof of an asbestos-related disease, based on the medical records of plaintiff, including but not limited to, tissue and/or slides that he will review. Further, he may testify on matters pertaining to the diagnosis of asbestos-related disease generally and the diagnosis of the condition of the plaintiff in this case specifically.

14.     Dr. James Crapo
        4650 South 4th Street
        Englewood, CO 80110
        (303) 221-6695

Dr. James Crapo is a physician and Chairman of the Department of Medicine at the National Jewish Medical and Research Center in Denver, Colorado. Further details of his background are contained in his CV, which has been or will be provided to plaintiff's counsel. He has been or will be provided with product exposure information and other case specific data in this case, including but not limited to, case depositions, including co-worker depositions, if any, Complaints, Amended Complaints (if any), Answers or Responses to Interrogatories, including any Supplemental Answers or Responses, certain Buffalo Pumps documents, records, and other discovery propounded and pleadings filed in this lawsuit.

Dr. Crapo will testify concerning the medical condition of plaintiff and, if appropriate, the cause of plaintiff's death. He will further testify as to whether plaintiff had a condition or illness caused by asbestos exposure. He may also testify on the latency period related to each type of asbestos-related disease and the carcinogenic properties of each different type of asbestos fiber.

Dr. Crapo will generally testify concerning asbestos-related diseases and the effects of exposure to various asbestos-containing products upon persons in occupational settings. He will further testify regarding the epidemiology of asbestos diseases, the criteria for diagnosis of asbestos-related disease, as well as the existence of a dose response relationship between exposure to asbestos and asbestos-related diseases.  He may also testify regarding asbestos-containing products generally, including their asbestos fiber content, use and their respective ability to cause or contribute to disease, including quantification of exposure to asbestos thermal system insulation products and other friable asbestos products generally used by plaintiff. He may further testify regarding the propensity of various asbestos fiber types to contribute to mesothelioma or other asbestos-related disease. He may also testify regarding the determination of the relative risks of suffering personal injury or death as a result of exposure to

1010325
Firm No. 15683

various asbestos-containing products in occupational settings. He will explain the dose response relationship between exposure to asbestos and asbestos-related disease for each type of disease alleged. Dr. Crapo's opinion is that the foreseeable use of gaskets and packing products during a human life span cannot produce an appreciable risk of any asbestos-related disease and cannot be a producing cause of any asbestos-related disease.

He may also testify regarding the existence or non-existence of any alleged asbestos-related disease in plaintiff, including but not limited to pleural changes, asbestosis, lung cancer, mesothelioma, laryngeal cancer, esophageal cancer, and gastrointestinal cancer, where applicable. He will also testify on general medicine issues regarding asbestos-related diseases including, but not limited to, lung physiology, lung function, lung defense mechanisms and the mechanisms by which asbestos fibers do or do not cause a particular disease. He may also testify that background levels of asbestos fibers in human tissue do not represent disease and background or ambient air exposure does not cause disease. He will further opine and testify that any asbestos-related disease allegedly suffered by plaintiff was not proximately caused by exposure to asbestos-containing products used in connection with Buffalo Pumps. He may also testify regarding government regulations applicable to defendant's products and whether these products are unreasonably dangerous. He may also testify on increased risk of cancer issues and whether a particular plaintiff has a reasonable fear of cancer due to exposure to asbestos. He may also testify on the health consequences of smoking and the relationship between smoking and alleged asbestos-related diseases, generally and with respect to this plaintiff He will testify regarding the contribution, if any, of smoking and asbestos, if any, to this plaintiff's disease.

Generally and with respect to plaintiffs, he may testify as to his review and interpretation of x-ray films, review and interpretation of pulmonary function testing, the nature and extent of any impairment or disability, whether a condition is progressive and whether other diseases or conditions are present in plaintiffs.

He will give an opinion that a plaintiff's use, installation, removal or contact, if any, with Buffalo Pumps' products cannot and did not cause or contribute and were not a substantial factor or producing cause of plaintiff's asbestos-related disease. He may further give an opinion that to the extent a plaintiff worked with products made only of chrysotile and which have low fiber release, such as gaskets and packing, those products would not have contributed to the risk of developing a mesothelioma, assuming such condition is confirmed.

Dr. Crapo's opinions and testimony will be based on his training, experience, education, publications and review of the medical, governmental and scientific literature and various air samplings studies, work facility inspections and documents, where applicable, as well as review of medical records, fiber burden or digestion studies, chest films, and all pathology materials, case depositions, including co-worker depositions, and other materials developed in discovery or otherwise.

1010325
Firm No. 15683

Based on his education, training, work experience, and review other medical/scientific literature, Dr. Crapo will render opinion testimony about the level of asbestos exposure in the ambient air and its effect on human health, if any.

Dr. Crapo has worked in the fields of inhalation toxicology and epidemiology. Based upon his work in these fields and his review of the literature, Dr. Crapo will give an opinion that the minimum cumulative level of asbestos exposure needed to cause asbestosis or lung cancer is at least 25 fiber years, i.e., the product of exposure (f/cc) over time (years), and that asbestos does not play a role in the development of lung cancer at cumulative asbestos exposure levels below 25 fiber years. Dr. Crapo will give opinion testimony, based on his work and his review of the medical literature, that exposure to pump gaskets and packing products will not cause or contribute to the development of mesothelioma. It is Dr. Crapo's opinion that, in the absence of long-term clearance, it would take an individual hundreds or even thousands of years of working with pump gaskets and packing to approach any level of appreciable risk of asbestos-related disease from using these gaskets and packing materials.

Dr. Crapo's opinion is that products used in connection with Buffalo Pumps are not unreasonably dangerous and pose no occupational hazard with foreseeable use in the workplace.

He may provide testimony and opinions reviewing and criticizing the opinions and testimony, including the basis therefor, of plaintiff's experts in this matter.

He will also provide testimony regarding historical literature and other applicable government regulations of asbestos and their importance to this defendant's products, including, but not limited to, the EPA and NESHAPS. He will provide an opinion that gaskets and packing products are not unreasonably dangerous. The basis for his testimony will be his experience, his education, research, testing, review of the appropriate scientific literature and review of case materials supplied to him.

Dr. Crapo will also give the following opinions: There is a dose-response relationship for development of any asbestos-related disease, and the dose is the most significant factor in causation of an asbestos-related disease. The risk is proportional to the dose: the greater the accumulated dose, the greater the risk. The dose is produced by various exposures accumulating over time. The dose is measured in fiber years, i.e., the product of exposure (f/cc) over time (years). As an example, an individual exposed at a continuous level of 1 f/cc for 20 years will have amassed 20 fiber years of exposure. There are threshold levels of dose necessary before asbestos diseases will develop. As an example, at least 20 fibers years of dose is required for the development of clinically and radiologically evident asbestosis. At the current OSHA PEL of 0.1 f/cc, it would take 200 years of exposure to accumulate 20 fiber years. It is Dr. Crapo's opinion that the best estimate of the threshold dose to cause mesothelioma is 5 fiber years for amphibole forms of asbestos and many fold higher than this for chrysotile forms of asbestos.

1010325
Firm No. 15683

It is also his opinion that the non-occupationally exposed general public is not at risk for the development of an asbestos-related condition or disease, even though there is asbestos in the ambient air. Thus, because of the large dose needed to cause an asbestos-related disease, a single asbestos fiber does not substantially contribute to disease.

Dr. Crapo believes to a reasonable degree of medical and scientific probability that the level of exposure, if any, to asbestos resulting from the use, handling, installation, and removal of asbestos-containing gaskets and packing is insufficient to provide a dose adequate to create risk of an asbestos-related disease, does not pose a risk to human health, and does not cause or substantially contribute to the cause of asbestos-related conditions or diseases.

15.    Michael A. Graham, M.D.
       Division of Forensic and Environmental Pathology
       St. Louis University School of Medicine
       1402 Grand Avenue Boulevard
       St. Louis, MO 63104
       (314) 577-8298

Dr. Graham is a pulmonary pathologist. Based on his review of medical records, including pathology materials, he will testify about the plaintiff's medical condition, and the cause of plaintiff's medical condition. His testimony will also include a discussion of asbestos and its effects on human health generally and plaintiff specifically, and the effect that other substances have on human health generally and plaintiff specifically.  Dr. Graham is a pathologist who will testify about asbestos-related diseases, causes of cancer, and the effect of other substances, such as cigarette smoke, on the plaintiff. Dr, Graham may also testify regarding the medical conditions of plaintiff based on review of medical records, x-rays, plaintiff's experts' reports and supplemental reports.

16.    J. Leroy Balzer, Ph.D.
       408 Horse Trail Court
       Walnut Creek, CA 94595
       (510) 2740826

Dr. Balzer is expected to testify concerning the types and characteristics of asbestos, as well as the pathogenic potential from exposure to asbestos fibers. He may also testify about the epidemiology of asbestos-related or associated diseases and the relevant medical and scientific literature in those subjects. He may also testify about concepts such as "dose-response and "latency" as they are related to the manifestation of asbestos-related or associated diseases. Dr. Balzer may also testify about the effects of other toxic substances on human physiology.

He may testify about toxicology, epidemiology and industrial hygiene generally and particularly as those disciplines and professions relate to asbestos fiber exposure in various work settings or environments, including those at issue in this matter. His testimony will include a

1010325
Firm No. 15683

discussion of the way asbestos-containing materials were used in general within the construction industry, and specifically as it relates to the present matter at the various times of interest.

He may also testify about statutes, regulations and relevant standards relating to asbestos exposure, including but not limited to Permissible Exposure Levels established by OSHA and Threshold Limit Values" established by the ACGIH. He may also testify concerning the importance and the use of Threshold Limit Values, Permissible Exposure Levels, and relevant state and federal regulations, including specifically those applicable to asbestos and asbestos exposures and others which might be applicable to the occupational settings in this action.

Dr. Balzer may also testify about the evolution of the role of industrial hygiene professionals in the management of industrial health concerns within the industry. Dr. Balzer will offer testimony and opinions concerning past and current industrial hygiene principles and practices in general and, in particular, with respect to asbestos. He may also testify concerning industrial hygiene issues and practices in various industrial settings relevant to the claims being asserted in this action.

He also may offer testimony concerning air-monitoring/air-testing in general and, in particular, air monitoring for levels of asbestos and other materials present in various occupational and non-occupational settings and in the ambient air. He also will discuss the results of studies which have been conducted for the purpose of determining the extent to which respirable asbestos fibers are released from various asbestos-containing materials, including pipe insulation materials, when those materials are installed, removed or otherwise handled in various occupational settings. He will also compare those results to the ambient or background levels as well as to the several current and former standards and regulations applicable to asbestos.

He may also testify concerning state of the art technical and scientific knowledge at times relevant to this lawsuit with respect to asbestos, asbestos exposures and related industrial hygiene practices, including but not limited to issues relating to an employer's duty to protect the health and safety of its workers. He may testify about the state of knowledge in his field, including the development of scientific knowledge concerning the relationship between exposure to asbestos at various levels and disease, the development of standards and regulations applicable to asbestos and other materials, the development of industrial hygiene procedures and technology and the role and impact of various studies, standard, regulations, reports and commentaries.

Dr. Balzer may also testify about the various duties imposed on employers concerning their employees as well as non-employees by various federal and state statutes and regulations, including but not limited to the OSHA.

1010325
Firm No. 15683

He may testify about and offer opinions regarding the merits of plaintiff's claims and the defenses offered by Buffalo Pumps, including his opinion on liability, damages and causation issues in this case. He may also testify as to any other matter raised by experts called by plaintiff, any co-defendant, or any other matter which he may be so qualified to testify.

The testimony and opinions of Dr. Balzer will be based upon his education, experience and professional training, his review of relevant scientific literature, his study and analysis of the composition and properties of the asbestos-containing materials at issue, and the testing of these and other materials, and his review of discovery, testimony, medical records and ACGIH and governmental standards and regulations.

17.    Larry R. Liukonen, CIH
       Technical Safety & Health Consulting, Inc. (TechCon)
       3605 West Pioneer Parkway, Suite D
       Arlington, TX 76013

Mr. Liukonen will offer testimony and opinions concerning past and current industrial hygiene principles and practices in general and, in particular, with respect to asbestos. He may also testify concerning materials used and industrial hygiene issues and practices in various industrial settings relevant to the claims being asserted in this action. He may also testify concerning the development, significance, and use of Threshold Limit Values ("TLVs"), Permissible Exposure Levels ("PELs"), and relevant state and federal regulations, including specifically those applicable to asbestos and asbestos exposures and others which might be applicable to the occupational settings in this action. He may also testify about the dose-response relationship between exposure to asbestos and the development of disease.

Mr. Liukonen also may offer testimony concerning air-monitoring, air-testing in general and, in particular, air monitoring for levels of asbestos and other materials present in various occupational and non-occupational settings and in the ambient air. He also will discuss the results of studies which have been conducted for the purpose of determining the nature and extent to which respirable asbestos fibers are released from various asbestos-containing materials, including but not limited to gasket and packing materials, when those materials are installed, removed or otherwise handled in various occupational settings. He will also compare those results to the ambient or background levels as well as to current and former standards and regulations applicable to asbestos.

Mr. Liukonen may also testify concerning state of the art technical and scientific knowledge at times relevant to this lawsuit with respect to asbestos, asbestos exposures and related industrial hygiene practices, including but not limited to issues relating to the development of and reliance on TL V s and PELs and the placement of warnings on products. He may testify concerning the state of knowledge in his field as reflected in the scientific and medical literature, including the development of scientific knowledge concerning the relationship between exposure to asbestos at various levels and disease, the development of

1010325
Firm No. 15683

standards and regulations applicable to asbestos and other materials, the development of industrial hygiene procedures and technology and the role and impact of various studies, standards, regulations, reports and commentaries. He may also discuss the effects that ventilation, distance from the source of exposure, and various work practices have on exposure levels.

He will render the opinion that the amount of respirable asbestos fibers which may be released from gasket and packing materials when installed, removed or otherwise handled in occupational settings in connection with a Buffalo Pumps product, including but not limited to those settings in which plaintiff allegedly worked, is minimal or non-existent, and, in any event, is inconsequential both as to persons working directly with the products and as to bystanders. He will also opine that such amounts will not materially exceed, if at all, existing ambient or background levels. Mr. Liukonen will opine that plaintiff's alleged exposure to asbestos fibers attributable to gasket and packing materials found in products of the type manufactured by Buffalo Pumps would not have exceeded the applicable TLV or PEL. He will also opine that such exposures do not trigger and/or would not have triggered statutory duties under the Occupational Safety and Health Act (OSHA), including the duty to provide an asbestos-related health warning with such products.

It is also anticipated that Mr. Liukonen will provide testimony and opinions in rebuttal to that of fact and/or expert witnesses called by plaintiff who offer testimony in these or in related fields. He may also offer opinions regarding the merits of plaintiff's claims and the defenses offered by Buffalo Pumps, including opinions on liability and causation.

Mr. Liukonen's testimony and opinions will be based upon his education, experience and professional training, his review of relevant scientific literature, his study and analysis of the composition and properties of gaskets and packing, and the testing of these and other materials, and his review of discovery, testimony, medical records and ACGIH and governmental standards and regulations.

18.     Dr. Tim Oury
        University of Pittsburgh
        Department of Pathology, S-737 Scaife Hall
        3550 Terrace Street
        Pittsburgh, Pennsylvania

Dr. Oury is a specialist in pulmonary pathology. He may testify as to all matters pertaining to his review/examination of the plaintiff's pathological tissue samples, autopsy results, and medical records to offer medical opinion regarding asbestosis diagnosis and cancer. He may also testify as to the physiological design and function of the lungs, the effect of asbestos on the lungs and other parts of the body, and on the body's defense mechanisms. He may also testify concerning the scientific literature on the biological and toxicological effects of asbestos. He may also testify about the body's biologic responses to asbestos and all types of

1010325
Firm No. 15683

cancer risks from asbestos exposure. Dr. Oury may further testify as to the facts and circumstances regarding the nature of the injuries and damages that are the subject of this action. He may also testify about the contribution of smoking or other exposures to the plaintiff's condition. Dr. Oury may testify about the medical literature.

      19.    Donna Ringo, CIH
              DMR Associates
              604 Peiurroyal Way
              Louisville, KY 40223
              (502) 245-5289

Ms. Ringo is a certified industrial hygienist. She will provide testimony regarding her experience and her studies relating to asbestos-containing gasket and packing material and will provide opinions that these products have been, and still are, used safely in a workplace environment, that they are not unreasonably dangerous, that they do not pose an occupational hazard and that no warning label is required to be placed on them. Further details of her background are contained in her CV, which has been or will be provided to plaintiff's counsel.

Ms. Ringo will give testimony on the fiber release from gasket and packing products in the occupational setting. She may testify regarding exposure assessments performed on such products, including assessments and testing she has performed on asbestos-containing gasket and packing materials. She may rely on the testing done by, among others, Mr. Mangold, Mr. Boelter, Mr. Spencer and Mr. Liukonen. Such testing will be listed in defendant's exhibit lists and are incorporated by reference.

She has been or will be provided with product exposure information and other case specific data in this case, including, but not limited to, the plaintiff and co-worker affidavits and depositions. She will review plaintiff's alleged exposures, if any, to asbestos-containing components of pumps as well as plaintiff's exposure to other manufacturers' products. She may quantify plaintiff's alleged exposure to the asbestos-containing pump components, as well as exposures to asbestos-containing products manufactured by other companies, and provide opinions regarding the significance of each exposure. She has also reviewed and will rely upon air sampling data and other literature regarding exposure to the asbestos-containing products. She will discuss historical uses of asbestos-containing pump components and asbestos-containing products and how they are used and/or manufactured. She may quantify exposures to all asbestos-containing products to which plaintiff may have been-exposed and discuss the distinction between friable and non-friable products. Ms. Ringo's opinion is that because gasket and/or packing products are encapsulated, any potential fiber release from the products are equal to, or less than, background exposure levels. Ms. Ringo's opinion is that asbestos-containing gasket and packing do not create an occupational hazard. Ms. Ringo's opinion is that working with or nearby to Buffalo pumps presented personnel no harmful airborne asbestos exposure from the associated asbestos-containing gaskets or packing. The contribution of the asbestos fibers to personnel from gasket and packing was so insignificant that the cumulative

1010325
Firm No. 15683

fiber dose would not have been discernible from ambient exposure that the general population incurs on a daily basis. Ms. Ringo will testify and opine that foreseeable use of Buffalo pumps do not cause any occupational hazard. She will further opine that there was no duty to warn associated with gaskets and packing. She may also provide testimony regarding asbestos-containing pump components, how they are used in the workplace and, specifically, plaintiff's workplace. She will provide testimony about the type of asbestos fiber and other fiber used in fluid sealing and/or packing products as applicable to this case. She will also testify about the types of asbestos fibers found in other companies' products.

She will discuss ambient air exposure to asbestos, the sources of ambient air asbestos exposure, quantification studies and the presence of asbestos in drinking water and provide her opinion that these exposures, if any, are not harmful or hazardous. Ms. Ringo's opinion is that exposure to asbestos-containing pump components is comparable to ambient air exposure. She may discuss general re-entrainment theory.

She will further provide testimony about the role of the industrial hygienist in assessing risk, generally, and with respect to asbestos-containing products. She will provide current and historical information regarding air and dust sampling methods for asbestos in occupational settings, including, but not limited to, the NIOSH 7400 and 7402 methods, the OSHA reference method, as well as EPA, AHERA and ASTM methods. She will provide expert testimony on the proper use and application of all such methodologies. She will also provide testimony regarding the proper and improper methods for occupational sampling of asbestos. She may also provide testimony that the use of settled dust methods or Tyndall or refractive light methods do not provide a proper scientific basis for sampling and have no value in assessing occupational risk to asbestos exposure.

She will provide testimony that the standard and accepted occupational exposure methodologies for asbestos require the use of validated scientific air sampling and analytical methods. She will testify that the standards for occupational exposure determination to asbestos are the NIOSH and OSHA established methods. In this methodology, air samples are collected in conformance with the OSHA methodology which has specific criteria for air sampling, filter preparation and fiber counting rules. Scientifically reliable samples are prepared by "direct" preparation techniques as opposed to "indirect" preparation techniques and are counted by phase contrast microscopy (PCM).

She will evaluate, review and provide comments on the tests performed on gaskets and packings by others, including plaintiff's experts.

She will further provide testimony regarding governmental regulations affecting maximum allowable concentrations or asbestos exposures in an occupational setting. She will also provide testimony regarding the ACGIH threshold limit values. She will provide opinions that any exposure to the asbestos-containing components contained within industrial pumps

1010325
Firm No. 15683

are below the current, and all historical, permissible exposure limits, excursion and short-term limits and are subject to the warning label exemption of OSHA.

She will testify that the current regulation for the industry is found at 29 CFR 1910.1001 and the regulation for construction trades is found at 29 CFR 1926.1101. The current OSHA permissible exposure level, published in 1994, is 0.1 fibers per cubic centimeter (f/cc), as an eight-hour time weighted average. The OSHA permissible level from 1986 to 1994 was 0.2 f/cc, as an eight-hour time weighted average. The OSHA permissible level from 1976 to 1986 was 2 f/cc, as an eight-hour time weighted average. The OSHA permissible level from 1971 to 1976 was 5 f/cc, as an eight-hour time weighted average. She may also provide testimony regarding historical literature and other applicable government regulations of asbestos and their importance to pump components, including, but not limited to the EPA and NESHAPS. The basis for her testimony will be her experience, education, research, testing, review of the appropriate scientific literature and, review of case materials supplied to her.

Ms. Ringo will give testimony on the typical methods for installation and removal of gaskets and/or packing from Buffalo Pumps products.

She may provide testimony and opinions reviewing and criticizing the opinions and testimony, including the bases therefor, of plaintiff's experts in this matter. She may also provide certain testimony regarding the state of the art of knowledge and literature regarding alleged asbestos fiber exposure risks from pumps, gaskets, and packing. She will opine that gasket and packing exposures have not been, and are not understood to present significant or serious asbestos exposure risks.

> 20.    John Spencer
>        Environmental Profile, Inc.
>        813 Frederick
>        Baltimore, Maryland 21228
>        (410) 744- 0700

John Spencer is a certified industrial hygienist and certified safety professional. He will provide testimony regarding his experience and his testing of pump components and will provide opinions that these products have been, and still are, used safely in a workplace environment, that they are not unreasonably dangerous, that they do not pose an occupational hazard and that no warning label is required to be placed on them.

He will give testimony on the fiber release from pump components in the occupational setting. He will testify regarding exposure assessments performed on pump components. He will rely on the testing done by Mr. Mangold, Mr. Boelter, Ms. Ringo, Mr. Balzer and Mr. Liukonen to the extent they have conducted such testing.

1010325
Firm No. 15683

He has been or will be provided with product exposure information and other case specific data in this case, including, but not limited to, plaintiff's deposition and co-worker depositions. He will review plaintiff's exposures, if any, to pump components as well as plaintiff's exposure to other manufacturers' products. He will quantify plaintiff's exposure to pump components, as well as exposures to asbestos-containing products manufactured by other companies, and provide opinions regarding the significance of each exposure. He has also reviewed and will rely upon air sampling data and other literature regarding exposure to other asbestos-containing products. He will discuss historical uses of pump components and how they are manufactured. He will quantify exposures to all asbestos-containing products to which plaintiff may have been exposed and discuss the distinction between friable and non-friable products. Mr. Spencer's opinion is that because pump components are encapsulated and blended with other agents, fiber release is controlled well below levels known to cause adverse health effects. Mr. Spencer's opinion is that pump components do not create an occupational hazard. Mr. Spencer will testify that foreseeable use pump components do not cause any occupational hazard. He will also provide testimony regarding pump components, how they are used in the workplace and, specifically, plaintiff's workplace. He will provide testimony about the type of asbestos fiber and other fiber used in pump components as applicable to this case. He will also testify about the types of asbestos fibers found in other companies' products.

He will discuss ambient air exposure to asbestos, the sources of ambient air asbestos exposure, quantification studies and the presence of asbestos in drinking water and provide his opinion that these exposures, if any, are not harmful or hazardous. Mr. Spencer's opinion is that exposure to pump components is comparable to ambient air exposure. He may discuss re-entrainment and fiber drift.

He will further provide testimony about the role of the industrial hygienist in assessing risk, generally, and with respect to asbestos-containing products. He will provide current and historical information regarding air and dust sampling methods for asbestos in occupational settings, including, but not limited to the NIOSH 7400 and 7402 methods, the OSHA reference method, as well as EPA, AHERA and ASTM methods. He will provide expert testimony on the proper use and application of all such methodology. He will also provide testimony regarding the proper and improper methods of occupational sampling of asbestos. He may also provide testimony that the use of settled dust methods or Tyndall or refractive light methods do not provide a proper scientific basis for sampling and have no value in assessing occupational risk to asbestos exposure.

He will provide testimony that the standard and accepted occupational exposure methodologies for asbestos require the use of validated scientific air sampling and analytical methods. He will testify that the standards for occupational exposure determination to asbestos are the NIOSH and OSHA established methods. In this methodology, air samples are collected in conformance with the OSHA methodology, which has specific criteria for air sampling, filter preparation and fiber counting rules. Scientifically reliable samples are prepared by "direct"

1010325
Firm No. 15683

preparation techniques as opposed to "indirect" preparation techniques and are counted by phase contrast microscopy (PCM).

He will provide testimony, reviewing and criticizing the tests, if any, performed by others, including plaintiff experts. He will further provide testimony regarding governmental regulations affecting maximum allowable concentrations or asbestos exposures in an occupational setting. He will also provide testimony regarding the ACGIH threshold limit values. He will provide opinions that any exposure to pump components of this defendant are below the current, and all historical, permissible exposure limits, excursion and short-term limits and are subject to the warning label exemption of OSHA.

He will testify that the current regulation for the industry is found at 29 CFR 1910.1001 and the regulation for construction trades is found at 29 CFR 1926.1101. The current OSHA permissible exposure level, published in 1994, is 0.1 fibers per cubic centimeter (f/cc), as an eight-hour time weighted average. The OSHA permissible level from 1986 to 1994 was 0.2 f/cc, as an eight-hour time weighted average. The OSHA permissible level from 1976 to 1986 was 2 f/cc, as an eight-hour time weighted average. The OSHA permissible level from 1971 to 1976 was 5 f/cc, as an eight-hour weighted average.

He will also provide testimony regarding historical literature and other applicable government regulations of asbestos and their importance to this defendant's products, including, but not limited to the EPA and NESHAPS. He will provide an opinion that thermal insulation products have the potential to present excessive exposures if disturbed or mishandled. Mr. Spencer's opinion is that pump components handled by accepted trade practices do not cause an occupational hazard. The basis for his testimony will be his experience, his education, research, testing, review of the appropriate scientific literature and, review of case materials supplied to him.

Mr. Spencer will give testimony on the typical methods for installation and removal of pump components.

21.     William Dyson, Ph.D.
         Workplace Hygiene, L.L.C.
         6518 Bryan Blvd., Suite 203
         Greensboro, NC 27409
         (336) 931-0300

Dr. Dyson is a certified industrial hygienist. He will testify concerning the history of industrial hygiene, industrial hygiene methods, and threshold limits and permissible exposure levels as promulgated by private organizations and government agencies. Dr. Dyson may also testify regarding the level of fiber release, if any, from operations involving various asbestos-containing products, including but not limited to gaskets and packing products. Dr Dyson may testify about uses of and work practices concerning these products. Dr. Dyson may also testify

1010325
Firm No. 15683

concerning OSHA and EPA reports, statements, guidelines, and regulations concerning asbestos-containing products. He may also testify about the levels of exposure to asbestos-containing products to the plaintiff during his employment. He may also discuss the state of the art as to asbestos diseases from both the medical and scientific standpoint.

22.     Malcolm MacKinnon, III
        MSCL, LLC - International Maritime Consultancy
        1414 Prince Street, Suite 310
        Alexandria, Virginia 22313-0028
        (703) 549-7577

Malcolm MacKinnon, III is a retired Rear Admiral of the United States Navy, in which he served between 1955 and 1990. He began his Navy career in 1955, immediately after receiving a Bachelor of Science degree in Naval Engineering from the United States Naval Academy at Annapolis, Maryland. Admiral MacKinnon also received two degrees from the Massachusetts Institute of Technology, a Master of Science in Naval Architecture and Marine Engineering, and a Naval Engineer's degree. Upon his retirement from the Navy, Admiral MacKinnon was Vice Commander of the Naval Sea Systems Command (NAVSEA) and also held the title Chief Engineer of the Navy. As Chief Engineer, he had overall responsibility for all matters technical in the Navy pertaining to ships and ship systems. During his career, Admiral MacKinnon held numerous positions including, but not limited to, the following: Production Officer at the Pearl Harbor Naval Shipyard, Engineering and Quality Assurance Officer in the Office of the Supervisor of Shipbuilding, Conversion and Repair at Groton, CT, and Ship Superintendent and Type Desk Officer at the San Francisco Naval Shipyard. Further details of his background are contained in his CV, a copy of which has been or will be provided to plaintiff's counsel as appropriate.

Admiral MacKinnon will also review and offer testimony with respect to plaintiff's naval service history and duties, plaintiff's alleged exposures, if any, to asbestos-containing packing and gaskets supplied by Buffalo Pumps as a component part of products that it manufactured, as well as plaintiff's alleged exposure to other manufacturers' products during his Navy service. He will discuss historical uses, operations, and handling of Buffalo Pumps' products aboard U.S. Navy vessels, including any vessels on which plaintiff served. He will testify with respect to the service record, history, design, layout, purpose, operation, equipment, and function of the U.S. Navy ships on which plaintiff served. He will provide opinions and testimony regarding a seamen's actual and potential exposure from products manufactured and supplied by Buffalo Pumps during reasonably foreseeable and anticipated use or uses of such products. In so doing, he may also rely on the testing performed by other experts, as well as data and literature available with respect to the asbestos-containing products at issue in this case.

Admiral MacKinnon will offer testimony in this matter relating to the level of supervision and control exercised by the U.S. Navy over the design and manufacture of equipment intended for installation on U.S. Navy vessels. In that regard, Admiral MacKinnon has personal knowledge of and experience with the comprehensive plans, specifications and requirements, which

1010325
Firm No. 15683

governed suppliers and vendors of equipment for use aboard Navy ships. More particularly, Admiral MacKinnon will testify and offer opinions that any and all work performed on pumps or similar equipment built and supplied for Navy ships by vendors such as Buffalo Pumps was performed to meet very specific and detailed requirements specified by the Navy, and that prior to the mid-1960s, the work was reviewed and inspected by Navy personnel in the vendor's plant. Since the mid-1960s, the work has been reviewed and inspected by a combination of Navy and Department of Defense personnel. In the shipbuilding yards, the work, including the installation of pumps or similar equipment, has always been reviewed and inspected by Navy personnel. In many instances, Admiral MacKinnon personally inspected equipment to verify conformance with the requirements specified, although more immediate oversight typically was exercised by officers and other Navy personnel under the Admiral's command or the command of NAVSEA or its predecessor, the Bureau of Ships (BUSHIPS).

Admiral MacKinnon will testify that pumps or similar equipment built for Navy vessels, including Buffalo Pumps were manufactured according to plans and specifications prepared, written and issued exclusively by the Navy, specifically NAVSEA or BUSHIPS. Having served as Chief Engineer and Deputy Commander for Ship Design and Engineering in NAVSEA, Admiral MacKinnon was responsible to the Commander of NAVSEA for developing ship designs and for overall technical support of the operating fleet, for maintenance of ships, and for ships under construction. Additionally, he was responsible for the maintenance of naval ship military specifications and for monitoring compliance with the specifications by all vendors and contractors of naval equipment.

The chain of command within the Navy concerning ship construction involves several layers of authority, particularly in the lines of command for technical and contractual control over Navy shipbuilding. Ultimately, the Secretary of the Navy has authority over the Navy and Navy shipbuilding; immediately below the Secretary, as has been the case since the creation of NAVSEA, is the Chief of Naval Operations ("CNO"), to whom NAVSEA reports.

Prior to the inception of NAVSEA, BUSHIPS controlled all Navy ship design and construction and reported to the CNO as well as a civilian Assistant Secretary. Since the creation of NAVSEA, NAVSEA reports to the CNO for all military ship design and construction.

Under the command of NAVSEA, as was the case with BUSHIPS, the Navy's shipbuilding organization included several divisions and levels of authority concerning ship design, construction, repair and inspection. Technical and contractual control over shipboard equipment and material was directed by the Chief of the BUSHIPS and the Chief of the Bureau of Supply and Accounts. Each of these two organizations had oversight responsibility concerning pumps or similar equipment built for Navy vessels. Compliance with the standards and specifications required for pumps or similar equipment built for Navy use was directly monitored by Naval Machinery Inspectors under both of these divisions: the Machinery Inspectors .under Naval Supply worked on-site at the vendor's manufacturing facility, and the Machinery Inspectors under BUSHIPS carried out their responsibilities at the shipbuilding yards. Moreover, after the

1010325
Firm No. 15683

mid-1960s, it was common for Directors of both the Machinery and Propulsion Equipment Groups and the Head of the Steam Turbine Branch to inspect the manufacturing process at a plant where equipment was manufactured to Navy specifications. The Machinery Inspectors ultimately worked for the Secretary of the Navy or the Secretary of Defense. These Inspectors exercised primary, front line control over the work performed for the Navy by manufacturers such as Buffalo Pumps in the production of pumps or similar equipment.

The most direct interaction between the Navy and Buffalo Pumps equipment, such as pumps or similar equipment, usually existed between Buffalo Pumps' engineers and Naval Machinery Inspectors, some of whom worked under authority of the Defense Logistics Agency (DLA) or its predecessor, BUSANDA, and others under authority of the Commander of NAVSEA or its predecessor, BUSHIPS. The Naval Machinery Inspectors were responsible to the Head of the Inspection Department for assuring that contractors such as Buffalo Pumps followed the required contract specifications as they relate to naval machinery. Further, the Naval Machinery Inspectors would report to their superiors any violations or failures to comply with specifications.

In addition, Admiral MacKinnon can attest that specifications for any equipment intended for use aboard a U.S. Navy ship, known as "MilSpecs," were drafted, approved and maintained by the Navy, specifically NAVSEA. MilSpecs were intended to address shipboard equipment and materials requirements, and any changes to those specifications were made by the Navy. NAVSEA maintained and controlled the MilSpecs largely because it had superior knowledge of the demands and requirements of combat-ready vessels. NAVSEA or BUSHIPS also prepared contract specifications which incorporated the MilSpecs. These specifications reflected the state of the art and the special needs of naval vessels, including the safety and protection of U.S. Navy sailors aboard fighting ships.

The specifications were communicated to Buffalo Pumps and other similar vendors when the Navy issued its Request for Proposal for certain equipment. Admiral MacKinnon will testify and offer opinions with respect to the creation, formation and enforcement of Ship Design and Naval Machinery Military Specifications, as well as Navy Ship Design/Construction Procedures, which explain how the Navy's machinery vendors were governed by the Navy's specifications. He will further testify and offer opinions with respect to those MilSpecs, which were applicable to vendors such as Buffalo Pumps including MilSpecs applicable to pumps or similar equipment, gaskets, and packing.

He will further testify that manufacturers of equipment, such as pumps or similar equipment were not necessarily also the suppliers of gasket and packing materials used to replace gasket and packing in original equipment. Thus, replacement of the original gaskets and packing within the equipment would be accomplished with products from other suppliers, not the original manufacturer. He will testify that the Navy did not consult the manufacturers of original equipment regarding the supply or replacement gaskets and packing that would be used in connection with that equipment.

1010325
Firm No. 15683

Similarly, he will testify that manufacturers of original equipment were not necessarily the suppliers of insulation products applied to such original equipment by the Navy after installation. Thus, other suppliers -- not the original manufacturer -- provided any insulation products that may have been used in relation to the original equipment, including pumps or similar equipment. He will testify that the Navy did not consult the manufacturers of original equipment regarding the use or installation of insulation materials to be used in connection with that original equipment.

The Navy also employed inspectors of material who reviewed material used in both the vendor's plant and in the shipbuilding yards prior to acceptance. As a Navy engineer, Admiral MacKinnon was often called upon to assist inspectors in determining conformance of the shipbuilder and the vendors to drawings and specifications prior to acceptance.

NAVSEA and BUSHIPS maintained in their command engineers highly qualified in specialty areas such as pumps or similar equipment, steam turbines, gas turbines, reduction gears, and other ship propulsion and auxiliary equipment. These engineers have control over the technical aspects of military specifications that concern their area of expertise. In addition, NAVSEA and BUSHIPS have always had an Engineering Standards Group to help manage the large number of specifications and contract plans that exist. Changes to specifications are continually under review as new technology and construction techniques evolve.

The U.S. Navy had precise specifications as to the nature of any communication affixed to or made a part of any machinery supplied by equipment manufacturers and vendors such as Buffalo Pumps to the Navy. Admiral MacKinnon will testify and offer opinions that vendors, such as Buffalo Pumps would not have been permitted, under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to vary or to deviate in any respect from the Navy specifications in supplying equipment, including affixing any type of warning or caution statement to equipment intended for installation onto a Navy vessel, beyond those required by the Navy without prior discussion and approval by the Navy.

The U.S. Navy had precise specifications as to the nature of written materials to be delivered with machinery supplied by equipment manufacturers such as Buffalo Pumps to the Navy, which included engineering reference materials to assist the engineering staff in servicing and maintaining such equipment, which are and were generically known as "instruction books" or "technical manuals." The Navy required that every piece of equipment be supplied with a defined number of copies of one or more technical manuals. Navy personnel participated intimately in the preparation of this kind of information in a standardized format used by the Navy. These manuals included safety information to the extent - and only to the extent - directed by the Navy. Buffalo Pumps would not have been permitted, under the specifications, associated regulations and procedures or under the actual practice as it evolved in the field, to include any type of warning or caution statement in instruction books or technical manuals,

1010325
Firm No. 15683

beyond those required and approved by the Navy without prior discussion and approval by the Navy.

Generally, the Navy had ultimate control over the nature and type of any equipment-related, safety warnings communicated to Navy personnel. He will testify with respect to general exchange of information and/or communications between the U.S. Navy and Buffalo Pumps with respect to the specification and use of asbestos-containing gaskets and packing used in Navy pumps or similar equipment, as well as the Navy's further development and modification of the pertinent specifications in the late 1980s and early 1990s.

Mr. MacKinnon will be made available for a deposition at a reasonable time upon reasonable notice to counsel for Defendant and he is tendered to plaintiff's counsel for such a deposition.

23.     Frederick M. Toca, Ph.D.
        Atlantic Environmental Inc.
        2 East Blackwell Street
        Dover, NJ 07801
        (973) 366-4660

Dr. Toca is a toxicologist and certified industrial hygienist with a background in the prevention of adverse health effects and injuries in the workplace. He is experienced in evaluating the workplace for potential hazards by analyzing work practices, measuring and evaluating exposures to various substances, and determining, then controlling the nature and extent of health risk in occupational settings. Dr. Toca may testify as to the state of the art with respect to asbestos in the field of industrial hygiene, and in particular the evolution of knowledge regarding the effects of asbestos exposure and its control during the time period relevant to this case. He may also testify as to the development and utility of methodologies for identifying and measuring asbestos in air, dust and products, and the setting of protective levels for asbestos exposure. He may also testify regarding the evolution of various standards for exposure to asbestos.

Dr. Toca may discuss the relationship between scientific knowledge and the development of public policy and standards relating to asbestos exposure, and all aspects of government regulation of asbestos exposure. He may testify as to industrial hygiene practices relating to asbestos, including but not limited to use of asbestos-containing products on work sites and construction sites, and assessment of the risk of exposure under various circumstances. He may also testify about the development of knowledge regarding the dose-response relationship between exposure to asbestos and disease, and other related matters. Dr. Toca may also testify regarding the potential for exposure associated with gaskets or packing, and may express opinions regarding plaintiff's exposure, if any, from such activities. He may also testify regarding the potential for, or plaintiff's actual, exposure during other activities.

1010325
Firm No. 15683

Dr. Toca may comment upon and/or respond to expert testimony or opinion offered on behalf of plaintiff in this case, including but not limited to testimony, if any, regarding state of the art, the evolution of knowledge of the effects of asbestos exposure, standards and regulations applicable to asbestos exposure. He also may comment on, critique or analyze the methodology, protocol or other basis for such expert testimony or opinion.

Dr. Toca may comment about testing done by or on behalf of plaintiff, including critique and analysis of the sampling methodologies and analysis, protocols and scientific basis for the tests, and the accuracy of the testing in reproducing field conditions. He may comment upon or analyze asbestos exposures described by plaintiff in this case.

24.     Morton Corn
        Morton Corn & Associates, Inc.
        3208 Bennett Point Road
        Queenstown, Maryland 21658-1126

Dr. Corn may offer testimony concerning industrial hygiene in general and, in particular, industrial hygiene practices with respect to asbestos exposures in specific industries and crafts. He may also testify as to the plaintiff's or workers' exposure to asbestos or other substances. He may testify as to the potential of exposure, or lack thereof, of workers outside of the immediate zone of use of asbestos-containing products. He may testify concerning the development and use of Threshold Limit Values and the promulgation of regulations, both on a state and federal level, concerning the use of asbestos and asbestos exposures in occupational settings. He may also offer testimony concerning air-monitoring/air-testing in general, and, in particular, air-monitoring for levels of asbestos present in various occupational settings. He may also testify concerning state of the art medical, technical and scientific knowledge at times relevant to this lawsuit with respect to asbestos, asbestos exposures and related industrial hygiene practices.

25.     Roger Home, Jr. - Rear Admiral, USN (Ret.)
        1900 Tekiu Road NW
        Seabeck, WA 98380
        (360) 830-2067

Roger Bigelow Home Jr. is a Retired Rear Admiral of the United States Navy. With his Bachelor of Science in Naval Engineering from the U.S. Naval Academy and Masters in Mechanical Engineering from the U.S. Naval Postgraduate School, he has experience in full working procedures and the requirements of the U.S. Navy, including the workings and relationship between the U.S. Navy and its contractors/vendors. He further has experience and background in the design, construction and maintenance of naval and commercial vessels and their accompanying equipment, including specifications and regulations regarding the installation, maintenance and repairs of same. He also has experience in the research and analysis of naval and maritime shipbuilding records from various national and federal resources. It is anticipated that he will provide testimony regarding the nature and kinds of equipment

1010325
Firm No. 15683

manufactured by Buffalo Pumps, if any, on various ships upon which plaintiff served. He may further testify about the various job duties and tasks in which the plaintiff may have engaged based upon plaintiff's classification, naval regulations and requirements for machinery, tradesmen, shipbuilding and any technical manuals related to equipment onboard naval vessels. He may testify and offer opinions, based upon his education, experience and personal training, on his review of maintenance records of the various vessels on which plaintiff alleges exposure, those vessels' histories, and his general knowledge concerning the maintenance procedure, aboard ships, that is, more likely than not that any asbestos-containing components within defendant's machinery, if any, would have been replaced numerous occasions prior to plaintiff's alleged exposure with materials manufactured and supplied by entities other than the defendant. He may also testify generally with regard to the promulgation and use of military specifications and "qualified products lists" by the U.S. Navy and the shipbuilding industry. He may also testify about the Naval regulations regarding the use of, placement of and repairs or maintenance of asbestos products generally and the Naval regulations regarding such maintenance, technical manuals and warnings permitted by the Navy. He may further testify regarding the likelihood or non-likelihood of plaintiff's work on or involvement with any machinery manufactured by Buffalo Pumps on board ship. He may further testify regarding the knowledge of the U.S. Navy of the dangers of asbestos materials and the Navy's efforts in dealing with warnings regarding same. He may further testify regarding issues surrounding warnings of the dangers of asbestos either by the Navy or governmental contractors or vendors.

Furthermore, he may also testify that precise specifications, which were known as Navy Specifications or Military Specifications (collectively, "MilSpecs"), for equipment installed aboard U.S. Navy vessels, including but not limited to the machinery at issue herein, were drafted, approved and maintained by the Navy. Admiral Home may also testify that such equipment would have required inspection and approval by Navy personnel to insure compliance with applicable MilSpecs before such equipment would have been installed on Navy vessels. He may also provide testimony, either live or by deposition, for the purpose of authenticating military specifications and qualified products lists relevant to products at issue in this lawsuit. Admiral Home may also testify and offer opinions, either live or by deposition, about requirements and practices pertaining to ship design and construction in general, and/or the design and construction of the ship(s) at issue in this lawsuit. He may also testify and offer opinions about shipbuilding and procurement practices and policies at shipyards in general and/or at specific shipyards which may be at issue in this lawsuit. It is also anticipated that he will provide testimony in rebuttal to that of fact and/or expert witnesses called by the plaintiff who offer testimony in these or related fields. He will base his testimony on their education, experience, research and review of relevant scientific and technical literature concerning the above topics.

1010325
Firm No. 15683

26.    Alan Gibbs, M.D.
        Department of Pathology
        Landough Hospital
        Penarth Glamorgan, United Kingdom CF71XX

Dr. Gibbs is a pathologist who may testify concerning the diagnosis or lack thereof of an asbestos-related disease, based upon the medical records of plaintiff, including but not limited to, tissue and/or slides that he will review. Further, he may testify on matters pertaining to the diagnosis of asbestos-related disease generally and the diagnosis of the condition of the plaintiff in this case specifically.

27.    Dr. David Weill
        7777 Forest Lane
        Dallas, Texas 75230
        (972) 566-4866

Dr. Weill is a pulmonary disease specialist. He may testify about the medical condition of the plaintiff and about asbestos-related diseases. He may also testify generally about the anatomy and function of the respiratory and circulatory system; the nature of asbestos; the symptomatology, disease process and diagnosis of asbestosis and cancer; the nature and extent of medical and scientific knowledge regarding any association of abstractive pulmonary disease with asbestos fiber exposure; the effect of exposure to substances other than asbestos and the development of respiratory ailments; methods of diagnosis of various respiratory diseases; incidence of lung cancer among individuals with asbestosis; cigarette smoking and its effect on the lung; the effect of asbestosis on disability and life expectancy; the toxicity of various asbestos fibers; and the lack of a relationship between the presence of pleural plaques and a later development of any form of cancer. Likewise, he may testify about scientific knowledge, research and study regarding exposure to asbestos and its effects on the human body; the latency periods of asbestos-related diseases; the various types of asbestos fibers and their effects on the human body; and the effects of exposure of the chrysotile fiber in regard to asbestos-related diseases.

28.    Dr. Andrew Marc Churg
        Department of Pathology
        University of British Columbia
        2211 Westbrook Mall
        Vancouver, British Columbia, Canada V6TIWS
        (604) 228-7111

Dr. Churg is a pathologist who may testify concerning the diagnosis or lack thereof of an asbestos-related disease based upon the medical records of plaintiff, including, but not limited to, tissue and/or slides. Further, he may testify on matters pertaining to the diagnosis of

1010325
Firm No. 15683

asbestos-related disease generally and the diagnosis of the condition of plaintiff in this case specifically.

29.    Harry Demopolous, M.D.
New York University Medical Center
550 First Avenue
New York, New York 10016
(212) 263-6314

Dr. Demopolous may testify about the state of the scientific and medical knowledge concerning asbestos. Included in his testimony may be discussion of the respiratory system, asbestos-related diseases, and the effect of other substances on the respiratory system. He may testify about the medical condition of plaintiff and about asbestos-related diseases. He may testify generally about the anatomy and function of the respiratory and circulatory system; the nature of asbestos; the symptomatology, disease process and diagnosis of asbestos and cancer; the nature and extent of medical and scientific knowledge regarding any association of obstructive pulmonary disease with asbestos fiber exposure; the effect of exposure to substances other than asbestos and the development of respiratory ailments; methods of diagnosis of various respiratory diseases; incidence of lung cancer among individuals with asbestosis; cigarette smoking and its effect on the lung; the effect of asbestosis on disability and life expectancy; the toxicity of various asbestos fibers; and the lack of a relationship between presence of pleural plaques and a later development of any form of cancer. Further, he may testify about the probable time period(s) of asbestos exposure with regard to the causation of mesothelioma and other asbestos-related diseases and may provide percentages of probability of causation for exposure to asbestos from first exposure to last exposure.

30.    William Hughson, M.D.
3969 4th Avenue
San Diego, California 92103
(619) 294-6206

Dr. Hughson may testify on the scientific and medical state of the art in the history and knowledge of asbestos-related diseases and asbestos-related diseases in general, and the medical condition of plaintiffs. He may also testify regarding epidemiology and general medicine regarding asbestos exposure. He may also testify about the probable time period(s) of asbestos exposure with relation to the causation of mesothelioma and other asbestos-related diseases and may provide percentages of probability of causation for exposure to asbestos from first exposure to the last exposure.

1010325
Firm No. 15683

    31.    Carl A. Mangold, CIH
             3033 170'x' Place, S.E.
             Bellevue, Washington 98008
             (425) 747-9620

Mr. Mangold may testify about product composition; the manner in which products historically have been processed and used; and the chronology and meaning of governmental and other regulations regarding permissible levels of airborne asbestos fibers. He may also testify regarding the potential for asbestos exposure resulting from work on and in the vicinity of gasket and packing materials based on various testing and studies, including his own, on this topic. He may testify regarding the historical development of knowledge regarding the risks, if any, associated with asbestos-containing gasket and packing materials. He may testify, based on his professional background and experience, regarding the use of asbestos and asbestos-containing products by the United States Navy, including the development of the Navy's awareness of asbestos-related health concerns and the response of the Navy with respect to asbestos generally and to specific products. He may testify regarding his personal involvement in such activities at various Navy facilities.

    32.    David P. Sargent, Jr.
             SET Associates
             P.O. Box 1466
             Great Falls, VA 22066-1466

    A.    Background

David P. Sargent, Jr. is a retired Rear Admiral of the United States Navy. He began his Navy career in 1967, after receiving a Bachelor of Science degree in Mechanical Engineering from Cornell University. Upon commissioning in the Navy, Admiral Sargent attended the Pacific Fleet Chief Engineer School in a course focused on the maintenance of engineering plants of World War II era steam propulsion ships. Admiral Sargent also received a Master of Engineering degree from the Naval Postgraduate School, Monterey, California, in 1974. In addition, Admiral Sargent is a licensed Professional Engineer with extensive operational experience in ship engineering, ship maintenance, and at-sea operations.

Following twenty years of operational experience in warships, Admiral Sargent held a variety of program and technical management positions in the Naval Sea Systems Command program offices responsible for the design, construction, introduction, and support of new warships from 1988 until his retirement in 1999. Upon selection to Rear Admiral in 1994, he was assigned as Commander, Naval Surface Warfare Center, a diverse organization of research laboratories and engineering stations responsible for research and development of all technical aspects of U.S. Navy surface ships and submarines. His final tour before retirement was Program Executive Officer (PEO) for Aircraft Carriers, Expeditionary Warfare and Auxiliary ships. In this position, he had the overall responsibility of all matters relating to both the technical and

1010325
Firm No. 15683

programmatic details of design, construction, delivery and support of both new and in-service aircraft carriers, expeditionary warfare, and auxiliary ships of the Navy.

Admiral Sargent is now President of Sargent Enterprises, Inc., which includes two companies serving the marine industry: SET Associates, a consulting business that provides technical and management advice to marine industries, and SET Marine Technologies, a company that operates and maintains various test and demonstration craft for research and development companies involved in developing new equipments and bull forms for future high performance ships.

Admiral Sargent has served for many years in active leadership of the American Society of Naval Engineers (ASNE), and in 2001 was elected to serve as president of that organization. He is also a member of the Sigma Xi Engineering Honorary Society, the American Society of Mechanical Engineers, and the Cornell Society of Engineers.

Admiral Sargent has been or will be provided with product usage information and other case specific data in this case, including, but not limited to, case depositions, including plaintiff and co-worker depositions, if any, complaints, amended complaints (if any), answers or responses to interrogatories and other discovery provided by plaintiff and/or other parties or third parties, and certain Buffalo Pumps documents/records. If applicable, Admiral Sargent has been or will be provided with drawings, specifications, and other data accessed from a variety of sources housing archives of United States Navy documentation. He will also be provided with an opportunity to interview Buffalo Pumps' witnesses, as may be needed or appropriate.

B.     Naval and Maritime Commission Vessel Mission/Purpose

Admiral Sargent may offer testimony with respect to the design, construction, operation, objectives, and mission of United States Navy and Maritime Commission ships, particularly within the times of the potential exposures alleged by plaintiff in this case.  Admiral Sargent may testify that, among other things, U.S. Navy and Maritime Commission vessels were designed and constructed to perform, along with its integral crew, certain general and specific tasks. For example, in the case of warships and their crew, vessels were designed and constructed to deliver an array of weapons and a combat-capable force to inflict or threaten to inflict grievous harm and damage to an enemy of the United States while being able to withstand combat damage.

C.     Plaintiffs Navy Service

Admiral Sargent may review and testify with respect to plaintiff's Naval service record, including without limitation, his rate, rating, and duties in general and aboard the specific ships, classification of ships, or type of ship, if any, identified by plaintiff. He may testify with respect to the function, purpose, and service record of such ships. Testimony may also include: the ship's layout; the locations of the areas aboard the ships where plaintiff worked or lived as a member

1010325
Firm No. 15683

of the crew; a description of the ships' propulsion systems, armaments, and other notable equipment; a description of the locations and uses of asbestos, particularly asbestos insulation products, aboard ships; and the general operations of the ships under peace and wartime conditions. He may testify regarding the training provided by the U.S. Navy for shipboard personnel, and the work conditions and environment aboard Navy vessels as well as training and conditions applicable to Navy personnel and the merchant seaman trades. In addition to such testimony, Admiral Sargent may prepare or otherwise refer to demonstrative exhibits including without limitation, drawings, videos, photos, models, samples, audio recordings, archive records, and other audio-visual materials.

> D.     U.S. Navy and Maritime Commission Ship Design, Construction & Repair

Admiral Sargent will testify with respect to various aspects of naval architecture and marine engineering, including without limitation, ship design, construction, maintenance, and repair. The chain of command within the Navy and Maritime Commission concerning ship design and construction involves several layers of authority, particularly in the lines of command for technical and contractual control over Navy and Maritime Commission ship design, construction, maintenance, and repair.

Ultimately, the Secretary of the Navy has authority over the Navy including Navy shipbuilding design, construction and operation. Immediately below the Secretary, as has been the case at least since the creation of NAVSEA, is the Chief of Naval Operations ("CNO"), to whom NAVSEA reports. Prior to the inception of NAVSEA, the Navy Bureau of Ships (BUSHIPS) controlled all Navy ship design and construction and reported to the CNO as well as a civilian Assistant Secretary of the Navy.

Under the command of NAVSEA, as was the case with BUSHIPS before it, the Navy's design and shipbuilding organization included several divisions and levels of authority concerning ship design, construction, maintenance, repair, and inspection. The Chief of BUSHIPS (and later NAVSEA) and the Chief of the Bureau of Supply and Accounts (BUSANDA), later Naval Supply (NAVSUP), maintained and directed technical and contractual control over shipboard equipment. Each of these two organizations had oversight responsibility concerning equipment built for installation or use aboard Navy vessels.

> E.     MilSpecs

Prior to the Second World War, the qualities and type of product delivered for use on Navy and Maritime Commission ships were generally not standardized. As a result, equipment manufactured and supplied for the Navy and Maritime Commission may have varied widely in terms of quality and performance. In order to assure quality and to promote efficiency and effectiveness, the Navy determined that a strict, explicit set of written standards were necessary to control the specifications of all equipment manufactured and supplied to the Navy. As a result, the Navy developed an engineering process for the creation and subsequent

1010325
Firm No. 15683

modification, as needed, of written specifications outlining all requirements for equipment manufactured and supplied for the Navy's use. Such specifications covered, for example, not only the physical requirements of the equipment, but also, as will be seen below, the nature and the content of written instructions, directions, and warnings that would accompany such equipment.

BUSHIPS and BUSANDA (later NAVSEA and NAVSUP respectively) maintained the responsibility to develop the written specifications and standards for the manufacture and supply of equipment used in the construction, maintenance, and repair of Navy vessels. Specifications for any equipment intended for use aboard a U.S. Navy ship, now known generally as "MilSpecs," were drafted, approved and maintained by the Navy. MilSpecs, and their predecessors, are intended to address shipboard equipment requirements. Once promulgated, only the Navy could make any changes or modifications to those specifications. NAVSEA maintained and controlled the MilSpecs largely because it had superior knowledge of the demands and requirements of combat-ready vessels.

In the context of ship construction, BUSHIPS (or NAVSEA) or BUSANDA (or NAVSUP) prepared contract specifications, which incorporated the MilSpecs. From time to time, privately owned shipyards or marine design professional firms also prepared contract specifications incorporating Navy MilSpecs. Whether issued by the Navy or by private entities, these specifications reflected the contemporaneous state of the art and the special needs of naval vessels, including considerations for the safety and protection of the crew aboard fighting ships.

F.      Applicability and Enforceability of MilSpecs

MilSpecs, and their predecessors, were communicated to vendors when the Navy (or private entities, such as shipyards or design professional firms) issued Requests for Proposal for the manufacture or supply of certain equipment. Admiral Sargent may testify and offer opinions-with respect to the creation, formation and enforcement of MilSpecs pertaining to ship design, construction, maintenance and repair activities, including without limitation, an explanation of how vendors manufacturing or supplying equipment for ultimate use aboard Naval vessels were governed and controlled by the Navy's specifications. He may further testify and offer opinions with respect to those MilSpecs, which were applicable to vendors, including MilSpecs applicable to a wide array of Navy ship products or applications, including by way of example, insulation products, pumps, gaskets, and packing.

Compliance with the standards and specifications required for equipment supplied for ultimate use aboard U.S. Navy vessels was directly monitored by Naval Machinery Inspectors under both of the following divisions: (1) the Machinery Inspectors under BUSANDA (later NAVSUP) worked on-site at the vendor's manufacturing facility; and (2) the Machinery Inspectors under BUSHIPS (later NAVSEA) carried out their responsibilities at the shipbuilding yards. Moreover, after the mid-1960s, it was common for Directors of both the Machinery and Propulsion Equipment Groups and the Head of the Steam Turbine Branch to inspect the

1010325
Firm No. 15683

manufacturing process at a plant where equipment was manufactured to Navy specifications. The Machinery Inspectors ultimately worked for the Secretary of the Navy or the Secretary of Defense, or its predecessor the Secretary of War.

These Inspectors exercised primary, front line control and direction over the work performed for the Navy by original equipment manufacturers (OEMs), regardless of whether the equipment was being constructed or supplied pursuant to a Navy or private contract. As a Navy engineer and program manager, Admiral Sargent assisted inspectors in determining conformance of the shipbuilder and the vendors to drawings and specifications prior to acceptance.

BUSHIPS and NAVSEA maintained engineers highly qualified in specialty areas such as pumps, steam turbines, gas turbines, reduction gears, ship propulsion, and auxiliary equipment. In addition, because a majority of the Navy's surface vessels operating in the time period prior to the decade of the 1970s used steam-powered engines as a principal form not only of propulsion, but also as a source of power in general, BUSHIPS and NAVSEA further maintained significant expertise in the important area of heat transfer and insulation particularly the use of certain asbestos fibers as an insulation material. These Navy engineers had control over the technical aspects of military specifications that concerned their area of expertise. In addition, BUSHIPS and NAVSEA have always had an Engineering Standards Group to help manage the large number of specifications and contract plans, as well as amendments and updates that exist at any given time. Changes to specifications were continually under review as new technology, construction techniques, or other considerations evolved.

G.     OEM Warnings

The Navy had precise specifications as to the nature of any communication or directions affixed to or made a part of any equipment supplied by OEMs for ultimate use aboard Navy vessels. Admiral Sargent may testify and offer opinions that OEMs would not have been permitted under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to vary or deviate in any respect from the Navy specifications in supplying equipment, including affixing any type of warning or caution statement to equipment intended for installation onto a Navy vessel, beyond those specified by the Navy without prior discussion and express approval by the Navy.

The U.S. Navy had precise specifications as to the nature of written materials to be delivered with equipment supplied by OEMs to the Navy, which included engineering reference materials to assist the engineering staff in servicing and maintaining such equipment. These written materials are and were generically known as "instruction books" or "technical manuals." Through MilSpecs, the Navy specified that every piece of equipment be supplied with a defined number of copies of one or more instruction books or technical manuals. Navy personnel participated intimately in the preparation of this kind of information in a standardized format used by the Navy. These manuals included safety information to the extent - and only to the

1010325
Firm No. 15683

extent - directed by the Navy. OEMs would not have been permitted under the specifications, associated regulations and procedures, or under the actual practice as it evolved in the field, to include any type of warning or caution statement in instruction books or technical manuals, beyond those specified and approved by the Navy without prior discussion and approval by the Navy.

Generally, the Navy had ultimate control over the nature and type of any equipment-related safety warnings communicated to Navy personnel. Moreover, the Navy made the final determination as to crew safety considerations with respect to the use, handling or operation of equipment on Navy vessels. Admiral Sargent may testify with respect to the general exchange of information and/or communications between the U.S. Navy and OEMs with respect to the specification and use of asbestos used in Navy equipment, as well as the Navy's further development and modification of the pertinent specifications in the late 1980s and early 1990s.

Prior to the mid-1960s, products manufactured for Navy use were reviewed and inspected by Navy personnel in the OEM's plant. Since the mid-1960s, the OEM's product, as well as in some cases its methods of production, has been reviewed and inspected by a combination of Navy and Department of Defense personnel. In the shipbuilding yards, the construction or repair work has always been reviewed and inspected by Navy personnel. In many instances, Admiral Sargent personally inspected equipment to verify conformance with the requirements specified, although officers and other Navy personnel under the Admiral's command or the command of NAVSEA or BUSHIPS had more direct oversight and responsibility for these functions.

H.     Navy Control of Use of an OEM's Products

The Navy's precise specifications also applied to the use of an OEM's product. Stated another way, OEMs had no control over the manner in which their products would be handled, installed, or used by the Navy in the construction or operation of a Navy vessel. Moreover OEMs had no ability to control or determine what other products might be used as a part of or in conjunction with equipment supplied by the OEM. Admiral Sargent may testify and offer opinions that vendors would not have been permitted under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to control, to determine, or to influence the manner in which its product would be used, handled, installed, modified, repaired, or incorporated into shipboard systems.

I.     Original Equipment vs. Replacement Products

Admiral Sargent may further testify with respect to the methods, manner and procedures for maintaining and repairing equipment aboard Navy vessels. Such testimony will include, by way of example: the general maintenance and repair requirements on a Navy vessel; a description of the forces (i.e., crew, auxiliary, shipyard, or other forces) generally used to effectuate maintenance and repair under a variety of circumstances, including extraordinary

1010325
Firm No. 15683

conditions associated with combat damage; where Navy personnel are involved, the identity and description of the rates and ratings of the crew trained and designated to perform such functions; and the use of and working in close proximity to asbestos-containing materials, particularly insulation materials, in the performance of such tasks.

Admiral Sargent will also testify that OEMs were not necessarily also the suppliers of replacement materials used in the maintenance or repair of the equipment aboard ship. For example, the OEM of a pump would likely not be the OEM or supplier of the replacement gasket or packing materials used to maintain or repair the pump. Thus, replacement of the original gaskets and packing within the equipment would be accomplished with products from other suppliers - not the OEM. He may testify that the Navy did not consult OEMs regarding the supply of replacement materials, such as gaskets and packing that might be used in connection with that equipment. Admiral Sargent may offer testimony and opinions with respect to the period of time in which packing and gaskets originally supplied by an OEM would likely remain with the OEMs equipment given the particular circumstances based on plaintiff's testimony, his shipboard service, and the ship's relevant service records.

Similarly, Admiral Sargent will testify that OEMs were not necessarily the suppliers of insulation products applied to the OEM's equipment by the Navy after installation. Thus, other suppliers - not the OEM - provided insulation products that may have been used in relation to the original equipment, including pumps. He may testify that the Navy did not consult OEMs regarding the use or installation of insulation materials to be used in connection with that original equipment. Moreover, not only did the OEM not have any control over the type and quantity of insulation product to be used in conjunction with its original equipment, the OEM could never be certain that any insulation would, in fact, be applied to the original equipment due to the variety of circumstances and potential uses of the original equipment.

J.      Plaintiff's Proximity to and Use of Asbestos Products Aboard Ship

Admiral Sargent will provide opinions and testimony regarding plaintiff's actual and potential proximity to asbestos in the Navy generally, as well as his actual and potential proximity to asbestos aboard specific Navy ships, if any, identified in plaintiff's discovery. In so doing, he may also rely on the testing performed by other experts, as well as data and literature available with respect to the asbestos-containing products at issue in this case.

Admiral Sargent's testimony may include, by way of example, a general statement of the types of asbestos encountered aboard ships; the quantities of asbestos found aboard ships; and a quantitative comparison or the types of asbestos or asbestos uses aboard ships. By way of example, and using fundamental principles of naval architecture and/or marine engineering, Admiral Sargent may compare the quantity of amphibole asbestos-containing insulation products with the quantity of chrysotile asbestos-containing gaskets and packing aboard a specific ship, class of ship, or type of ship. As noted above, Admiral Sargent may prepare or refer to demonstrative exhibits in connection with his testimony and opinions on these subjects.

1010325
Firm No. 15683

In addition to plaintiff's general proximity to asbestos-containing insulation products during his Navy service, Admiral Sargent may also testify regarding plaintiff's alleged use of or interaction with products manufactured or supplied by Buffalo Pumps, which products may or may not have included some quantity of asbestos fibers as a component part. To the extent there ever were any Buffalo Pumps products aboard U.S. Navy vessels, including any vessels on which plaintiff served, Admiral Sargent may discuss the historical uses, operations, and handling of such products.

K.      Conclusion

This disclosure is based on the information available to Admiral Sargent at this time. Should any additional information become available, he reserves the right to determine the impact, if any, of the new information on his opinions and conclusions, and to revise his opinions and conclusions if necessary. Further, he may respond to opinions offered by any other experts and/or fact witnesses relating to any subject matter that pertains to his specialty or area of expertise and experience.

33.      Dennis J. Paustenbach, Ph.D., DABT, CIH
ChemRisk, 100 Spear Street, Suite 525
San Francisco, CA 94105-1524

Dr. Paustenbach is a board-certified toxicologist and certified industrial hygienist with more than 20 years of experience in occupational health, risk assessment, toxicology, and environmental engineering. His experience includes investigating the health effects of exposure to, as well as the remediation of, carcinogenic and non-carcinogenic chemicals. He has published approximately 200 peer-reviewed articles and written nearly 40 book chapters in these fields. He also has given many lectures at universities on these issues and has conducted or supervised more than 700 risk assessments related to individuals, contaminated sites, consumer products, and many other scenarios. He has specialized in the areas of industrial and environmental toxicology, occupational health, historical state of knowledge regarding environmental issues, as well as ecological and human health risk assessment.

Dr. Paustenbach will offer opinions based on his professional qualifications, work experience, and knowledge of industrial hygiene, toxicology, risk assessment, and related fields, as well as information he received while visiting Buffalo Pumps' facility and other information he has been or may be provided regarding plaintiff and any alleged exposure to asbestos, including alleged exposure from Buffalo Pumps products.

Dr. Paustenbach may offer testimony concerning industrial hygiene in general and, in particular, industrial hygiene practices with respect to asbestos exposures in specific industries and crafts. He may also testify as to plaintiff's or others' exposure to asbestos or other substances. He may testify as to potential of exposure, or the lack thereof, of workers outside of

1010325
Firm No. 15683

the immediate zone of use of asbestos-containing products. He may testify concerning the development and use of threshold limit values and the promulgation of regulations, both on a state and federal level, concerning the use of asbestos and asbestos exposures in occupational settings. He may also offer testimony concerning air-monitoring/air-testing in general, and, in particular, air-monitoring for levels of asbestos present in various occupational settings. He may also testify concerning state of the art medical, technical and scientific knowledge at times relevant to this lawsuit with respect to asbestos, asbestos exposures and related industrial hygiene practices, generally and specifically with respect to exposures associated with the use of gasket and packing materials. He may offer any or all of the following opinions, among others: asbestos-related disease exhibits a dose-response relationship; low airborne concentrations of asbestos, such as those associated with the ambient background environment, are not believed to pose an increased risk of asbestos-related disease; the length, dimension, and chemical nature of the asbestos fibers are known to play a role in the etiology of disease; amphiboles present a much greater risk of mesothelioma than chrysotile fibers; regulatory approaches for estimating risks due to exposure to carcinogenic chemicals, including asbestos, rely on dose extrapolation models which are intended not to underestimate the risk and, in nearly all cases, can be expected to significantly over predict the actual risks at doses to which most persons are exposed; from the 1940s to the 1960s, the US Navy used amosite asbestos insulation extensively on ships, and studies of shipyards and ships performed during that time span have typically measured concentrations of airborne asbestos well above current and historical exposure limits; it was not until the late 1970s that studies began to evaluate asbestos exposures associated with handling gaskets and packing materials, and prior to that time, it was believed among the scientific community that these products did not pose a health risk due to encapsulation of asbestos fibers.

Dr. Paustenbach may also testify regarding warnings and labeling of products, including the development and evolution of warnings practices and applicable regulations and standards.

34.     Michael J. Warhol
        Department of Pathology
        Pennsylvania Hospital
        800 Spruce Street
        Philadelphia 19107

Dr. Warhol is a pathologist who may testify concerning the diagnosis or lack thereof of an asbestos-related disease, based upon the medical records of plaintiff, including but not limited to, tissue and/or slides that he will review. Further, he may testify on matters pertaining to the diagnosis of asbestos-related disease generally and the diagnosis of the condition of the plaintiff in this case specifically.

1010325
Firm No. 15683

35.     Samuel Forman
         Dale and Ivy Health Systems, Inc.
         3-B Hollis Street
         Cambridge, Massachusetts 02140

Dr. Forman is a medical doctor specializing in preventive medicine and is board certified in occupational medicine. He graduated from the University of Pennsylvania with a Bachelor of Arts degree in history and biology in 1973. He earned a Doctor of Medicine degree from the Cornell University Medical College in 1977. He also received a degree in public health in 1977 as a result of a joint program with the Harvard School of Public Health. Thereafter, he became board certified in occupational medicine after attending a residency at the Harvard School of Public Health. Dr. Forman completed his internship in internal medicine at the National Naval Medical Center in Bethesda, Maryland.

In 1977, Dr. Forman went on active duty as a commissioned officer in the United States Navy, and he performed his internship at the Bethesda Naval Medical Center in Bethesda, Maryland during 1977 and 1978. He resigned his commission as a Lieutenant Commander but continued to work for the Navy as a civilian employee at the Navy Environmental Health Center in Norfolk, Virginia until 1986. While serving on active duty, Dr. Forman was head of the occupational health clinic at the Seal Beach Naval Weapons Station, Seal Beach, California, and assisted in a medical surveillance program at Long Beach Naval Shipyard. In this capacity, he managed the asbestos medical surveillance program at Long Beach Naval Shipyard. In 1982, Dr. Forman was stationed at the Naval Environmental Health Center in Norfolk, Virginia, where he designed occupational medical programs with regard to Navy-specific occupational diseases, investigated potentially new hazards, assisted local commands in the execution of their occupational health programs and assisted in the Navy Occupational Safety and Health Inspection Program (NOSHIPS). In this capacity he also trained Navy doctors and nurses in occupational medicine.

In 1983, Dr. Forman worked with the Naval Medical Command to analyze and organize government documents. Through this work, Dr. Forman investigated the historical knowledge of the United States Government, and particularly of the Navy and the Maritime Commission, concerning industrial health aspects of various materials, including asbestos. Through this research, he became familiar with historic government and Navy documents including materials from the Bureau of Medicine and Surgery. Following his research, he published an article entitled *U.S. Navy Shipyard Occupational Medicine Through World War II,* published in the *Journal of Occupational Medicine,* Volume 30, No.1, January 1988.

Dr. Forman bases his opinions with regard to the state of the art upon all of the published medical and scientific literature that he has reviewed to date. His opinions with regard to government knowledge also are based upon his review of countless government documents while employed by the United States Navy as well as his subsequent research. In addition to relying upon his previous research, Dr. Forman has been or will be provided with case specific

1010325
Firm No. 15683

data in this case, including, but not limited to, case depositions, including deposition testimony, and answers or responses to discovery.

Dr. Forman will offer fact and expert testimony regarding the sources of the Navy's knowledge regarding industrial hygiene issues, including asbestos-related issues, the sources of that knowledge and the steps taken by the Navy in response to such knowledge. He will testify with respect to various aspects of the Navy's understanding and practices with respect to occupational medicine, including without limitation, such knowledge as it relates to Navy and civilian personnel involved in all aspects of maritime and/or shipyard service. Dr. Forman will testify, based on his research that, among other things, the Navy's occupational health program paralleled and, at times, led the development of occupational medicine and industrial hygiene. Particularly in the area of asbestos-related diseases, the Navy has been a leader in the field of occupational medicine and industrial hygiene. Dr. Forman will testify, based upon his review, the Navy knew by 1922 that asbestos exposure was a potential health hazard, and that its knowledge and awareness continued to develop throughout the following decades. As a leader in the field, the Navy was not dependent upon and did not solicit advice or guidance with respect to occupational medicine and industrial hygiene from manufacturers and suppliers of pumps or other similar equipment installed aboard Navy ships. Dr. Forman will testify and offer opinions that the Navy did not, and had no reason to relinquish the command and control over occupational health and safety issues with respect to the design, construction and operation of Navy vessels. Dr. Forman will testify and offer opinions that the Navy understood the asbestos-related hazards, if any, presented by different types of asbestos and different types of products and dictated the standards for mitigating any such hazard. Dr. Forman may testify, and offer opinions, regarding Navy historical knowledge, policy and practice regarding industrial hygiene, occupational medicine, hazard communication and workplace safety and health, both generally and specifically regarding asbestos.

Dr. Forman may also testify regarding industrial hygiene generally, applicable regulations and standards relating to asbestos exposure, and the responsibility of employers to maintain safe working conditions and the control of asbestos in various workplaces. Further, he may respond to or comment upon records, evidence and testimony regarding plaintiff and any alleged exposure of plaintiff to asbestos, and to opinions offered by any other experts and/or fact witnesses relating to any subject matter that pertains to his specialty or area of expertise and experience.

36.     Kenneth W. Fisher
        Fisher Maritime
        147 Columbia Turnpike, Suite 203
        Florham Parle, New Jersey 97932

Dr. Fisher is a naval architect and marine engineer. He may offer testimony regarding materials and practices used in the construction of naval and commercial vessels, the purpose and functioning of equipment and other materials, and industrial hygiene and other

1010325
Firm No. 15683

considerations associated with shipbuilding and repair. Dr. Fisher may testify regarding the state of the art in the shipbuilding industry with respect to asbestos and asbestos-containing materials and the availability and viability of substitutes for such materials. Dr. Fisher also may testify regarding the knowledge and awareness of the United States Navy with respect to potential adverse health effects of asbestos, the actions taken by the Navy in response to such knowledge and awareness, and the timing of such actions. Dr. Fisher also may comment on the alleged activities and exposures of plaintiff, the vessels, jobsites or products at issue in this case, and the testimony and evidence offered by plaintiffs and/or their expert witnesses.

37.     Robert W. Morgan, M.D.
        18 Spanish Main Drive
        Freeport, Grand Bahamas Island

Dr. Morgan is a board-certified physician in occupational and environmental health, and is a fellow of the American College of Epidemiology. He is expected to be called as an expert witness to testify regarding medical causation and state of the art.

Dr. Morgan is expected to testify about the plaintiff's alleged exposure to Buffalo Pumps' products, .and whether such exposure could be considered a substantial contributing cause of the plaintiff's alleged asbestos-injury.

Dr. Morgan is also expected to describe how the state of medical knowledge about asbestos-related disease has progressed from 1900 to the present. He is expected to discuss the numerous articles published in medical literature concerning asbestos-related conditions and is expected to explain the significance of the differences found in the multiple case reports and epidemiological studies.

Dr. Morgan's testimony is expected to be based upon his review of the medical records, pathology, pathology reports, pleadings, deposition transcripts, testimony of witnesses at trial, his education, training, and experience, medical and scientific literature and studies in his field of expertise. Dr. Morgan has not prepared a report in this case.

38.     Richard F. Silloway, P.E.
        Engineering Partners International, Inc.
        1310 Kingwood Drive, Kingwood, TX 77339

Richard Silloway is a retired United States Naval Engineering Duty Officer, a Marine Engineer and a licensed Professional Engineer. He received his Bachelors of Science degree in naval engineering from the United States Naval Academy, and a Masters degree in International Business from the University of Houston.

Since 1996, Mr. Silloway has been a Principal Marine Engineer with Engineering Partners International. Inc. ("EPI"). Mr. Silloway's areas of expertise include the design and operation of

1010325
Firm No. 15683

maritime and naval vessels, atmosphere control systems, and marine casualty investigation and response. During his time with EPI, Mr. Silloway has had the distinct opportunity to conduct the on-site investigation and provide engineering analysis for the RMS TITANIC 1998 Scientific Expedition.

Prior to joining EPI, Mr. Silloway worked for SeaRiver Maritime Inc. / Exxon Shipping *Co.* in various capacities including Special Engineering, Safety & Environmental Project Directory, Maritime Regulatory Complaint Program Director, Economic Analyst, Customer Representative and Senior Engineering Project Manager from 1981 to 1996.

From 1976 to 1981, Mr. Silloway was a senior mechanical engineer for M. Rosenblatt & Son, Inc., where he directed the design of naval vessel modifications for all major U.S. Naval shipyards. As Senior Mechanical Engineer. Mr. Silloway concentrated on fire suppression systems, refrigeration, HVAC, and sanitary systems.

Before his work with M. Rosenblatt & Son, Inc., Mr. Silloway's career in marine engineering started in 1966, when he entered the United States Navy. After completing his service in 1976, Mr. Silloway continued in the United States Naval Reserves as an engineering duty officer specializing in ship design and repair. Mr. Silloway was a reservist from 1976 until 1996, retiring as a Captain.

Mr. Silloway is expected to testify about the documents and things he reviewed in connection with this case and about his training and experience. He is also expected to testify about the construction and/or repair work performed by or near the plaintiff as set forth in more detail below.

Mr. Silloway may testify generally about the design differences of ships and the procedures maintained at various shipbuilding facilities. Further, Mr. Silloway is expected to testify about the distinctions between government contract shipbuilding practices and those in private industry.

Mr. Silloway is also expected to testify about the layout, practices and procedures of the shipyard(s) where plaintiff alleges to have been exposed to asbestos-containing products. Moreover, Mr. Silloway is expected to testify about the type, size, capacity, and purpose of the ship(s) that plaintiff allegedly worked aboard. He is expected to testify about the history of the ship(s) including the design, construction, overhaul, maintenance and repairs. He is also expected to testify about the construction specifications, critical materials, and components required to build or modify the ship(s).

Also, Mr. Silloway is expected to testify about the plaintiff's role and duties in the construction, overhaul, maintenance or repair of the ship(s). He is also expected to testify about the products and tools the plaintiff would have used in the course of his work.

1010325
Firm No. 15683

In addition, Mr. Silloway is expected to testify about the different tradesmen needed to complete the construction, maintenance or repair of the ship(s). He is expected to testify about the tradesmen's respective duties, the products they would have used and the specific sequence of steps taken to construct, overhaul and repair the ship(s).

Mr. Silloway's testimony will be based upon his own education, experience, investigation, review of the plaintiff's and/or co-workers' testimony, naval records, plaintiff's military and work records, public records, and other reference sources.

39.    James P. Delaney, PMP
       VJ Services, LLC
       1398 N. Liberty Greens Dr.
       Washington, UT 84780

Mr. Delaney served in the U.S. Navy as a machinist mate from 1964 until 1979. He served on a number of nuclear surface ships, as well as a nuclear submarine. In 1979, Mr. Delaney was commissioned as an ensign, and served as an assistant to Admiral Rickover from 1979 until 1991. During this time, he audited, inspected, and reported on maintenance and repair performance of machinist mates on both nuclear surface crafts and nuclear submarines. In 1991, Mr. Delaney became an inspector at Pearl Harbor Naval Shipyard, focusing on nuclear ships, especially nuclear submarines. In 1996, he was assigned to head a nuclear program for the U.S. Navy, and retired in 1997 with the rank of Commander.

Mr. Delaney will testify based on his background and experience regarding work practices, equipment, maintenance and repair techniques and other activities aboard U.S. Navy vessels; including the range of duties he practiced himself as a machinist mate and those he observed throughout his career; and regarding the maintenance and repair techniques machinist mates performed on pumps and valves that he practiced and observed. He may comment on the testimony or other evidence offered by plaintiff.

40.    Peter A. Valberg, Ph.D.
       Gradient Corporation
       238 Main Street
       Cambridge, Massachusetts

Dr. Valberg is a senior scientist at Gradient Corporation and also maintains a faculty position as adjunct Associate Professor of Physiology at the Harvard School of Public Health. Dr. Valberg is expected to be called as an expert witness to testify regarding inhalation toxicology and human health risk assessment. Dr. Valberg is expected to testify about the plaintiff's alleged occupational exposure and whether such exposure could be considered a substantial contributing cause of the plaintiff's alleged disease. He may offer a quantitative risk analysis with respect to users of asbestos-containing products suffering adverse health effects from such exposure.

1010325
Firm No. 15683

Dr. Valberg is also expected to testify that it cannot be said, to a reasonable degree of scientific certainty, that any hypothetical person's alleged exposure to products that may have contained asbestos was of particular significance to that individual, without reference to that specific person's individual and family-related work history, medical history, information concerning the individual's use of protective equipment, specific types of asbestos-containing products used and/or handled and the resolution of the numerous questions regarding exposures to substances other than asbestos-containing products.

Dr. Valberg's testimony is expected to be based upon his review of pleadings, deposition transcripts; testimony of the witnesses at trial, his education, training, experience, medical and scientific literature and studies in his field of expertise.

      41.     Gary R. Epler, M.D.
            Department of Pulmonary & Critical Care Medicine
            Brigham & Women's Hospital
            75 Francis Street
            Boston, Massachusetts

Dr. Epler is a pulmonologist at Brigham & Women's Hospital, and is a Clinical Associate Professor of Medicine at Harvard Medical School. Dr. Epler is expected to be called as an expert witness to testify regarding pulmonary aspects of asbestos exposure, including matters such as dose response. Dr. Epler is expected to testify about alleged occupational exposure and whether such exposure could be considered a substantial contributing factor to the plaintiff's alleged disease.

Dr. Epler is expected to testify about certain asbestos-containing products in that he has reviewed information and studies regarding exposure levels experienced with certain work, and is familiar with the literature concerning low level exposures. He is expected to provide testimony concerning the functioning of the lung, the defense mechanisms and functioning of the lung, the responses of the lung to various stimuli and the role of various components of the respiratory system in the proper functioning of the lung. Dr. Epler is expected to describe and distinguish the various types of asbestos fibers; to describe the things that affect the ability of asbestos fibers to affect various structures within the respiratory system; and to describe the body's specific responses to asbestos fibers that are inhaled, whether or not they are retained in the body.

Dr. Epler is also expected to testify regarding the various asbestos-related conditions that may be attributable to the results of long-term inhalation and retention of asbestos fiber(s). He also is expected to testify concerning the circumstances under which exposure to certain forms and types of asbestos may be associated with the incidence of some forms of asbestos-related injury.

1010325
Firm No. 15683

Dr. Epler is expected to testify concerning his review of the vast literature and of the alleged evidence regarding the plaintiff's asbestos exposure and whether Buffalo Pumps' product(s) was or were a substantial contributing factor to the plaintiff's alleged asbestos-related disease.

Dr. Epler's testimony is expected to be based upon his review of the medical records, pathology, pathology reports, pleadings, deposition transcripts, testimony of the witnesses at trial, his education, training, experience, medical and scientific literature and studies in his field of expertise. Dr. Epler has not prepared a report in this case.

42.     Charles Blake
        Clayton Group Services, Inc.
        3380 Chastain Meadows Pkwy #300
        Kennesaw, Georgia

Mr. Blake may offer testimony concerning industrial hygiene in general and, in particular, industrial hygiene practices with respect to asbestos exposures in specific industries. He may also testify concerning the development and use of Threshold Limit Values and the promulgation of regulations, both on a state and federal level, concerning the use of asbestos and asbestos exposures in occupational settings. He may offer testimony concerning air monitoring/air-testing in general, and, in particular, air-monitoring for levels of asbestos present in various occupational settings. He may also testify concerning state of the art medical, technical and scientific knowledge at times relevant to this lawsuit with respect to asbestos, asbestos exposures and related industrial hygiene practices. In addition, Mr. Blake may testify concerning the state of knowledge of his field, including the development of scientific knowledge concerning the relationship between exposure to asbestos at various levels and disease, the development of standards and regulations applicable to asbestos and other materials, the development of industrial hygiene procedures and technology and the role and impact of various studies, standards, regulations, reports and commentaries.

Mr. Blake may also testify concerning his personal experiences in the field of asbestos-related disease, including his activities with the American Conference of Governmental Industrial Hygienists, articles he has written, tests he has performed which relate to air quality and asbestos-containing materials and his many other experiences in the field of asbestos-related disease as they may pertain to the claims of plaintiff in this lawsuit.

He may testify about and offer opinions regarding the merits of plaintiff's claims and the defenses offered by Defendant, including his opinion on liability, damages and causation issues in this case. He may also testify as to any other matter raised by experts called by plaintiff, any co-defendants, or any other matter which he may be so qualified to testify. The above witness will base his testimony on their education, experience, research and review of relevant medical, scientific and technical literature concerning the above topics.

1010325
Firm No. 15683

Mr. Blake may offer testimony and opinions concerning past and current industrial hygiene principles and practices in general and, in particular, with respect to asbestos. He may also testify concerning materials used and industrial hygiene issues and practices in various industrial settings relevant to the claims being asserted in this action. He may also testify concerning the development, significance, and use of Threshold Limit Values ("TLVs"), Permissible Exposure Levels ("PELs"), and relevant state and federal regulations, including specifically those applicable to asbestos and asbestos exposures and others which might be applicable to the occupational settings in this action. He may also testify about the dose-response relationship between exposure to asbestos and the development of disease.

Mr. Blake also may offer testimony concerning air-monitoring/air-testing in general and, in particular, air monitoring for levels of asbestos and other materials present in various occupational and non-occupational settings and in the ambient air. He also will discuss the results of studies which have been conducted for the purpose of determining the nature and extent to which respirable asbestos fibers are released from various asbestos-containing materials, including but not limited to gasket and packing materials, when those materials are installed, removed or otherwise handled in various occupational settings. He will also compare those results to the ambient or background levels as well as to current and former standards and regulations applicable to asbestos.

He may also testify concerning state of the art technical and scientific knowledge at times relevant to this lawsuit with respect to asbestos, asbestos exposures and related industrial hygiene practices, including but not limited to issues relating to the development of and reliance on TLV s and PELs and the placement of warnings on products. He may testify concerning the state of knowledge in their fields as reflected in the scientific and medical literature, including the development of scientific knowledge concerning the relationship between exposure to asbestos at various levels and disease, the development of standards and regulations applicable to asbestos and other materials, the development of industrial hygiene procedures and technology and the role and impact of various studies, standards, regulations, reports and commentaries. He may also discuss the effects that ventilation, distance from the source of exposure, and "wet methods" have on exposure levels. He will render the opinion that the amount of respirable asbestos fibers which may be released from gasket and packing materials when installed, removed or otherwise handled in occupational settings in connection with a Buffalo Pumps product, including but not limited to those settings in which plaintiff allegedly worked, is minimal or non-existent, and, in any event, is inconsequential both as to persons working directly with the products and as to bystanders. He will also opine that such amounts will not materially exceed, if at all, existing ambient or background levels. He will opine that plaintiffs alleged exposure to asbestos fibers attributable to gasket and packing materials associated with Buffalo Pumps, Inc. products would not have exceeded the applicable TLV or PEL. He will also opine that such exposures do not trigger and/or would not have triggered statutory duties under the Occupational Safety and Health Act (OSHA), including the duty to provide an asbestos-related health warning with such products. He will also opine that the Buffalo Pumps, Inc. products at issue are not unreasonably dangerous.

1010325
Firm No. 15683

It is also anticipated that Mr. Blake will provide testimony and opinions in rebuttal to that of fact and/or expert witnesses called by the plaintiff who offer testimony in these or related fields. He may also offer opinions regarding the merits of plaintiff's claims and the defenses offered by Buffalo Pumps, Inc., including opinions on liability and causation.

Mr. Blake's testimony and opinions will be based upon his education, experience and professional training, his review of relevant scientific literature, his study and analysis of the composition and properties of gaskets and packing, and the testing of these and other materials, and his review of discovery, testimony, medical records and ACGIH and governmental standards and regulations.

43.    Steven Richard Smith, M.D., P.C.
       Hancock Professional Park – Suite 26
       12315 Hancock Street
       Carmel, IN 46032-5885
       (317) 674-9797

Dr. Smith is the Director of Occupational and Environmental Health and Medicine for the Community Health Network and Community Hospitals in Indianapolis, Indiana. Dr. Smith is board certified by the American Board of Preventive Medicine in the specialty of Occupational and Environmental Medicine, areas in which he practices full-time. He is a Fellow of the American College of Occupational and Environmental Medicine and a Fellow of the American College of Preventive Medicine. By virtue of his post-graduate education, training, and experience in the disciplines of epidemiology, biostatistics, toxicology, environmental health, public health, industrial hygiene, occupational medicine and health services administration, Dr. Smith has attached a Master of Public Health Equivalency. Dr. Smith will testify based on his professional experience and training.

Dr. Smith may specifically testify concerning the medical condition of any plaintiff and in the case of a deceased plaintiff, may give testimony as to the cause(s) of death. He may testify as to whether each plaintiff of plaintiff's decedent had a condition or illness caused by asbestos exposure. He may also testify about the latency periods relevant to each type of asbestos-related disease and the carcinogenic properties of different types of asbestos fiber.

Dr. Smith may generally testify concerning asbestos-related diseases and the effects of exposure to various asbestos-containing products upon persons in occupational settings. He may further testify regarding the epidemiology of asbestos-related diseases, the criteria for diagnosis of asbestos-related diseases, as well as the existence of a dose response relationship between exposure to asbestos and asbestos-related diseases. He may also testify regarding asbestos-containing products generally, including their asbestos fiber content, use and respective ability to cause or contribute to disease.

1010325
Firm No. 15683

He may further testify regarding the propensity of various asbestos fibers to contribute to mesothelioma or other asbestos-related diseases. He may also testify regarding the determination of the relative risks of suffering personal injury or death as a result of exposure to various asbestos-containing products in occupational settings. He will explain the dose response relationship between exposure to asbestos and asbestos-related diseases for each type of disease or disorder alleged. Dr. Smith's opinion is that the appropriate use of gaskets and packing products during a human life span cannot produce an appreciable risk of any asbestos-related disease and is not a producing cause of any asbestos-related disease which may be alleged by any plaintiff and/or plaintiff's decedent.

He may also testify regarding the existence or non-existence of any alleged asbestos-related disease in the plaintiff or plaintiff's decedent including, but not limited to, various pleural changes and benign pleural disorders, asbestosis, lung cancer, mesothelioma, laryngeal cancer, esophageal cancer, other gastrointestinal cancers, and renal cancer, where applicable. He may also testify on general medical issues regarding asbestos-related diseases, including, but not limited to, lung physiology, lung function, lung defense mechanisms and the mechanisms by which asbestos fibers do or do not cause a particular disease. He may also testify that background levels of asbestos fibers in human tissue do not represent disease and background and/or ambient air exposures do not cause disease. He will further testify that any asbestos-related disease allegedly suffered by plaintiff or plaintiff's decedent was not proximately caused by exposure to encapsulated asbestos-containing fluid sealing products. He may also testify regarding government regulations.

He may also testify on increased risk of cancer issues and whether a particular plaintiff has a reasonable fear of cancer due to exposure to asbestos. He may also testify on the health consequences of smoking and the relationship between smoking and any alleged asbestos-related diseases generally and specifically with respect to this plaintiff. He will testify regarding the contribution, if any, of smoking and asbestos, to this plaintiff's disease.

Generally and with respect to this particular plaintiff, he may testify as to his review and interpretation of radiographic materials, including, but not limited to, x-rays and CT scans, review and interpretation of pulmonary function testing, the nature and extent of any impairment or disability, whether a condition is progressive and whether other diseases or conditions are present in plaintiffs.

Dr. Smith's testimony will be bases on one or more of the following: his training, experience, education, publications and review of the medical, governmental and scientific literature and various air sampling studies, work facility inspections and documents, where applicable, as well as review of medical records, fiber burden or digestion studies, chest films, and all pathology materials. Dr. Smith will rely upon all of the testing of each industrial hygienist disclosed on Defendant's exhibit list, including but not limited to, testing done by Mr. Mangold, Mr. Liukonen, Mr. Balzer (to the extent Mr. Balzer has conducted any testing), Mr. Spencer, Mr. Boelter and Ms. Ringo. Such testing is incorporated by reference. Dr. Smith may review plaintiff

1010325
Firm No. 15683

and co-worker's(s') deposition testimony given in this case and rely upon them as a basis for his opinions. He may also provide testimony consistent with the disclosure of any other expert disclosed by this Defendant or any other party to this case.

Based on his education, training, work experience, and review of the medical/scientific literature, Dr. Smith will render opinion testimony about the level of asbestos exposure in the ambient air and its effect on human health, if any. He will testify about his review of tests of gasket and packing materials performed by others. Dr. Smith will compare the level of asbestos exposure from these tests to the levels of asbestos found in the ambient air, and he will render opinion testimony concerning the health hazards, if any, an individual would be subject to as a result of his use and/or exposure to encapsulated gasket and packing materials.

Dr. Smith has education, training, knowledge, and personal experiences in the fields of inhalation toxicology and epidemiology. Based upon his knowledge and experience in these fields and his review of the literature, Dr. Smith will give an opinion that the minimum cumulative level of asbestos exposure needed to cause asbestosis or lung cancer is at least 25 fiber years, i.e., the product of exposure (f/cc) over time (years), and that asbestos does not play a role in the development of lung cancer at cumulative asbestos levels below 25 fiber years. Dr. Smith will give opinion testimony, based on his knowledge and experience and his review of the medical literature that exposure to fluid sealing products containing encapsulated chrysotile asbestos fibers will not cause or contribute to the development of mesothelioma. It is Dr. Smith's opinion that it would take an individual hundreds or even thousands of years of working with fluid sealing products containing encapsulated chrysotile asbestos fibers to approach any level of cumulative exposure that is associated with any appreciable risk of asbestos-related disease from using these types gaskets and packing materials.

He has been or will be provided with product exposure information and other case specific data in this case, including, but not limited to plaintiff's deposition and co-worker depositions. He will review plaintiff's or plaintiff's decedent's exposures, if any, to asbestos-containing products. He will quantify plaintiff's or plaintiff's decedent's exposure to the asbestos-containing products and provide opinions regarding the significance of each exposure. He has also reviewed and will rely upon air sampling data and other literate regarding exposure to other asbestos-containing products. He will evaluate exposures to all asbestos-containing products to which plaintiff or plaintiff's decedent may have been exposed and discuss the distinction between friable and non-friable asbestos-containing products/materials.

Dr. Smith will also give the following opinions. There is a dose-responsive relationship associated with the development of any asbestos-related disease, and the does is the most significant factor in causation of asbestos-related diseases and disorders. The risk is proportional to the dose: the greater the accumulated dose, the greater the risk. The dose is produced by various exposures accumulating over time. The dose is measured in fiber years, i.e., the product of exposure (f/cc) over time (years). As an example, an individual occupationally exposed at a consistent level of 1.0 f/cc (on an 8-hour time weighted average) for 20 years will

1010325
Firm No. 15683

have amassed 20 fiber years of asbestos exposure. Similarly, an individual occupationally exposed at a consistent level of 0.5 f/cc (on an 8-hour time weighted average) for 40 years will also have amassed 20 fiber years of asbestos exposure. There are threshold levels of dose necessary before asbestos disease will develop. As an example, at least 25 fiber years of dose is required for the development of clinically and radiologically evident asbestosis. At the current OSHA PEL of 0.1 f/cc, it would take 250 years of exposure to accumulate 25 fiber years, the level associated with risk of asbestosis and lung cancer. It is Dr. Smith's opinion that the best estimate of the threshold dose to cause mesothelioma is 5 fiber years of exposure to amphibole forms of asbestos. It is also Dr. Smith's opinion that the current reliable scientific evidence indicates that pure chrysotile (not admixed with substantial amounts of one or more of the amphibole forms of asbestos) does not cause or substantially contribute to either peritoneal or pleural forms of mesothelioma.

It is also his opinion that the non-occupationally and non-paraoccupationally exposed general public is not at risk for the development of any asbestos-related condition or disease, even though there is asbestos in the ambient air. Thus, because of the large does needed to cause an asbestos-related disease, a single asbestos fiber does not substantially contribute to disease.

Dr. Smith believes to a reasonable degree of medical and scientific probability that the level of exposure, if any, to asbestos resulting from the use, handling, installation and removal of encapsulated asbestos-containing gaskets and packings is insufficient to provide a does adequate to create risk of any asbestos-related disease or disorder, does not pose a risk to human health, and does not cause of substantially contribute to the cause of asbestos-related conditions or diseases.

As a recognized expert in determining the etiology of occupationally and/or environmentally induced disease and disorders, Dr. Smith may address the role that exposures other than asbestos and other non-environmental factors may have played in the development of the medial disease(s) or disorder(s) which the plaintiff or plaintiff's decedent is alleged to have or have had. These alternative etiologies, other than asbestos, about which Dr. Smith may testify, include, but are not limited to, radiation, industrial chemicals, solvents, metals/metalloids, non-asbestiform dusts/fibers, household chemicals, other xenobiotic agents, genetic factors, tobacco smoke, alcoholic beverages, drugs, medications, diet, outdoor air pollutants, indoor air pollutants, exercise, lifestyle, and stress. Dr. Smith may discuss the role that one or more of these factors, either independently or interactively, may have played in the genesis and/or progression of the disease(s) or disorder(s) manifested in this plaintiff or plaintiff's decedent.

For further clarification of Dr. Smith's testimony, he will be made available for deposition at a mutually convenient time by contacting Defendant's counsel. Dr. Smith may also utilize demonstrative exhibits when presenting his opinions at trial.

1010325
Firm No. 15683

44.    Earl D. Gregory, Ph.D., CIH
       CSP Consulting
       5718 Yamassee Drive
       Hamilton, OH  45011

Dr. Gregory is a certified industrial hygienist.  He will provide testimony based upon his education, training, experience, observations and review of materials obtained or supplied to him in connection with this case, and upon his review of relevant medical, scientific and technical literature.  He will provide testimony regarding industrial hygiene and occupational health issues, including the principles and methodologies used to evaluate and assess potential asbestos exposure and the state of the art concerning the historical use of and knowledge and awareness of potential hazards associated with asbestos and asbestos-containing materials.  He may also testify regarding the building, construction and engineering specifications and requirements for the use of such materials.

Dr. Gregory will testify regarding the relationship between intensity and duration of asbestos exposures and their potential for causing asbestos-related illnesses.  He will testify as to the measured or expected levels of asbestos exposure relating to various products and work practices, including those materials and work practices encountered by plaintiffs.  He may also testify as to the regulatory schemes and governmental and other standards applicable to workplaces generally and specifically with respect to asbestos exposures during time periods relevant to this case.

Dr. Gregory may also testify concerning his personal experiences in the field of asbestos-related disease.  He may testify about and offer opinions regarding the merits of plaintiffs' claims and the defenses offered by Buffalo Pumps, including his opinion on liability, liability and causation issues in this case. He may also testify as to any other matter raised by experts called by plaintiffs, any co-defendants, or any other matter which he may be so qualified to testify.  It is also anticipated that Dr. Gregory may provide testimony and opinions in response to those of fact and/or expert witnesses called by plaintiffs who offer testimony in these or in related fields.

45.    Thomas Brady
       Brady Consulting Services
       18 Tuscan Court
       Oak Brook, IL 60523

Mr. Brady has worked in the construction industry for over thirty-eight years.  During this time, he has held positions including tradesman, project engineer, owner of a mechanical construction company and owner of a design engineering company.  He has participated in construction site activities, as well as supervised construction that was both design and build nature.  Mr. Brady is a member of the American Society of Heating, Refrigeration and Air-Conditioning Engineers and International District Energy Association.

1010325
Firm No. 15683

Mr. Brady is familiar with and may offer testimony regarding the standards for specification of products, means and methods of construction established by the American Institute of Architects, General Condition of Contract for Construction and related documents such as those formats provided by the Construction Specification Institute. He may also offer testimony regarding specification of products, means and methods of construction established by the US Military Specifications and similar specifications, means and methods used in commercial, industrial and government sector construction projects. He may also provide testimony regarding the standard design, construction and engineering practices used in the construction of commercial and industrial premises. If called to testify, Mr. Brady will discuss the testimony of plaintiff or plaintiff's witnesses regarding the alleged exposures to this defendant's products.

46.     Gomer Consulting Group
        10605 East Cactus Road, Suite 100
        Scottsdale, Arizona  85259-2929

Dr. Frank E. Gomer is a professional member of the American Society of Safety Engineers and Human Factors Engineering and Ergonomics Society. He is also a member of the Safety Standards Technical Panel for Underwriters Laboratories.

Dr. Gomer may provide testimony regarding engineering data and acceptable safety regulations and standards. He may provide testimony regarding safety engineering methods for production, design, development, manufacturing, safety testing and certification, premises design and maintenance and accident prevention.

Specifically, Dr. Gomer may provide expert opinions and conclusions, from the perspective of a human factors engineer and safety engineer, addressing whether Buffalo Pumps, Inc. (Buffalo) had a requirement to warn of an asbestos hazard when it sold industrial pumps used for process applications from the 1950s to the 1990s. His testimony will consider whether reliable information sources, which would have been available to Buffalo, advised that the removal and replacement of non-friable, asbestos-containing gaskets and packing created a health risk of exposure to dangerous levels of airborne asbestos fibers, thereby triggering a requirement to warn of an asbestos hazard. Also, to the extent that friable, asbestos-containing thermal insulation may have been applied to and/or removed from the exterior surfaces of some Buffalo pumps, he may testify as to whether a pump manufacturer like Buffalo was required to conduct any hazard analyses and then to warn of any potential asbestos hazards. In addition, he will testify as to whether any alleged exposure was the result of a violation of the Federal OSHA regulations pertaining to prevention and control of diseases resulting from exposure to dangerous levels of asbestos fibers in the workplace. He will also testify that the OSHA regulations applied to every place of employment, and required that employers enforce appropriate controls, including fundamental housekeeping practices that forbade the removal of potentially contaminated work clothes from the workplace.

1010325
Firm No. 15683

47.     Richard J. Arnould, Ph.D.
        Professor of Economics
        3108 Meadow Brook Drive
        Champaign, IL 61822

Dr. Arnould will discuss and evaluate any claims of economic loss which may be made.

48.     Edward Sattler, Ph.D.
        Foster College of Business
        123 Baker Hall
        1501 W Bradley Ave
        Peoria, IL 61625-0001

Dr. Sattler will discuss and evaluate any claims of economic loss which may be made.

49.     Kelly Scribner Tuttle, Ph.D., CIH

Dr. Tuttle is a Project Toxicologist at CTEH®, LLC, an environmental consulting firm that is an associate of the University of Arkansas Medical Sciences BioVentures Program. CTEH® has several specialties including toxicology, human health risk assessment, industrial hygiene, indoor air quality, and emergency response.

She holds a Bachelor of Science degree in Veterinary Science, Biomedical option from the University of Nebraska in Lincoln, Nebraska (2008) and a Ph.D. degree in Toxicology from Texas A&M University in College Station, TX (2013). Since receiving her Ph.D., she has been actively involved in the area of toxicology. Since 2013, she has been active at CTEH® as a consultant in the area of human and environmental toxicology and has been involved in numerous projects involving the assessment of chemical exposure and their effects on humans. Her current duties at CTEH® include serving as a consulting toxicologist; providing guidance for risk assessment and remediation plans; leading responses to, and providing toxicological support for, hazardous materials incidents; and providing toxicological support to care providers and workers with potential chemical exposures. As a toxicologist, she routinely assists in the determination of disease causation by evaluating chemical exposure and the scientific evidence relating exposure to human diseases according to the methodology of toxicological causation analysis. In addition, she is certified in the comprehensive practice of industrial hygiene by the American Board of Industrial Hygiene (CIH #11510CP).

She is a member of the Society of Toxicology (SOT), the Lone Star Chapter of the Society of Toxicology, and the American Industrial Hygiene Association. She has written peer-reviewed publications and grants in toxicology and related fields. A list of her publications is included within on her curriculum vitae which is available upon request. She will be retained in this case as an expert in Toxicology.

1010325
Firm No. 15683

Toxicology, a blend of biology, chemistry, and medicine, is the science of the adverse effects of substances (e.g., chemicals, physical agents, drugs) on biological systems including the effects, the recognition, and the mechanisms of a chemical-related disease. Whether a substance is toxic depends upon two inseparable criteria: 1) the intrinsic nature of the substance, and 2) the dose, or how much a substance the individual actually takes into their body. In toxicology, we study the dose-response of chemicals on biological systems, with emphasis on understanding the mechanisms of harmful effects. Toxicologists also provide expert opinions with respect to causation in toxic tort litigation. As stated by the Federal Reference Manual on Scientific Evidence (Federal Judicial Center, 2011), "In tort litigation, toxicologists offer evidence that either supports or refutes plaintiffs' claims that their diseases or injuries were caused by chemical exposures."

The opinions she will provide at trial are based on her education, training, and experience in the field of toxicology and her review of the referenced information. All of her opinions will be stated to a reasonable degree of toxicological and scientific certainty.

She will testify as follows: Inhalation of asbestos fibers can result in three main respiratory conditions: mesothelioma, lung cancer with underlying asbestosis, and asbestosis. Upon inhalation, asbestos fibers are deposited in the lungs, with smaller fibers able to reach deeper portions of the lung than larger fibers that are often captured in the upper airways (Mossman et al., 2011). The mechanisms of disease are not completely understood, but the toxicity of asbestos depends on several factors: the type of asbestos, the diameter of the fiber, the length of the fiber, and the number of fibers (Bernstein et al., 2013). Some fibers, most likely amphibole fibers, may penetrate the lung and move into the pleura where they can remain for extended periods of time, leading to asbestos bodies and, ultimately, mesothelioma.

Over approximately the last decade, a general scientific consensus has developed that chrysotile asbestos poses a much lower risk, if any, for the development of mesothelioma as compared to amphibole asbestos (Bernstein et al., 2013). Yarborough reviewed data from 71 cohorts and concluded that "the review of 71 asbestos cohorts exposed to free asbestos fibers does not support the hypothesis that chrysotile, uncontaminated by amphibolic substances, causes mesothelioma" (Yarborough, 2006). Berman and Crump performed an extensive analysis of several epidemiological studies and concluded that "the hypothesis that chrysotile and amphibole asbestos are equally potent (rpc=1) was strongly rejected by every metric and the hypothesis that (pure) chrysotile is nonpotent for mesothelioma was not rejected by any metric" (Berman and Crump, 2008). Their analysis also demonstrated that the estimated potency of chrysotile asbestos in regards to mesothelioma causation ranges from zero to 200 times less than that of amphibole asbestos (Berman and Crump, 2008). Hodgson and Darnton (2000) estimate that the exposure-specific risk of mesothelioma from chrysotile asbestos is 100 times less than amosite asbestos and 500 times less than crocidolite asbestos, which they updated in 2010 stating that "the risk of mesothelioma from chrysotile [is] at least an order of magnitude lower than the risk we estimate for amphibole fibres" (Hodgson and Darnton, 2000, Hodgson and Darnton, 2010).

1010325
Firm No. 15683

In 2003, the USEPA convened a panel of experts to discuss a proposed model for asbestos cancer risk assessment (USEPA, 2003). In regards to the issue of relative potency of chrysotile versus amphibole asbestos fibers in causation of mesothelioma, the panel unanimously agreed that, "the available epidemiological studies provide compelling evidence that the carcinogenic potency of amphibole fibers is two orders of magnitude greater than that for chrysotile fibers" (USEPA, 2003). More recently, the USEPA Science Advisory Board (SAB) was convened to discuss proposals to modify current asbestos risk assessment methodologies (USEPA, 2008). One of the issues addressed was the evidence indicating that differences in fiber type and size are critical factors in the assessment of risk for mesothelioma from asbestos exposure (USEPA, 2008). Regarding this issue, the SAB members were asked to address whether, "you agree that the data are sufficient to indicate that such differences exist…" Of the 10 SAB members addressing this question, only one indicated that he did not agree with that proposition (USEPA, 2008).

She will testify that, in conclusion, the risk of mesothelioma is much lower, if there is any risk at all, from chrysotile asbestos exposure than from amphibole asbestos, which includes crocidolite asbestos. Studies indicate that chrysotile asbestos does not cause cancer at very low exposure levels, and governmental agencies have recognized the lower potency of chrysotile compared to the amphiboles.

The physical and chemical mechanisms whereby fibers may degrade in the lung have been studied extensively in vitro (Bauer, 1998a, Bauer, 1998b) using simulated lung fluids (Klingholz and Steinkopf, 1984, Leineweber, 1984, Law et al., 1991, Law et al., 1990, de Meringo et al., 1994, Luoto et al., 1994, Christensen et al., 1994, Hesterberg et al., 1996, Knudsen et al., 1996). Because fiber dissolution and breakdown in lung fluids is a major determinant of lung clearance, in vitro dissolution tests have been suggested for fiber toxicity screening (Scholze and Conradt, 1987, Eastes and Hadley, 1996). Chrysotile fibers have a magnesium hydroxide surface layer that is rapidly broken down in an acidic environment whereas amphiboles have a silicon dioxide surface layer that is not readily broken down (Hargreaves and Taylor, 1946, Wypych et al., 2005, Suquet, 1989). This propensity to break down allows for the chrysotile fibers to become more silica-like in nature and thus more susceptible to breakage and the body's defense mechanisms (Seshan, 1983, Larsen, 1989).

Bernstein et al. reported on the toxicological response of a commercial Brazilian chrysotile following exposure in a multi-dose subchronic 90-day inhalation toxicity study, which was performed according to the protocols mentioned above as specified by the USEPA and the European Commission (Bernstein et al., 2006, Bernstein and Reigo Sintes, 1999, USEPA, 2001). In this study, rats were exposed to mean chrysotile concentrations of either 536 or 1,429 WHO fibers/cm3. Inhalation exposure to chrysotile for 90 days at 536 WHO fibers/cm3 resulted in no lung fibrosis (Bernstein et al., 2006). In these animals, chrysotile fibers were observed to break into small particles and shorter fibers. However, the higher chrysotile exposure concentration of 1,429 WHO fibers/cm3 overpowered the lung's clearance abilities and resulted in slight lung fibrosis (Bernstein et al., 2006). The lower exposure level produced less inflammatory response

1010325
Firm No. 15683

than observed in earlier studies of biosoluble synthetic vitreous fibers (SVFs) as reviewed previously (Hesterberg and Hart, 2001). In contrast, inhalation exposure to tremolite asbestos to 1,090 WHO fibers/cm3 resulted in an extensive inflammatory response with interstitial fibrosis observed within 28 days after the exposure was stopped (Bernstein et al., 2005).

In addition to the level and type of asbestos exposure, the risk of developing mesothelioma has also been shown to increase with lower age at first exposure in humans ((Spirtas et al., 1994, Rake et al., 2009, Lacourt et al., 2012). Lacourt et al. determined that subjects who were first exposed at 30 years of age had a lower risk of pleural mesothelioma than subjects exposed at 10 years of age (OR 0.2, 95% CI 0.0-0.4) (Lacourt et al., 2012). Additionally, early exposure combined with increased duration of exposure increased risk of developing mesothelioma compared to exposure later in life with the same duration of exposure (Lacourt et al., 2012).

Malignant mesothelioma is a rare tumor which usually occurs in the pleura (lining) of the lung or less commonly in the abdominal peritoneum [GI tract lining] (ACS, 2016). Incidence in the U.S. is approximately 3,000 cases per year at an average age of approximately 60 years old (ACS, 2016). Mesothelioma is associated with overexposure to asbestos, but there are idiopathic or unknown cases that are associated with approximately 20% of diagnoses, with approximately 80% of cases in the United States attributed to occupational exposure to asbestos (Roggli et al., 2002, Barreiro and Katzman, 2006). Mesothelioma has an average latency period of 30-40 years after asbestos exposure and may extend to 70 years after exposure (Sporn and Roggli, 2004). The onset of mesothelioma is usually subtle, with patients commonly presenting with complaints of pain or dyspnea [shortness of breath] (ACS, 2016).

Research has also shown a low level of idiopathic malignant mesothelioma with no known asbestos exposure (Peterson et al., 1984, Dawson et al., 1993, Hirsch et al., 1982, Huncharek, 2002, Ilgren and Wagner, 1991). Evidence of idiopathic malignant mesothelioma is largely based upon the fact that a proportion of cases in many epidemiological series have no confirmable history of asbestos exposure. Case reports have also shown the development of pleural and peritoneal mesothelioma in response to therapeutic radiation (Craighead and Gibbs, 2008, Shannon et al., 1995, Jasani and Gibbs, 2012, de Bruin et al., 2009, Gibb et al., 2013). Mesothelioma has also been seen in children with no known risk factors (Fraire et al., 1988, Grundy and Miller, 1972).

She will testify that in order for adverse health effects to be attributed to a specific chemical exposure, a valid scientific causation analysis must be performed. Causation analysis is a two-phased process involving both general and specific causation.

She will testify that exposure to chrysotile containing components associated with Buffalo Pumps, if any and as described by the evidence or testimony in this case, was such that to a reasonable degree of toxicological and scientific certainty, the alleged association with Buffalo pumps did not cause a significant, if any, exposure to asbestos or resulting risk of the development of mesothelioma. She will further testify that to a reasonable degree of

1010325
Firm No. 15683

toxicological and scientific certainty, the alleged association with the reported Buffalo pumps did not cause or contribute to the disease process leading to the development of mesothelioma.

A report may be provided to further supplement her opinions in this case.

      50.    <u>Brent Finley, PhD, DABT</u>
              Cardno Chemrisk
              Managing Principal Health Scientist
              231 Front Street Suite 201,
              Brooklyn, New York 11201

Dr. Brent Finley is a board-certified toxicologist with over 30 years of experience in chemical exposure and human health risk assessment. He may offer testimony concerning toxicology, industrial hygiene in general and, in particular, practices, procedures and methods with respect to the evaluation of asbestos exposure in general and in specific industries and crafts. He may also testify as to plaintiff's or others' exposure, or lack thereof, to asbestos or other substances, and the cause or causes of plaintiff's alleged disease. He may offer testimony concerning asbestos fiber type, fiber dimension and fiber dose as they related to asbestos-containing products and/or to the potential for and/or fact of asbestos exposure. He may testify as to potential for exposure, or the lack thereof, to workers outside the immediate zone of use of asbestos-containing products (i.e., "bystanders"). He may testify concerning the development and use of threshold limit values and the promulgation of regulations, both on state and federal levels, concerning the use of asbestos and asbestos exposures in occupational settings. He may also offer testimony concerning air-monitoring/air-testing in general, and, in particular, air-monitoring for levels of asbestos present in various occupational settings. In addition, Dr. Finley may testify concerning the state of medical, technical and scientific knowledge at times relevant with respect to asbestos, asbestos exposures and related industrial hygiene practices, generally and specifically with respect to exposures associated with the use of particular kinds of products and materials. He may also testify regarding warnings and labeling of products, including the development and evolution of warnings practices and applicable regulations and standards generally and as they relate to asbestos in particular.

Dr. Finley may comment on the testimony or other evidence offered by plaintiff, including expert witnesses called by plaintiff.

In connection with his testimony, Dr. Finley may prepare or otherwise refer to demonstrative exhibits including without limitation, drawings, videos, photos, models, samples, audio recordings, archive records, and other audio-visual materials.

A case specific report may be provided to further supplement his opinions in this case.

1010325
Firm No. 15683

51.    Amanda M. Burns MSPH, DABT
       Cardno ChemRisk
       231 Front Street, Suite 212
       Brooklyn, New York

Ms. Amanda Burns is a board-certified toxicologist with over 10 years of experience in chemical exposure and human health risk assessment.  She may offer testimony concerning toxicology, industrial hygiene in general and, in particular, practices, procedures and methods with respect to the evaluation of asbestos exposure in general and in specific industries and crafts.  She may also testify as to plaintiff's or others' exposure, or lack thereof, to asbestos or other substances, and the cause or causes of plaintiff's alleged disease.  She may offer testimony concerning asbestos fiber type, fiber dimension and fiber dose as they related to asbestos-containing products and/or to the potential for and/or fact of asbestos exposure.  She may testify as to potential for exposure, or the lack thereof, to workers outside the immediate zone of use of asbestos-containing products (i.e., "bystanders").  She may testify concerning the development and use of threshold limit values and the promulgation of regulations, both on state and federal levels, concerning the use of asbestos and asbestos exposures in occupational settings.  She may also offer testimony concerning air-monitoring/air-testing in general, and, in particular, air-monitoring for levels of asbestos present in various occupational settings.  In addition, Ms. Burns may testify concerning the state of medical, technical and scientific knowledge at times relevant with respect to asbestos, asbestos exposures and related industrial hygiene practices, generally and specifically with respect to exposures associated with the use of particular kinds of products and materials.  She may also testify regarding warnings and labeling of products, including the development and evolution of warnings practices and applicable regulations and standards generally and as they relate to asbestos in particular.

Ms. Burns may comment on the testimony or other evidence offered by plaintiff, including expert witnesses called by plaintiff.

In connection with her testimony, Ms. Burns may prepare or otherwise refer to demonstrative exhibits including without limitation, drawings, videos, photos, models, samples, audio recordings, archive records, and other audio-visual materials.

A case specific report may be provided to further supplement her opinions in this case.

52.    Dr. Brian Taylor, M.D.
       25 Ramsgate Dr.
       St. Louis, MO  63132

Dr. Taylor is board certified by the American Board of Internal Medicine.  Dr. Taylor is expected to testify regarding the existence or non-existence of any asbestos-related disease in the Plaintiff, including but not limited to pleural changes, asbestosis, lung cancer, mesothelioma, laryngeal cancer, esophageal cancer and gastrointestinal cancer.  He may further testify on

1010325
Firm No. 15683

whether any asbestos-related disease allegedly suffered by the Plaintiff was proximately caused by exposure to certain asbestos-containing products.

With respect to particular plaintiffs, he is expected to testify as to his review and interpretation of clinical data, medical documentation (including pathology, x-ray and pulmonary function testing reports), the nature and extent of any impairment or disability, whether other diseases or conditions are present and whether a condition is progressive.

Dr. Taylor is expected to testify regarding relevant studies and reports contained in the scientific and medical literature as well as in the Plaintiff's specific case. Dr. Taylor's testimony will be based on his training, experience, education and review of the medical and scientific literature concerning asbestos disease and related matters.

Dr. Taylor may also testify about any matter raised by experts called by the plaintiffs or any co-defendants, including state of the art, causation and medical issues.

In connection with his testimony, Dr. Taylor may prepare or otherwise refer to demonstrative exhibits including without limitation, drawings, videos, photos, models, samples, audio recordings, archive records, and other audio-visual materials.

A case specific report may be provided to further supplement his opinions in this case.

AIR & LIQUID SYSTEMS CORPORATION as successor by merger to BUFFALO PUMPS, INC.

BY: _____/s/ Tobin J. Taylor_____
HEYL, ROYSTER, VOELKER & ALLEN
Tobin J. Taylor, #6238227

1010325
Firm No. 15683

## CERTIFICATE OF FILING AND PROOF OF SERVICE

I certify that on August 3, 2021, at approximately 2:00 p.m., I electronically filed and transmitted the foregoing **AIR & LIQUID SYSTEMS CORPORATION as successor by merger to BUFFALO PUMPS, INC.'S LIST OF POTENTIAL FACT/EXPERT WITNESSES** with the Clerk of the Court for Cook County by using the Odyssey eFileIL system.

I further certify that all counsel of record have been served via File & ServeXpress.

Under penalties as provided by law pursuant to section 1-109 of the Illinois Code of Civil Procedure [735 ILCS 5/1-109], I certify that the statements set forth in this **Certificate of Filing and Proof of Service** are true and correct, except as to matters therein stated to be on information and belief and as to such matters I certify as aforesaid that I verily believe the same to be true.

*/s/ Dionne McCray*

HEYL, ROYSTER, VOELKER & ALLEN
300 Hamilton Blvd. ▪ P.O. Box 6199
Peoria, IL 61601-6199
Telephone: 309.676.0400
Facsimile: 309.420.0402
*and*
HEYL, ROYSTER, VOELKER & ALLEN
33 N. Dearborn St., 7th Floor
Chicago, IL 60602
Telephone: 312.853.8700
Facsimile: 309.420.0402
Primary e-service:     peoecf@heylroyster.com
Secondary e-service #1: ttaylor@heylroyster.com
Secondary e-service #2: chiecf@heylroyster.com

FILED
7/20/2021 3
IRIS Y. MAR
CIRCUIT CLERK
COOK COUNTY, IL

E-SERVICE
66783779
Jul 20 2021
04:13PM
File & ServeXpress

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

2021L006906

CHLOYDE PELTON and SHIRLEY PELTON,   )
                                            )
                  Plaintiffs,   )
                                            )
          v.   )   No. 21-L-006906
                                              )
AIR & LIQUID SYSTEMS CORPORATION,   )
successor-by-merger to BUFFALO PUMPS,   )
INC., et al.,   )
                                            )
               Defendants.   )

## <u>NOTICE OF FILING</u>

TO:   To All Attorneys of Record:

     PLEASE TAKE NOTICE that on July 20, 2021, we filed with the Clerk of the Circuit Court of Cook County, Illinois, Defendant Velan Valve Corp. erroneously named and served as Velan Valve Corporation a/k/a Velan Valve Corporation's Entry of an Attorney Appearance and Jury Demand, a copy of which is herewith served upon you.

                                 Respectfully submitted,

                               By:  /s/Franchezka L. Reichard-Labault
                                    Attorney for Defendant
                                    *Velan Valve Corp.*

Franchezka L. Reichard-Labault, #6338070
Gordon Rees Scully Mansukhani, LLP
One North Franklin Street, Suite 800
Chicago, Illinois 60606
(312) 565-4930
freichard@grsm.com
*Attorney for Defendant*
*Velan Valve Corp.*
Firm ID 44373

FILED DATE: 7/20/2021 3:49 PM   2021L006906

FILED DATE: 7/20/2021 3:49 PM   2021L006906

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, being first duly sworn on oath, deposes and states that she served the foregoing documents referred to therein by serving via Odyssey eFileIL a copy to all attorneys of record on July 20, 2021.

By:  /s/ Denise Pocica

[x]        Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the statements set forth herein are true and correct.

1244224/59834822v.1

FILED
7/20/2021 3:49 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L006906

66783779
Jul 20 2021
04:13PM

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 21-L-006906 |
| | ) |
| AIR & LIQUID SYSTEMS CORPORATION, | ) |
| successor-by-merger to BUFFALO PUMPS, | ) |
| INC., et al., | ) |
| | ) |
| Defendants. | ) |

**APPEARANCE AND JURY DEMAND**

The undersigned, as attorney, enters the appearance of the defendant,

**VELAN VALVE CORP., erroneously named and served as
VELAN VALVE CORP. a/k/a VELAN VALVE CORPORATION**

*Defendant demands trial by jury.*

**/s/ Franchezka L. Reichard-Labault**

| | |
|---|---|
| **Name** | **Franchezka L. Reichard-Labault (#6338070)** |
| | **GORDON REES SCULLY MANSUKHANI, LLP** |
| **Attorney for** | **VELAN VALVE CORP., erroneously named and served herein as** |
| | **VELAN VALVE CORP. a/k/a VELAN VALVE CORPORATION** |
| **Address** | **One North Franklin, Suite 800** |
| **City** | **Chicago, Illinois 60606** |
| **Telephone** | **(312) 619-4930** |
| **Email:** | freichard@grsm.com |

*Strike demand for trial by jury if not applicable.*

I certify that a copy of the within instrument was served on all parties who have appeared and have not heretofore been found by the Court to be in default for failure to plead.

**/s/ Franchezka L. Reichard-Labault**

*Attorney for Defendant*
**Velan Valve Corp., erroneously named and
served herein as Velan Valve Corp. a/k/a
Velan Valve Corporation**

FILED DATE: 7/20/2021 3:49 PM  2021L006906

1244224/59834583v.1

FILED DATE: 7/21/2021 4:46 PM  2021L006906

FILED
7/21/2021 4
IRIS Y. MAR
CIRCUIT CLERK
COOK COUNTY, IL
2021L006906

E-SERVICE
66789197
Jul 22 2021
09:26AM
File & ServeXpress

e-Served
by MyDocFileServe
2273955
Jul 21 2021 04:46 PM

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

CHLOYDE PELTON and SHIRLEY      )
PELTON,                         )
                                )
            Plaintiffs,          )
                                )
      vs.                        )        No. 21 L 6906
                                )
AIR & LIQUID SYSTEMS CORPORATION, )
et al.,                          )
                                )
            Defendants.          )

**NOTICE OF FILING**

PLEASE TAKE NOTICE that on July 21, 2021, there was filed with the Clerk of the Circuit Court of Cook County, Illinois, the *Entry of Appearance and Jury Demand* and *Motion to Dismiss Plaintiffs' Complaint for Lack of Personal Jurisdiction and Failure to State a Claim,* for Alfa Laval Inc., improperly sued as "Alfa Laval Inc., individually and as successor-in-interest to DeLaval Purifiers," a copy of which is attached and served upon all counsel of record.

Respectfully submitted,

**SWANSON, MARTIN & BELL, LLP**

/s/ Michael A. Long
One of the attorneys for Defendant,
**Alfa Laval Inc.**

John J. O'Sullivan / Rick C. Shea
C. Matt Alva / Michael A. Long #6317413
**SWANSON, MARTIN & BELL, LLP**
330 N. Wabash Ave., Suite 3300
Chicago, IL 60611
(312) 321-9100
Firm ID #29558
mlong@smbtrials.com

**PROOF OF SERVICE**

The undersigned certifies that Alfa Laval Inc.'s Entry of Appearance and Jury Demand and Motion to Dismiss Plaintiff's Complaint for Lack of Personal Jurisdiction and Failure to State a Claim, was electronically with File and Serve X-Press Serve for service on the attorneys of record in this case on July 21, 2021.

/s/ Linda Flentye_____

FILED DATE: 7/21/2021 4:46 PM   2021L006906

FILED
7/21/2021 4
IRIS Y. MAR
CIRCUIT CLERK
COOK COUNTY, IL
2021L006906

e-Served
by MyDocFileServe
2273955
Jul 21 2021 04:46 PM

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

|  |  |  |
|---|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 21 L 6906 |
| AIR & LIQUID SYSTEMS CORPORATION, et al., | ) ) ) | |
| Defendants. | ) | |

**ENTRY OF APPEARANCE AND JURY DEMAND**

The undersigned, John J. O'Sullivan, Rick C. Shea, C. Matt Alva, and the firm of SWANSON, MARTIN & BELL, LLP, hereby enters their Appearance and Jury Demand on behalf of defendant Alfa Laval Inc., improperly sued as "Alfa Laval Inc., individually and as successor-in-interest to DeLaval Purifiers."

Respectfully submitted,

**SWANSON, MARTIN & BELL, LLP**

/s/ Michael A. Long
One of the attorneys for Defendant,
**Alfa Laval Inc.**

John J. O'Sullivan / Rick C. Shea
C. Matt Alva / Michael A. Long #6317413
**SWANSON, MARTIN & BELL, LLP**
330 N. Wabash Ave., Suite 3300
Chicago, IL 60611
(312) 321-9100
Firm ID #29558
mlong@smbtrials.com

FILED DATE: 7/21/2021 4:46 PM   2021L006906

FILED DATE: 7/21/2021 4:46 PM    2021L006906

FILED
7/21/2021 4
IRIS Y. MART
CIRCUIT CLERK
COOK COUNTY, IL
2021L006906

e-Served
by MyDocFileServe
2273955
Jul 21 2021 04:46 PM

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

CHLOYDE PELTON and SHIRLEY )
PELTON, )
 )
 Plaintiffs, )
 )
 vs. )      No. 21 L 6906
 )
AIR & LIQUID SYSTEMS CORPORATION, )
et al., )
 )
 Defendants. )

**ALFA LAVAL INC.'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR
LACK OF PERSONAL JURISDICTION AND FOR FAILURE TO STATE A CLAIM**

COMES NOW, defendant, Alfa Laval Inc., improperly sued as "Alfa Laval Inc.,
individually and as successor-in-interest to DeLaval Purifiers," (Alfa Laval") by and through its
attorneys, and hereby specially appears, for the purpose of this motion and preserving all defenses,
and respectfully moves this Court to dismiss plaintiffs' complaint against it for lack of personal
jurisdiction pursuant to 735 ILCS 5/2-301 and for failure to state a claim pursuant to 735 ILCS
5/2-615. In support of this motion, Alfa Laval states:

**INTRODUCTION**

1.     Chloyde Pelton and Shirley Pelton, ("plaintiffs") brought this action against dozens
of defendants, claiming that exposure to asbestos in their products caused Chloyde Pelton ("Mr.
Pelton") to develop mesothelioma. *See generally* Complaint.

2.     There are no allegations on the face of the complaint that demonstrate that Mr.
Pelton was exposed to asbestos in Illinois. In fact, plaintiffs allege Mr. Pelton was exposed to
asbestos while serving in the U.S. Navy as a pipefitter and shipfitter aboard the USS Lyman K.
Swenson, USS Pritchett, and USS Frontier from 1959 to 1963. *Id.* at Count I ¶ 1.

3.     Plaintiffs included Alfa Laval in the lengthy list of defendants named in counts

FILED DATE: 7/21/2021 4:46 PM    2021L006906

alleging negligence, willful and wanton misconduct, negligent spoliation of evidence, and willful and wanton spoliation of evidence. *Id.* at Counts I-II, IV-V. Additionally, Shirley Pelton pled her own count for loss of consortium. *Id.* at Count VI. The Court should dismiss these counts against Alfa Laval for either of two reasons: lack of personal jurisdiction or failure to state a claim.

4.      First, plaintiffs do not allege any facts establishing that Illinois can exercise personal jurisdiction over Alfa Laval in this matter.  Nor are plaintiffs able to.  It is undisputed that Alfa Laval is a New Jersey corporation with its principal place of business in Virginia.  *See* Declaration of Robert Madison at ¶ 3, attached hereto as Exhibit 1.  Alfa Laval is not incorporated in Illinois, nor does it operate its principal place of business here.  Moreover, any contacts Alfa Laval has with Illinois are insufficient to establish that Alfa Laval is "essentially at home" here and thus subject to general personal jurisdiction.  Those contacts are also insufficient to support the exercise of specific personal jurisdiction over plaintiffs' claims against Alfa Laval, which plaintiffs do not allege arose from Alfa Laval's conduct in Illinois.

5.      Second, plaintiffs do not state a claim for which relief can be granted against Alfa Laval. The complaint is filled with legal conclusions unsupported by the factual allegations necessary to establish that plaintiffs are entitled to any relief. Specifically, plaintiffs fail to identify any facts supporting the alleged claims that Mr. Pelton was exposed to asbestos through an Alfa Laval product.

6.      As a result, plaintiffs' complaint must be dismissed as to Alfa Laval.

## I.      MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION PURSUANT TO 735 ILCS 5/2-301

Alfa Laval is not subject to personal jurisdiction in this case.  Plaintiffs bear the burden of establishing a prima facie basis for the Court's exercise of personal jurisdiction over Alfa Laval to adjudicate the claims. *Aspen Am. Ins. Co. v. Interstate Warehousing, Inc.*, 2017 IL 121281, ¶ 12

*Russell v. SNFA*, 987 N.E.2d 778, 784 (Ill. 2013). Nevertheless, plaintiffs allege no facts suggesting any contacts at all between Alfa Laval and the state of Illinois.

**A.**     **Alfa Laval Is Not Subject to General Personal Jurisdiction in Illinois.**

To demonstrate that the Court can exercise general personal jurisdiction over Alfa Laval, plaintiffs must establish that Alfa Laval's contacts with Illinois are "so 'continuous and systematic' as to render [it] essentially at home" here. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011); *Aspen Am.*, 2017 IL 121281, ¶ 16; *Russell*, 987 N.E.2d at 786. In most instances, a company is "essentially at home" in the state where it is incorporated and the state where it operates its principal place of business. *Goodyear*, 131 S. Ct. at 2854. Although it is possible that a "corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State," the Supreme Court has noted that such a case would be "exceptional." *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 n.19 (2014); *see Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773, 1779–80 (2017) (citing *Goodyear* and *Daimler*); *Aspen Am. Ins. Co.*, 2017 IL 121281, ¶ 17 (quoting *Daimler*); *Russell*, 987 N.E.2d at 786 (stating that because it "permits a cause of action against a defendant based on activity that is entirely distinct from its activity in the forum," "the standard for finding general jurisdiction is very high"). The Supreme Court has further emphasized that this due process constraint "applies to all state-court assertions of general jurisdiction over nonresident defendants; [it] does not vary with the type of claim asserted or business enterprise sued." *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558–59 (2017).

Illinois courts, including the Supreme Court of Illinois, have followed *Goodyear*, *Daimler*, and their progeny to dismiss non-resident corporate defendants when they are not "at home" in

FILED DATE: 7/21/2021 4:46 PM   2021L006906

Illinois, and thus, not subject to general personal jurisdiction in the state, and when there is likewise no other basis for the exercise of personal jurisdiction. Most significantly, in the case of *Aspen American Insurance Company v. Interstate Warehouse, Inc.*, 2017 IL 121281, the Supreme Court of Illinois recognized that

> to comport with the federal due process standards laid out in *Daimler* and, in doing so, comply with subsection (c) of the long-arm statute, plaintiff must make a *prima facie* showing that defendant is essentially at home in Illinois. This means that plaintiff must show that defendant is incorporated or has its principal place of business in Illinois or that defendant's contacts with Illinois are so substantial as to render this an exceptional case.

*Id*. at ¶ 7. In the absence of such evidence in *Aspen*, the Supreme Court reversed the appellate and circuit courts and ordered dismissal of the defendant at issue for lack of personal jurisdiction. Lower Illinois courts have likewise followed the standards set forth in the United States Supreme Court's recent opinions on general personal jurisdiction. *See, e.g.*, *In re Plavix Related Cases*, 2014 WL 3928240 at *7 (Ill. Cir. Cook Co. Aug. 11, 2014) (refusing to exercise general personal jurisdiction over defendants even though they "derive[d] 2.56% of U.S. sales revenue from Illinois sales," amounting to more than a billion dollars during the relevant time period, and "ha[d] retained an Illinois agent for service of process, occupied buildings in Illinois, and employed Illinois residents"); *Cirkles v. Asbestos Corp.*, No. 13-L-940, slip op. at *2 (Ill. Cir. Mad. Co. Feb. 13, 2014) (dismissing defendant for lack of general personal jurisdiction where the defendant was incorporated in New Jersey, headquartered in Connecticut, and had no contacts with Illinois).

Alfa Laval is a New Jersey corporation with its principal place of business in Virginia. *See* Exhibit 1. Thus, it is "at home" in New Jersey and Virginia and subject to general personal jurisdiction in those states. Plaintiffs cannot establish that Alfa Laval has comparable contacts in Illinois such that it is also "at home" in this forum and can be sued here on matters wholly distinct

FILED DATE: 7/21/2021 4:46 PM    2021L006906

from its contacts with the state.[1]  For these reasons, plaintiffs cannot meet the burden of establishing that an Illinois court may exercise general personal jurisdiction over Alfa Laval for purposes of the alleged claims.

**B.      Alfa Laval Is Not Subject to Specific Personal Jurisdiction in Illinois.**

To demonstrate that this Court may exercise specific personal jurisdiction over Alfa Laval for purposes of the alleged claims, plaintiffs must demonstrate that those claims arise from or relate to Alfa Laval's contacts with the forum.  *Bristol-Myers Squibb*, 137 S. Ct. at 1780; *Daimler*, 134 S. Ct. at 754; *Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). In cases where no such showing is made, Illinois courts have routinely concluded that no specific personal jurisdiction exists.  *See, e.g.*, *Roiser v. Cascade Mountain., Inc.*, 855 N.E.2d 243, 247 (Ill. App. Ct. 2006) ("The [plaintiff's] lawsuit is not based on any activity within Illinois; therefore, specific jurisdiction principles are not relevant to their appeal."); *Adkins v. Nestle Purina PetCare Co.*, 973 F. Supp. 2d 905, 913 (N.D. Ill. 2013) ("Because plaintiff concede that their claims against [defendant] do not arise from any business conducted in Illinois, [defendant] cannot be subject to specific jurisdiction."); *see also Spartan Motors, Inc. v. Lube Power, Inc.*, 786 N.E.2d 613, 619 (Ill. App. Ct. 2003).

---

[1] Even allegations that Alfa Laval "engages in a substantial, continuous, and systematic course of business" in Illinois would be insufficient for that purpose.  *Daimler*, 134 S. Ct. at 760-62 ("A corporation that operates in many places can scarcely be deemed at home in all of them.  Otherwise, 'at home' would be synonymous with 'doing business'…."); *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 622–23 (2d Cir. 2016) (no general jurisdiction over Lockheed Martin in Connecticut even though company leased space in four in-state locations, employed between approximately 30 and 70 workers in the state, and derived about $160 million in revenue there during the relevant time period); *Perez v. Air & Liquid Sys. Corp.*, No. 316CV00842NJRDGW, 2016 WL 7049153, at *4 (S.D. Ill. Dec. 2, 2016) (finding no general personal jurisdiction over Defendant General Electric even though the company "has conducted business in Illinois since 1897, employs more than 4,300 employees in Illinois, and has leased more than 500,000 square feet of property in the state"); *Denton v. Air & Liquid Sys. Corps.*, No. 13-CV-1243-SMY-DGW, 2015 WL 753732, at *2 (S.D. Ill. Feb. 20, 2015) (finding that the defendant was not subject to general personal jurisdiction even though it had "a presence in Illinois including a sales manager and distribution centers").

FILED DATE: 7/21/2021 4:46 PM  2021L006906

Plaintiffs fail to allege facts sufficient to make plausible that the alleged claims arise from or relate to any contacts Alfa Laval may have had with Illinois. In fact, all of plaintiffs' allegations of where Mr. Pelton was exposed to asbestos occurred in the U.S. Navy. *See* Complaint at Count I ¶ 1. Further, the complaint does not allege that plaintiffs were ever current resident of Illinois. In fact, the complaint is silent to where plaintiffs currently reside or ever resided.

None of the allegations suggest any connection at all between Mr. Pelton's injuries and any contacts Alfa Laval may have with Illinois. Without such allegations, plaintiffs cannot meet the burden of establishing that the Court has specific jurisdiction over Alfa Laval in this case. *Keller v. Henderson*, 834 N.E.2d 930, 936 (Ill. App. Ct. 2nd Dist. 2005) (recognizing that federal due process is not satisfied unless "the action arose out of or related to the defendant's contacts with the forum state"). Because this Court has neither general nor specific jurisdiction over Alfa Laval in this case, plaintiffs' complaint must be dismissed.

## II.    MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM PURSUANT TO 735 ILCS 5/2-615

Plaintiffs' complaint must be dismissed if it is either legally or factually insufficient. *Misselhorn v. Doyle*, 629 N.E.2d 189, 191 (Ill. App. Ct. 5th Dist. 1994); *Cummings v. City of Waterloo*, 683 N.E.2d 1222, 1225 (Ill. App. Ct. 5th Dist. 1997); *Lykowski v. Bergman*, 700 N.E.2d 1064, 1069 (Ill. App. Ct. 1st Dist. 1998). The complaint is legally insufficient if it fails to "set forth a legally recognized cause of action." *Misselhorn*, 629 N.E.2d at 191. It is factually insufficient if it does not "allege facts that set forth the essential elements of the cause of action." *Visvardis v. Ferleger*, 873 N.E.2d 436, 441 (Ill. App. Ct. 1st Dist. 2007) (citing *Urbaitis v. Commonwealth Edison,* 575 N.E.2d 548 (Ill. 1991)); *Misselhorn*, 629 N.E.2d at 191. Stated differently, a factually sufficient claim both (1) provides facts that, if established, entitle the plaintiff to relief, *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1214 (Ill. 1996), and (2)

FILED DATE: 7/21/2021 4:46 PM    2021L006906

"apprise[s] a defendant of sufficient facts upon which to base a defense," *Kozak v. Armstrong World Indus., Inc.*, 572 N.E.2d 279, 282 (1991). Although a court reviewing a motion to dismiss must "assume the truth of all facts properly pleaded," it "must ignore conclusions of law and fact not supported by allegations of the specific facts upon which such conclusions rest." *Misselhorn*, 629 N.E.2d at 191.

**A.    Plaintiffs Have Not Alleged Any Facts to Establish That Mr. Pelton Was Exposed to Asbestos through Any Product Attributable to Alfa Laval.**

In Counts I, II, IV, and V, plaintiffs claim that defendants acted negligently, engaged in willful and wanton misconduct, and are guilty of negligent and willful and wanton negligent spoliation of evidence. As a result, Shirley Pelton pled her own count for loss of consortium. In support of these alleged claims, however, plaintiffs offer only boilerplate legal conclusions without any specific factual allegations on which those conclusions rest. With respect to Alfa Laval, plaintiffs failed to identify any Alfa Laval product that Mr. Pelton allegedly worked with or around, the time period or frequency of that work, and what, if anything, Alfa Laval did not preserve, disposed of, or destroyed.

Specifically to Counts IV and V, Illinois law does not recognize a separate and independent tort for spoliation of evidence. *Dardeen v. Kuehling*, 213 Ill. 2d 329, 821 N.E.2d 227 (2004); *Boyd v. Travelers Ins. Co.,* 166 Ill. 2d 188, 652 N.E.2d 267 (1995). In *Boyd,* the seminal Illinois Supreme Court decision addressing spoliation of evidence, the court recognized that a claim for negligent spoliation of evidence could be brought under existing negligence principles. 166 Ill. 2d at 192-93, 652 N.E. 2d at 270. Subsequent Illinois decisions have declined to extend *Boyd* to allow claims for intentional or fraudulent spoliation of evidence. *Orr v. Knapheide Mfg. Co.,* No. 10-CV-1123, 2010 U.S. Dist. LEXIS 125348, at *5-10 (C.D. Ill. Oct. 26, 2010); *Dardeen,* 213 Ill. 2d at 335-36, 821 N.E.2d at 231; *Cangemi v. Advocate South Suburb. Hosp.,* 364 Ill. App. 3d 446,

FILED DATE: 7/21/2021 4:46 PM   2021L006906

471-72, 845 N.E.2d 792, 814-15 (1st Dist. 2006). For these reasons, Counts IV and V fail to meet the requirements of 735 ILCS 5/2-615 and must be dismissed.

Without such allegations, Counts I, II, IV, and V are factually insufficient. *See Kozak*, 572 N.E.2d at 281-82 (1991) (finding plaintiff's failure to identify the "injury-producing product" in their complaint the epitome of factual insufficiency). Even if the Court accepts plaintiffs' allegations as true, it is impossible to conclude that plaintiffs are entitled to any relief from Alfa Laval. Further, the factual void in plaintiffs' complaint prevents Alfa Laval from responding to any of the allegations or preparing any defense for trial. *See, e.g., id.* For these reasons, Counts I, II, IV, and V fail to meet the requirements of 735 ILCS 5/2-615 and must be dismissed.

WHEREFORE, Alfa Laval Inc., improperly sued as "Alfa Laval Inc., individually and as successor-in-interest to DeLaval Purifiers," respectfully requests that the Court dismiss plaintiffs' complaint against it in its entirety, and for such other and further relief as the Court deems just and proper.

Defendant demands trial by jury.

Respectfully submitted,

**SWANSON, MARTIN & BELL, LLP**

/s/ Michael A. Long
One of the attorneys for Defendant,
**Alfa Laval Inc.**

John J. O'Sullivan / Rick C. Shea
C. Matt Alva / Michael A. Long #6317413
**SWANSON, MARTIN & BELL, LLP**
330 N. Wabash Ave., Suite 3300
Chicago, IL 60611
(312) 321-9100
Firm ID #29558
mlong@smbtrials.com

FILED DATE: 7/21/2021 4:46 PM    2021L006906

FILED
7/21/2021 4
IRIS Y. MAR
CIRCUIT CLERK
COOK COUNTY, IL
2021L006906

E-SERVICE
66789197
Jul 22 2021
09:26AM
File & ServeXpress

**IN THE CIRCUIT COURT**
**THIRD JUDICIAL CIRCUIT**
**MADISON COUNTY, ILLINOIS**

IN RE: ALL ASBESTOS LITIGATION )
FILED IN MADISON COUNTY )

e-Served
by MyDocFileServe
2273955
Jul 21 2021 04:46 PM

### <u>DECLARATION OF ROBERT MADISON</u>

I, Robert Madison, hereby declare:

1.      I am over the age of 18, and I am competent to make this declaration.  I have personal knowledge of the facts stated in this declaration and, if sworn as a witness, could and would testify competently thereto.

2.      I have worked for Alfa Laval Inc. ("Alfa Laval") since March 2007.  I am currently the Tax Director for the company and have held this particular position since 2015. Prior to that, I held positions within the company as Tax Accountant and Tax Manager.  I have also served as Assistant Treasurer for Alfa Laval since 2013.

3.      Alfa Laval is a New Jersey corporation.  Its principal place of business is Richmond, Virginia.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Executed on this 9th day of April 2018 in Richmond, Virginia.

Robert Madison


EXHIBIT
1

E-SERVICE
66789658
Jul 22 2021
10:54AM
File & ServeXpress

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

|  |  |  |
|---|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) ) ) ) | |
| Plaintiff, | ) | Case No. 21-L-006906 |
| vs. | ) ) | RE: ASBESTOS |
| AIR & LIQUID SYSTEMS CORPORATION, Successor-by-Merger to BUFFALO PUMPS, INC., et al., | ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

## <u>ENTRY OF APPEARANCE</u>

COMES NOW the law firm of The Cook Group, PLLC, by and through its attorneys and hereby enters appearance on behalf of Defendant The Nash Engineering Company.

Respectfully submitted,

**THE COOK GROUP, PLLC**

/s/ *Joseph A. Hargraves, Jr.*
Joseph A. Hargraves, Jr. #6296682
Anthony J. Albrecht #6305223
One Metropolitan Square
211 North Broadway, Suite 2200
St. Louis, MO 63102
Phone: (314) 882-9869
jhargraves@cookgrouplegal.com
*Cook County ID: 65584*

Attorneys for The Nash Engineering Company

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was electronically filed with the Court through Odyssey eFileIL and served to all Counsel of Record via File & ServeXpress on this 22nd day of July 2021.

*/s/ Joseph A. Hargraves, Jr.*

FILED
7/22/2021 1:

IRIS Y. M/

CIRCUIT C

E-SERVICE
66792799
Jul 23 2021
09:20AM
File & ServeXpress

72806-48-111-106-121-                                    Firm I.D. #04927

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION                 COOK COUNTY, IL

CHLOYDE PELTON and SHIRLEY PELTON,

            Plaintiffs,

v.

AIR & LIQUID SYSTEMS CORPORATION, successor
by merger to BUFFALO PUMPS, INC., et al.,

            Defendants.

2021L006906

NO. 21 L 006906

IN RE: ASBESTOS LITIGATION

Hon. Clare E. McWilliams

Calendar: "J1"

## SPECIAL AND LIMITED ENTRY OF APPEARANCE

The undersigned, as attorney, enters the special and limited appearance of the Defendant, Syd Carpenter, Marine Contractor, Inc., for the sole purpose of contesting this Court's jurisdiction over it. ~~*Defendant demands trial by jury.~~

        /s/ McKenna Storer
        McKENNA STORER

        Gregory L. Cochran
        Paul S. Steinhofer
        Thomas W. Hayes
        Kelly E. Purkey
Name        McKenna Storer
Attorney for    Defendant, Syd Carpenter, Marine Contractor Inc.
Address     33 North LaSalle Street, Suite 1400
City        Chicago, Illinois 60602-2610
Email       service@mckenna-law.com
Telephone   312/558-3900
Atty No.     04927

      *Strike demand for trial by jury if not applicable.

I certify that a copy of the within instrument was served on all parties who have appeared and have not heretofore been found by the Court to be in default for failure to plead.

        /s/ Gregory L. Cochran
        Attorney for Defendant, Syd Carpenter, Marine Contractor Inc.

FILED DATE: 7/22/2021 1:10 PM 2021L006906

FILED DATE: 7/22/2021 1:10 PM    2021L006906

**<u>Certificate of Service</u>**

The undersigned certifies that a copy of the foregoing and the above-reference document was filed on the 22nd day of July, 2021 via File & Serve Illinois and served via File & ServeXpress.

[X]     Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the statements set forth herein are true and correct.

<u>/s/ Autumn Ehrenberg</u>

E-SERVICE
66801666
Jul 27 2021
01:38PM
File & ServeXpress

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) ) ) | |
| | ) | NO: 2021L006906 |
| Plaintiffs, | ) | |
| | ) | IN RE:  ASBESTOS LITIGATION |
| v. | ) | |
| | ) | Calendar: J-1 |
| AIR & LIQUID SYSTEMS CORPORATION, successor-by-merger to BUFFALO PUMPS, INC., et al., | ) ) ) ) | |
| Defendants. | ) | |

## **ENTRY OF APPEARANCE**

COMES NOW MANNING GROSS + MASSENBURG LLP, and hereby enters its

appearance on behalf of Defendant, JOHN CRANE INC.

Respectfully submitted,

MANNING GROSS + MASSENBURG LLP

By:     */s/ Pamela R. Gamble*_____
Alexander J. Baker #6305401
Mark I. Tivin, #6210281
Pamela R. Gamble, #6282922
pgamble@mgmlaw.com
Nandini A. Pillai, #6330291
Anthony D. Danhelka, #6305698
55 W. Monroe Street, Suite 3360
Chicago, IL  60603
Telephone: (312) 625-4995
Facsimile:  (312) 291-9396
FIRM ID NO.:  63354
ATTORNEYS FOR DEFENDANT
JOHN CRANE INC.

## <u>PROOF OF SERVICE</u>

This is to certify that a true and accurate copy of the foregoing was filed via Odyssey e-FileIL.com and served on all counsel of record via File & ServeXpress on this 27th day of July, 2021.

Ethan A. Flint
Flint Law Firm, LLC
222 E. Park Street, Suite 500
P.O. Box 189
Edwardsville, IL 62025
*Attorneys for Plaintiffs*

*/s/ Pamela R. Gamble*
ATTORNEYS FOR DEFENDANT
JOHN CRANE INC.

010579.0078

#60168

E-SERVICE
66802681
Jul 27 2021
04:22PM
File & ServeXpress

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT - LAW DIVISION

| | |
|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | |
| Plaintiffs, | No. 21 L 6906 |
| v. | IN RE: ASBESTOS LITIGATION |
| AIR & LIQUID SYSTEMS CORPORATION, et al., | Calendar J1 |
| Defendants. | |

### *APPEARANCE

The undersigned, as attorney, enters the appearance of defendant

TACO, INC.

*Defendant demands trial by jury.

/s/ Daniel S. Schwartz
Daniel S. Schwartz
Douglas M. Sinars

| | |
|---|---|
| Name: | Sinars Slowikowski Tomaska LLC |
| Attorney for: | Defendant, *Taco, Inc.* |
| Address: | 55 West Monroe Street, Suite 4000 |
| City: | Chicago, Illinois 60603 |
| Telephone: | (312) 767-9790 |
| Email: | dschwartz@sinarslaw.com |
| Atty No: | #60168 |

I certify that a copy of the within instrument was served on all parties who have appeared and have not heretofore been found by the court to be in default for failure to plead.

/s/ Daniel S. Schwartz
Daniel S. Schwartz
Douglas M. Sinars

**IRIS Y. MARTINEZ, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

010579.0078

#60168

E-SERVICE
66802681
Jul 27 2021
04:22PM
File & ServeXpress

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT - LAW DIVISION

CHLOYDE PELTON and SHIRLEY PELTON,

|  |  |
|---|---|
| Plaintiffs, | No. 21 L 6906 |
| v. | IN RE: ASBESTOS LITIGATION |
| AIR & LIQUID SYSTEMS CORPORATION, et al., | Calendar J1 |
| Defendants. | |

### NOTICE OF FILING

To:     ALL COUNSEL OF RECORD

PLEASE TAKE NOTICE that on July 27, 2021, we filed with the Clerk of the Circuit Court of Cook County, Illinois, Defendant, **Taco, Inc.'s APPEARANCE**, a copy of which is attached hereto and hereby served upon you.

/s/ Daniel S. Schwartz
Daniel S. Schwartz
Sinars Slowikowski Tomaska LLC
55 West Monroe Street, Suite 4000
Chicago, Illinois 60603
Telephone: (312) 767-9790
Email: dschwartz@sinarslaw.com
Attorneys for Defendant,
*Taco, Inc.*
Atty. No.: 60168

### CERTIFICATE OF SERVICE

I, the undersigned, a non-attorney, certify and state that true and correct copies of this notice and aforementioned documents were served upon all counsel of record via File & Serve Xpress on July 27, 2021.

/s/ Ellen Chirikos
Ellen Chirikos

*Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the statements set forth herein are true and correct.*
**IRIS Y. MARTINEZ, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

010579.0078                                                                      #601



## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT - LAW DIVISION

| | |
|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | |
| Plaintiffs, | No. 21 L 6906 |
| v. | IN RE: ASBESTOS LITIGATION |
| AIR & LIQUID SYSTEMS CORPORATION, et al., | Calendar J1 |
| Defendants. | |

### NOTICE OF MOTION

To:     ALL COUNSEL OF RECORD

On July 27, 2021, at 1:30 p.m., or as soon thereafter as counsel may be heard, I shall appear before Judge Clare E. McWilliams or any judge sitting in her stead in the courtroom usually occupied by her in Room 2310 of the Richard J. Daley Center, Chicago, Illinois and there and then present Defendant, **Taco, Inc.'s SECTION 2-619.1 COMBINED MOTION TO DISMISS PLAINTIFFS' COMPLAINT**, a copy of which is attached hereto and hereby served upon you.

*/s/ Daniel S. Schwartz*
Daniel S. Schwartz
Sinars Slowikowski Tomaska LLC
55 West Monroe Street, Suite 4000
Chicago, Illinois 60603
Telephone: (312) 767-9790
Email: dschwartz@sinarslaw.com
Attorneys for Defendant,
*Taco, Inc.*
Atty. No.: 60168

### CERTIFICATE OF SERVICE

I, the undersigned, a non-attorney, certify and state that true and correct copies of this notice and aforementioned documents were served upon all counsel of record via File & Serve Xpress on July 27, 2021.

*/s/ Ellen Chirikos*
Ellen Chirikos

*Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the statements set forth herein are true and correct.*
**IRIS Y. MARTINEZ, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

E-SERVICE
66802681
Jul 27 2021
04:22PM
File & ServeXpress

010579.0078                                                                    #60168

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT - LAW DIVISION**

| | |
|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | |
| Plaintiffs, | No. 21 L 6906 |
| v. | IN RE: ASBESTOS LITIGATION |
| AIR & LIQUID SYSTEMS CORPORATION, et al., | Calendar J1 |
| Defendants. | |

**TACO, INC.'S SECTION 2-619.1 COMBINED MOTION TO DISMISS**
**PLAINTIFFS' COMPLAINT**

Defendant, Taco, Inc., by and through its attorneys, SINARS SLOWIKOWSKI TOMASKA LLC, for its Combined Motion to Dismiss pursuant to 735 ILCS 5/2-619.1, moves this honorable Court to dismiss Plaintiffs' Complaint under 735 ILCS 5/2-619, 735 ILCS 5/2-615, 735 ILCS 5/2-101, 735 ILCS 5/2-301, 735 ILCS 5/2-604.1, and Illinois Supreme Court Rule 187. In support thereof, Taco, Inc. states:

**Section 2-619 Motion to Dismiss**

**1.      Motion to Dismiss for Lack of Personal Jurisdiction**

This Court's assertion of jurisdiction over Taco, Inc. violates the Due Process Clause of the United States Constitution under the unanimously decided cases of *Daimler AG v. Bauman*, 571 U.S. 117 (2014) and *Walden v. Fiore,* 571 U.S. 277 (2014), and therefore the Complaint must be dismissed.

Sections 2-619 and 2-301 of the Illinois Code of Civil Procedure provide for the dismissal of claims where a court lacks personal jurisdiction over the defendant. A plaintiff in Illinois has the burden to establish a prima facie basis to exercise personal jurisdiction over a nonresident defendant. *Russell v. SNFA*, 2013 IL 113909, ¶ 28. "[T]he defendant may overcome plaintiff's

*prima facie* case for jurisdiction by offering uncontradicted evidence that defeats jurisdiction." *Id.* at ¶ 28, *citing Wiggen v. Wiggen*, 2011 IL App (2d) 100982, ¶ 20. The relevant time period in determining a jurisdictional question is "the time the nonresident defendant became a party to the suit or was served with process." *Reeves v. Baltimore & Ohio Railroad Company*, 171 Ill. App. 3d 1021, 1027 (1st Dist. 1988); *see also Howard v. Missouri Bone and Joint Center, Inc.*, 373 Ill. App. 3d 738, 742 (5th Dist. 2007); *Morecambe Maritime, Inc. v. Nat'l Bank of Greece*, S.A., 354 Ill. App. 3d 707, 713 (1st Dist. 2004). Though the court may also consider the time the claim arose, that alone is not determinative, and "the critical point of the focus of inquiry must be upon the time that the defendant is made a party to the suit and is served with process." *Id.*

The United States Supreme Court addressed the distinction between general and specific jurisdiction in *Walden v. Fiore* and *Daimler AG v. Bauman*. With respect to general or "all-purpose" jurisdiction, in *Daimler AG v. Bauman*, the Supreme Court held that the exercise of general jurisdiction will comport with Due Process if the corporate defendant's connections "with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State.'" *Daimler AG v. Bauman*, 571 U.S. 117 at 122 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011)).

In *Daimler*, the United States Supreme Court rejected the argument that general jurisdiction exists in any state in which a corporation "engages in a substantial, continuous, and systemic course of business." *Daimler*, 571 U.S. 117 at 138. Instead, the Court held that general jurisdiction exists only where the defendant is "*fairly regarded at home,*" and for a corporation, "*the place of incorporation and principal place of business are 'paradig[m] … bases for general jurisdiction.*" *Id.* at 137 (citation omitted) (alteration in original) (emphasis added).

Plaintiffs fail to allege facts sufficient to even suggest a showing of general jurisdiction

over Taco, Inc. in Illinois. Taco, Inc. began its operations in Elizabeth, New Jersey in 1920. Taco, Inc. was incorporated in 1928 in Cranston, Rhode Island, where it is still headquartered. Taco, Inc. does not advertise in Illinois, has no employee sales representatives in Illinois, and it does not have an authorized agent in Illinois to accept service of process in Illinois. This Defendant does not own or possess any real property, hold any mortgages or liens, have any corporate offices, facilities, or have any telephone listings or have any bank accounts, in the state of Illinois. Plaintiffs do not allege that Taco, Inc. is incorporated in Illinois, or that its principal place of business is located in Illinois. Nor do Plaintiffs allege any exceptional circumstances which so closely tie Taco, Inc. to Illinois that it would be considered "essentially at home" here, despite being incorporated and maintaining its principal place of business elsewhere. *See generally Plaintiffs' Complaint*. Thus, there is no basis for an Illinois court to assert general jurisdiction over Taco, Inc. regarding any of Plaintiffs' claims.

The case of *Walden v. Fiore* addressed "minimum contacts" with the forum state necessary to create specific jurisdiction. "For a state to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum [s]tate." *Walden*, 571 U.S. at 284. The inquiry "focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Id.* (quoting *Keeton* v. *Hustler Magazine, Inc.*, 465 U. S. 770, 775 (1984)). "[The] unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)).

The Court reaffirmed these principles in *Bristol-Myers Squibb Co. v. Superior Court of California*, reiterating that "there must be an 'affiliation between the forum and the underlying

controversy, principally, [an] activity or an occurrence that takes place in the forum State.'"

*Bristol-Myers Squibb Co. v. Superior Court of California*, 582 U.S. ___, ___, 137 S. Ct. 1773,

1780 (2017) (quoting *Goodyear,* 564 U.S. at 919). "When there is no such connection, specific

jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State."

*Id.*

Pursuant to the Illinois "long-arm" statute, an Illinois court may exercise specific

jurisdiction over a nonresident defendant if the defendant performs one of several enumerated acts

within the state of Illinois (such as the commission of a tort) and the cause of action "directly

arise[s] out of the contacts between the defendant and the forum." 735 ILCS 5/2-209(a); *see also*

*Bolger v. Nautica International, Inc.*, 369 Ill. App. 3d 947, 952 (2d Dist. 2007).

Here, Plaintiffs fail to allege that Taco, Inc.'s suit-related conduct created a substantial

connection with the state of Illinois. Thus, there is no basis for an Illinois court to assert specific

jurisdiction over Taco, Inc. regarding any of Plaintiffs' claims.

Taco, Inc. specifically reserves the right to supplement its challenge to personal

jurisdiction.

### 2. Motion to Dismiss Pursuant to 735 ILCS 5/2-101 and Forum *Non Conveniens* Pursuant to Illinois Supreme Court Rule 187

Plaintiffs fail to allege sufficient facts which demonstrate the propriety and convenience of

venue in Cook County, Illinois. Therefore, this matter should be dismissed due to improper venue

on the basis of forum *non conveniens*. *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167 (2003);

*Gulf Oil Corporation v. Gilbert*, 330 U.S. 501 (1947).

A case must be dismissed based on the doctrine of interstate forum *non conveniens* when

it has "no practical connection to the forum." *Vinson v. Allstate*, 144 Ill. 2d 306, 310 (1991). The

doctrine of forum *non conveniens* is an equitable doctrine that allows a court to decline to exercise

jurisdiction of a case, even though it may have proper jurisdiction over the subject matter and the parties, whenever it appears that there is another forum with jurisdiction over the parties in which trial can be more conveniently had. *Fennell v. Illinois Central R.R. Co.*, 2012 IL 113812, ¶ 12 (citing *Gridley v. State Farm Mutual Insurance* Co., 217 Ill. 2d 158, 169 (2005)). Considerations of fundamental fairness as well as sensible and effective judicial administration underlie the doctrine. *Id.* The inquiry is not one of jurisdiction or proper venue but must center upon which forum is most convenient under the facts of this particular case. *Wieser v. Missouri Pacific R.R. Co.*, 98 Ill. 2d 359, 364 (1983). A case should not be tried in a forum that has no significant factual connections to the cause of action. *Foster v. Chicago & Northwestern Transportation Co.*, 102 Ill. 2d 378, 838 (1984).

In *Fennell*, the Supreme Court of Illinois reaffirmed the analytical framework established in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) to guide Illinois courts in their consideration of forum *non conveniens* challenges. *Fennell*, 2012 IL 113812, ¶ 14. The *Gulf Oil* balancing test outlines certain private and public interest factors that the court must weigh in determining whether the plaintiff's forum is inconvenient and another forum is more convenient to all parties. *Id.*, ¶¶ 14–16. Although the factors involved in this test are established, every case is unique and the court must consider each case on its own facts. *Id.*, ¶ 17. In making its determination of whether the total circumstances of the case favor dismissal, the court must evaluate "all of the relevant private and public interest factors." *Id.*, ¶ 24; *Schuster v. Richards*, 2018 IL App (1st) 171558, ¶ 19.

Private interest factors to be considered by the court include: (1) the convenience of the parties; (2) the relative ease of access to sources of testimonial, documentary, and real evidence; (3) the availability of compulsory process to secure the attendance of unwilling witnesses; (4) the cost of obtaining the attendance of willing witnesses; (5) the possibility of viewing the premises if

appropriate; and (6) all other practical considerations that make a trial easy, expeditious, and inexpensive. *Fennell*, 2012 IL 113812, ¶ 15. The Court must also consider certain public-interest factors: (1) the administrative burdens of litigation piling up in congested centers instead of being handled at their place of origin; (2) the imposition of jury duty upon the people of a community that has no relation to the litigation; and (3) the interest in deciding localized controversies at home. *Id.*, ¶ 16.

A consideration of each of the above factors demonstrates that dismissal of this case is warranted because an Illinois court is not the most convenient forum for resolution of Plaintiffs' action. As discovery is ongoing, Taco, Inc. reserves the right to amend/supplement this motion.

### 3. Additional Defenses Pursuant to 735 ILCS 5/2-619(a)(9)

a.     Plaintiffs' claims are barred by virtue of all applicable statutes of limitation and/or repose, including but not limited to 735 ILCS 5/13-202, 735 ILCS 5/13-214(b), 735 ILCS 5/13-213, 740 ILCS 180/1, and 735 ILCS 5/13-209.

b.     Plaintiffs' claims against this Defendant are barred by the superseding negligence of non-party manufacturers who failed to warn of their products that they supplied to this Defendant, which was the sole proximate cause of the alleged injuries.

c.     Plaintiffs' claims against this Defendant are barred by the intentional misrepresentation and suppression of information by non-party manufacturers of the potential health effects of the products they supplied to this Defendant.

d.     The alleged injuries were caused by Chloyde Pelton's failure to exercise due care and caution for his own safety.

e.     Defendant owed no duty to Plaintiffs, as this Defendant had no knowledge of and no reason to know that asbestos was capable of causing injury to Plaintiffs. *See Hunt v. Blasius*,

74 Ill. 2d 203 (1978).

f.      This Defendant denies that it was a proximate cause of the alleged injuries.  The sole proximate cause of the alleged injuries and damages was Chloyde Pelton's exposure to other party defendants' products and other non-party entities' products.  Plaintiffs' claims against this Defendant are therefore barred.  *See Nolan v. Weil-McLain*, 233 Ill. 2d 416 (2009).

g.      The sole proximate cause of the alleged injuries and damages was the failure of Chloyde Pelton's employers to take adequate precautions and properly follow applicable safety regulations and guidelines, including but not limited to the Occupational Safety and Health Act (OSHA).  Such failures include but are not limited to the failure of said employers to properly inspect, repair, and maintain their facilities and the failure of said employers to properly instruct and warn their employees regarding proper methods of handling asbestos products.  Chloyde Pelton's employers were also sophisticated users and/or learned intermediaries who had a duty to warn of the hazards of asbestos-containing products.

h.      If Chloyde Pelton was exposed to asbestos-containing products associated with this Defendant, which is denied, then such exposure was inconsequential or *de minimis*, thus barring any recovery by Plaintiffs.

i.      If any of Plaintiffs' allegations regarding the allegedly defective condition of asbestos, asbestos-containing products, packaging, or warnings are proven, Plaintiffs are nonetheless barred from recovery against this Defendant because there was no known practical or feasible substitute for asbestos or asbestos-containing products at the time of the alleged exposure, and the benefit of the product outweighed any harm allegedly caused by the same.

j.      The state of the medical and scientific knowledge and the published literature and other materials reflecting the state of the medical art at all relevant times was such that this

Defendant neither knew nor could have known that the products it manufactured or distributed presented a foreseeable risk of harm, if any, to Chloyde Pelton in the normal and expected use of these products at the time of the alleged exposure.

k.      The alleged injuries, if any, were proximately caused by Chloyde Pelton's acts of knowingly and voluntarily assuming a position of danger and thus assuming the risks ordinarily incident to such acts, which were open, obvious, apparent, and actually known to him.  The alleged injuries, if any, were proximately caused by his assumption of such risks and such conduct bars Plaintiffs' cause of action and any recovery.

l.      At all relevant times, asbestos-containing products allegedly attributable to this Defendant were in compliance with all applicable industry standards and health and safety statutes and regulations applicable to the manufacturer, sale, and use of said products.

m.      The allegedly injured party's use of and/or exposure to tobacco products is the sole proximate cause of any claimed asbestos-related disease.

n.      Taco, Inc. reserves the right to assert any additional defenses of which it may learn through discovery, and further adopts and asserts all defenses raised or asserted by other defendants in this action to the extent that said defenses do not conflict with this Defendant's defenses.

### **Section 2-615 Motion to Dismiss**

**1.      Insufficient Facts to State a Cause of Action**

Plaintiffs fail to plead sufficient facts to properly state a cause of action under Illinois law. Illinois is a fact pleading, not a notice pleading jurisdiction.  *Teter v. Clemens*, 112 Ill. 2d 252, 256 (1986); *People ex rel. Fahner v. Carriage Way West, Inc.*, 88 Ill. 2d 300, 308 (1981).  To avoid dismissal under Illinois law, a complaint must not only set forth a legally recognized claim as its

avenue of recovery, but it must also set forth sufficient facts to bring the claim within a legally recognized cause of action. *Teter*, 112 Ill. 2d at 256; *Carriage Way*, 88 Ill. 2d at 307–08.

In order to state a valid cause of action under Illinois law, a Plaintiff must plead with greater specificity than that which is present here. "The complaint must contain factual allegations of every fact which must be proved in order for the plaintiff to be entitled to judgment on the complaint, and a judgment cannot be rendered on facts demonstrated by evidence at trial unless those facts shown were alleged in the complaint." *In re: Beatty*, 118 Ill. 2d 489, 499 (1987). Plaintiffs' Complaint is factually insufficient as it fails to identify all of the jobsites, including the location and time period for each, where Chloyde Pelton was allegedly exposed to asbestos. *See generally Plaintiffs' Complaint.* Moreover, the Complaint fails to identify the specific products of each defendant that allegedly caused his injury at such sites. *Id.* As such, Plaintiffs fail to meet the pleading requirements of Illinois law, and therefore, Plaintiffs' cause of action must be dismissed.

### 2. No Facts Establishing Concurrent Negligence

Plaintiffs fail to allege facts that any asbestos-containing Taco, Inc. products were used concurrently or in conjunction with asbestos-containing products sold by other defendants. Plaintiffs therefore fail to plead a case of concurrent negligence for joint and several liability. *See Knox v. Keene Corporation*, 210 Ill. App. 3d 141 (2d Dist. 1991).

### 3. No Facts Alleged Establishing Duty, Negligence, or Proximate Cause Regarding Alleged Failure to Warn

Plaintiffs make conclusory allegations as to all named defendants, including Taco, Inc., that each used asbestos and failed to warn Chloyde Pelton despite alleging facts regarding what each defendant knew or should have known of its hazards at unspecified dates and times over a period of many years. Plaintiffs provide no facts that support these allegations.

A duty to warn is determined by an objective standard, *i.e.*, the awareness of an ordinary person. *Sollami v. Eaton*, 201 Ill. 2d 1, 7 (2002). The determination of whether a duty to warn exists is a question of law. *Id*. In *Woodill v. Parke Davis & Co*., the Supreme Court stated that a manufacturer is required to give a warning only if it has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge of the presence of the ingredient and the hazard which made its product unreasonably dangerous. *Woodill v. Parke Davis & Co*., 79 Ill. 2d 26, 32. Further, a manufacturer has a duty to warn where the product possesses dangerous propensities and there is unequal knowledge with respect to the risk of harm from the product, and the manufacturer possessed of such knowledge, knows or should know that harm may occur absent a warning. *Sollami*, 201 Ill. 2d at 7.

The Complaint contains no factual allegations establishing a hazard created by any defendant's specific product or a disparity of knowledge between any defendant and Chloyde Pelton as to the dangers associated with the specific product sold by each defendant. *See Plaintiffs' Complaint*. As such, Plaintiffs' cause of action should be dismissed. *See e.g., Huff v. Elmhurst Stone Company*, 94 Ill. App. 3d 1091, 1099–1100 (1st Dist. 1981) (finding that a duty to warn did not arise when there was general knowledge in the industry concerning the harmful nature of the product at issue, of which the Plaintiff had actual knowledge, and when the Plaintiff had suffered an injury as a result of a common propensity of the product with which he was familiar).

Moreover, Plaintiffs fail to allege (1) the type of warning that should have been on the product; (2) that such warning would have been seen by Chloyde Pelton; or (3) that such warning would have caused Chloyde Pelton to change his conduct to avoid the alleged exposure. Without facts concerning each defendant's product, date and place of use, or the friability of asbestos used in the defendant's product, the Complaint does not state a cause of action and does not even provide

notice of what the defendant is being called on to defend. Plaintiffs fail to allege any of the required specific facts against this Defendant and, therefore, Plaintiffs' cause of action should be dismissed as a matter of law.

### 4. No Facts Establishing Willful and Wanton Misconduct

Count II of Plaintiffs' Complaint attempts to assert a generic cause of action for willful and wanton misconduct against all defendants. However, that claim must fail as a matter of law. "To sufficiently plead willful and wanton misconduct, the plaintiff must allege either a deliberate intention to harm or utter indifference to or conscious disregard for the welfare of the plaintiff." *Adkins v. Sarah Bush Lincoln Health Center*, 129 Ill. 2d 497, 518 (1989). The plaintiff must allege well-pleaded facts establishing such conduct and not merely label the alleged conduct as willful and wanton. *Winfrey v. Chicago Park District*, 274 Ill. App. 3d 939, 943 (1st Dist. 1995). Here, Plaintiffs fail to allege sufficient facts that establish conduct so egregious that it rises to the level of willful and wanton misconduct. Instead, Plaintiffs merely make unsupported legal conclusions that this Defendant was willful and wanton by labeling the same allegations pleaded in all other counts as willful; they do not provide any underlying facts from which one could properly draw such an inference. As such, Plaintiffs' willful and wanton claim must be dismissed.

### 5. The Conspiracy Allegations Against Taco Inc. Should Be Dismissed under 2-615.

To the extent that any conspiracy allegations of Count III may be construed to apply to Taco Inc., the same are denied and said Count should be stricken for failure to state a cause of action against this defendant.

To state a claim for civil conspiracy, a plaintiff must plead: 1) a combination of two or more persons; 2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose or a lawful purpose by unlawful means; 3) in the furtherance of which

one of the conspirators committed an overt tortious or unlawful act. *Fritz v. Johnston*, 209 Ill. 2d 302, 317 (2004). To withstand a motion to dismiss, the plaintiff must support a conspiracy claim with specific facts demonstrating a "concert of action" and an underlying tortious act, including the existence of a duty and a breach of that duty. *Hume & Liechty Veterinary Associates v. Hodes*, 259 Ill. App. 3d 367, 369 (1st Dist. 1994). Here, Plaintiffs fail to allege sufficient facts to support their allegations of a tortious act.

### 6. The Spoliation Allegations Against Taco, Inc. Should Be Dismissed under 2-615.

Plaintiffs attempt to assert an action for spoliation of evidence against Taco, Inc. in Counts IV and V for negligent and willful and wanton spoliation of evidence. However, Plaintiffs' claims are not factually sufficient in pleading any general spoliation claim. In *Boyd v. Travelers Insurance Company*, the Illinois Supreme Court characterized spoliation of evidence as a negligence action, requiring a plaintiff to plead the existence of a duty, breach, proximate cause and damages to state a cause of action. *Boyd v. Travelers Insurance Company*, 166 Ill. 2d 188, 194–95 (1995). The *Boyd* court specifically addressed the requirements of pleading the duty and causation elements of a legally sufficient spoliation claim.

There is generally no duty to preserve evidence; however, a duty may arise through an agreement, contract, statute or other special circumstance. *Id.* at 195. Also, a defendant may voluntarily assume a duty by affirmative conduct. *Id.* In other words, a defendant owes a duty of due care to preserve evidence if a reasonable person should have foreseen that the evidence was material to a potential cause of action. *Id.*

In this case, Plaintiffs' Complaint fails to allege any facts on which, if proven, a duty would arise on the part of Taco, Inc. Plaintiffs' allegations are nothing more than vague generalizations. Plaintiffs do not allege that Taco, Inc. performed any specific act at any specific time which could

give rise to a duty to Plaintiffs.

In *Boyd*, Travelers voluntarily assumed a duty to preserve a heater when its agent removed the heater from the plaintiff's possession two days after a fire in order to perform tests. *Boyd*, 166 Ill. 2d at 195. Here, Plaintiffs have failed to allege facts showing that the records were kept for the benefit of others and, in particular, of Chloyde Pelton, who was not injured until many years after the records in questions had allegedly been destroyed.

Plaintiffs further fail to allege facts which would give rise to a duty through agreement, contract, statute, special circumstance, or voluntary assumption as required by the Supreme Court in *Boyd*. Conclusions of law or conclusions of fact unsupported by allegations of specific facts do not meet the minimal pleading requirements under Section 2-615. *Jackson v. Michael Reese Hospital & Medical Center*, 294 Ill. App. 3d 1, 13 (1st Dist. 1997).

Plaintiffs fail to allege sufficient facts regarding causation. Plaintiffs have not pled facts which would prove that without Taco, Inc.'s alleged conduct, the underlying lawsuit had a reasonable probability of success. Plaintiffs' allegations are therefore insufficient under the standard required by the *Boyd* court.

Finally, it is incumbent upon the plaintiff to specifically plead facts evidencing that an action was brought within the applicable statute of limitations. *See generally Kielminski v. St. Anthony's Hospital*, 68 Ill. App. 3d 407 (1st Dist. 1979). Here, Plaintiffs fail to allege any date upon which the alleged tortious acts occurred. Accordingly, Plaintiffs' spoliation allegations are insufficient and should therefore be dismissed.

### 7. Plaintiffs' Prayer for Punitive Damages Violates 735 ILCS 5/2-604.1, and Therefore Should be Stricken.

Count V of Plaintiffs' Complaint alleges willful and wanton spoliation of evidence and, in addition to seeking compensatory damages, requests the imposition of punitive damages.

Section 2-604.1 of the Illinois Code of Civil Procedure specifically provides:

In all actions on account of bodily injury or physical damage to property, based on negligence, or product liability based on strict tort liability, where punitive damages are permitted no Complaint shall be filed containing a prayer for relief seeking punitive damages. However, a plaintiff may, pursuant to a pretrial motion and after a hearing before the Court, amend the Complaint to include a prayer for relief seeking punitive damages. The Court shall allow the motion to amend the Complaint if the plaintiff established at such hearing a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages.

735 ILCS 5/2-604.1.

Plaintiffs have not made the requisite motion for leave to amend their Complaint in this matter to include a prayer for relief seeking punitive damages, nor has the Court held such a hearing to determine that there is a factual basis for such relief. Plaintiffs' claims for such relief should therefore be stricken as to this Defendant.

Finally, Plaintiffs' claim for punitive damages also violates this Defendant's rights to substantive and procedural due process, among other rights, secured by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; Article I, Sections 2, 8, 10, and 11 of the Illinois Constitution; and 735 ILCS 5/2-1115.05. *See* U.S. Const., amends. V, VI, VIII, XIV; Ill. Const. 1970, art. I, §§ 2, 8, 10, 11; 735 ILCS 5/2-1105.05.

### 8. The Loss of Consortium Claim in Count VI Must Be Dismissed.

In Count VI, Plaintiff Shirley Pelton claims the loss of support, consortium, and society of her husband, Chloyde Pelton, due to injuries that he allegedly suffered as a result of exposure to asbestos from unidentified Taco, Inc. products. As explained by the Fifth District, to recover on a loss of consortium claim, the deprived party must prove, inter alia, liability on the part of the defendant. *Johnson v. May*, 223 Ill. App. 3d 477, 488 (5th Dist. 1992); *Casey v. Pohlman*, 198 Ill. App. 3d 503, 509 (5th Dist. 1990). As purely derivative in nature, recovery under consortium theory requires that the defendant be liable for the injuries of the person whose spouse brings the

action. *Jarvis v. Stone*, 517 F. Supp. 1173, 1177 (N.D. Ill. 1981) (applying Illinois law).

Here, Shirley Pelton's consortium claim is wholly dependent on first stating a viable cause of action and establishing liability against Taco, Inc. As the negligence claims in this case fail to state a cause of action against Taco, Inc., or are otherwise insufficient as a matter of law, the consortium claim against this Defendant cannot be sustained and accordingly must be dismissed. *See Nielsen v. Village of Lake in the Hills*, 948 F. Supp. 786, 797-98 (N.D. Ill. 1996).

WHEREFORE Defendant, TACO, INC., prays that its Combined Motion to Dismiss Plaintiffs' Complaint pursuant to 735 ILCS 5/2-619.1 be granted in its entirety.

TACO, INC.

By:     */s/ Daniel S. Schwartz*
         Daniel S. Schwartz

Douglas M. Sinars
James P. Kasper
Daniel S. Schwartz
SINARS SLOWIKOWSKI TOMASKA LLC #60168
55 West Monroe Street, Suite 4000
Chicago, Illinois 60603
Telephone: (312) 767-9790
Email: dschwartz@sinarslaw.com
Attorneys for Defendant, *Taco, Inc.*

E-SERVICE
66804419
Jul 28 2021
10:21AM
File & ServeXpress

## IN THE CIRCUIT COURT OF
## COOK COUNTY, ILLINOIS

| | |
|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) No.: 2021-L-006906 |
| vs. | ) |
| | ) J1 |
| AIR & LIQUID SYSTEMS CORP., et.al., | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S VOLUNTARY DISMISSAL

Plaintiffs, by and through their attorneys, Flint Law Firm, LLC, hereby voluntarily dismiss this action without prejudice against Defendant **Carrier Global Corporation**, only. Each party to bear their own costs.

**FLINT LAW FIRM, LLC**

*/s/ Lawrence K. Holcomb*
Lawrence K. Holcomb (6328944)
Flint Law Firm, LLC
222 E. Park Street, Suite 500
Edwardsville, IL 620025
(618) 288-4777
(618) 288-2864 (facsimile)
service@flintlaw.com

**IN THE CIRCUIT COURT OF**
**COOK COUNTY, ILLINOIS**

| | |
|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) |
| | ) |
|    Plaintiffs, | ) |
| | ) No.: 2021-L-006906 |
| vs. | ) |
| | ) J1 |
| AIR & LIQUID SYSTEMS CORP., et.al., | ) |
| | ) |
|    Defendants. | ) |

**<u>ORDER</u>**

Pursuant to Plaintiff's Voluntary Dismissal filed by plaintiffs herein, IT IS HEREBY ORDERED that the above-entitled action is voluntarily dismissed without prejudice as to Defendant **Carrier Global Corporation**, only. Each party to bear its own costs.

Dated: _____     JUDGE:_____

E-SERVICE
66804697
Jul 28 2021
11:32AM
File & ServeXpress

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 21-L-006906 |
| vs. | ) ) | RE: ASBESTOS |
| AIR & LIQUID SYSTEMS CORPORATION, Successor-by-Merger to BUFFALO PUMPS, INC., et al., | ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

## <u>ENTRY OF APPEARANCE</u>

COMES NOW the law firm of The Cook Group, PLLC, by and through its attorneys and hereby enters appearance on behalf of Defendant Weir Valves & Controls USA, Inc. d/b/a Atwood & Morrill Co., Inc.

Respectfully submitted,

**THE COOK GROUP, PLLC**

/s/  *Joseph A. Hargraves, Jr.*
Joseph A. Hargraves, Jr. #6296682
Anthony J. Albrecht #6305223
One Metropolitan Square
211 North Broadway, Suite 2200
St. Louis, MO  63102
Phone: (314) 882-9869
jhargraves@cookgrouplegal.com
***Cook County ID: 65584***

Attorneys for Weir Valves & Controls USA, Inc. d/b/a
Atwood & Morrill Co., Inc.

## **<u>CERTIFICATE OF SERVICE</u>**

  The undersigned certifies that the foregoing document was electronically filed with the Court through Odyssey eFileIL and served to all Counsel of Record via File & ServeXpress on this 28th day of July 2021.

*/s/ Joseph A. Hargraves, Jr.*

1043577/Firm ID 90384

FILED
7/28/2021
IRIS Y. MART
CIRCUIT CLERK
COOK COUNTY, IL
2021L006906

E-SERVICE
66804834
Jul 28 2021
12:01PM
File & ServeXpress

14215439

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

|  |  |  |
|---|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 2021 L 6906 |
| v. | ) | |
| | ) | IN RE: ASBESTOS LITIGATION |
| A.W. CHESTERTON COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**APPEARANCE**

The undersigned enters the appearance of Defendant SPIRAX SARCO, INC.

| | |
|---|---|
| | Daniel W. McGrath |
| | Paul M. Markese |
| **Name:** | HINSHAW & CULBERTSON LLP |
| **Attorney for:** | Spirax Sarco, Inc. |
| **Address:** | 151 North Franklin Street, Suite 2500 |
| **City:** | Chicago, IL 60606 |
| **Telephone:** | 312-704-3000 |
| **Atty No.:** | 90384 |

I certify that a copy of the within instrument was served on all parties who have appeared and have not heretofore been found by the Court to be in default for failure to plead.

/s/*Daniel W. McGrath*
Attorneys for Spirax Sarco, Inc.

Daniel W. McGrath
dmcgrath@hinshawlaw.com
Paul M. Markese
pmarkese@hinshawlaw.com
HINSHAW & CULBERTSON LLP
151 North Franklin Street, Suite 2500
Chicago, IL 60606
312-704-3000
312-704-3001 (fax)

FILED DATE: 7/28/2021 11:16 AM 2021L006906

1043577\308610555.v1

E-SERVICE
66805720
Jul 28 2021
02:37PM
File & ServeXpress

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| CHLOYDE PELTON AND SHIRLEY PELTON, | ) | IN RE: ASBESTOS |
| | ) | LITIGATION |
| Plaintiffs, | ) | Case No.: 2021 L 006906 |
| | ) | |
| v. | ) | Calendar: J1 |
| | ) | |
| AIR AND LIQUID SYSTEMS CORPORATION et al. | ) | PERSONAL INJURY |
| | ) | LUNG CANCER |
| Defendants. | ) | |

<u>**APPEARANCE**</u>

The undersigned, as attorney, enters the appearance of the defendant

**Honeywell International Inc., f/k/a AlliedSignal Inc., as successor-in-interest to The Bendix Corporation**.

HONEYWELL INTERNATIONAL INC., f/k/a ALLIEDSIGNAL INC., as successor-in-interest to THE BENDIX CORPORATION

BY:/s/ Matthew J. O'Malley _____
One of Its Attorneys

Shannon Harvey – sharvey@tresslerllp.com
Jennifer L. Smith– jsmith@tresslerllp.com
Matthew J. O'Malley – momalley@tresslerllp.com
Tressler LLP
233 South Wacker Drive, 61st Floor
Chicago, Illinois 60606
(312) 627-4000
Firm No. 46239

I certify that a copy of the within instrument was served on all parties who have appeared and have not hereto been found by the Court to be in default for failure to plead.

/s/ Matthew J. O'Malley _____
*Attorney for Defendant*

Doc. 4827-1662-1556

E-SERVICE
66805720
Jul 28 2021
02:37PM
File & ServeXpress

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| CHLOYDE PELTON AND SHIRLEY PELTON, | ) | IN RE:  ASBESTOS |
| | ) | LITIGATION |
| Plaintiffs, | ) | Case No.: 2021 L 006906 |
| | ) | |
| v. | ) | Calendar: J1 |
| | ) | |
| AIR AND LIQUID SYSTEMS CORPORATION et al. | ) | PERSONAL INJURY |
| | ) | LUNG CANCER |
| Defendants. | ) | |

**DEFENDANT HONEYWELL INTERNATIONAL INC.'S**
**MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

Defendant, Honeywell International Inc., f/k/a AlliedSignal Inc., as successor-in-interest to The Bendix Corporation ("Honeywell"), through its undersigned counsel and pursuant to Illinois Supreme Court Rule 5/2-301, hereby moves to dismiss Plaintiffs' Complaint based on lack of personal jurisdiction.  In support thereof, Honeywell states:

**INTRODUCTION**

Plaintiffs Chloyde Pelton and Shirley Pelton allege exposure to asbestos, from 1959 through approximately 1963 during Chloyde Pelton's employment and non-occupational projects. The Complaint lacks any factual detail to describe brake exposure linked to the state of Illinois.  Chloyde Pelton does not allege any exposure in the state of Illinois, nor does he make any specific claims as to any exposure to asbestos from Bendix products in Illinois.  All of Chloyde Pelton's occupational exposure and employment is based on US Naval ships with unknown locations, presumably all on bodies of water nowhere near the state of Illinois.  A true copy of the Complaint is attached hereto as **Exhibit 1**.

Based on well-established United States and Illinois Supreme Court law, this Court does not have general or specific jurisdiction over Honeywell. Honeywell is not subject to general jurisdiction in Illinois because it is a Delaware corporation, with its principal place of business in North Carolina. Honeywell is not subject to specific jurisdiction in Illinois because Chloyde Pelton was not exposed to Honeywell products in Illinois. Accordingly, this Court must dismiss the Plaintiffs' Complaint At Law against Honeywell.

## LEGAL STANDARD

A party has the right to object to a court's jurisdiction over it, pursuant to Section 2-301 of the Illinois Code of Civil Procedure. 735 ILCS 5/2-301(a). "The plaintiff has the burden of establishing a *prima facie* basis to exercise personal jurisdiction over a nonresident defendant." *Aspen Am. Ins. Co. v. Interstate Warehousing, Inc.*, 2017 IL 121281, ¶ 12 (2017). The plaintiff's prima facie case may be overcome by a defendant's un-contradicted evidence that defeats jurisdiction. *Russell v. SNFA*, 2013 IL 113909, ¶ 28 (2013). Whether the circuit court has personal jurisdiction over a party is a question of law. *Neighborhood Lending Servs., Inc. v. Griffin*, 2018 IL App (1st) 162855, ¶ 16 (1st Dist. 2018).

The Illinois long-arm statute, found in section 2–209 of the Code of Civil Procedure, "governs the exercise of personal jurisdiction by an Illinois court over a nonresident defendant." *Russell*, 2013 IL 113909 at ¶ 29; 735 ILCS 5/3–209. Subsection (a) of section 2-209 governs specific jurisdiction, while subsection (b) pertains to general jurisdiction. Subsection (c) is a "catchall provision" that permits Illinois courts to "'exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States.'" *Russell*, 2013 IL 113909 at ¶ 30. In light of the catchall provision, Illinois courts have

held that courts should not consider the Illinois long-arm statute separately from federal due process concerns. *Russell*, 2013 IL 113909 at ¶ 33. Thus, "[i]f both the federal and Illinois due process requirements for personal jurisdiction have been met, the Illinois long-arm statute is satisfied and no other inquiry is required." *Keller v. Henderson*, 359 Ill. App. 3d 605, 611 (2nd Dist. 2005). If a defendant does not argue that the Illinois Constitution imposes any greater restraints on the exercise of jurisdiction than the federal constitution, as is the case here, courts should only consider federal constitutional principles. *Russell*, 2013 IL 113909 at ¶ 33; *see also Aspen Am. Ins. Co.,* 2017 IL 121281 at ¶ 13.

With respect to cases involving a nonresident defendant, a court can only subject the defendant to a judgment *in personam* when it is found that the defendant has certain minimum contacts with the forum State such that maintenance of the suit there does not offend "traditional notions of fair place and substantial justice." *Russell*, 2013 IL 113909 at ¶ 34. The minimum contacts must be based on some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Purposeful availment is required so that a defendant is not forced to litigate in a distant or inconvenient forum based upon the result of random, fortuitous, or attenuated contacts or the unilateral act of some third person. *Keller*, 359 Ill. App. 3d at 613.

There are two types of personal jurisdictions, both of which are subject to the due process analysis: specific and general. Specific jurisdiction is case-specific; it exists when the plaintiff's cause of action arises out of or relates to the defendant's contacts with the forum state. *Aspen Am. Ins. Co*., 2017 IL 121281 at ¶ 14. In contrast, general jurisdiction is all-

purpose. With general jurisdiction a plaintiff may pursue a claim against the defendant even if the allegedly tortious conduct occurred entirely outside of the forum state. *Id*.

ARGUMENT

**A. Honeywell is not subject to general jurisdiction in Illinois**

General jurisdiction for a corporate defendant exists when it has engaged in business so "continuous and systematic" as to render it essentially home in the forum state. *Aspen Am. Ins. Co*., 2017 IL 121281 at ¶ 16 (*citing Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)). Since a finding of general jurisdiction permits a court to exercise jurisdiction over a corporation based on activity that is wholly distinct from its activity within the forum, "the standard for finding general jurisdiction is very high." *Russell*, 2013 IL 113909 at ¶ 36. "[T]o comport with the federal due process standards laid out in *Daimler* and, in doing so, comply with subsection (c) of the long-arm statute, plaintiff must make a *prima facie* showing that defendant is essentially at home in Illinois. This means that plaintiff must show that defendant is incorporated or has its principal place of business in Illinois or that defendant's contacts with Illinois are so substantial as to render this an exceptional case." *Aspen Am. Ins. Co.*, 2017 IL 121281 at ¶ 18 (*citing Daimler AG,* 571 U.S. 117). Registering to do business in Illinois "in no way suggests that the foreign corporation has consented to jurisdiction." *Aspen American Ins. Co.*, 2017 IL 121281, ¶ 26 (internal quotations omitted).

The First District decision in *Campbell v. Acme Insulations, Inc.*, 2018 IL App (1st) 173051 (2018), an asbestos matter which found that General Electric ("GE") was not subject to personal jurisdiction in Illinois is directly on point to this case. In *Campbell*, the trial court denied GE's

4

Motion to Dismiss for Lack of Personal Jurisdiction because the decedent allegedly worked with GE's products in Illinois for about six to eight months at Republic Steel.

On appeal the First District reversed the trial court's denial of GE's personal jurisdiction motion. The appellate court first held that GE was not subject to general jurisdiction because its state of incorporation is New York and its principal place of business is in Massachusetts. Further, even though GE employs 3,000 people at 30 facilities in Illinois and has conducted business in the state sine 1897, the appellate court found that GE is not "at home" in Illinois when its operations are put in the context of its worldwide operations and revenue. "[A]pproximately 2% of GE's income from U.S. operations is generated in Illinois and only approximately 2.4% of its U.S. workforce is employed in Illinois." *Id*. at ¶ 15. The court also rejected the notion that GE "consented" to jurisdiction in one proceeding by reason of its failing to contest jurisdiction in other cases. *Id*. at ¶ 17. Nor did it consent to jurisdiction by appointing a registered agent. *Id*.

Here, Honeywell is not subject to general jurisdiction in Illinois because it is incorporated in Delaware and has its principal place of business in North Carolina. Chloyde and Shirley Pelton have not alleged any facts to show Honeywell's contact with Illinois are so exceptional that Honeywell is "at home" in Illinois, thereby subjecting it to general jurisdiction in this state. The Complaint offers no facts that Honeywell's affiliations with Illinois are "so continuous and systematic as to render" Honeywell at home in Illinois.

In fact, the U.S. District Court for the Southern District of Illinois has found Honeywell is not subject to jurisdiction in Illinois:

> Further, Plaintiff has alleged insufficient facts to establish that Honeywell's affiliation with Illinois is 'so continuous and systematic as to render' Honeywell

5

at home in Illinois. Honeywell undoubtedly has contacts in Illinois. However, the Supreme Court has made it clear that the mere presence of a defendant in the forum does not subject it to all-purpose jurisdiction in that forum.[1]

Because Honeywell is not incorporated in Illinois, does not have its principal place of business in Illinois, and cannot be deemed to be "at home" in Illinois, this Court does not have general jurisdiction over Honeywell.

### B. Honeywell is not subject to specific jurisdiction in Illinois

In order to exercise specific jurisdiction over a defendant, the suit must arise out of or relate to the defendant's contacts with the forum. *Aspen Am. Ins. Co.*, 2017 IL 121281 at ¶ 14. Importantly, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780.

In the case at bar, there are no facts in Plaintiffs' Complaint that show the claims against Honeywell having any connection with Illinois. Chloyde Pelton's allegations of asbestos exposure against Honeywell lack any detail whatsoever, let alone assert a location. They do not offer Illinois connection - besides the fact that the suit is filed in Illinois and names Honeywell. Moreover, Chloyde and Shirley Pelton have failed to allege any facts, which establish that Honeywell has acted so as to submit to the jurisdiction of this Court pursuant to the Illinois' Long Arm Statute. *See* 735 ILCS 5/2-209. Plaintiffs have not offered evidence that the requirements of this Statute apply so that due process has been afforded to Honeywell. *See Illinois Commerce Com'n v. Entergy-Koch Trading, LP*, 362 Ill. App. 3d 790, 796 (1st Dist. 2005).

---

[1] *See* Memorandum and Order, *McAlvey v. Atlas Copco Compressors, L.L.C.*, No. 3:14-cv-00064 (S.D. Ill. July 1, 2015), Dkt. No. 401, attached as **Exhibit 2**, granting Honeywell's Motion to Dismiss based on lack of personal jurisdiction.

WHEREFORE, Defendant Honeywell International Inc., f/k/a AlliedSignal Inc., as successor-in-interest to The Bendix Corporation, prays that this Court grant Honeywell's Motion to Dismiss for Lack of Personal Jurisdiction, and for other relief where appropriate.


Respectfully submitted,

Honeywell International Inc., f/k/a AlliedSignal Inc., as successor-in-interest to The Bendix Corporation


By: /s/ Matthew J. O'Malley
       One of Its Attorneys


Shannon Harvey – sharvey@tresslerllp.com
Jennifer L. Smith– jsmith@tresslerllp.com
Matthew J. O'Malley – momalley@tresslerllp.com
Tressler LLP
233 South Wacker Drive, 61st Floor
Chicago, Illinois 60606
(312) 627-4000
Firm No. 46239
4844-6302-4628

E-SERVICE
66805720
Jul 28 2021
02:37PM
File & ServeXpress

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | | |
|---|---|---|---|
| CHLOYDE PELTON AND SHIRLEY PELTON, | ) | IN RE: ASBESTOS | |
| | ) | LITIGATION | |
| Plaintiffs, | ) | Case No.: 2021 L 006906 | |
| | ) | | |
| v. | ) | Calendar: J1 | |
| | ) | | |
| AIR AND LIQUID SYSTEMS CORPORATION et al. | ) | PERSONAL INJURY | |
| | ) | LUNG CANCER | |
| Defendants. | ) | | |

## NOTICE OF FILING

TO:  Ethan A. Flint                          cc:    All Attorneys of Record
     Laci M. Whitley                                (via File & Serve Xpress)
     Flint Law Firm, LLC
     222 East Parlc Street, Suite 500
     P.O. Box 189
     Edwardsville, IL 62025
     service@flintlaw.com

PLEASE TAKE NOTICE that on **July 28, 2021** there was filed with the Clerk of the Circuit Court of Cook County, Illinois, Law Division, by Honeywell International Inc., f/k/a AlliedSignal Inc., as successor-in-interest to The Bendix Corporation, **Appearance** and **Motion to Dismiss for Lack of Personal Jurisdiction**, copies of which are attached hereto and served upon you.

                    HONEYWELL INTERNATIONAL INC., f/k/a
                    ALLIEDSIGNAL INC., as successor-in-interest to
                    THE BENDIX CORPORATION

                    BY:/s/ Matthew J. O'Malley
                         One of Its Attorneys

Shannon M. Harvey – sharvey@tresslerllp.com
Matthew J. O'Malley – momalley@tresslerllp.com
Tressler LLP
233 South Wacker Drive – 61st Floor
Chicago, Illinois 60606-6359
Telephone: (312) 627-4000

## **PROOF OF SERVICE**

The undersigned, being first duly sworn on oath, deposes and states that she served the foregoing Notice of Filing and the documents referred to therein via File&ServeXpress a copy to all attorneys of record on the 28th day of July, 2021.

/s/ Diane B. Novosel
[x] Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the statements set forth herein as true and correct.

4817-6477-7204

E-SERVICE
66808587
Jul 29 2021
02:26PM
File & ServeXpress

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) |
| | ) |
| Plaintiffs, | ) Case No.: 2021 L 006906 |
| | ) |
| vs. | ) |
| | ) IN RE: ASBESTOS LITIGATION |
| AIR & LIQUID SYSTEMS CORPORATION, *successor* | ) |
| *by merger* to BUFFALO PUMPS, INC., et al., | ) |
| | ) |
| Defendants. | ) |

**NOTICE OF FILING**

**PLEASE TAKE NOTICE** that the **Entry of Special Appearance** and **Combined Motion to Dismiss,** filed on behalf of Defendant, The J.R. Clarkson Company LLC, were electronically served upon Plaintiffs' Counsel and all Defense Counsel of Record via LexisNexis File & ServeXpress on this __29th__ day of __July__, 2021, pursuant to the Court's Order of April 25, 2007.

Respectfully submitted,

**FOLEY & MANSFIELD, P.L.L.P.**

By:___/s/ Joseph P. Rejano_____
  Robert J. Brummond    #6184723
  Joseph P. Rejano     #6294183
  70 West Madison Street, Suite 3000
  Chicago, IL 60602
  (312) 254-3800
  (312) 254-3801 [FAX]
  **Firm Id No. 44251**

  Steven G. Carlson     #6282627
  von Briesen & Roper, s.c.
  411 East Wisconsin Avenue, Suite 1000
  Milwaukee, WI 53202
  (414) 287-1560
  (414) 238-6444 [FAX]
  **Firm Id No. 39868**
  **Attorneys for The J.R. Clarkson Company, LLC**

**CERTIFICATE OF SERVICE**

      The undersigned certifies that a copy of the foregoing document was electronically served upon all other Defense Counsel of Record via LexisNexis File & Serve on this  29th  day of   July  , 2021,  pursuant to the Court's Order of April 25, 2007.


                                   /s/ Joseph P. Rejano

E-SERVICE
66808587
Jul 29 2021
02:26PM
File & ServeXpress

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) |
| | ) |
| Plaintiffs, | ) Case No.: 2021 L 006906 |
| | ) |
| vs. | ) |
| | ) IN RE: ASBESTOS LITIGATION |
| AIR & LIQUID SYSTEMS CORPORATION, *successor* | ) |
| *by merger* to BUFFALO PUMPS, INC., et al., | ) |
| | ) |
| Defendants. | ) |

## ENTRY OF SPECIAL APPEARANCE

**COMES NOW** the law firm of Foley & Mansfield, P.L.L.P., and hereby enters its

special and limited appearance on behalf of Defendant, The J.R. Clarkson Company LLC, for the

sole purpose of contesting this Court's jurisdiction over The J.R. Clarkson Company LLC.

**FOLEY & MANSFIELD, P.L.L.P.**


By:____/s/ Joseph P. Rejano_____
     Robert J. Brummond         #6184723
     Joseph P. Rejano           #6294183
     70 West Madison Street, Suite 3000
     Chicago, IL 60602
     (312) 254-3800
     (312) 254-3801 [FAX]
     **Firm Id No. 44251**

     Steven G. Carlson         #6282627
     von Briesen & Roper, s.c.
     411 East Wisconsin Avenue, Suite 1000
     Milwaukee, WI 53202
     (414) 287-1560
     (414) 238-6444 [FAX]
     **Firm Id No. 39868**

     **Attorneys for The J.R. Clarkson Company LLC**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the foregoing document was electronically served upon Plaintiffs' Counsel and all Defense Counsel of Record via File & ServeXpress on this __29th__ day of __July__, 2021, pursuant to the Court's Order of April 25, 2007.

__/s/ Joseph P. Rejano_____

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) |
| | ) |
| Plaintiffs, | ) Case No.: 2021 L 006906 |
| | ) |
| vs. | ) |
| | ) IN RE: ASBESTOS LITIGATION |
| AIR & LIQUID SYSTEMS CORPORATION, *successor* | ) |
| *by merger* to BUFFALO PUMPS, INC., et al., | ) |
| | ) |
| Defendants. | ) |

**THE J.R. CLARKSON COMPANY LLC'S**
**COMBINED MOTION TO DISMISS**

NOW COMES Defendant, The J.R. Clarkson Company LLC (hereinafter "Defendant"), by its undersigned attorneys, and pursuant to 735 ILCS 5/2-619.1, 735 ILCS 5/2-301(a) and Illinois Supreme Court Rule 187 hereby moves to dismiss Plaintiffs' Complaint for lack of personal jurisdiction or, in the alternative, based on the doctrine of *forum non conveniens*.  In support thereof, Defendant states as follows:

**MOTION TO DISMISS BASED ON LACK OF PERSONAL JURISDICTION**
**(735 ILCS 5/2-301(a))**

Pursuant to 735 ILCS 5/2-301(a), Defendant hereby moves for an Order dismissing Plaintiffs' Complaint against it for lack of personal jurisdiction.

**I.       INTRODUCTION**

"The plaintiff has the burden of establishing a *prima facie* basis to exercise personal jurisdiction over a nonresident defendant." *Aspen American Insurance Company v. Interstate Warehousing, Inc.*, 2017 IL 121281, ¶ 12, 90 N.E.3d 440.  That burden requires Plaintiffs to plead sufficient facts to allow this Court to exercise general and/or specific personal jurisdiction over Defendant.  Plaintiffs have failed to satisfy their burden.

## II.     ARGUMENT

Whether Illinois can exercise jurisdiction over Defendant rests on the applicability of Illinois' long-arm statute.  735 ILCS 5/2-209.  However, with the enactment of subsection (c), the "catch-all provision," the Illinois long-arm statute has been held to be coextensive with the due process requirements of the Illinois and United States Constitutions. *Kostal v. Pinkus Dermatopathology Laboratory*, P.C., 357 Ill.App.3d 381, 386, 827 N.E.2d 1031 (1st Dist. 2005). In other words, the long-arm statute is satisfied when due process concerns are satisfied, regardless of whether the defendant performed any of the acts enumerated in the long-arm statute. *Id.* at 387, 827 N.E.2d 1031.

Due process allows for two forms of personal jurisdiction: general (sometimes called "all-purpose") and specific (sometimes called "case-linked"). *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017).  Under either theory, due process requires that a defendant have sufficient minimum contacts with the forum state such that haling the defendant into court in the forum does not offend "traditional notions of fair play and substantial justice." *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) (quoting *Goodyear*, 564 U.S. at 923); *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).

### 1.     Plaintiffs Have Failed to Plead Sufficient Facts to Establish a *Prima Facie* Basis of General Personal Jurisdiction Over Defendant.

The threshold for general personal jurisdiction is very high and essentially means that the defendant has taken up residence in Illinois.  *Russell v. SNFA*, 2013 IL 113909, ¶ 36, 987 N.E.2d 778.  In *Daimler*, the Supreme Court substantially limited the scope of general jurisdiction and made clear that general jurisdiction exists over a foreign defendant "*only* when the corporation's affiliations with the State in which suit is brought are so constant and pervasive 'as to render [it]

essentially at home in the forum State.'" 134 S. Ct. at 751 (quoting *Goodyear*, 564 U.S. at 919). The Court rejected as "unacceptably grasping" the notion that "general jurisdiction [exists] in every State in which a corporation 'engages in a substantial, continuous, and systematic course of business." *Id.* at 760-61. Rejecting this broad notion of general jurisdiction, the Court held that "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." *Id.* at 760. For corporations, those affiliations consist of two "paradigm bases" for general jurisdiction: (1) state of incorporation and (2) principal place of business[1]. *Id.* at 760; *see also BNSF Railway Co*, 137 S. Ct. at 1552 and *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cnty.*, 137 S. Ct. 1773, 1780 (2017). Exceptional cases aside, it is only in these forums that a corporation is truly "at home" such that the exercise of general jurisdiction comports with due process. *See id.*

In this matter, Plaintiffs' Complaint fails to allege any basis that would establish general jurisdiction over Defendant. (*See* Plaintiffs' Complaint.) Plaintiffs do not contend that Defendant is incorporated or has its principal place of business in Illinois.[2] Further, Plaintiffs have provided no factual allegations that would establish that Defendant's affiliation with Illinois is so continuous and systematic as to render it "at home" in Illinois. (*See* Plaintiffs' Complaint.) Accordingly, Plaintiffs have failed to make out a *prima facie* basis of general personal jurisdiction against Defendant.

---

[1] The Supreme Court has previously defined a corporation's principal place of business as the place "where the corporation's high level officers direct, control, and coordinate the corporation's activities" or where its "nerve center" is. *Hertz Corp. v. Friend*, 559 U.S. 77, 80-81 (2010). Typically, a company's principal place of business is found at the company's headquarters. *Id.* at 81.

[2] In fact, Defendant is a limited liability company formed under the laws of Nevada. Defendant has never been incorporated in Illinois; it does not own or operate any facilities in Illinois; it does not have any employees in Illinois; and none of its corporate officers are located in Illinois.

2.     **Plaintiffs Have Failed to Plead Sufficient Facts to Establish a *Prima Facie* Basis of Specific Personal Jurisdiction Over Defendant.**

In order for a state court to exercise specific jurisdiction, "the suit" must "aris[e] out of or relat[e] to the defendant's contacts with the forum." *Bristol-Myers,* 137 S.Ct. at 1780 (citing *Daimler*, 134 S.Ct. at 754). In other words, there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulations." *Id.* (citing *Goodyear*, 564 U.S. at 919). For this reason, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.* When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State. *Id*. at 1781 (citing *Goodyear*, 564 U.S. at 931 n. 6) ("[E]ven regularly occurring sales of a product in a State do not justify the exercise of jurisdiction over a claim unrelated to those sales."). The United States Supreme Court recently confirmed that "[t]he law of specific jurisdiction … seeks to ensure that States with 'little legitimate interest' in a suit do not encroach on States more affected by the controversy." *Ford Motor Co.*, 141 S.Ct. 1017 (quoting *Bristol-Myers*, 137 S.Ct., at 1780).

The Illinois Supreme Court's recent decision in *Rios v. Bayer Corp.*, 2020 IL 125020 provides additional guidance. In *Rios*, nonresident plaintiffs alleged personal injuries caused by a permanent form of birth control product. *Id.* at ¶¶ 1-2. Plaintiffs alleged specific personal jurisdiction existed over the birth control manufacturer because the manufacturer conducted clinical trials in Illinois (among other states), conducted a physician training program in Illinois, and marketed the birth control in Illinois. *Id.* at ¶ 8. Plaintiffs were unable to say, however, that the device was manufactured in Illinois, implanted in Illinois, or that they suffered any injury in Illinois. *Id.* at ¶ 27. The Court found that Plaintiffs failed to identify a link between their claims

and Illinois such that jurisdiction was appropriate. *Id.* at ¶ 28. Because the nonresident plaintiffs failed to identify an affiliation between their claims and the State of Illinois, the Court relied on *Bristol-Myers* to dismiss the nonresident plaintiffs' claims. *Id.* at ¶ 29.

Like the plaintiffs in *Rios*, Plaintiffs here asserts no allegations linking their claims to the State of Illinois. Plaintiffs do not allege that they reside in Illinois. They do not allege that Defendant designed, manufactured or sold the products at issue in Illinois. Moreover, Plaintiffs' do not even allege that Plaintiff was exposed to asbestos from Defendant's products in Illinois. The Complaint is simply devoid of any allegations that Defendant committed any act or omission in Illinois in connection with Plaintiffs' claim. For these reasons, Plaintiffs have failed to establish a *prima facie* basis for specific personal jurisdiction over Defendant.

## V.    CONCLUSION

Plaintiffs' Complaint fails to plead sufficient facts to allow this Court to exercise general and/or specific personal jurisdiction over Defendant. As such, Plaintiffs have failed in their burden to establish a *prima facie* basis for this Court's exercise of personal jurisdiction over Defendant. For these reasons, this Court should enter an order dismissing Plaintiffs' Complaint against Defendant.

### MOTION TO DISMISS BASED ON FORUM NON CONVENIENS
**(Illinois Supreme Court Rule 187)**

Pursuant to Illinois Supreme Court Rule 187, Defendant hereby moves this Honorable Court to dismiss Plaintiffs' Complaint based on the doctrine of *forum non conveniens*.

Plaintiffs' Complaint should be dismissed and/or transferred pursuant to Illinois Supreme Court Rule 187 and the doctrine of *forum non conveniens*. Plaintiffs have failed to allege any facts which establish that venue is proper in Cook County, Illinois, as a result of any connection on the part of Plaintiffs, Plaintiffs' witnesses, or any other evidence against Defendant in Cook County,

Illinois. (*See* Plaintiffs' Complaint.)  A convenient, alternate forum for Plaintiffs' action against Defendant exists.

As will be more fully set forth in a separate memorandum, the total circumstances of this case establish that the private and public interest factors weigh unquestionably in favor of dismissal and/or transfer of the case pursuant to Illinois Supreme Court Rule 187 and that to deny this motion would be an abuse of discretion. *See, e.g.*, *Fennell v. Illinois Central Railroad Company*, 2012 IL 113812, 987 N.E.2d 355 (2012) (trial and appellate court reversed) and *Laverty v. CXR Transportation, Inc.*, 404 Ill.App.3d 534, 956 N.E.2d 1 (5th Dist. 2010) (trial court reversed).

WHEREFORE, Defendant, The J.R. Clarkson Company LLC, respectfully requests this Court enter an Order dismissing Plaintiffs' Complaint against it for lack of personal jurisdiction or, in the alternative, based on *forum non conveniens* and granting such other relief as the Court deems just and proper.

Respectfully submitted,

**FOLEY & MANSFIELD, P.L.L.P.**

By:___/s/ Joseph P. Rejano_____

Robert J. Brummond                        #6184723
Joseph P. Rejano                            #6294183
70 W. Madison St., Suite 3000
Chicago, IL 60602
(312) 254-3800
(312) 254-3801 [FAX]
**Firm Id No. 44251**

Steven G. Carlson                          #6282627
von Briesen & Roper, s.c.
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202
(414) 287-1560
(414) 238-6444 [FAX]
**Firm Id No. 39868**

**Attorneys for the defendant,**
**The J.R. Clarkson Company**

## CERTIFICATE OF SERVICE

     The undersigned certifies that a copy of the foregoing document was electronically served upon all other Defense Counsel of Record via File & ServeXpress on this _29th_ day of July 2021 pursuant to the Court's Order of April 25, 2007.

                        _____/s/ Joseph P. Rejano_____

E-SERVICE
66809891
Jul 30 2021
08:32AM
File & ServeXpress

## IN THE CIRCUIT COURT COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    No. 21-L-006906 |
| | ) |
| AIR & LIQUID SYSTEMS CORPORATION, *successor* | ) |
| *by merger to* BUFFALO PUMPS, INC., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

### NOTICE OF FILING

TO:    To All Attorneys of Record:

PLEASE TAKE NOTICE that on July 30, 2021, we filed with the Clerk of the Circuit Court of Cook County, Illinois, Defendant Velan Valve Corp.'s Motion to Dismiss Plaintiffs' Complaint.

Respectfully submitted,

By: /s/ Franchezka L. Reichard-Labault
Attorney for Defendant

Stephanie F. Jones
Franchezka L. Reichard-Labault
Gordon Rees Scully Mansukhani LLP
One North Franklin Street, Suite 800
Chicago, Illinois 60606
(312) 619-4934
sfjones@grsm.com
freichard@grsm.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, being first duly sworn on oath, deposes and states that she served the foregoing documents referred to therein by serving via Pohlman MyDocFileServe a copy to all attorneys of record on June 18, 2021.

By: /s/ Jennifer E. Reece

[x]     Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the statements set forth herein are true and correct.

E-SERVICE
66809891
Jul 30 2021
08:32AM
File & ServeXpress

**IN THE CIRCUIT COURT COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   No. 21-L-006906 |
| | ) |
| AIR & LIQUID SYSTEMS CORPORATION, *successor* | ) |
| *by merger to* BUFFALO PUMPS, INC., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANT VELAN VALVE CORP.'S MOTION TO DISMISS PLAINTIFFS'**
**COMPLAINT UNDER 735 ILCS 5/2-619.1**

NOW COMES Defendant, VELAN VALVE CORP. ("Velan" or "Defendant"), by and through its attorneys, GORDON REES SCULLY MANSUKHANI, LLP, and hereby moves this Honorable Court to dismiss Plaintiffs' Complaint pursuant to 735 ILCS 5/2-619, 735 ILCS 5/2-615, 735 ILCS 5/2-101, 735 ILCS 5/2-301, 735 ILCS 5/2-604.1, and Supreme Court Rule 187. In support thereof, Velan states as follows:

## SUMMARY OF ARGUMENT

Plaintiffs, Chloyde Pelton and Shirley Pelton, filed their Complaint in Cook County, Illinois, alleging that Plaintiff Chloyde Pelton experienced exposure to asbestos at various locations from products designed, manufactured, sold, delivered, distributed, processed, applied, specified and/installed by all named Defendants, including Velan. *See Plaintiffs' Complaint.* Specific to Velan, Plaintiffs' allege six Counts: Count I attempts to allege negligence, Count II attempts to allege willful and wanton misconduct, Count III attempts to allege conspiracy, Count IV attempts to allege negligent spoliation of evidence, Count V attempt to allege willful and wanton spoliation of evidence, and Count VI attempts to allege loss of consortium. *Id.*

Because Plaintiffs' claims against Velan have no connection whatsoever to Illinois, there is no personal jurisdiction over Defendant Velan based on either specific or general jurisdiction under 735 ILCS 5/2-619 ("Section 2-619"). Notwithstanding personal jurisdiction, Plaintiffs' Complaint fails to plead sufficient facts to properly state a cause of action under Illinois law pursuant to 735 ILCS 5/2-615 ("Section 2-615"). Plaintiffs' Complaint further fails to plead sufficient facts to establish that forum and venue are proper in Cook County, Illinois pursuant to Section 2-615, 735 ILCS 5/2-101, 735 ILCS 5/2-301, and Illinois Supreme Court Rule 187. For these reasons, the Plaintiffs' Complaint should be dismissed in its entirety.

I. **Section 2-619 Motion to Dismiss for Lack of Personal Jurisdiction**

Dismissal pursuant to 735 ILCS 5/2-301 is proper because this Court lacks personal jurisdiction over Velan. First, the U.S. Supreme Court's decision in *Daimler AG v. Bauman*, 571 U.S. 117 (2014), as well as the Illinois Supreme Court's recent holding in *Aspen American Insurance Company v. Interstate Warehousing, Inc.*, 2017 IL 121281, make clear that Velan – which is a Delaware limited liability company – is not subject to general personal jurisdiction in Illinois. Furthermore, the Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017), makes clear that this Court lacks specific personal jurisdiction over Velan because Plaintiffs' claims do not arise out of any conduct by Velan that occurred in Illinois. The relevant time period in determining a jurisdictional question must be "the time the nonresident defendant became a party to the suit or was served with process." *Reeves v. Baltimore & Ohio Railroad Company*, 526, N.E.2d 404, 408 (1st Dist. 1988), *see also Howard v. Missouri Bone and Joint Center, Inc.*, 869 N.E.2d 207, 211-212 (5th Dist. 2007); *Morecambe Maritime, Inc. v. Nat'l Bank of Greece*, S.A., 821 N.E.2d 780, 786 (1st Dist. 2004). Though a court may also consider the time the claim arose, that alone is not determinative, and "the critical point of the focus of inquiry

must be upon the time that the defendant is made a party to the suit and is served with process." *Id*.

Illinois' "Long Arm Statute" includes a provision stating that a court "may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 Ill. Comp. Stat. 5/2-209(c). Therefore, the United States Supreme Court's position as to the Due Process requirements for personal jurisdiction defines the Due Process requirements of Illinois.

The United States Supreme Court addressed the distinction between general and specific jurisdiction in *Walden v. Fiore*, 134 S. Ct. 1115 (2014) and *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). With respect to general or "all-purpose" jurisdiction, in *Daimler AG v. Bauman*, the Supreme Court held that the exercise of general jurisdiction will comport with Due Process if the corporate defendant's connections "with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State.'" *Daimler AG v. Bauman*, 134 S. Ct. at 751, *quoting Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2852 (U.S. 2011). The paradigm for a corporation to be considered "at home" is if it is incorporated in that state or has its principal place of business there because these places are "easily ascertainable" and "afford Plaintiff recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims." *Id.* At 760. To extend general jurisdiction to every "[s]tate in which a corporation engaged in a substantial, continuous, and systemic course of business" would be "unacceptably grasping" and "would reach well beyond these exemplar bases." *Id.* at 761. Regarding an "agency theory" of general jurisdiction, the Court stated, "to subject foreign corporations to general jurisdiction whenever they have an in-state subsidiary or affiliate...[is] an outcome that would sweep beyond the 'sprawling view of general jurisdiction' we rejected in *Goodyear* (citation omitted)." *Id.* at 760.

In its recent decision, *BNSF Railway Co. v. Tyrrell, special administrator for the Estate of Tyrell, Deceased, et. al.*, 137 S. Ct. 1549, 1559 (2017), the Court repeated its clarification of general jurisdiction from *Daimler* and *Goodyear*, stating "in-state business . . . does not suffice to permit the assertion of general jurisdiction over claims . . . that are unrelated to any activity occurring in [a state]."

Plaintiffs fail to allege facts sufficient to even suggest a showing of general jurisdiction over Velan in Illinois. Plaintiffs do not allege that Velan is incorporated in Illinois, or that its principal place of business is located in Illinois. Nor do Plaintiffs allege any exceptional circumstances which so closely tie Velan to Illinois that it would be considered "essentially at home" here, despite being incorporated and maintaining its principal place of business elsewhere. Thus, there is no basis for an Illinois court to assert general jurisdiction over Velan regarding any of Plaintiffs' claims.

The Court affirmed the principles of personal jurisdiction in *Bristol-Myers Squibb Co. v. Superior Court of California,* 137 S. Ct. 1773 (2017), stating that "there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'" *Bristol-Myers,* 137 S. Ct. at 1780; *quoting Goodyear,* 131 S. Ct. at 2846. "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Id.* (holding that even regularly occurring sales of a product in a state do not justify the exercise of jurisdiction over a claim unrelated to those sales). "For specific jurisdiction, a defendant's general connections with the forum are not enough." *Id.*

Here, Plaintiffs fail to meet any of the requirements deemed essential by the Court in *Bristol-Myers* which would permit this Court to exercise specific personal jurisdiction over Velan.

Specifically, Plaintiffs' Complaint fails to allege that Plaintiff had contact with any Velan products in the State of Illinois. Thus, there is no basis for an Illinois court to assert specific jurisdiction over Velan regarding any of Plaintiffs' claims.

## II.    Section 2-615 Motion to Dismiss

Illinois is a fact-pleading state, which means that a complaint must contain sufficient factual allegations to reasonably inform a defendant of the nature of the claim or defense it has been called upon to meet. *Zeitz v. Vill. of Glenview*, 227 Ill. App. 3d 891, 894 (1st Dist. 1992). If, after disregarding conclusions pleaded by the plaintiff, there are no sufficient allegations of fact which state a cause of action against the defendant, the motion to dismiss must be granted. *Knox Coll. v. Celotex Corp.*, 88 Ill. 2d 407, 426 (1981).

A plaintiff may not rely on conclusions of law or fact unsupported by specific factual allegations. *Pooh–Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009). Illinois law requires that a plaintiff asserting an asbestos-related injury must do more than include conclusory allegations of asbestos exposure attributable to a defendant. *See Knox v. Keene Corp.*, 210 Ill. App. 3d 141, 146-47 (2nd Dist. 1999); *Kozak v. Armstrong World Ind., Inc.,* 213 Ill. App. 3d 1061, 1067 (4th Dist. 1991); *Costello v. Unarco Ind., Inc.*, 129 Ill. App. 3d 736, 744 (4th Dist. 1984), rev'd on other grounds, 11 Ill. 2d 476, 490 (1986). Here, Plaintiffs fail to allege specific factual allegations necessary to meet Illinois fact-pleading requirements and fail to apprise Velan of "sufficient facts upon which [it can] base a defense." *Kozak*, 213 Ill. App. 3d at 1067.

Plaintiffs have not sufficiently alleged any injury-causing Velan product, the dates and places of exposure to that Velan product, the time during which any Velan product was supplied to Plaintiff's employer, or where Velan was located in the chain of production. Similarly, Plaintiffs have failed to state viable claims of negligence, willful and wanton misconduct, conspiracy, negligent spoliation

of evidence, willful and wanton spoliation of evidence, and loss of consortium. Plaintiffs merely allege conclusions and not facts. A complaint which fails to apprise the defendant of both the injury-producing product and the defendant's alleged place in the chain of production is insufficient under the fact pleading requirements of Illinois law. *Knox v. Keene Corp.*, 210 Ill. App. 3d 141, 147 (2nd Dist. 1991); *Costello v. Unarco Industries, Inc.*, 129 Ill. App. 3d 736, 744-745 (4th Dist. 1984), *rev'd on other grounds*, 111 Ill. 2d 476 (1986). Because Plaintiffs cannot state a viable claim against Velan for their alleged injuries, Plaintiffs' negligence, willful and wanton misconduct, conspiracy, negligent spoliation of evidence, willful and wanton spoliation of evidence, and loss of consortium. claims also fail. *See Blagg v. Illinois F.W.D. Truck & Equip. Co.,* 143 Ill. 2d 188, 199 (1991); *Schweighart v. Standard Mut. Ins. Co.,* 227 Ill. App. 3d 249, 253 (4th Dist. 1992). Accordingly, Counts I, II, III, IV, V, and VI of Plaintiffs' Complaint must be dismissed.

In order to state a valid cause of action under Illinois law, a plaintiff must plead with greater specificity than that which is present here. "The complaint must contain factual allegations of every fact which must be proved in order for the plaintiff to be entitled to judgment on the complaint, and a judgment cannot be rendered on facts demonstrated by evidence at trial unless those facts shown were alleged in the complaint." *In re: Beatty*, 118 Ill. 2d 489, 499 (1987). As such, Plaintiffs' Complaint fails to meet the pleading requirements of Illinois law and must be dismissed.

III. **Motion to Dismiss Pursuant to 735 ILCS 5/2-101 and *Forum Non Conveniens* Pursuant to Supreme Court Rule 187**

Plaintiffs' Complaint fails to allege sufficient facts which demonstrate the propriety and convenience of venue in Cook County, Illinois. Therefore, this matter should be dismissed due to improper venue on the basis of *forum non conveniens*. *Dawdy v. Union Pacific Railroad*, 207 Ill. 2d 167 (2003); *Gulf Oil Corporation v. Gilbert*, 330 U.S. 501, 508-09 (1947).

According to the equitable doctrine of *forum non conveniens*, a court should dismiss or transfer a case when it is apparent that trial in another forum with jurisdiction over the parties would be more convenient and would better serve the ends of justice. *Vinson v. Allstate*, 144 Ill. 2d 306, 310, 579 N.E.2d 857 (Ill. 1991). Moreover, "[f]orum non conveniens is applicable to an intrastate as well as on an interstate basis. In other words, the doctrine may be applied where the choice is between forums in the same state as well as when the choice is between forums in different states. The *same* considerations of convenience and fairness apply in deciding the question of the forum for trial." *Dawdy v. Union Pac*, R.R., 207 Ill. 2d 167, 176 (Ill. 2003) (granting intrastate motion for forum non conveniens); *see also Peile v. Skelgas, Inc.*, 163 Ill. 2d 323 (Ill. 1994) (The trial court abused its discretion in denying a gas distributor and furnace manufacturers' motion, based on forum non conveniens, for intrastate transfer of a consumer's personal injury suit.)

An Illinois court determines whether to dismiss a case under the *forum non conveniens* doctrine by balancing the private interests affecting the convenience of the litigants and the public interests affecting the administration of the courts. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). Some deference may be given to a plaintiff's choice of forum; however, the "plaintiff's choice of forums is entitled to *less* deference where the situs of the injury is not located in the chosen forum . . . and the plaintiff is not a resident of the chosen forum." *Id*. at 337-38, 645 N.E.2d at 191 (emphasis added); *see also Washington v. Illinois Power Co.*, 144 Ill. 2d 395, 400, 581 N.E.2d 644, 646 (1991), *citing Piper Aircraft Co. v Reyno*, 454 U.S. 235, 255-56 (1981). Generally, '[W]hen the plaintiff is foreign to the forum chosen and the action that gives rise to the litigation did not occur in the chosen forum, . . . it is reasonable to conclude that the plaintiff engaged in forum shopping to suit his individual interest, a strategy contrary to the purposes behind

the venue rules." *Certain Underwriters at Lloyd's v. Ill Cent. R.R.*, 329 Ill. App. 3d 189, 196, 768 N.E. 2d 779, 875 (2d Dist. 2002).

Although the doctrine of *forum non conveniens* considers private interest and public interest factors, Illinois courts have consistently and uniformly held that a plaintiff cannot litigate a claim if it has no connection to the chosen forum; in this case, Cook County, Illinois. *See McClain*, 121 Ill. 2d at 289 (stating that if the plaintiff's chosen forum is not his home forum, the deference given to the plaintiff's choice is considerably lessened); *see also Satkowiak*, 106 Ill. 2d at 233 (noting that when the plaintiff is foreign, the assumption of convenience is the chosen forum is much less reasonable); *Laverty*, 404 Ill. App. 3d at 539. Indeed, every Illinois Appellate Court and Illinois Supreme Court case that has considered the issue of a non-resident plaintiff, injured outside of his chosen forum, whose claims have no pertinent connection to chosen forum, has held that the case must be dismissed or transferred. *See, e.g. Weiser v. Missouri Pacific R.R. Co.,* 98 Ill. 2d 359, 372 (Ill. 1989); *McClain v, Ill. Cent. Gulf R.R. Co.*, 121 Ill. 2d 278, 520 N.E.2d 368 (Ill. 1988); *Bland v. Norfolk & W. Ry. Co.*, 116 Ill. 2d 217, 223 (Ill. 1987); *Satkowiak v. Chesapeake & Ohio Ry. Co*., 106 Ill. 2d 224, 478 N.E.2d 370 (Ill. 1985); *Moore v. Chicago & N.W. Transp. Co*., 99 Ill. 2d 73, 78-82 (Ill. 1983); *Laverty v. CSX Corp.,* 404 Ill. App. 3d 534 (Ill. 5th Dist. 2010); *Mansfield v. Curtis-Jansen, Inc*., 183 Ill. App. 3d 154, 538 N.E.2d 1282 (Ill. 5th Dist. 1989); *Carona v. Ill. Cent. Gulf R.R. Co*., 145 Ill. App. 3d 880, 495 N.E.2d 1364 (Ill. 5th Dist. 1986); *Petersen v. Chicago & NW Transp. Co*., 117 Ill. App. 3d 163, 453 N.E.2d 27 (Ill. 5th Dist. 1983); *Olsson v. Gen. Motors Corp*., 318 Ill. App. 3d 87, 93, 742 N.E.2d 1251 (Ill. 1st Dist. 2001*); Carlberg v. Chrysler Motors Corp.*, 199 Ill. App. 3d 127, 556 N.E.2d 1284 (Ill. 2nd Dist. 1990); *Stein v. Volkswagen of Am., Inc*., 135 Ill. App. 3d 127, 131-32, 481 N.E.2d 1022 (Ill. 1st Dist. 1985).

Here, there is no indication that Plaintiff Chloyde Pelton ever lived, worked or received any medical treatment within Cook County, Illinois. Nevertheless, this litigation has been filed in this forum, which has no interest in the subject lawsuit and no discernable connection to Plaintiffs' claims. Therefore, because the private and public factors weigh strongly in favor of another forum, this case should be dismissed based on the doctrine *of forum non conveniens.*

Defendant, VELAN VALVE CORP., prays that its Combined Motion to Dismiss Plaintiffs' Complaint pursuant to 2-619.1 be granted in its entirety, with prejudice, for the reasons aforesaid.

July 30, 2021                                             Respectfully submitted,


Stephanie F. Jones –sfjones@grsm.com          By:/s/ Franchezka L. Reichard-Labault
Franchezka L. Reichard-Labault –freichard@grsm.com          Attorneys for
Gordon Rees Scully Mansukhani LLP                VELAN VALVE CORP.
One North Franklin Street, Suite 800
Chicago, Illinois 60606
(312) 619-4934

E-SERVICE
66812456
Jul 30 2021
04:23PM
File & ServeXpress

FILED
7/30/2021 4
IRIS Y. MART
CIRCUIT CLERK
COOK COUNTY, IL
2021L006906

Firm ID #04927

72806-48-111-106-121-

FILED DATE: 7/30/2021 4:04 PM    2021L006906

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

CHLOYDE PELTON and SHIRLEY PELTON,

        Plaintiffs,

v.

AIR & LIQUID SYSTEMS CORPORATION, successor
by merger to BUFFALO PUMPS, INC., et al.,

        Defendants.

NO.  21 L 006906

IN RE:  ASBESTOS LITIGATION

Hon. Clare E. McWilliams

Calendar: "J1"

**DEFENDANT SYD CARPENTER, MARINE CONTRACTOR, INC.'S
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

        NOW COMES Defendant, SYD CARPENTER, MARINE CONTRACTOR, INC. (hereinafter "Syd Carpenter Marine"), by and through its attorneys, McKENNA STORER, pursuant to special and limited appearance, and moves this Honorable Court, pursuant to Sections 2-209 and 2-301(a) of the Illinois Code of Civil Procedure, to dismiss Plaintiffs' Complaint for lack of personal jurisdiction.  In support thereof, Syd Carpenter Marine states as follows:

        1.      Plaintiffs filed a Complaint on July 8, 2021 alleging Plaintiff, Chloyde Pelton, was exposed to asbestos containing products manufactured, sold, distributed or installed by multiple Defendants, including Syd Carpenter Marine while serving in the U.S. Navy from 1959 until 1963 on various ships and while performing non-occupational home remodeling and automotive repair work.  Plaintiffs' Complaint purports to set forth claims for negligence in Count I, wilful and wanton misconduct in Count II, conspiracy in Count III, negligent spoliation of evidence in Count IV, wilful and wanton spoliation of evidence in Count V and for loss of consortium in Count VI. There are no allegations specifically directed to Syd Carpenter Marine, including no allegations

FILED DATE: 7/30/2021 4:04 PM  2021L006906

of the State in which Plaintiff claims that he was exposed to products associated with Syd Carpenter Marine. The Complaint is incorporated herein by reference.

2.    The affidavit of James Carpenter, attached hereto as Exhibit A, establishes the following:

    a.    That he has been employed by Syd Carpenter, Marine Contractor, Inc. ("Syd Carpenter Marine") for approximately forty years. Syd Carpenter Marine was incorporated in 1947, and was subsequently run by his grandfather and father. That he took charge of Syd Carpenter Marine in or around 1982 and continued to run the company until it ceased activity in 2000.

    b.    That Syd Carpenter Marine has always been a marine insulation contractor based in the Los Angeles, California area, and has been a California corporation throughout its years of incorporation. Throughout its years of active existence, Syd Carpenter Marine performed virtually all of its work in the State of California.

    c.    That Syd Carpenter Marine has never registered to do business in Illinois, nor has Syd Carpenter Marine ever maintained any office, registered agent, or physical presence of any type in Illinois.

    d.    That Syd Carpenter Marine has never performed any work in Illinois or made a sale in Illinois, and has never derived any revenue from goods sold or services rendered in Illinois.

    e.    That Syd Carpenter Marine has never directed any activities of any type towards the State of Illinois.

    f.    That Syd Carpenter Marine owns no real estate in Illinois.

3.    Under the Illinois long-arm statute, Section 2-209 of the Illinois Code of Civil Procedure, an Illinois court may exercise jurisdiction against a corporation if the cause of action arises from:

    (a)(1)  The transaction of any business within this State

    (a)(2)  The commission of a tortious act within this State

4.    Under Section 2-209(b)(3) of the Illinois Code of Civil Procedure, a court may exercise jurisdiction in any action arising within or without this State against any person who is a corporation organized under the laws of this State.

FILED DATE: 7/30/2021 4:04 PM    2021L006906

5.      Under Section 2-209(c) of the Illinois Code of Civil Procedure, a court may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States.

6.      In order to exercise personal jurisdiction over a non-resident defendant, the requirements of both the long-arm statute, set forth above, and due process must be met. *Campbell v. Mills*, 262 Ill.App.3d 624, 634 N.E.2d 41 (5th Dist. 1994).  When personal jurisdiction over a non-resident is contested, the plaintiff bears the burden of establishing a *prima facie* case that jurisdiction over the nonresident defendant exists.  *Carlson v. Carlson*, 147 Ill.App.3d 610, 498 N.E.2d 708 (2nd Dist. 1986).

7.      "The Due Process Clause of the Fourteenth Amendment limits the power of a state court to render a valid personal judgment against a nonresident defendant." *Rios v. Bayer Corp.*, 2020 IL 125020 ¶17, *citing World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). There are two types of personal jurisdiction, specific and general.  *See Daimler AG v. Bauman*, 134 S.Ct. 746, 754-758 (2014). General jurisdiction is proper only when a corporation's "affiliations with the state are so continuous and systematic as to render [it] at home in the forum state."  *Daimler AG v. Bauman*, 134 S.Ct. 746, 754-758 (2014).

8.      A court has specific jurisdiction over a defendant "if the suit arises out of or relates to the defendant's contacts with the forum state." *Bolger v. Nautica Int'l., Inc.*, 369 Ill.App.3d 947, 952 (2nd Dist. 2007). However, "[w]here no adequate link exists between Illinois and the nonresident plaintiffs' claims, it necessarily follows that Illinois lacks specific personal jurisdiction over defendants as to those claims." *Rios*, 2020 IL 125020 ¶28.

9.      Syd Carpenter Marine had no contact with Illinois and is entitled to dismissal pursuant to Sections 2-209 and 2-301 of the Illinois Code of Civil Procedure.

FILED DATE: 7/30/2021 4:04 PM    2021L006906

WHEREFORE, Defendant, SYD CARPENTER, MARINE CONTRACTOR, INC., moves to dismiss Plaintiffs' Complaint at Law, pursuant to Sections 2-209 and 2-301(a) of the Illinois Code of Civil Procedure, for lack of personal jurisdiction, and for all further and proper relief.

SYD CARPENTER, MARINE CONTRACTOR, INC.

By:    /s/ Gregory L. Cochran
          Gregory L. Cochran, One Of Its Attorneys

Gregory L. Cochran – ARDC #3126969
Paul S. Steinhofer – ARDC #6239259
Thomas W. Hayes – ARDC #6194126
Kelly E. Purkey – ARDC #6283785
McKENNA STORER
33 North LaSalle Street, Suite 1400
Chicago, Illinois  60602-2610
312/558-3900 – Facsimile No. 312/558-8348
Attorneys for Defendant, Syd Carpenter, Marine Contractor, Inc.

Certificate of Service

The undersigned certifies that a copy of the foregoing and above-referenced document was filed on the 30th day of July 2021, via File & Serve Illinois, and served upon all counsel of record by electronic transmission via File & ServeXpress.

[X]    Under penalties as provided by
      law pursuant to 735 ILCS 5/1-109,
      I certify that the statements set
      forth herein are true and correct.      /s/ Autumn Ehrenberg

FILED DATE: 7/30/2021 4:04 PM   2021L006906

# Exhibit A

FILED DATE: 7/30/2021 4:04 PM    2021L006906

IN THE CIRCUIT COURT
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

STANLEY R. ARMSTRONG,     )
        Plaintiff,     )
                      )
v.                    )    NO. 10-L-217
                      )
A.O. SMITH CORPORATION, et al., )
        Defendants.  )

## AFFIDAVIT OF JAMES CARPENTER

Comes now the Affiant, James Carpenter, and pursuant to Section 1-109 of the Illinois Code of Civil Procedure, states as follows:

1.    That he has been employed by Syd Carpenter, Marine Contractor, Inc. ("Syd Carpenter") for approximately forty years.  Syd Carpenter was incorporated in 1947, and was subsequently run by Affiant's grandfather and then his father.  That he took charge of Syd Carpenter Marine in or around 1982 and continued to run the company until it ceased activity in 2000.  Based on the foregoing, he is knowledgeable concerning the history and activities of Syd Carpenter Marine.

2.    That Syd Carpenter Marine has always been a marine insulation contractor based in the Los Angeles, California area, and has been a California corporation throughout its years of incorporation.  Throughout its years of active existence, Syd Carpenter Marine performed virtually all of its work in the State of California.

3.    That Syd Carpenter Marine has never registered to do business in Illinois, nor has Syd Carpenter Marine ever maintained any office, registered agent, or physical presence of any type in Illinois.

FILED DATE: 7/30/2021 4:04 PM  2021L006906

4.   That Syd Carpenter Marine has never performed any work in Illinois or made a sale in Illinois, and has never derived any revenue from goods sold or services rendered in Illinois.

5.   That Syd Carpenter Marine has never directed any activities of any type towards the State of Illinois.

6.   That Syd Carpenter Marine owns no real estate in Illinois.

Further Affiant sayeth not.

[X]   Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be upon information and belief and as to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true.

_____
JAMES CARPENTER
Syd Carpenter, Marine Contractor, Inc.

Dated:   ___4 / 1 / 10_____

Gregory L. Cochran - ARDC #3126969
Margaret M. Foster - ARDC #6198138
Thomas W. Hayes - ARDC #6194126
McKENNA STORER
33 North LaSalle Street, Suite 1400
Chicago, Illinois  60602-2610
312/558-3900
Facsimile No. 312/558-8348
Attorneys for Defendant, Syd Carpenter Marine Contractor, Inc.

E-SERVICE
66815243
Aug 02 2021
02:42PM
File & ServeXpress

249-17823/ws

## IN THE CIRCUIT COURT
## COOK COUNTY, ILLINOIS

CHLOYDE PELTON and SHIRLEY PELTON )
                                                    )

       Plaintiffs )

                                                  )

       v. )          No. 2021 L 006906

                                                  )

TATE ANDALE, INC., et al. )         **ASBESTOS**

                                                  )

       Defendants )       **JURY TRIAL DEMANDED**

## CERTIFICATE OF SERVICE

    I, Wendy Segalla, a non-attorney, certify that a copy of Defendant, TATE ANDALE

INC.'S Special and Limited Appearance, Jury Demand, Motion to Dismiss for Lack of Personal

Jurisdiction, Memorandum in support thereof, Motion To Dismiss Counts II, V and VI of

Plaintiffs' Complaint, Motion to Dismiss for Improper Statutory Venue or, in the Alternative,

Motion to Dismiss on the Grounds of Forum Non Conveniens and this Certificate of Service

were served on all Counsel of Record in this case via *LexisNexis* pursuant to the Court's Order of

August 19, 2016, on **August 2, 2021.**


                 /s/Wendy Segalla


Paul Van Lysebettens – ARDC: 6226279
Jeremy Harris – ARDC: 6273694
Gunty & McCarthy
150 South Wacker Drive, Suite 2500
Chicago, IL 60606
Phn: (312) 541-0022/Fax: (312) 541-0033
Jharris@guntymccarthy.com

E-SERVICE
66815243
Aug 02 2021
02:42PM
File & ServeXpress

249-17823/ws

**IN THE CIRCUIT COURT
COOK COUNTY, ILLINOIS**

CHLOYDE PELTON and SHIRLEY PELTON )
)
         Plaintiffs )
)
         v. )     No. 2021 L 006906
)
TATE ANDALE, INC., et al. )     **ASBESTOS**
)
         Defendants )     **JURY TRIAL DEMANDED**

## SPECIAL AND LIMITED APPEARANCE

    Defendant, TATE ANDALE, INC. enters its special and limited appearance for the sole

purpose of contesting this Honorable Court's in personam jurisdiction over Tate Andale, Inc., in

the above-captioned matter.


               By:    /s/ Jeremy Harris_____
                      Jeremy Harris, One of the Attorneys for Defendant

Paul Van Lysebettens, ARDC: 6226279
Jeremy Harris, ARDC: 6273694
GUNTY & McCARTHY
150 South Wacker Drive, Suite 2500
Chicago, Illinois 60606
Phone: (312) 541-0022
Fax: (312) 541-0033
Jharris@guntymccarthy.com


** On June 1, 2019, Tate Andale, Inc., underwent a conversion pursuant to Section 3-901, et seq.
of the Maryland General Corporation Law and is now known as Tate Andale, LLC

249-17823/ws

**IN THE CIRCUIT COURT**
**COOK COUNTY, ILLINOIS**

| | | |
|---|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | No. 2021 L 006906 |
| | ) | |
| TATE ANDALE, INC., et al. | ) | **ASBESTOS** |
| | ) | |
| Defendants | ) | **JURY TRIAL DEMANDED** |

## JURY DEMAND

NOW COMES the Defendant, Defendant, TATE ANDALE, INC., through its attorneys,

GUNTY & McCARTHY, and demands a trial of this matter by a jury of twelve.

Respectfully submitted,

Defendant, TATE ANDALE, INC.

By: /s/ Jeremy Harris
One of the Attorneys for Defendant

Paul Van Lysebettens – ARDC: 6226279
Jeremy Harris – ARDC: 6273694
Gunty & McCarthy
150 South Wacker Drive, Suite 2500
Chicago, IL 60606
Phn: (312) 541-0022/Fax: (312) 541-0033
Jharris@guntymccarthy.com

E-SERVICE
66815243
Aug 02 2021
02:42PM
File & ServeXpress

249-17823/ws

## IN THE CIRCUIT COURT
## COOK COUNTY, ILLINOIS

| | | |
|---|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | No. 2021 L 006906 |
| | ) | |
| TATE ANDALE, INC., et al. | ) | **ASBESTOS** |
| | ) | |
| Defendants | ) | **JURY TRIAL DEMANDED** |

## DEFENDANT, TATE ANDALE, INC.'s MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR LACK OF PERSONAL JURISDICTION

Defendant, TATE ANDALE, INC., by and through its attorneys, GUNTY & McCARTHY, and enters its special and limited appearance for the sole purpose of contesting this Honorable Court's *in personam* jurisdiction over TATE ANDALE, INC. Defendant requests the Court to dismiss Plaintiffs' claims against TATE ANDALE, INC. for lack of personal jurisdiction pursuant to 735 ILCS 5/2-301. In support of its motion, TATE ANDALE, INC. states as follows:

1.     According to Plaintiffs' Complaint, the Plaintiff , Chloyde Pelton, was exposed to products manufactured, sold, distributed or installed by TATE ANDALE, INC.

2.     There is no evidence that Plaintiff's exposure to asbestos arose from any action which TATE ANDALE, INC. undertook in Illinois.

3.     TATE ANDALE, INC. is a Maryland corporation. (See Affidavit of William J. Tate attached hereto as Exhibit A.) TATE ANDALE, INC. has never owned real property in Illinois or had any corporate offices, facilities, mailing addresses, telephone numbers, distribution centers or bank accounts in Illinois (Id. Par. 6).

4.     TATE ANDALE, INC. is not registered to do business in the State of Illinois. (Id. par. 4).

5.     TATE ANDALE, INC. does not have an agent authorized to accept service of process in the State of Illinois (Id. par. 5).

7.     Based on the foregoing, Plaintiffs have not met their burden of establishing that Illinois has personal jurisdiction over TATE ANDALE, INC. based on the United States Supreme Court Decision in Daimler AG v. Bauman, 134 S. Ct. 746, 760 (U.S. 2014).

8.     Indeed, the exercise of personal jurisdiction over TATE ANDALE, INC. in this case would violate 735 ILCS 5/2-209, the Due Process Clause of the Illinois Constitution, and the Due Process Clause of the United States Constitution.  Accordingly, TATE ANDALE, INC. respectfully requests the Court to dismiss Plaintiffs' claims against TATE ANDALE, INC. and to award TATE ANDALE, INC. its costs in this action.

9.     In further support of this motion, TATE ANDALE, INC. submits the accompanying memorandum of law.

WHEREFORE, Defendant, TATE ANDALE, INC., respectfully prays that this Court dismiss Plaintiffs' Complaint against this Defendant, award TATE ANDALE, INC. its costs in this action, and award TATE ANDALE, INC. such further relief as the Court deems just and proper.  TATE ANDALE, INC. also prays this Court to enter its dismissal order pursuant to Illinois Supreme Court Rule 304(a) as there is no just reason to delay enforcement or appeal.

Respectfully submitted,

TATE ANDALE, INC.

By:  /s/ Jeremy Harris
One of the Attorneys for Defendant

Paul Van Lysebettens – ARDC:  6226279
Jeremy Harris – ARDC:  6273694
Gunty & McCarthy
150 South Wacker Drive, Suite 2500
Chicago, IL  60606
Phn: (312) 541-0022/Fax: (312) 541-0033
Jeremy.harris@guntymccarthy.com

3

249-17823

## IN THE CIRCUIT COURT OF
## COOK COUNTY, ILLINOIS

CHLOYDE PELTON and SHIRLEY PELTON   )
   )
          Plaintiff,   )
   )
        v.   )   No: 2021 L 006906
   )
TATE ANDALE, INC., et al.,   )
   )
          Defendants.   )

### AFFIDAVIT

I, William J. Tate, after first being duly sworn on oath, state as follows:

1.    I am currently the President for Tate Andale, Inc. I have been in this capacity since 1983. Previously, I served as Vice President.

2.    Tate Andale, Inc. is located at 1941 Lansdowne Rd., Baltimore, MD 21227.

3.    Tate Andale, Inc. is a foreign corporation and is incorporated in the State of Maryland, which is also where its principal place of business is located.

4.    Tate Andale, Inc. is not registered to do business in the State of Illinois.

5.    Tate Andale, Inc. has no registered agent in the State of Illinois.

6.    Tate Andale, Inc. has no real property in the State of Illinois or any corporate offices, facilities, mailing addresses, telephone numbers, distribution centers or bank accounts in Illinois.

7.    Tate Andale, Inc. has no employees in the State of Illinois.

 

_____
William J. Tate

SUBSCRIBED and SWORN to
before me _August 17_, 2015.

_____
NOTARY PUBLIC



ROSE M. McCAULEY
NOTARY PUBLIC
ANNE ARUNDEL COUNTY
MARYLAND
My Commission Expires Nov. 15, 2015

Page 1 of 1

15-L-879

E-SERVICE
66815243
Aug 02 2021
02:42PM
File & ServeXpress

249-17823/ws

**IN THE CIRCUIT COURT
COOK COUNTY, ILLINOIS**

| | | |
|---|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | No. 2021 L 006906 |
| | ) | |
| TATE ANDALE, INC., et al. | ) | **ASBESTOS** |
| | ) | |
| Defendants | ) | **JURY TRIAL DEMANDED** |

<u>**MEMORANDUM OF LAW IN SUPPORT OF TATE ANDALE, INC.'S MOTION TO
DISMISS PLAINTIFFS' COMPLAINT FOR LACK OF PERSONAL JURISDICTION**</u>

Defendant, TATE ANDALE, INC., (hereinafter "TATE ANDALE"), through its

attorneys, GUNTY & McCARTHY, submits this Memorandum of Law in support of its Motion

to Dismiss for Lack of Personal Jurisdiction.

**INTRODUCTION**

The record in this case shows conclusively that there is no basis for long-arm jurisdiction

over TATE ANDALE.  According to Plaintiffs' complaint, Chloyde Pelton, was exposed to

products manufactured, sold, distributed or installed by numerous defendants, including TATE

ANDALE.  However, there has been no evidence of any wrongful conduct or injury occurring in

Illinois, but instead alleges that he was injured by asbestos exposure occurring in Illinois.

Moreover, TATE ANDALE lacks sufficient connections with Illinois to support general

jurisdiction.  TATE ANDALE, INC. is a Maryland corporation.  <u>See</u> Affidavit of William J.

Tate, attached hereto and incorporated herein as <u>Exhibit A</u>.  TATE ANDALE, INC. has never

owned real property in Illinois or had any corporate offices, facilities, mailing addresses,

telephone numbers, distribution centers or bank accounts in Illinois.  <u>Id</u>. at Par. 6.  TATE

ANDALE, INC. is not registered to do business in the State of Illinois.  <u>Id</u>. at Par. 4.  TATE

ANDALE, INC. does not have an agent authorized to accept service of process in the State of Illinois.  Id. at Par. 5.

Since Illinois is in no sense TATE ANDALE's corporate home, it would violate Due Process for an Illinois court to assert long-arm jurisdiction over TATE ANDALE for a controversy unrelated to Illinois.

## SUMMARY OF ARGUMENT

I.      **It Is The Plaintiffs' Burden To Establish Jurisdiction.**

II.     **No Basis For Specific Jurisdiction Exists.**

III.    **No Basis For General Jurisdiction Exists.**

  A.    **Due Process Requires A Defendant To Be "At Home" In Illinois To Exercise General Jurisdiction.**

    1.    **Controlling  U.S. Supreme Court Authorities**

    2.    **Controlling Illinois Supreme Court Authority**

    3.    **Persuasive Authorities**

  B.   **TATE ANDALE Inc. Is Not "At Home" In Illinois.**

    1.    **The Complaint Fails To Allege That TATE ANDALEIs "At Home" In Illinois.**

    2.    **TATE ANDALE Is In Fact Not "At Home" In Illinois.**

## ARGUMENT

I.      **It Is The Plaintiffs' Burden To Establish Jurisdiction.**

"Personal jurisdiction is a court's power to bring a person into its adjudicative process." *In re M. W*., 232 Ill. 2d 408, 415 (2009). To be valid, the exercise of personal jurisdiction must be authorized by state law and consistent with state and federal Due Process. Illinois law authorizes courts to exercise jurisdiction over non-resident defendants to the extent permitted by the Illinois

and federal Constitutions, 735 ILCS 5/2-209(c). Illinois Due Process requirements are coextensive federal Due Process. *See Russell v. SNFA*, 2013 IL 113909, 987 N.E.2d 778 *cert. denied,* 134 S. Ct. 295, 187 L. Ed. 2d 152 (2013). Therefore, the Due Process requirement resolves to whether an exercise of jurisdiction comports with Due Process under the Fourteenth Amendment to the United States Constitution. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853, 180 L. Ed. 2d 796 (U.S. 2011).

There are two forms of personal jurisdiction: specific and general. Specific jurisdiction permits a forum to exercise judicial power over a non-resident defendant for claims arising from the defendant's contacts with that forum. *Russell*, 987 N.E.2d at 787. In contrast, general jurisdiction permits a forum to exercise judicial power over a non-resident defendant for any and all claims, regardless of any nexus with Illinois. *Id.* at 786. Under either theory, Due Process requires the defendant to have sufficient minimum contacts with the forum, so that requiring the person or entity to defend there "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316, 90 L. Ed. 95 (1945). In cases of specific jurisdiction, arising from the "commission of a tortious act" or a "transaction of business" in Illinois, the very facts giving rise to the action supply the necessary minimum contacts to satisfy Due Process. However, the more expansive claims of general jurisdiction, requiring a defendant "to answer in Illinois for any conceivable claim that any conceivable plaintiff might have against it." *uBID, Inc. v. GoDaddy Group, Inc.,* 623 F.3d 421, 426 (7th Cir. 2010), require a higher order of connection with Illinois, to satisfy Due Process.

"The burden of asserting personal jurisdiction over a nonresident defendant rests on the party who asserts that jurisdiction exists." *Reeves v. Baltimore & Ohio R.R. Co.,* 171 Ill. App. 3d 1021, 1024, 526 N.E.2d 404, 406 (Ill. App. Ct. 1st Dist. 1988). *See Bolger v. Nautica Int'l, Inc.,*

369 Ill. App. 3d 947, 949, 861 N.E.2d 666, 669 (Ill. App. Ct. 2d Dist. 2007) ("The plaintiff has the burden of proving a *prima facie* case for jurisdiction when seeking jurisdiction over a nonresident defendant.").  "[W]here a plaintiff seeks to hold a non-resident defendant liable, the complaint must allege facts upon which jurisdiction under the Long-Arm Statute is based."  See *Kadala v. Cunard Lines, Ltd.,* 226 Ill.App.3d 302, 310, 589 N.E.2d 802, 807 (1st Dist. 1992) (quoting *Bobka v. Cook County Hosp.,* 117 Ill.App.3d 359, 360, 453 N.E.2d 828, 829-30 (1st Dist. 1983)). The failure to allege sufficient jurisdictional facts on which Illinois courts can base jurisdiction - standing alone - is fatal to a claim.  *Reeves,* 171 Ill.App.3d at 1024. Additionally, a plaintiffs' *prima facie* allegations of jurisdiction can be overcome by a defendant's evidence that defeats jurisdiction. *Bolger,* 369 Ill.App.3d at 950; *Morecambe Mar., Inc. v. Nat'l Bank of Greece, S.A.,* 354 Ill.App.3d 707, 710, 821 N.E.2d 780, 784 (1st Dist. 2004).  When evidence contesting jurisdiction is offered, Plaintiff in turn must establish by a preponderance of the evidence that personal jurisdiction is proper under the Illinois Long-Arm Statute, 735 ILCS 5/2-209, and that the exercise of personal jurisdiction meets constitutional Due Process standards.  *See, e.g., Rollins v. Ellwood*, 141 Ill.2d 244, 271, 565 N.E.2d 1302, 1314-16 (1990).

In this case, "Plaintiff bears the burden of establishing a valid basis for jurisdiction over [TATE ANDALE]." *Kostal v. Pinkus Dermatopathology Lab., P.C.*, 357 Ill.App.3d 381, 383, 827 N.E.2d 1031, 1033 (1st Dist. 2005).  As more fully follows, Plaintiff cannot meet that burden.

## II.     No Basis For Specific Jurisdiction Exists.

Specific jurisdiction is based upon a state's power to adjudicate controversies arising within its borders.  Accordingly, specific jurisdiction requires a direct nexus between the underlying occurrence or controversy and the forum state.  "[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes

jurisdiction." *Bristol-Myers Squibb Company v. Superior Court of California*, 582 U.S. ___ , 137 S. Ct. 1773, 1780 (2017), quoting *Goodyear Dunlop Tires Operations SA v. Brown*, 564 U.S. 915, 919 (2011). The Complaint herein alleges a tort claim for personal injury from exposure to asbestos.  In Illinois, specific jurisdiction over a tort claim is ordinarily based on "The commission of a tortious act within this State."  735 ILCS 5/2-209(a).

There is no evidence in this case of any tortious act by TATE ANDALE in Illinois.

**No Basis For General Jurisdiction Exists.**

TATE ANDALE is not at home in Illinois in a manner permitting the exercise of general jurisdiction consistent with Due Process under the Illinois or United States Constitutions.

A. **Due Process Requires That A Defendant Be "At Home" In Illinois To Exercise General Jurisdiction.**

1. **Controlling U.S. Supreme Court Authorities**

"In recent years, the Supreme Court has clarified and, it is fair to say, raised the bar for [general jurisdiction]". *Kipp v. Ski Enter. Corp. of Wisconsin*, 783 F.3d 695, 698 (7ᵗʰ Cir. 2015). General jurisdiction over a nonresident defendant now requires "more than the 'substantial, continuous, and systematic course of business' that was once thought to suffice."  *Kipp,* 783 F.3d. at 698, quoting *Daimler AG v. Bauman,* 571 U.S. 117 (2014)*.*

The Supreme Court "raised the bar" for general jurisdiction in *Daimler AG v. v. Bauman,* 571 U.S. 117 (2014).  The *Daimler* opinion held that general jurisdiction required affiliations with a state "so 'continuous and systematic' *as to render them essentially at home in the forum State.*" *Id*. at 127 (emphasis supplied).  The opinion continued that "only a limited set of affiliations with a forum" render a defendant "at home" in a state, listing the state of incorporation and the corporation's principal place of business as "paradigm all-purpose forums for general jurisdiction," *Id.* at 137.  Otherwise, general jurisdiction can be exercised only in "an exceptional

case" such as *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437 (1952), in which another forum becomes a "surrogate for place of incorporation or home office." *Daimler,* 571 U.S. 117, at 129 n.8.

The *Daimler* opinion expressly rejected much prior law, which had permitted general jurisdiction based on a foreign defendant "doing business" in a forum state. In underlying proceedings, jurisdiction over the defendant Daimler AG had been sustained on the basis of its business activities in California, which included a subsidiary which was the largest supplier of luxury automobiles in California, and maintenance of a regional California office, along with multiple other facilities including a vehicle preparation center and classic car center. Notwithstanding that substantial business presence, the Supreme Court reversed, ruling that to "approve the exercise of general jurisdiction in every State in which a corporation engages in a substantial, continuous, and systematic course of business ... is unacceptably grasping." *Id.* at 138 (citations and internal quotation marks omitted). *See also, Goodyear,* 131 S. Ct. at 2856 (rejecting the plaintiffs' argument for jurisdiction because under it, "any substantial manufacturer or seller of goods would be amenable to suit, on any claim for relief, wherever its products are distributed").

Underscoring its rejection of the "doing business" standard, the *Daimler* opinion also clarified the analysis by which general jurisdiction must be evaluated. Under the "doing business" paradigm, courts tallied up a non-resident defendant's in-state contacts, to assess whether they satisfied Due Process. Rejecting that narrow focus confined to the forum state, the *Daimler* opinion broadened the lens, ruling that general jurisdiction does not focus solely on the magnitude of the defendant's in-state contacts, but instead "calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide. *Id.* at 149. A corporation that operates in many places

6

can scarcely be deemed at home in all of them. Otherwise, 'at home' would be synonymous with 'doing business' tests" that the Court has rejected. *Id.* at 139.

The Supreme Court reasoned that limiting general jurisdiction to only those forums in which a corporation is "at home" allows entities "to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit" while also "afford[ing] plaintiff recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims." *Id*. at 137 (citations and internal quotation marks omitted).

Initially, the *Daimler* opinion met a mixed reception in lower courts. The Supreme Courts of Missouri and Oregon recognized and enforced the higher bar for general jurisdiction. *See, State ex rel. Norfolk Southern Rwy. Co, v. Dolan*, ___ Mo. ___, 512 S.W.3d 41 (Mo. 2017) (Interstate railroad company with substantial trackage and operations in Missouri not subject to general jurisdiction for personal injury action arising elsewhere); *Barrett v. Union Pac. R.R. Co*., 359 Or. 526, 379 P.3d 521 (2016) (Interstate railroad company with substantial trackage and operations in Oregon not subject to general jurisdiction for personal injury action arising elsewhere); *Figueroa v. BNSF Rwy. Co.,* 361 Or. 142, 390 P.3d 1019 (2017) (registration as foreign business entity in Oregon not submission to general jurisdiction, in case otherwise failing *Daimler* standard). However, the highest courts in Montana and California issued opinions which failed to apply the "at home" test, and approved general jurisdiction on more liberal grounds.

In 2017, the U.S. Supreme Court granted *certiorari* in the latter two cases and reversed them, emphatically reaffirming *Daimler's* standard and analysis. In *BNSF Railway Co. v. Tyrrell*, 137 S. Ct. 1549 (2017)*,* the Court reversed Montana's assertion of long arm jurisdiction over two personal injury actions arising under the Federal Employer's Liability Act (FELA). Kelli Tyrrell,

appointed administrator of her deceased husband's estate in South Dakota, claimed that Brent Tyrrell had developed a fatal kidney cancer from exposure to carcinogenic chemicals while working for the defendant railroad, BNSF. Robert Nelson, a North Dakota resident, sought recovery for knee injuries allegedly sustained working for BNSF as a forklift driver. Injured worker neither resided in Montana, nor alleged that their injuries arose from work performed in Montana. On the contrary, the record did not reflect that Nelson or Tyrrell had ever worked for BNSF in Montana. Nevertheless, both plaintiffs commenced suit there.

The defendant, BNSF, was incorporated in Delaware, and had its principal place of business in Texas. BNSF had a substantial presence in Montana: over 2000 miles of railroad track, and operations conducted by approximately 2100 employees. However, the record further showed that BNSF's trackage in Montana was only about 6% of its total track mileage, that its Montana employees were less than 5% of its total workforce, and that less than 10% of its corporate revenue was generated in Montana.

BNSF moved to dismiss both cases for lack of personal jurisdiction. The railroad conceded that it was a "person found within… Montana," but contended that it was not "at home" in Montana, and therefore not subject to general jurisdiction for actions unrelated to its Montana activities. The Montana Supreme Court ruled that Montana courts had jurisdiction to entertain both cases. The Montana Supreme Court found two alternative grounds for jurisdiction: (1) specific statutory language in the FELA, and (2) in Montana's Rule of Civil Practice 4(b)(1) authorizing jurisdiction over " all persons found within … Montana."

The U.S. Supreme Court reversed, rejecting both rationales. Preliminarily, the *Tyrrell* opinion ruled that the FELA provisions relied on by the plaintiffs and the Montana Supreme Court concerned only venue and subject matter jurisdiction, and did not authorize personal jurisdiction

8

over the defendant. *Tyrrell,* 137 S. Ct. 1549 at 1554-1559. More significantly, the *Tyrrell* opinion further ruled that Montana's assertion of long-arm jurisdiction over BNSF as a "person found" in that state violated the Due Process Clause of the Fourteenth Amendment.

The *Tyrrell* opinion reaffirmed the standard and followed the analysis previously announced in *Daimler.* A "court may assert general jurisdiction over a foreign (sister – state or foreign – country) corporation to hear any and all claims against them where their affiliations with the state are so 'continuous and systematic' as to render them essentially at home in the forum State." *Tyrrell,* 137 S. Ct. 1549 at 1558. The "paradigm" forums in which a corporate defendant is "at home" are the corporation's place of incorporation and its principal place of business. *Id.* "[T]he exercise of general jurisdiction is not limited to these forums; in an 'exceptional case,' a corporate defendant's operations in another forum' may be so substantial and of such a nature is to render the corporation at home in that state." *Id.* Again referring back to its earlier *Daimler* opinion, the Court reiterated that *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952), involving the wholesale wartime relocation of a corporate defendant from the Philippines to Ohio, "exemplified such a case." *Tyrrell,* 137 S. Ct. 1549 at 1558.

Applying those principles, the *Tyrrell* opinion first noted that BNSF fit neither "paradigm" for a corporate "home" in Montana. The corporation was neither incorporated in Montana, nor maintained its principal place of business there. *Id.* at 1159. Further, the Court ruled that BNSF's operations in Montana were not so "exceptional" as to render the railroad subject to general jurisdiction. "Nor is BNSF so heavily engaged in activity in Montana' as to render [it] essentially at home' in that State." *Id.* While acknowledging BNSF's substantial presence in Montana, the Supreme Court again echoed *Daimler*:

"[T]he general jurisdiction inquiry does not focus solely on the magnitude of the defendant's in-state contacts… Rather, the inquiry' calls for an appraisal of a corporation's

activities in their entirety';' [a] corporation that operates in many places can scarcely be deemed at home in all of them.'"

*Id.* Noting the scope and scale of BNSF's overall corporate operations, and the small role of its Montana operations in relative terms, the *Tyrrell* opinion concluded that BNSF's Montana business "does not suffice to permit the assertion of general jurisdiction over claims like Nelson's and Tyrrell's that are unrelated to any activity occurring in Montana." *Id.*

Three weeks later, a further Supreme Court opinion in: *Bristol-Myers Squibb Company v. Superior Ct. of California*, *582* U.S. ___, 137 S. Ct. 1773 (2017) again reaffirmed *Daimler*. The case concerned consolidated claims by more than 600 plaintiffs alleging injury from a Bristol-Myers Squibb (BMS) drug called Plavix. 86 of the plaintiffs were California residents, who claimed that they had purchased Plavix and suffered injuries in California. The jurisdiction of California courts to entertain their claims was uncontested. However, 592 of the plaintiffs were not California residents, but residents of 33 other states, who did not claim that they had purchased Plavix or suffered injury in California.

The defendant BMS was incorporated in Delaware, and headquartered in New York. Like BNSF in Montana, BMS admittedly conducted substantial business in California. It employed approximately 160 people in five California research and laboratory facilities, along with approximately 250 sales representatives in the state. Between 2006 and 2012, it sold almost 187 million Plavix pills in California, generating more than $800 million in sales revenue. However, BMS' principal business operations were located in New York and New Jersey. Over 50% of its workforce was employed in those two states. Its California sales revenue from Plavix represented slightly more than 1% of BMS' nationwide sales revenue. BMS developed Plavix, created its marketing strategy, worked on its regulatory approval, manufactured, labeled, and packaged the drug in New York and New Jersey. On that record, BMS maintained that it was not "at home" in

California, and objected to California's jurisdiction to entertain the Plavix claims of non-Californians.

During the pendency of the underlying case, the U.S. Supreme Court issued its opinion in *Daimler AG v. Bauman*, 571 U.S. 117 (2014), after which the California courts ruled that they lacked general jurisdiction over BMS. However, a divided California Supreme Court held that California had specific jurisdiction over BMS, on the basis of a "sliding-scale" analysis that considered the extent of BMS' activity in California unrelated to Plavix, and the similarity of the Plavix claims raised by both the California residents and nonresidents.

The U.S. Supreme Court reversed, ruling that the assertion of California jurisdiction violated due process. The *BMS* opinion criticized the California Supreme Court for muddling the distinct categories of general jurisdiction and specific jurisdiction. Emphasizing that specific jurisdiction requires an immediate nexus between the substance of the lawsuit and the forum, the opinion dismissed California's "sliding-scale approach" as a "loose and spurious form of general jurisdiction." 137 S. Ct. at 1780. Since specific jurisdiction properly understood was not established, the *BMS* opinion evaluated the claims of the non-Californian plaintiffs under *Daimler's* "at home" test for general jurisdiction, and ruled that California's assertion of jurisdiction over those claims violated due process. Plainly stated, the *BMS* opinion ruled that imprecise, overly expansive concepts of "specific jurisdiction" cannot be employed to evade the due process standard established by *Daimler* and its antecedents.

The *Daimler*, *Tyrrell, and BMS* opinions are grounded on constitutional Due Process. The Supreme Court has been explicit about the basis of its holdings. "The question presented is whether the Due Process Clause of the Fourteenth Amendment precludes the district court from exercising jurisdiction over Daimler in this case …" *Daimler*, 571 U.S. 117, 121 (2014). The Court "granted

Certiorari to decide whether, consistent with the Due Process clause of the Fourteenth Amendment, Daimler is amenable to suit in California." *Id*. at 125. "We therefore inquire whether the Montana courts' exercise of personal jurisdiction under Montana law comports with the Due Process Clause of the Fourteenth Amendment." *Tyrrell,* 137 S. Ct. 1549 at 1558. "We granted certiorari to decide whether the California courts' exercise of jurisdiction in this case violated the Due Process Clause of the Fourteenth Amendment." *BMS*, 582 U.S. ___, 137 S. Ct. 1773, 1779 (2017). The constitutional principle is universally applicable to all cases. "The Fourteenth Amendment due process constraint described in *Daimler*, however, applies to all state – court assertions of general jurisdiction over nonresident defendants; the constraint does not vary with the type of claim asserted or business enterprise sued." *Tyrrell,* 137 S. Ct. 1549 at 1559.

<h3 style="text-align:center">2.    <u>Controlling Illinois Supreme Court Authority</u></h3>

Consistent with the foregoing U.S. Supreme Court authorities, the Illinois Supreme Court recently issued its opinion in *Aspen American Insurance Company v. Interstate Warehousing, Inc.* 2017 IL 12128. Citing the *Daimler* and *Tyrrell* opinions, *Aspen American* recognized the "at home" standard for general jurisdiction, and applied it as a limitation on the Illinois long arm statute. The case was a subrogation action for property damage, arising from a warehouse collapse in Wisconsin. The defendant was an Indiana corporation with its principal place of business in Fort Wayne, Indiana, but which also operated a warehouse facility in Joliet, Illinois. Plaintiff maintained that the defendant was subject to general jurisdiction, because it was doing business in Illinois through the Joliet warehouse, and the circuit court and appellate court sustained Illinois jurisdiction on that basis.

The Supreme Court reversed, ruling that under *Daimler,* "even a company's' engage[ment] in a substantial, continuous, and systematic course of business' is alone insufficient to render it at

home in a forum." 2017 IL 121281 ¶16.   Rather, "… [P]laintiff must make a prima facie showing that defendant is essentially at home in Illinois. This means that plaintiff must show that defendant is incorporated or has its principal place of business in Illinois or that defendant's contacts with Illinois are so substantial as to render this an exceptional case." 2017 IL 121281 ¶18.  The opinion continued, "To be sure, plaintiff has established that defendant does business in Illinois through the warehouse in Joliet. But this fact falls far short of showing that Illinois is a surrogate home for the defendant. Indeed, if the operation of the warehouse was sufficient, in itself, to establish general jurisdiction, then defendant would also be at home in all the other states where its warehouses are located. The Supreme Court has expressly rejected this reasoning. *Daimler* [citation omitted] ("[A] corporation that operates in many places can scarcely be deemed at home in all of them")." 2017 IL 121281 ¶19.

The *Aspen American* opinion expressly recognized that the test for general jurisdiction announced in *Daimler* rested on considerations of constitutional due process. "Plaintiff has failed to show that defendant's contacts with Illinois render it at home in the state. To subject defendant to general personal jurisdiction would therefore deny it due process of law."  2017 IL 121281 ¶20. Illinois law is now squarely aligned with federal law regarding general jurisdiction, and the "at home" test limits the operation   of Illinois' long arm statute.

### 3.    Persuasive Authorities

The forgoing U.S. Supreme Court authorities, now adapted by the Illinois Supreme Court, plainly set the Due Process limits of general jurisdiction for Illinois courts and other courts nationwide.  In the last several years, a considerable body of persuasive authority has emerged recognizing and applying the "at home" test.

13

Federal appellate courts have recognized and followed the *Daimler* standard for general jurisdiction. *See, See uBID, Inc. v. GoDaddy Grp. Inc.*, 623 F.3d 421, 425-26 (7th Cir. 2010) (affirming district court finding that the defendant was not subject to general jurisdiction in Illinois despite its "extensive and deliberate" web-based contacts because it would be "unfair to require [the defendant] to answer in Illinois for any conceivable claim that any conceivable plaintiff might have against it"); *Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (Second Circuit 2016) (aerospace company with interstate operations not subject to general jurisdiction in Connecticut, notwithstanding substantial business operations there).

A growing tide of published federal district court opinions have likewise followed and applied *Daimler* in resolving jurisdictional challenges. *See, Shrum v. Big Lots Stores, Inc.*, No. 3:14-cv-03135-CSB, 2014 WL 6888446, at *7 (N.D. Ill. Dec. 8, 2014) (applying *Daimler* and finding the defendant was not subject to general jurisdiction in Illinois where it had no offices or real property in Illinois and employed two Illinois residents, even though the defendant had "fairly extensive and deliberate" Illinois contacts); *Holman v. AMU Trans, LLC*, No. 14 C 04407, 2015 WL 3918488 (N.D. Ill. 2015) (trucking company's contacts with Tennessee, including using its highways and paying a Motor Vehicle Use Tax, fall short of the *Daimler* standard); *Farber v. Tennant Truck Lines, Inc.*, No. 14–5028, 2015 WL 518254 (E.D. Pa. 2015) (trucking corporation's "regular and systematic conduct [with Pennsylvania] is insufficient to subject [it] to general jurisdiction in Pennsylvania under *Goodyear* and *Daimler*," despite the defendant company's Pennsylvania contacts of thousands of delivery and related annual revenue between $800,000 and $1,600,000 over a four year period, travelling between 382,000 and 636,000 miles over a five year period, purchasing between 69,000 and 104,000 gallons of gas annually over a five year period, employing several individuals residing in Pennsylvania, and making numerous tax payments to

the state) *Hayward v. Taylor Trucking Line, Inc.,* 15-CV-00866, 2015 WL 5444787 (N.D. Ill. Sept. 14, 2015) (interstate trucking company not subject to Illinois jurisdiction despite deliveries in Illinois; revenue generated by deliveries to Illinois; travel on Illinois roads; customers and employees residing in Illinois; solicitation of driers from Illinois through its website; and permits with the Illinois Department of Transportation).

While some aspects of *Daimler's* analysis may have seemed novel when that opinion was first issued, the Supreme Court has emphatically reaffirmed the "at home" standard for general jurisdiction in its 2017 *Tyrrell* and *BMS* opinions. Recognized and applied in a growing body of persuasive authority, the "at home" test has clearly become the law of the land.

**B.    TATE ANDALE Is Not "At Home" In Illinois.**

**1.    The Complaint Fails To Allege That TATE ANDALE Is "At Home" In Illinois.**

The Complaintdoes not allege that TATE ANDALE is an Illinois corporation. It does not allege that TATE ANDALE has its principal place of business in Illinois. It does not allege that TATE ANDALE is "doing business" in Illinois, much less that its business rises to the level of an "exceptional case" making TATE ANDALE "at home" in Illinois. As far as Illinois jurisdiction goes, the Complaint is a complete vacuum. Standing alone, that failure to allege *prima facie* facts supporting jurisdiction requires dismissal of TATE ANDALE from this action.

**2.    TATE ANDALE Is In Fact Not "At Home" In Illinois.**

To establish general jurisdiction, Plaintiffs must show that TATE ANDALE has affiliations with Illinois that render the company is at home in Illinois. *See, Daimler,* 571 U.S. 117 (2014); *BMS*, 582 U.S. ___, 137 S. Ct. 1773, 1779 (2017)*; Tyrrell,* 137 S. Ct. 1549 (2017). In this case, the record shows the opposite. TATE ANDALE has proved that it is domiciled elsewhere, and has done nothing remotely to make Illinois its corporate home.

TATE ANDALE is not incorporated in Illinois. It is incorporated in Maryland. See Exhibit A, Par. 2. TATE ANDALE is not headquartered in Illinois. Its sole offices and physical facilities are located in Baltimore. Id. Illinois is not one of the "paradigm all-purpose forums" in which TATE ANDALE is "at home" under *Daimler, BMS,* and *Tyrrell*.

The question then becomes whether TATE ANDALE's Illinois contacts are so "exceptional" as to make Illinois a "surrogate" for its state of incorporation or principal place of business. TATE ANDALE has never remotely established Illinois as such a center of gravity for its business. TATE ANDALE is not registered to do business in Illinois. Id. TATE ANDALE has no registered agent in Illinois. Id. TATE ANDALE owns no real property in Illinois. Id. TATE ANDALE has no corporate offices, employees, facilities, operations, mailing addresses, telephone numbers, distribution centers, or bank accounts in Illinois. Id. As noted above, Plaintiffs have not adduced allegations – much less evidence – suggesting that TATE ANDALE has made a home in Illinois in any sense.

By way of contrast, the defendant's contacts with Montana in *Tyrrell* included 2000 miles of railroad track and 2100 employees. *Tyrrell*, 137 S. Ct. at 1555-56. BMS had hundreds of employees, five facilities, and sales revenue of $800,000,000 in California. The defendant in *Daimler* included a subsidiary which was the largest supplier of luxury automobiles in California, and maintained a regional office in California, along with multiple other facilities including a vehicle preparation center and classic car center. In *Aspen American*, the Defendant likewise operated a physical facility in Illinois on an ongoing basis. If those examples were insufficiently "exceptional" to render defendants "at home" in those states, it cannot be seriously maintained that TATE ANDALE is at home in Illinois.

16

Once again, the *Daimler*, *BMS*, *Tyrrell* and *Aspen American* opinions are grounded in Due Process. Their "at home" standard is the outer boundary of constitutional Due Process for general jurisdiction. Since TATE ANDALE is not at home in Illinois, it lies outside that constitutional boundary. Compelling TATE ANDALE to defend this case in Illinois would not violate merely some technical, procedural rule. It would violate the fundamental right of constitutional Due Process.

## CONCLUSION

WHEREFORE, Defendant, TATE ANDALE, respectfully prays this Honorable Court to dismiss Plaintiffs' firstcomplaint against this Defendant, award TATE ANDALE its costs in this action and award TATE ANDALE such further relief as the Court deems just and proper. TATE ANDALE also prays this Honorable Court to enter its dismissal order pursuant to Illinois Supreme Court Rule 304(a) as there is no just reason to delay enforcement or appeal.

Respectfully submitted,

TATE ANDALE, INC.

By: /s/ Jeremy Harris
One of the Attorneys for Defendant

Paul Van Lysebettens – ARDC: 6226279
Jeremy Harris – ARDC: 6273694
Gunty & McCarthy
150 South Wacker Drive, Suite 2500
Chicago, IL 60606
Phn: (312) 541-0022/Fax: (312) 541-0033
Jeremy.harris@guntymccarthy.com

249-17823

### IN THE CIRCUIT COURT OF
### COOK COUNTY, ILLINOIS

CHLOYDE PELTON and SHIRLEY PELTON )
                             )
             Plaintiff, )
               v. )      No: 2021 L 006906
                             )
TATE ANDALE, INC., et al., )
                             )
           Defendants. )

### AFFIDAVIT

I, William J. Tate, after first being duly sworn on oath, state as follows:

1.      I am currently the President for Tate Andale, Inc. I have been in this capacity since 1983. Previously, I served as Vice President.

2.      Tate Andale, Inc. is located at 1941 Lansdowne Rd., Baltimore, MD 21227.

3.      Tate Andale, Inc. is a foreign corporation and is incorporated in the State of Maryland, which is also where its principal place of business is located.

4.      Tate Andale, Inc. is not registered to do business in the State of Illinois.

5.      Tate Andale, Inc. has no registered agent in the State of Illinois.

6.      Tate Andale, Inc. has no real property in the State of Illinois or any corporate offices, facilities, mailing addresses, telephone numbers, distribution centers or bank accounts in Illinois.

7.      Tate Andale, Inc. has no employees in the State of Illinois.

 

                                                _____
                                                William J. Tate

SUBSCRIBED and SWORN to
before me *August 17*, 2015.

_____
NOTARY PUBLIC



ROSE M. McCAULEY
NOTARY PUBLIC
ANNE ARUNDEL COUNTY
MARYLAND
My Commission Expires Nov. 15, 2015

Page 1 of 1

15-L-879

E-SERVICE
66815243
Aug 02 2021
02:42PM
File & ServeXpress

249-17823/ws

## IN THE CIRCUIT COURT
## COOK COUNTY, ILLINOIS

| | | |
|---|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | No. 2021 L 006906 |
| | ) | |
| TATE ANDALE, INC., et al. | ) | **ASBESTOS** |
| | ) | |
| Defendants | ) | **JURY TRIAL DEMANDED** |

### DEFENDANT, TATE ANDALE, INC.'S MOTION TO DISMISS
### COUNTS II, V and VI OF PLAINTIFFS' COMPLAINT

Defendant, TATE ANDALE, INC., by and through its attorneys, GUNTY & McCARTHY, for and as its request for relief alternative to its pending motion to transfer venue and subject to the outcome of said motion to transfer, hereby moves this Honorable Court to dismiss Counts II, V and VI of Plaintiffs' complaint pursuant to 735 ILCS 5/2-615 and 735 ILCS 5/2-604.1. In support of its motion, Defendant, TATE ANDALE, INC., states as follows:

**I.      Standard to Dismiss**

A Motion to Dismiss under Section 2-615 tests the legal sufficiency of a pleading. Brogan v. Mitchell International, Inc., 181 Ill.2d 178 183, 692 N.E.2d 276, 277 (1998). When the trial court is presented with a Motion to Dismiss, it must determine whether the complaint sets forth sufficient allegations that, if established, could entitle the plaintiff to relief. Jarvis v.

South Oak Dodge, Inc., 201 Ill.2d 81, 85-86, 773 N.E.2d 641, 644 (2002). When ruling on a §2-615 motion, the court may only consider the facts apparent from the face of the complaint. Storm & Associates, Ltd. v. Cuculich, 298 Ill.App.3d 1040, 1047, 700 N.E.2d 202, 206 (1st Dist. 1998).

**II.     Counts II and VI Fail to State a Claim Upon Which Relief May Be Granted and Should be Dismissed Pursuant to 735 ILCS 5/2-615**

To plead willful and wanton conduct sufficiently, a plaintiff must allege either a course of action which shows actual or deliberate intent to harm or which, if the course of action is not intentional, shows an utter indifference to or conscious disregard for the safety or property of others. Brock v. Anderson Road Association 287 Ill.App.3d 16, 25, 677 N.E.2d 985 (2nd Dist. 1997). Here, the plaintiff alleges a legal conclusion ("Defendant acted intentionally and/or in a reckless disregard…") without factual allegations indicating in what way this Defendant acted with intent or with utter indifference. Plaintiff simply states the words "intentionally" and "reckless disregard" without a single fact to support the claim. Because of this, Plaintiffs' Counts II and VI are insufficient and is therefore properly dismissed.

**III.    The Prayer for Relief Contained in Count VI Improperly Seeks Punitive Damages.**

Count VI purports to set forth causes of action for willful and wanton misconduct and contains prayers for relief in the form of punitive damages. However, Section 2-6041.1 of the Illinois Compiled Statutes 735 ILCS 5/2-604.1, applies to this case and provides that no complaint shall be filed containing prayers for relief seeking punitive damages until the court finds, after the a hearing, that the plaintiffs have a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." 735 ILCS 5/2-604.1 (West 2003). See also McCann v. Presswood, 308 Ill.App.3d. 1068, 721 N.E.2d. 811, 242 Ill.Dec. 532 (4th Dist. 1999). The hearing required by §2-604.1 has not been held as to this Defendant. Accordingly, the prayers for relief

contained in Counts II and V should be stricken pursuant to Illinois Code of Civil Procedure §2-604.1.

**IV.     Counts V and VI Fail to State a Claim Upon Which Relief May Be Granted and Should be Dismissed Pursuant to 735ILCS 5/2-615.**

As pled, Counts V and VI fail to plead a cause of action against this defendant. Spoliation of evidence is not recognized as an independent cause of action in Illinois but rather is a form of negligence. Martin v. Keeley & Sons, Inc. 2012 IL 113270, para. 26, 365 Ill.Dec. 656, 979 N.E.2d 22; Boyd v. Travelers Insurance Co., 166 Ill.2d. 188, 195, 209 Ill.Dec. 727, 730, 652 N.E.2d 267, 270 (1995). In order to set forth a sufficient claim of spoliation of evidence, plaintiffs' amended complaint must allege facts in support of the four elements of a spoliation claim: "(1) the defendant owed the plaintiffs a duty to preserve the evidence; (2) the defendant breached that duty by losing or destroying the evidence; (3) the loss or destruction of the evidence was the proximate cause of the plaintiffs' inability to prove an underlying lawsuit; and (4) as a result, the plaintiffs suffered actual damages." Martin, 2012 IL 113270, para. 26, 365 Ill.Dec. 656, 979 N.E.2d 22. Counts V and VI fail to plead the necessary elements and are thus, improperly pled.

There is no duty under common law to preserve evidence, although a duty may arise through an agreement, a contract, a statute, or other special circumstances. Martin, 2012 IL 113270, para. 26, 365 Ill.Dec. 656, 979 N.E.2d 22; Boyd 166 Ill.2d. at 195. A plaintiff can establish an exception to the general no-duty rule if it meets the two-prong test set forth by our Supreme Court in Boyd v. Travelers. Boyd 166 Ill.2d. at 195; Kilburg v. Mohiuddin, 2013 IL App. (1st) 113408, 990 N.E.2d 292, 371 Ill. Dec. 392 (1st Dist, 2013).

Under the first or 'relationship' prong of the test, a plaintiff must show that an agreement, contract, statute, special circumstance or voluntary undertaking has given rise to a duty to preserve evidence on the part of the defendant. Under the second, or 'foreseeability' prong of the Boyd

test, a plaintiff must show that the duty extends to the specific evidence at issue by demonstrating that 'a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential civil action.' <u>Boyd</u> 166 Ill.2d. at 195; <u>Kilburg v. Mohiuddin</u>, 2013 IL App. 113408, para. 23, 990 N.E.2d 292, 371 Ill. Dec. 392 (1st Dist, 2013).  If the plaintiff fails to satisfy both prongs of the <u>Boyd</u> test, the defendant has no duty to preserve the evidence at issue." <u>Kilburg</u>, 2013 IL App. 113408, para 23; <u>Martin</u>, 2012 IL 113270, para. 27, 365 Ill.Dec. 656, 979 N.E.2d 22.  Here, plaintiffs fail to allege any facts to support the existence of a duty under either prong of the <u>Boyd</u> test that would require this Defendant to preserve evidence for the benefit of Plaintiffs and cannot do so because no such duty exists.

During the pleading stage, a plaintiff may not be required to prove his or her case; however, he must allege sufficient facts to satisfy all the elements of the asserted cause of action.  <u>Inland Real Estate Corp. v. Tower Construction Co.</u>, 174 Ill.App.3d. 421, 433, 123 Ill.Dec. 876, 528 N.E.2d. 421 (1st Dist. 1988).  In this case, Plaintiffs allege that the above-referenced moving Defendant had a duty "to maintain and preserve documents and information because it knew or should have known that said documents and information were material evidence in potential asbestos litigation."  This statement is a legal conclusion unsupported by fact, as Plaintiffs fail to identify the documents and information that allegedly should have been preserved by this Defendant.  Illinois courts have held that only where a specific piece or pieces of evidence are shown to have been lost or destroyed when a defendant had a duty to preserve said evidence, can a claim for spoliation of evidence be maintained.  Absent such facts, dismissal of the spoliation count is warranted.  See <u>Boyd v. Travelers Insurance Co.</u>, 166 Ill.2d. 188, 195, 209 Ill.Dec. 727, 730, 652 N.E.2d. 267, 270 (1995); <u>Kilburg v. Mohiuddin</u>, 2013 IL App. 113408, para. 23, 990 N.E.2d 292, 371 Ill. Dec. 392 (1st Dist, 2013); <u>Kelly v. Sears, Roebuck & Co.</u>, 308 Ill.App.3d. 633,

720 N.E.2d. 683, 242 Ill.Dec. 62, (5th Dist. 1999). Therefore, Counts V and VI of the Complaint should be stricken and dismissed.

An actionable wrong cannot be made out merely by characterizing acts as having been wrongfully done. Adkins v. Sarah Bush Lincoln Health Center, 129 Ill.2d. 497, 520, 136 Ill.Dec. 47, 544 N.E.2d. 733 (1989). Counts V and VI contain no facts and only allege the elements of negligence (i.e., that Defendant had evidence in its possession, that Defendant had a duty to maintain that evidence, that duty was breached, and that damages ensued as a result) and willful and wanton misconduct, without any specificity. Because legal conclusions cannot sufficiently allege a cause of action, Counts V and VI are improperly pled and should be dismissed.

In order to prevail in an action involving the loss or destruction of evidence, a plaintiff must allege sufficient facts to support a claim that the loss or destruction of the evidence caused the Plaintiff to be unable to prove an underlying lawsuit. Boyd, 166 Ill.2d. at 196. A Complaint may not rest on conclusions not supported by specific facts. J. Eck & Sons, Inc. v. Reuben H. Donnelley Corp., 213 Ill.App.3d. 510, 512, 157 Ill.Dec. 626, 627-28, 572 N.E.2d. 1090, 1091-92 (1st Dist. 1991). Here, Plaintiffs set forth only legal conclusions that broadly allege that he has been prejudiced and impaired in proving claims against this Defendant without alleging any specific facts showing that his chance for succeeding in the underlying claim is hindered due to the loss or destruction of evidence. This causes the spoliation of evidence count to be further deficient, thus warranting dismissal.

If, after disregarding any legal and factual conclusions, the Complaint does not allege sufficient facts to state a cause of action, the trial court must grant the motion to dismiss. Lake County Grading Co., 275 Ill.App.3d. 452, 457, 211 Ill.Dec. 299, 304, 654 N.E.2d. 1109, 1114 (2nd Dist. 1995). Counts V and VI allege only legal conclusions in lieu of facts to support the count

for spoliation of evidence, resulting in wholly inadequate claims. As a result, Defendant's Motion to Dismiss brought pursuant to 735 ILCS 5/2-615 should be granted.

WHEREFORE Defendant, TATE ANDALE, INC., respectfully requests this Court to strike and dismiss Counts II, V and VI of the Plaintiffs' complaint as an alternative and subject to previously filed Motion to Transfer Venue and for such other and further relief as this Court may deem appropriate.

Respectfully submitted,

TATE ANDALE, INC.


 /s/Jeremy Harris
Jeremy Harris
One of the Attorneys for Defendant


Paul Van Lysebettens – ARDC:  6226279
Jeremy Harris – ARDC:  6273694
Gunty & McCarthy
150 South Wacker Drive, Suite 2
Chicago, IL  60606
Phn: (312) 541-0022, Fax: (312) 541-0033
JHarris@guntymccarthy.com

E-SERVICE
66815319
Aug 02 2021
02:41PM
File & ServeXpress

**IN THE CIRCUIT COURT**
**COOK COUNTY, ILLINOIS**

| | |
|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) |
| | ) |
| Plaintiffs, | ) No. 2021-L-006906 |
| | ) |
| vs. | ) J1 |
| | ) |
| AIR & LIQUID SYSTEMS CORP., et.al., | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFFS' AMENDED (as to time only) NOTICE TO TAKE THE VIDEOTAPED
DISCOVERY DEPOSITION**

**PLEASE TAKE NOTICE** that pursuant to the Illinois Statutes and Supreme Court Rules governing, the discovery deposition of the following person will be taken at the time and place indicated below.

**TO:**          All Counsel of Record

**DATE & TIME:** Tuesday, August 3, 2021 at 1:00 p.m. central time

**PLACE:**     **Zoom Video Conference**

https://pohlmanusa.zoom.us/j/88132376512
Meeting ID: 881 3237 6512
Passcode: 276277

TELEPHONIC  DIAL IN INSTRUCTIONS
1. Dial 1-877 853 5257 US Toll-free
2. Meeting ID: 881 3237 6512
3. Passcode: 276277

**DEPONENT:**   Chloyde "Pete" Pelton

**REPORTER:**   Pohlman Reporting Company
10 South Broadway, Suite 1400
St. Louis, MO 63102
(314) 421-0099

**PLEASE TAKE FURTHER NOTICE** that the deposition will be taken of the deponent at the above-stated date and location under oral examination pursuant to Illinois Supreme Court Rules, and that the undersigned attorneys intend to have the deponent's testimony record by use of an audio-visual recording device. Any party or their attorney may appear and participate as they see fit. Any party wishing to attend by telephone should make prior arrangements with Pohlman Reporting, (314) 421-0099, www.pohlmanreporting.com.

Respectfully submitted,
FLINT LAW FIRM, LLC

By: */s/ Lawrence K. Holcomb*
Lawrence K. Holcomb #6328944
222 East Park Street, Suite 500
P.O. Box 189
Edwardsville, Illinois 62025
(618) 288-4777 Telephone
(618) 288-2864 Facsimile

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was filed and served via Pohlman MyDocServe and all anticipated counsel of record this 2nd day of August, 2021.

*/s/ Lawrence K. Holcomb*





August 2, 2021

<u>*Via electronic mail*</u>

All Counsel of Record

> **Re:** ***Chloyde Pelton and Shirley Pelton vs. Air & Liquid Systems Corp et. al***
> ***Cook County Illinois, 21-L-006906***
> ***PLAINTIFFS' STIPULATION LIST – DEPOSITION OF***
> ***CHLOYDE PELTON***

Dear Counselors:

The Defendants listed below are offered stipulations for the deposition of Chloyde Pelton on August 3, 2021.

The offering of a stipulation means we anticipate that this deponent will not identify that defendant's product by manufacturer name or trade name at this deposition, although the witness may describe such products without being able to name them. Acceptance of the stipulation is assumed unless defense counsel explicitly denies the stipulation prior to the beginning of said deposition.

If a stipulation is accepted no questioning of the deponent will take place on the day of the deposition by that defense counsel receiving said stipulation. Failure to refrain from questioning will result in the stipulation being retracted. This letter is based on our best information available to date and, if the witness testifies in a manner inconsistent with this letter, the stipulation will be withdrawn on the record. If it is determined after the deposition that the witness does, in fact, have relevant information relating to a defendant who received a stipulation, plaintiff will endeavor to retender the witness as to the stipulated defendant. A copy of this letter will be attached as an exhibit to the deposition transcript.

Furthermore, defendants offered a stipulation for this deposition may be pursued through other means throughout the course of the litigation for example through other witnesses, co-workers and written discovery.

The defendants offered a stipulation for this deposition are:

CARRIER CORPORATION,
CATERPILLAR, INC.,
CLEAVER-BROOKS, INC., *f/k/a* CLEAVER-BROOKS, a
    *division of* AQUA-CHEM, INC., *and successor for* DAVIS
    HEATERS,

FLOWSERVE US, INC., *solely as successor in interest to*
    EDWARD VALVES, INC.,
FOSTER WHEELER ENERGY CORPORATION,
GREENE, TWEED & CO.,
GRINNELL, LLC, d/b/a GRINNELL CORPORATION,
HILL BROTHERS CHEMICAL COMPANY,
HONEYWELL INTERNATIONAL, INC., *f/k/a* ALLIED
    SIGNAL INC., *successor-in-interest to* THE BENDIX
    CORPORATION
J AND H MARINE & INDUSTRIAL ENGINEERING
    COMPANY
THE J.R. CLARKSON COMPANY, *successor to the* KUNKLE
    VALVE COMPANY, *and successor to* J.E. LONERGAN
    COMPANY,
METALCLAD INSULATION, LLC,
METROPOLITAN LIFE INSURANCE COMPANY,
PNEUMO ABEX, LLC,
ROBERTSHAW CONTROLS CO.,
SPIRAX SARCO, INC.,
SYD CARPENTER MARINE CONTRACTORS,
TACO, INC.,
TATE ANDALE, INC.,
THOMAS DEE ENGINEERING COMPANY,
TRIPLE A MACHINE SHOP, INC.,
UNION CARBIDE CORPORATION,
VELAN VALVE CORP., *a/k/a* VELAN VALVE
    CORPORATION,

Sincerely,
**FLINT LAW FIRM, LLC**

*/s/ Lawrence K. Holcomb*

Lawrence K. Holcomb, Esq.
Partner
Attorney for Plaintiffs

E-SERVICE
66817044
Aug 03 2021
09:30AM
File & ServeXpress

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

| | | |
|---|---|---|
| CHLOYDE PELTON, and SHIRLEY PELTON, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 2021-L-006906 |
| vs. | ) ) | |
| AIR & LIQUID SYSTEMS CORPORATION, Successor by merger to BUFFALO PUMPS, INC., et. al., | ) ) ) ) | |
| Defendants. | ) | |

## ENTRY OF APPEARANCE

The undersigned and the law firm of Litchfield Cavo LLP, enter their appearance on behalf of the Defendant, **AMTROL, INC, individually and as successor in interest to THRUSH CO., INC.**

Respectfully Submitted,

By:/s/ Joseph P. Sullivan
Attorneys for Thrush Co., INC.
Joseph P. Sullivan (6206202)
Kevin Titus (6217520)
LITCHFIELD CAVO LLP
303 W. Madison, Suite 300
Chicago, Illinois 60606
P 312-781-6677
F 312-781-6630
Sullivan@litchfieldcavo.com
titus@litchfieldcavo.com

E-SERVICE
66817044
Aug 03 2021
09:30AM
File & ServeXpress

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

|  |  |  |
|---|---|---|
| CHLOYDE PELTON, and SHIRLEY PELTON, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 2021-L-006906 |
| vs. | ) ) | |
| AIR & LIQUID SYSTEMS CORPORATION, Successor by merger to BUFFALO PUMPS, INC., et. al., | ) ) ) ) | |
| Defendants. | ) | |

## MOTION FOR EXTENSION OF TIME TO FILE RESPONSIVE PLEADING

NOW COMES Defendant, AMTROL, INC, individually and as successor in interest to THRUSH PRODUCTS, INC, by and through its attorneys, LITCHFIELD CAVO LLP, and moves this court for an order granting Defendant, AMTROL, INC., individually and as successor in interest to THRUSH PRODUCTS, INC, an extension of time to file its responsive pleading.

Defendant prays for relief accordingly.

Respectfully submitted,

LITCHFIELD CAVO LLP

By: _____

Attorneys for AMTROL, INC.-THRUSH
PRODUCTS, INC.
Joseph P. Sullivan (6206202)
LITCHFIELD CAVO LLP
303 W. Madison, Suite 300
Chicago, IL 60606
t 312-781-6559 (Sullivan)
f 312-781-6630

E-SERVICE
66818017
Aug 03 2021
12:37PM
File & ServeXpress

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| CHLOYDE PELTON and<br>SHIRLEY PELTON, | |
| Plaintiffs, | Court No. 2021L006906 |
| v. | CALENDAR: J1 |
| AIR & LIQUID SYSTEMS<br>CORPORATION, successor by merger to<br>BUFFALO PUMPS, INC., et al., | JURY TRIAL DEMANDED |
| Defendants. | |

<u>**MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**</u>

NOW COMES, Defendant J & H MARINE & INDUSTRIAL ENGINEERING COMPANY, a suspended California corporation, incorrectly sued as "J and H Marine & Industrial Engineering Company" (hereinafter "J&H"), by and through its attorneys CLYDE & CO US LLP, and for its Motion to Dismiss for Lack of Personal Jurisdiction brought pursuant to 735 ILCS 5/2-619 and 735 ILCS 5/2-301, hereby moves to dismiss Plaintiffs' cause of action for lack of personal jurisdiction and, in support thereof, states as follows:

<u>**Introduction**</u>

1.     Plaintiffs Chloyde Pelton and Shirley Pelton filed Plaintiffs' Complaint in Cook County, Illinois, alleging that Plaintiff Chloyde Pelton was exposed to asbestos manufactured, sold, distributed or installed by numerous named defendants including J&H.  (*See* Plaintiffs' Complaint, Count I, ¶ 2).

2.     Plaintiffs allege that Plaintiff Chloyde Pelton contracted mesothelioma as a result of his asbestos exposure.  (*See* Plaintiffs' Complaint, Count I, ¶ 6 and 9).

3. Plaintiffs are pursuing J&H on theories of negligence (Count I), willful and wanton (Count II), conspiracy (Count III), spoliation of evidence (Counts IV and V) and loss of consortium (Count VI). (*See* Plaintiffs' Complaint, Counts I-VI).

4. Plaintiffs allege that Plaintiff Chloyde Pelton was exposed to asbestos while serving in the Unites States Navy from 1959 to 1963. (*See* Plaintiffs' Complaint, Count I, ¶ 1-2).

5. Plaintiffs' Complaint also alleges that Plaintiff Chloyde Pelton was exposed to asbestos through non-occupational work projects (including, but not limited to, automotive repairs, while laundering clothes, maintenance, and remodeling). (*See* Plaintiffs' Complaint, Count I, ¶ 2).

6. Plaintiffs' Complaint makes no specific allegations the Plaintiff Chloyde Pelton worked with any J&H products in the State of Illinois. (*See Generally* Plaintiffs' Complaint).

7. Plaintiffs' Complaint also makes no specific allegations that Plaintiff Chloyde Pelton was exposed to asbestos from a product associated with J&H in the State of Illinois. *Id.*

8. J&H is not incorporated under the laws of the State of Illinois nor does it maintain its principal place of business in Illinois.

9. Additionally, J&H does not have any offices or manufacturing facilities located in the State of Illinois. *Id.*

10. J&H does not manufacture, package, supply or test any products or equipment in the State of Illinois. *Id.*

11. As Plaintiffs' claims against J&H have no connection to Illinois, there is no personal jurisdiction over J&H, based on either specific or general jurisdiction, and J&H should be dismissed pursuant to 735 ILCS 5/2-619 and 735 ILCS 5/2-301.

12. For these reasons, Plaintiffs' cause of action should be dismissed in its entirety against J&H.

## 735 ILCS 5/2-301

13. Pursuant to 735 ILCS 5/2-301 and 735 ILCS 5/2-619, J&H objects to this Court's jurisdiction over it as this Court's assertion of jurisdiction would violate the Due Process clause of the United States Constitution. *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014).

14. Illinois Courts may not exercise jurisdiction over a nonresident defendant where the court's exercise of jurisdiction violates the Due Process Clause of the Fourteenth Amendment. *Commercial Coin Laundry Sys. v. Loon Inv.*, 375 Ill. App. 3d 26, 29-30 (1st Dist. 2007). Plaintiffs bear the burden of establishing a prima facie case of personal jurisdiction over any nonresident parties. *Russell v. SNFA*, 2013 IL 113909, 987 N.E. 778 (Ill. 2013); *Morgan, Lewis & Bockius LLP v. City of East Chicago*, 401 Ill. App. 3d 947, 951-52 (1st Dist. 2010). Once a prima facie case for personal jurisdiction has been established, a defendant may nevertheless defeat jurisdiction with un-contradicted evidence which rebuts a plaintiffs' prima facie showing. *Russell v. SNFA*, 2013 IL at ¶ 28; *Morecambe Mar., Inc. v. Nat'l Bank of Greece, S.A.*, 354 Ill. App. 3d 707, 710 (1st Dist. 2004).

15. Illinois courts may exercise jurisdiction over nonresident companies under the Illinois long-arm statute, Section 2-209 of Illinois Code of Civil Procedure. Section 2-209 allows for the exercising of specific jurisdiction in subsection (a), general jurisdiction in subsection (b), and the catch-all provision in subsection (c) that permits Illinois Courts to exercise jurisdiction on any basis permitted by the Illinois and Federal constitutions. 735 ILCS 5/2-209. The trial court must ascertain whether the defendant has certain minimum contacts with the State such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."

*Daimler*, 134 S. Ct. at 754, quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853 (2011). Personal jurisdiction under Section 2-209(b) and (c) must comport "with the limits imposed by federal due process." *Klump v. Duffus*, 71 F.3d 1368, 1371 (7th Cir. 1995).

16.     The relevant time period in determining a jurisdictional question must be "the time the nonresident defendant became a party to the suit or was served with process." *Reeves v. Baltimore & Ohio Railroad Company*, 526 N.E.2d 404, 408 (1st Dist. 1988). Though the court may also consider the time the claim arose, that alone is not determinative, and "the critical point of the focus of inquiry must be upon the time that the defendant is made a party to the suit and is served with process." *Id.*

17.     In this matter, Plaintiffs have not pleaded a specific connection that J&H has to Plaintiff Chloyde Pelton, this forum, or this manner of litigation. Further, there are no allegations that specifically link J&H to actions that have occurred in Illinois including any pleading that Plaintiff Chloyde Pelton worked with, or was exposed to asbestos from, any J&H products in the State of Illinois. Therefore, this Court lacks specific jurisdiction over J&H. See, e.g., *Denton v. Air & Liquid Sys. Corps.*, 2015 WL 682158 at \*1-2 (S.D. Ill. Feb. 17, 2015)(declining to exercise specific jurisdiction in multi-defendant asbestos exposure cases because plaintiff's injuries did not arise out of or relate to defendant's Illinois contacts); *Dimitrov v. Nissan North America, Inc.*, 2015 WL 9304490 at \*3 (N.D. Ill. Dec. 22, 2015)(declining to exercise specific jurisdiction in Illinois over claims stemming from a shooting in Mississippi because claims "are wholly unrelated to defendant's contacts with Illinois"); *Campbell v. Acme Insulations, Inc.*, 2018 IL App (1st) 173051, 105 N.E. 984 (1st Dist. 2018)(declining to exercise specific jurisdiction in Illinois where the evidentiary material did not support an inference that the plaintiff was exposed to asbestos in Illinois).

18.     Similarly, this Court cannot exercise general jurisdiction over J&H. General jurisdiction arises over a foreign corporation when their affiliations with the State are such that the corporation is fairly regarded "as at home." *Daimler*, 134 S. Ct at 760, citing *Goodyear*, 131 S. Ct. at 2853; *Russell*, 2013 IL 113909 at ¶ 20.   With respect to a corporation, the place of incorporation and principal place of business are "paradigm...bases for general jurisdiction." *Daimler*, 134 S. Ct. at 760.  A defendant is normally "at home" in only two states – its state of incorporation and the state of its principal place of business.  *Id.*  Moreover, the *Daimler* Court has noted that a corporation that operates in many places cannot be at home in all of them.  *Id.* at 762, n.20.  The standard for finding general jurisdiction is very high and requires a showing that the nonresident defendant carried on systematic business activities in Illinois not casually or occasionally, but with a fair measure of permanence and continuity.  Accordingly, the general jurisdiction inquiry under *Goodyear* is "not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether the corporation's affiliations with the State are so continuous and systematic as to render it essentially at home in the forum State. " *Daimler*, 134 S. Ct. at 761.  Essentially, this means that the foreign corporation has taken up residence in Illinois.  *Russell*, 2013 IL 113909, quoting *Morgan, Lewis & Bockius LLP*, 401 Ill. App. 3d at 953.

19.     Plaintiffs have failed to allege facts sufficient to suggest a showing of general jurisdiction over J&H in Illinois.  Plaintiffs do not allege that J&H is incorporated in Illinois or that its principal place of business is located in Illinois.  (*See Generally* Plaintiffs' Complaint).  Additionally, Plaintiffs do not allege that there are any exceptional circumstances which so closely tie J&H to Illinois that it would be considered "essentially at home" in Illinois, despite being incorporated and maintaining its principal place of business elsewhere.

20.     As a result, Plaintiffs cannot establish either specific jurisdiction or general jurisdiction over J&H and Plaintiffs' cause of action should be dismissed in its entirety.

21.     J&H reserves the right to amend its motion as discovery continues.

WHEREFORE, the Defendant J & H MARINE & INDUSTRIAL ENGINEERING COMPANY, a suspended California corporation, incorrectly sued as "J and H Marine & Industrial Engineering Company" respectfully requests this Court enter an order dismissing Plaintiffs' cause of action against J & H Marine & Industrial Engineering Company with prejudice for lack of personal jurisdiction. J & H Marine & Industrial Engineering Company further requests leave to fully participate in the defense of Plaintiffs' action without waiver of and without prejudice to its motion. J & H Marine & Industrial Engineering Company requests that this Court grant all other just and proper relief.

(SIGNATURE ON NEXT PAGE)

Respectfully submitted,

CLYDE & CO US LLP

By:  /s/ William C. Swallow
Attorneys for Defendant, J & H MARINE &
INDUSTRIAL ENGINEERING
COMPANY, a suspended California
corporation, incorrectly sued as "J and H
Marine & Industrial Engineering Company"

WILLIAM C. SWALLOW, Esq. #6293910
DANIEL M. PAMMER, Esq. #6316645
PATRICK M. GRAND, Esq. #6310900
CLYDE & CO US LLP
55 West Monroe, Suite 3000
Chicago, Illinois 60603
T: (312) 635-7000
F: (312) 635-6950
E: bill.swallow@clydeco.us
E: daniel.pammer@clydeco.us
E: patrick.grand@clydeco.us
Firm No: 61229

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

E-SERVICE
66818017
Aug 03 2021
12:37PM
File & ServeXpress

CHLOYDE PELTON and
SHIRLEY PELTON,

                         Plaintiffs,

               v.

AIR & LIQUID SYSTEMS
CORPORATION, successor by merger to
BUFFALO PUMPS, INC., et al.,

                         Defendants.

Court No. 2021L006906

CALENDAR: J1

JURY TRIAL DEMANDED

## <u>APPEARANCE</u>

NOW COMES, the firm of CLYDE & CO US LLP, and hereby enters its appearance on behalf of Defendant J & H MARINE & INDUSTRIAL ENGINEERING COMPANY, a suspended California corporation, incorrectly sued as "J and H Marine & Industrial Engineering Company".

                    Respectfully submitted,

                    CLYDE & CO US LLP

By:    /s/ William C. Swallow
        Attorneys for Defendant J & H MARINE &
        INDUSTRIAL ENGINEERING COMPANY, a
        suspended California corporation, incorrectly sued
        as "J and H Marine & Industrial Engineering
        Company"

WILLIAM C. SWALLOW, Esq. #6293910
PATRICK M. GRAND, Esq. #6310900
DANIEL M. PAMMER, Esq. #6316645
CLYDE & CO US LLP
55 West Monroe, Suite 3000
Chicago, Illinois 60603
T: (312) 635-7000
F: (312) 635-6950
E: bill.swallow@clydeco.us
E: patrick.grand@clydeco.us
E: daniel.pammer@clydeco.us
Firm No.: 61229



E-SERVICE

66818017
Aug 03 2021
12:37PM

File & ServeXpress

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

CHLOYDE PELTON and
SHIRLEY PELTON,

                        Plaintiffs,

                      v.

AIR & LIQUID SYSTEMS
CORPORATION, successor by merger to
BUFFALO PUMPS, INC., et al.,

                      Defendants.

Court No. 2021L006906

CALENDAR: J1

JURY TRIAL DEMANDED

## NOTICE OF FILING

      PLEASE TAKE NOTICE that on this 3rd day of August, 2021, the undersigned attorney filed with the Clerk of the Circuit Court of Cook County Defendant **J & H MARINE & INDUSTRIAL ENGINEERING COMPANY, a suspended California corporation, incorrectly sued as "J and H Marine & Industrial Engineering Company"'s APPEARANCE AND MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**, a copy of which, along with this Notice, is hereby served upon you.

                      Respectfully submitted,

                      CLYDE & CO US LLP

By:    /s/ William C. Swallow
          Attorneys for Defendant J & H Marine &
          Industrial Engineering Company, a
          suspended California corporation,
          incorrectly sued as "J and H Marine &
          Industrial Engineering Company"

WILLIAM C. SWALLOW, Esq. #6293910
PATRICK M. GRAND, Esq. #6310900
CLYDE & CO US LLP
55 West Monroe, Suite 3000
Chicago, Illinois 60603
T: (312) 635-7000
F: (312) 635-6950
E: bill.swallow@clydeco.us
E: patrick.grand@clydeco.us
Firm No.: 61229

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing was served on at least one attorney of record for each party on this <u>3rd day of August, 2021</u> from 55 West Monroe Street, Suite 3000, Chicago, Illinois 60603 via Pohlman USA MyDocFileServe.

/s/ William C. Swallow

Under penalties as provided by law pursuant to 735
ILCS5/1-109, I certify that the statements set forth as true
and correct.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| CHLOYDE PELTON and SHIRLEY PELTON, | ) ) ) | |
| | ) | NO: 2021L006906 |
| Plaintiffs, | ) | |
| v. | ) | IN RE:  ASBESTOS LITIGATION |
| | ) | |
| AIR & LIQUID SYSTEMS CORPORATION, successor-by-merger to BUFFALO PUMPS, INC., et al., | ) ) ) | Calendar: J-1 |
| | ) | |
| Defendants. | ) | |

**NOTICE OF FILING**

TO:  Ethan A. Flint, #6286170          cc:   All Attorneys of Record
     Laci M. Whitley, #6314263               (via File & Serve Xpress)
     Tyler B. Wilke, #6314268
     222 East Park Street, Suite 500
     P.O. Box 189
     Edwardsville, Illinois 62025

PLEASE TAKE NOTICE that on August 12, 2021 filed with the Clerk of the Circuit Court

of Cook County, Illinois, Law Division, by John Crane, Inc. **Notice of Removal**, a copy of which

is attached hereto and served upon you.

Respectfully submitted,

MANNING GROSS + MASSENBURG LLP

By:      */s/ Pamela R. Gamble*
          Alexander J. Baker #6305401
          abaker@mgmlaw.com
          Mark I. Tivin, #6210281
          mtivin@mgmlaw.com
          Pamela R. Gamble, #6282922
          pgamble@mgmlaw.com
          Nandini A. Pillai, #6330291
          npillai@mgmlaw.com
          Anthony D. Danhelka, #6305698
          adanhelka@mgmlaw.com
          55 W. Monroe Street, Suite 3360
          Chicago, IL  60603

Telephone: (312) 625-4995
Facsimile: (312) 291-9396
FIRM ID: 63354
ATTORNEYS FOR DEFENDANT
JOHN CRANE INC.
pgamble@mgmlaw.com

### PROOF OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served upon all counsel of record via File & ServeXpress with a Certificate of Service filed with Cook County Clerk via IL Odyssey efile system this 12th day of August, 2021.

Ethan A. Flint
Flint Law Firm, LLC
222 E. Park Street, Suite 500
P.O. Box 189
Edwardsville, IL 62025
*Attorneys for Plaintiffs*

*/s/ Pamela R. Gamble*
ATTORNEYS FOR DEFENDANT JOHN CRANE INC.