## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CHLOYDE PELTON and SHIRLEY PELTON,

        Plaintiffs,

        v.

JOHN CRANE, INC.,

        Defendant.

Case No. 1:21-cv-4316

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

In this maritime tort case, Plaintiffs Chloyde Pelton and Shirley Pelton sue Defendant John Crane, Inc., a manufacturer of asbestos-containing products to which Mr. Pelton alleges he was exposed during his tenure in the Navy. Plaintiffs allege that Defendant's products caused Mr. Pelton to develop malignant mesothelioma and bring causes of actions for negligence (Count I), willful and wanton conduct (Count II), and strict product liability (Count III). [305].[1] Defendant moves for summary judgment. [316].

For the reasons explained below, this Court grants in part, and denies in part, Defendant's motion.

### I.    Factual Background[2]

Mr. Pelton is a Navy veteran who developed malignant mesothelioma due to his occupational exposure to asbestos-containing products, including gaskets and packing, from

---

[1] The operative complaint is Plaintiffs' Fourth Amended Complaint. [305].

[2] The following facts come from Defendant's Local Rule 56.1 statement of material facts, [317-1], Plaintiffs' statement of additional facts and responses to Defendant's statement of material facts, [320], and Defendant's response to Plaintiffs' statement of additional facts, [327], [328].

1959–1961. *See* [328] ¶¶ 1–3. Mr. Pelton enlisted in the United States Navy in 1959. *Id.* ¶ 2. He served as a pipefitter and shipfitter aboard two destroyers, the USS Lyman K Swenson (DD-729) from 1959–1961 and the USS Pritchett (DD-561) from 1961–1962, and a destroyer tender, the USS Frontier, for 10 months until 1963 when he retired from the Navy. *Id.* As a pipefitter/shipfitter, Mr. Pelton testified that he routinely installed and removed gaskets and packing from pipe valves containing asbestos. *See* [321-6] at 25:20–26:3; 28:4–8.

Asbestos was regularly employed at workplaces for a wide variety of purposes during this time, including the manufacture of insulating materials, gaskets, and packing material of pumps. *See* [321-5] at 3; [321-1] at 18. Asbestos-containing gaskets were used to seal and tighten pipe joint connections to prevent pipe leakage. *See* [321-7] at 184:1–6. The gaskets were used because "metal on metal" would not seal. [321-6] at 29:5–10. Similarly, asbestos-containing packing was used as a bearing for revolving and moving parts to prevent leakage. [321-1] at 18.

Although quite useful, scientists later discovered the dangers of asbestos exposure, including that it causes mesothelioma. *See* [321-1] at 2. Plaintiffs' industrial hygienist, Kenneth Garza, highlighted the hazards of exposure to asbestos-containing products in his report. *See* [321-5] at 15–19 ("In 1965, the link between asbestos exposure and mesothelioma had been firmly established in public health and industrial safety literature."). Likewise, Plaintiffs' medical expert, Dr. Richard Kradin, further explained that occupational and para-occupational exposures to asbestos results in the inhalation of asbestos fibers at "enormously high amounts." [321-1] at 2–3. And Defendant's expert, Dr. Michael Graham, specifically noted the "strong relationship" between occupational and paraprofessional "exposure to asbestos" and the development of the type of tumor Mr. Pelton developed. [328-2] at 3.

During his deposition, Mr. Pelton testified regarding his work as a pipefitter/shipfitter in detail. *See* [321-6]. He explained that removing old gaskets and packing was "dirty work," requiring scraping and using a wire brush that would create "lots of dust in the air," such that breathing it in was "inevitable." [328] ¶¶ 6–7. When asked about the manufacturer or brand name of the gaskets he installed and removed, Mr. Pelton testified that he "remember[ed] it being John Crane." [321-6] at 61:8–16. Mr. Pelton also testified that the manufacturer or brand name of the packing he worked with was "primarily" John Crane. *Id.* at 61:17–21. Mr. Pelton estimated that he installed or removed John Crane gaskets "[h]undreds of times," removed John Crane packing from pumps "numerous times," and installed new John Crane packing on pumps "[h]undreds of times." *Id.* at 63:3–64:21.

Retired U.S. Navy Captain Bruce Woodruff opined in an affidavit that "more likely than not" Mr. Pelton received substantial exposure to asbestos during the 38 months on the destroyers USS Lyman K. Swenson (DD-729) and USS Prichett (DD-561), and Destroyer Tender USS Frontier (AD 25). *Id.* at 3–4. John Crane, Inc. was a major supplier of gaskets and packing to the Navy during this period, and among the most significant equipment suppliers on these ships. [327-5] at 6, 27. Captain Woodruff confirmed that Mr. Pelton's possible exposure time on the two destroyers where he was "unmistakably overhauling many valves and pumps" was twenty-seven months or 810 days, and more than thirty-eight months or 1,140 days on the three ships. *Id.* at 4.

Plaintiffs now bring causes of action against Defendant for negligence (Count I) and strict liability (Count III) on design defect and failure to warn theories. [305]. Plaintiffs also sue Defendant for "willful and wanton" conduct (Count II). *Id.* Defendant moves for summary judgment on all counts. [316]. For the reasons explained below, the Court grants in part, and denies in part, Defendant's motion.

## II.    Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). The non-moving party bears the burden of identifying the evidence creating an issue of fact. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021–22 (7th Cir. 2018). To satisfy this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Barnes v. City of Centralia*, 943 F.3d 826, 832 (7th Cir. 2019). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

## III.    Discussion

In its motion, Defendant argues that (1) Counts I, II, and III fail because Plaintiffs cannot establish specific causation; (2) Plaintiffs' strict liability claims fail because (a) the record is insufficient for a reasonable jury to balance the usefulness of the products at issue against the severity of the harms they pose, and (b) Plaintiffs' strict liability-design defect

claim fails because Plaintiffs have failed to present evidence of a safer alternative design; and (3) Plaintiffs' claim for willful and wanton conduct fails because it is not a cognizable cause of action under maritime law. [317]. Finally, Defendant argues that to the extent Plaintiffs' claims are premised solely upon a failure to test theory, they fail as a matter of law, because maritime law does not recognize a freestanding cause of action based upon such a theory. *Id.* The Court addresses each argument in turn.

### A. Causation

To maintain an action for either negligence or strict liability under maritime law, Plaintiffs must establish causation. *Lindstrom v. A-C Prod. Liab. Tr.*, 424 F.3d 488, 492 (6th Cir. 2005), *overruled on other grounds by Air and Liquid Sys. Corp. v. DeVries*, 139 S. Ct. 986, 203 L. Ed. 2d 373 (2019). The parties agree that *Lindstrom* sets forth the governing causation standard under maritime law. *See* [317] at 5; [319] at 4*; see also Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 677 (7th Cir. 2017) (applying *Lindstrom*).

To establish causation, Plaintiffs must show that: "(1) [Mr. Pelton] was exposed to the defendant's product, and (2) the product was a substantial factor in causing the injury he suffered." *Lindstrom*, 424 F.3d at 492 (citing *Stark v. Armstrong World Indus., Inc.*, 21 Fed. Appx. 371, 375 (6th Cir. 2001)).

A plaintiff may meet his specific causation burden by direct evidence that a product to which a worker has been exposed is a substantial factor in causing injury, such as through expert testimony or testimony of the plaintiff. *See Lindstrom*, 424 F.3d at 498 (citing *Stark*, 21 App'x at 376). But expert testimony is not required, *Lindstrom*, 424 F.3d at 498, and a plaintiff may satisfy the substantial factor test with circumstantial evidence demonstrating "substantial exposure for a substantial period of time to provide a basis for the inference that a product was a substantial factor in causing the injury," *id.* at 492.

Defendant argues that this Court's Final Pretrial Order, [315] (excluding the specific causation opinions of Dr. Richard Kradin), prevents Plaintiffs from establishing specific causation, and thus their claims fail as a matter of law. [317] at 5. Defendant also contends that Plaintiffs cannot satisfy their specific causation burden under maritime law without admissible expert testimony. *Id.* at 6.

## 1. Requirement of Expert Testimony

Defendant contends that the law requires expert testimony on specific causation for Plaintiffs' claims to proceed. [317] at 6–7. Not so. As *Lindstrom* teaches, expert testimony that the defendant's product constitutes a substantial factor can be useful, but it is not *necessarily* required. *Lindstrom*, 424 F.3d at 498 (citing *Stark*, 121 Fed. App'x at 376) ("Courts do not require that cause necessarily be established by expert testimony."). Nonetheless, the question of causation related to levels of asbestos exposure remains a "difficult one for which expert testimony is helpful for a trier of fact." [319] at 4. As such, courts applying the substantial-factor test in asbestos cases have consistently "expressed concern that defendants not be subjected to open-liability based solely on a jury's inexpert speculation on proximate cause." *Stark*, 21 Fed. App'x at 376.

Plaintiffs contend that the expert opinions of their medical expert, Dr. Richard Kradin, and their industrial hygienist, Kenneth Garza, sufficiently establish specific causation, considering all of the evidence in the record. [319] at 4.

## 2. This Court's Final Pretrial Order

As a preliminary matter, this Court clarifies the scope of its Final Pretrial Order, [315]. In that Order, this Court conducted a detailed analysis of Dr. Kradin's specific causation opinions based upon Dr. Kradin's Report, deposition testimony, and testimony during the *Daubert* hearing held on November 29, 2023. *Id.* This Court concluded that certain opinions offered by Dr. Kradin relied upon "cumulative dose" or "each and every

exposure" theory, and therefore, these specific causation opinions remain inadmissible under Federal Rule of Evidence 702 and *Daubert*. Consequently, the Court granted Defendant's motion *in limine* to exclude them. *See* [273] at 1, 6 (moving to exclude Dr. Kradin's specific causation opinions generally, which Defendant asserted would be based upon "cumulative dose" theory); [291] at 4 (confirming scope of motion *in limine*).

Plaintiffs now attempt to argue that there are *specific* causation opinions of Dr. Kradin's that survive this Court's Final Pretrial Order; there are not. For example, Plaintiff states:

> When questioned whether Dr. Kradin had an opinion as to whether or not Mr. Pelton's work with JCI's gaskets and packing substantially contributed to cause his mesothelioma, Dr. Kradin answered, "Based on his deposition testimony, the answer would be yes." See id. at 26:3-7. On cross-examination, Dr. Kradin confirmed this opinion based in part on: "...the work that [Mr. Pelton] described would have released asbestos into the ambient air that he breathed at levels well above background and at levels that have been shown to cause mesothelioma." Id. at 26:22-27:2, 27:5-8.

[319] at 5. This opinion, however, which is undeniably based upon a variation of "each and every exposure" theory, is precisely the type of specific causation opinion that this Court excluded in its prior Final Pretrial Order.

Nonetheless, this Court also ordered that Dr. Kradin may testify regarding the "generally accepted principles regarding mesothelioma," outlined in Sections 1−12 of his Report, which were not the subject of Defendant's motion *in limine* and thus, they were not excluded by this Court's Final Pretrial Order.[3] For example, Dr. Kradin may testify that "asbestos causes mesothelioma" and that "the great majority of mesotheliomas are caused by asbestos." [321-1] at 2–3. He may further explain to the jury that mesothelioma is a "dose-responsive disease, which means that the more someone is exposed to asbestos, the greater

---

[3] The sole prohibited causation opinion outlined in his report is Dr. Kradin's expert opinion that all of a person's above background exposures to asbestos *are medical and scientific causes* of mesothelioma. *See* [321-11] at 11.

their risk for developing mesothelioma." *Id.* at 3. Dr. Kradin may testify about the difference between "ambient" or "background" levels of asbestos exposure on one hand, and "occupational levels" on the other, and the corresponding exposure levels in fibers per cubic centimeters of air (f/cc). He may testify that asbestos exposures at occupational levels "result in asbestos fiber levels thousands and tens of thousands of times higher than background/ambient air levels"; that a "'safe' or 'threshold' level of exposure to asbestos has never been identified for the disease mesothelioma"; and asbestos "exposures as brief as a few days have been shown to cause mesothelioma." *Id.* at 6–7.

Based upon these underlying principles, Dr. Kradin may also testify to his *general* causation opinion that "the exposures above background levels, taken in context of the individual's total (cumulative) asbestos exposures, are significant and non-trivial." *Id.* at 11. He simply may not testify that each (or all) of a person's occupational level exposures, being above background levels, cause or constitute a substantial contributing factor to mesothelioma, or more critically, that Mr. Pelton's malignant mesothelioma was caused by "his cumulative exposure to asbestos, predominantly with Crane valves and John Crane gaskets." *Id.* at 21.

### 3. Kenneth Garza's Opinions

Kenneth Garza, an industrial hygienist, reviewed in detail case-specific information and provided an expert opinion about the actual amount of asbestos, expressed in fibers per cubic centimeter (f/cc), to which Mr. Pelton would have been exposed, personally and as a bystander, for thermal systems installation (TSI) removal, TSI cleanup, gasket removal, gasket installation, packing removal, and packing installation. [317-4] at 3–4, 54.

Garza explained that his report is not a "lifetime cumulative asbestos dose reconstruction" but rather an "asbestos exposure assessment, in which opinions of asbestos exposure significance and risk are made based on available data." *Id.* at 7. Garza stated that

although instantaneous, "real-time measurements specific to asbestos exposure were not, and are not done," he can still provide an "asbestos air sample" that represents an "average of varying concentration over some period of time." *Id.* at 4–5. To provide these exposure ranges, Garza reviewed studies assessing the amount of asbestos exposure a person would sustain when working with the various products and activities that Mr. Pelton described, including studies regarding the average airborne fiber concentration from Crane products. *See id.* at 46, 50. Garza opined that when a person engages in the activities Mr. Pelton described with the products he described, he is exposed to "significant airborne concentrations of asbestos" for "each type of product." *Id.* at 54–55.

### 4. Causation Analysis

Given the entire record, Plaintiffs present sufficient evidence from which a reasonable jury could conclude that: (1) Mr. Pelton was exposed to John Crane, Inc.'s products; and (2) those products were a substantial factor in causing his mesothelioma. *Lindstrom*, 424 F.3d at 492. As noted above, even though neither Dr. Kradin nor Mr. Garza will specifically testify that John Crane, Inc.'s gaskets and packing were a substantial factor in causing Mr. Pelton's mesothelioma, Plaintiffs' causation burden can be met via the admissible expert testimony in conjunction with circumstantial evidence demonstrating that Mr. Pelton had "substantial exposure to the relevant asbestos for a substantial period of time." *McIndoe v. Huntington Ingalls, Inc.,* 817 F.3d 1176 (9th Cir. 2016) (citing *Lindstrom*, 424 F.3d at 492); *see also Quirin v. Lorillard Tobacco Co.,* 17 F. Supp. 3d 760, 771 (N.D. Ill. 2014) ("The question is therefore not whether Quirin can point to direct evidence that the products were Crane Co.'s, but whether Quirin has identified sufficient circumstantial evidence to allow a jury to infer that Mr. Quirin was exposed to Crane Co.'s products, and that the exposure was substantial enough to contribute to his injury.").

To meet this burden, Plaintiffs must present some evidence of either the amount of asbestos dust to which he was exposed, or the duration of his exposure. *See id.* at 1176. Evidence of only "minimal exposure" or merely showing that "defendant's product was present somewhere at plaintiff's place of work" remains insufficient. *Lindstrom*, 424 F.3d at 492. Rather, the plaintiff must show a "high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural." *Id.*

Plaintiffs satisfy that burden here. According to Garza, Mr. Pelton endured significant airborne concentrations of asbestos from, among other things, gasket removal, gasket installation, packing removal, and packing installation. [317-4] at 52. Garza provides specific exposure estimates in fibers per cubic centimeter per product and activity, which reveal that Mr. Pelton was exposed to asbestos at "occupational levels" from these products and activities. *See id.* Although Garza did not conduct a breakdown of exposure per manufacturer, he looked at exposure specific to the facts of this case. *See Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 675 (7th Cir. 2017) (noting that experts provided little to no evaluation of the "actual facts of this case").

Likewise, Dr. Kradin opined that occupational levels of exposure are "thousands and tens of thousands of times higher than background/ambient air levels." [321-1] at 6. Dr. Kradin explained the link between asbestos and mesothelioma, and that mesothelioma is a dose-responsive disease. *Id.* at 2–3. And Defendant's expert, Dr. Michael Graham opined that Mr. Pelton's malignant mesothelioma was "caused by occupational/paraoccupational exposure" to asbestos. [328-2] at 4.

Significantly, to satisfy their causation burden, Plaintiffs must also be able to show asbestos exposure attributable to John Crane, Inc. *See Krik,* 87 F.3d at 675 (discussing causation standard and stating "substantial exposure that cannot be attributed to a

particular defendant is likewise insufficient"). And thus, to prevail at trial, Plaintiffs will need to convince a jury that it was Mr. Pelton's exposure to John Crane, Inc.'s products that caused his mesothelioma. *See id.*

At this stage, the admissible expert testimony, along with Mr. Pelton's own testimony and the opinions of Captain Woodruff, preclude the entry of summary judgment for Defendant. Mr. Pelton testified that the "large percentage" of gaskets that he both removed and installed in the Navy were manufactured by "John Crane." [321-6] at 61:8–16. Although some other manufacturers' materials "came through," Mr. Pelton explained that the Navy "disproportionately had John Crane gaskets" and estimated that he removed and installed gaskets on Crane valves "hundreds of times." *Id.* at 105:16–21, 63:3–64:12. Likewise, he testified that "primarily" the packing he used on the valves that he worked on was "John Crane." *Id.* 61:17–21. Mr. Pelton testified that he installed new John Crane packing on pumps "[h]undreds of times." *Id.* at 63:3–65:21.

Moreover, Captain Woodruff likewise testified that John Crane was a major supplier of gaskets and packing to the Navy during this period, and among the most significant equipment suppliers of the ships where Mr. Pelton worked. [327-5] at 7, 27. Woodruff also opined regarding Mr. Pelton's duration of asbestos exposure, noting his possible exposure time on the destroyers was 810 days, and on all three ships, more than 1,140 days. *Id.* at 4.

Thus, the record contains sufficient circumstantial evidence of the amount of asbestos to which Mr. Pelton was exposed, the duration for which he was exposed, and evidence that such exposure is attributable to Defendant's products. This record prevents entry of summary judgment on the issue of specific causation. Construing the facts in Plaintiffs' favor, the inference that asbestos attributable to Defendant's product(s) was a substantial factor in causing Mr. Pelton's mesothelioma is far "more than conjectural." *Lindstrom*, 424 F.3d at 492.

Accordingly, Plaintiffs have demonstrated a genuine issue of material fact on the issue of causation, and Defendant's motion for summary judgment is denied.

## B.    Strict Liability (Count III)

In Count III, Plaintiffs assert a strict liability claim "as restated and summarized in § 402A of the Restatement (Second) of Torts." [305] ¶¶ 3–4; *see* Restatement (Second) of Torts (Am. L. Inst. 1965) ("Second Restatement").

Defendant first argues for summary judgment on Plaintiffs' strict liability claims because Plaintiffs have offered insufficient evidence to apply the "risk-utility test" under the Restatement (Third) of Torts: Prod. Liab. § 2 (Am. L. Inst. 1998) ("Third Restatement"), because the record lacks "evidence that the risk of the products" outweighs "their utility." [317] at 10. Defendant acknowledges that courts applying general maritime law have consistently adopted Section 402A of the Second Restatement to strict liability claims, but claims that, courts applying § 402A in maritime products liability cases, rely instead on the "risk-utility" test of the Third Restatement. [317] at 8. Plaintiffs respond that the "consumer-expectations" test of the Section 402A of the Restatement (Second) of Torts[4] applies to their strict liability claims, but even if the risk-utility test[5] applies, Plaintiffs' evidence satisfies that test as well. [319] at 10, 15.

---

[4] Section 402A of the Second Restatement provides: "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user." Restatement (Second) of Torts § 402A(1) (Am. L. Inst. 1965). Under the "consumer expectations" test, a product is "unreasonably dangerous" if it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id.*, cmt. *i.*

[5] The Third Restatement adopted the risk-utility test to determine whether a product is defective or unreasonably dangerous. Under this test, to determine whether a product is defective or unreasonably dangerous, "some sort of independent assessment of advantages and disadvantages, to which some attach the label 'risk-utility balancing,' is necessary." Restatement (Third) of Torts): Prod. Liab. § 2, cmt. a (Am. L. Inst. 1998).

Obviously, federal maritime law stands as an "amalgam of traditional common law rules, modifications of those rules, and newly created rules," drawn from "state and federal sources." *Batterton*, 139 S.Ct. at 2278 (quoting *East River S.S. Corp v. Transamerica Delaval*, 476 U.S. 858, 865 (1986)). In maritime law cases, this Court also remains bound, of course, by "our circuit precedents and those of the Supreme Court." *Stark*, 21 Fed. App'x at 374.

The Supreme Court first recognized strict product liability as part of the general maritime law in *East River*. *See East River*, 476 U.S. at 865 ("We join the Courts of Appeals in recognizing products liability, including strict liability, as part of the general maritime law."). In that case, the Supreme Court implicitly adopted the Restatement (Second) of Torts § 402A (1965) for strict product liability cases. *Id.* (citing *Alaska Fisheries, Inc. v. Marine Constr. & Design Co.*, 565 F.2d 1129, 1135 (9th Cir. 1977) (adopting Restatement (Second) of Torts § 402A)); *see also* [317] at 8.

Since *East River*, federal courts have continued to apply the Second Restatement to discern the applicable principles of negligence law in maritime tort cases, viewing this approach as consistent with that of the Supreme Court. *See Garcia v. United States*, 986 F.3d 513, 531 (5th Cir. 2021) ("We and the Supreme Court apply the Second Restatement to maritime products liability cases."); *Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1310 (11th Cir. 2023) (quoting *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1178 (11th Cir. 2020) ("For maritime tort cases, 'we rely on general principles of negligence law' and have consulted 'in particular the Restatement (Second) of Torts' to discern these general principles.")).[6]

---

[6] Consistent with this precedent, Schoenbaum's *Admiralty and Maritime Law* states that in "most cases, the applicable substantive law of products liability in admiralty is Section 402A of the Restatement (Second) of Torts (1965) . . . ." 1 Thomas J. Schoenbaum, Admiralty & Mar. Law § 5:13 (6th ed. 2023); *see also Morgan v. Almars Outboards, Inc.*, 316 F. Supp. 3d 828, 834 n.2 (D. Del. 2018) (Federal appellate courts "have yet to adopt the Third Restatement as the standard for maritime law.").

In more recent cases, some federal courts, including the Supreme Court, have begun to also cite the Third Restatement in resolving certain maritime tort cases. *See, e.g., Dehring v. Keystone Shipping Co.*, No. 10-CV-13959, 2013 WL 3879619 (E.D. Mich. July 26, 2013) (noting that some courts have moved toward Third Restatement in federal cases); *Oswalt v. Resolute Industries, Inc.*, 642 F.3d 856 (9th Cir. 2011) (discussing § 2 of the Third Restatement but declining to adopt the Third Restatement for all cases); *Air & Liquid Sys. Corp. v. DeVries*, 139 S.Ct. 986, 993 (2019) (citing Restatement (Second) of Torts for "basic tort-law principles" and Restatement (Third) of Torts: Products Liability § 2, comment *i* for manufacturer's duty to warn); *Saratoga Fishing Co. v. J. M. Martinac & Co.*, 520 U.S. 875 (1997) (citing § 402A of the Restatement (Second) of Torts and Restatement (Third) of Torts: Products Liability § 6, Comment *d* (Proposed Final Draft, Preliminary Version, Oct. 18, 1996), but declining to adopt Third Restatement for maritime law cases)).

But Defendant cites no controlling precedent adopting the Third Restatement of Torts in favor of the Second Restatement for all maritime law claims.[7] Indeed, nearly all the cases Defendant cites consult the Third Restatement *in addition to* the Second Restatement for the applicable tort principles. *See also Williams v. Coleman Co., Inc.*, No. 4:11-CV-02384-KOB, 2016 WL 3166250, at *2−3 (N.D. Ala. Apr. 21, 2016) (distinguishing *St. Paul Fire & Marine Ins. Co. v. Lago Canyon, Inc.*, 561 F.3d 1181 (11th Cir. 2009) ("The [Eleventh Circuit] in *St. Paul Fire* did not make a broad pronouncement that the Restatement (Third) of Torts applies

---

[7] It is for this reason that the Fifth Circuit in *Garcia v. United States*, 986 F.3d 513, 531 (5th Cir. 2021)—decided after the Supreme Court's decision in *DeVries,* 139 S.Ct. at 993—held that it could not overrule its prior decision holding that § 402A of the Second Restatement, not the Third Restatement, supplied the applicable substantial law for maritime products liability claims. *See* 986 F.3d at 532 (Under our precedent, the "Second Restatement, not the Third, supplies the substantive law for determining standing in maritime products liability claims. And, to the extent that Garcia argues we should adopt the Third Restatement, we may not: "Under our rule of orderliness, we may not overrule a prior panel decision absent an intervening change in the law, such as a statutory amendment or a decision from either the Supreme Court or our en banc court." The Restatement is neither.).

to all strict liability claims in admiralty in the Eleventh Circuit. Rather, it used the Third Restatement to demonstrate that courts and the Restatements distinguish between different types of product defects . . .The Eleventh Circuit has not yet declared a change from the Second Restatement to the Third."); *Garcia*, 986 F.3d at 532 (distinguishing its decision in *Krummel v. Bombardier Corp.*, 206 F.3d 548 (5th Cir. 2000), explaining that in that case, the plaintiff sued the defendant under the Restatement (Third) of Torts § 2(b) and Louisiana Products Liability Act (LPLA), which both require a risk-utility analysis).

In support of applying the Third Restatement's risk-utility test to Plaintiffs' strict liability claims, Defendant also cites the Seventh Circuit's decision in *United States Fidelity & Guaranty Co. v. Plovidba*, 683 F.2d 1022, 1026 (7th Cir. 1982). This case, however, is unavailing. *United States Fidelity & Guaranty Co.* involved a longshoreman's claim under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b), and the court considered the appropriate negligence definition under the amended version of the Act. *Id.* at 1025. The Seventh Circuit cited with approval as a "negligence formula" (a variation of the Hand formula) requiring "balancing the usefulness to the ship of the dangerous condition and the burden involved in curing it against the probability and severity of the harm it poses." *Id.* at 1026. Nevertheless, the court expressly noted, "we do not hold that [district courts] must use the Hand formula in all maritime negligence cases." *Id.* In short, this decision does not require the application of the risk-utility test to Plaintiffs' strict liability claims under general maritime law nor the wholesale application of the Third Restatement.

In the absence of contrary precedent (and none exists here), this Court remains bound by the controlling case law of this circuit and that of the Supreme Court. *Stark*, 21 Fed. App'x at 374. This Court is not, however, bound by the publication of a new Restatement. *See Garcia*, 986 F.3d at 532. Neither the Supreme Court nor the Seventh Circuit has abandoned

the use of the Second Restatement in favor of the Third. As a result, the Second Restatement remains the controlling authority, a risk-utility analysis need not be conducted for Plaintiffs' strict liability claims, and Plaintiffs may attempt to prove their strict liability claims by the consumer-expectations test of the Second Restatement.[8] The motion for summary judgment on this basis is, thus, denied.

Defendant next argues for summary judgment on Plaintiffs' strict liability—design defect claim because Plaintiffs have failed to set forth evidence of a "reasonable alternative design" as required by The Third Restatement. [317] at 11 (citing Restatement (Third) of Torts: Products Liability § 2 cmt. f (1998) ("To establish a prima facie case of defect, the plaintiff must prove the availability of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm.")).

Because this Court applies the Second Restatement to Plaintiffs' claims, Plaintiffs need not prove a reasonable alternative design to maintain their strict liability design defect claim. The Court denies summary judgment for Defendant under this theory.

## C. Willful and Wanton Conduct

Defendant argues that Count II must be dismissed because "willful and wanton" conduct is not a cognizable cause of action under maritime law. [317] at 12. Plaintiffs do not

---

[8] Even if the Court applied the risk-utility analysis to Plaintiffs' strict liability claims, however, Plaintiffs' record evidence also creates a jury question under this alternate test. Dr. Kradin, Mr. Garza, Captain Woodruff, and Mr. Pelton each testified to the vast utility of asbestos-containing products, including gaskets and packing, during the relevant period. [319-5] at 3; [319-6] at 29:5–10; [319-7] at 184:1–6. [321-1] at 18. Plaintiffs' experts explained that asbestos was used to manufacture a wide array of materials used in workplaces, and the asbestos-containing gaskets and packing enabled pipefitters/shipfitters like Mr. Pelton to seal pipe connections to prevent leakage. *See* [321-1] at 18; [321-7] at 184:1–6. Dr. Kradin, Mr. Garza, and Dr. Graham also testified to the hazards and risks posed by these asbestos-containing products, including of course, the significant risk of developing mesothelioma. [321-1] at 2–3 [328-2] at 2; [321-5] at 15–19. Thus, this Court remains unpersuaded by Defendant's contention that Plaintiffs have "not adduced sufficient evidence" to allow the application of a risk-utility analysis, [317] at 10, and denies summary judgment on this basis as well.

refute this assertion, but instead argue that their complaint "operatively asserts a claim for punitive damages." [319] at 18.

Defendant is correct that "willful and wanton conduct" is not a separate cause of action, but rather, "a prerequisite to recovery of punitive damages." [317] 12–13. Thus, Defendant is entitled to summary judgment with respect to Count II. Nonetheless, the entry of summary judgment on Count II does not preclude Plaintiffs from seeking punitive damages under maritime law.

As a threshold matter, since punitive damages constitute a type of relief, not a separate cause of action, Plaintiffs are not precluded from seeking punitive damages simply because they do not explicitly request such relief. *See Back Doctors Ltd. v. Metropolitan Property and Casualty Ins. Co.*, 637 F.3d 827, 831 (7th Cir. 2011) (quoting Fed. R. Civ. P. 54(c)) ("In federal courts, 'every…final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.'"). Accordingly, to the extent Plaintiffs might be entitled to punitive damages under the law, their failure to explicitly allege them as a form damages in the request for relief is not material. *Id.*

Turning to the availability of punitive damages, this Court begins with *Atlantic Sounding Company v. Townsend*, 557 U.S. 404 (2009). In *Atlantic Sounding*, the Court considered whether an "injured seaman may recover punitive damages for his employer's willful failure to pay maintenance and cure" under federal maritime law. *Id.* at 407. In resolving this question, the Court relied upon "settled legal principles" that: (1) punitive damages "have long been an available remedy at common law"; (2) the "common-law tradition of punitive damages extends to maritime law claims"; and (3) "there is no evidence that maintenance and cure were excluded from this general admiralty rule." *Id.* at 415.

Based upon these principles, the Court held that the plaintiff was entitled to pursue punitive damages, "unless Congress enacted legislation departing from this common-law

understanding." *Id.* at 424. After reviewing the Jones Act, 46 U.S.C. § 30104,[9] the Court concluded that Congress had prescribed no limitation on the available damages applicable to the plaintiff's claim, and thus punitive damages were available. *Id.*

In *Atlantic Sounding*, the Court expressly stated that the "reasoning of *Miles* remains sound." *Atl. Sounding*, 557 U.S. at 420 (citing *Miles v. Apex Marine Corp.*, 298 U.S. 19 (1990)). The Court cited with approval *Miles*' reasoning that Congress, under the Jones Act and Death on the High Seas Act (DOHSA), 46 U.S.C. § 30301−30306, had chosen to limit the damages available for wrongful-death actions, and thus Congress's "judgment must control the availability of remedies for wrongful-death actions brought under general maritime law." *Id.* at 419−20. In other words, where Congress limits damages by statute, courts may not permit more expansive remedies in a maritime action. But where Congress does not provide such a limitation, *Atlantic Sounding* states that the "laudable quest for uniformity in admiralty does not require the narrowing of available damages to the lower common denominator approved by Congress for distinct causes of action." *Id.* at 424.

Applying those principles here, neither the Jones Act nor the DOHSA provides a basis for this Court to depart from the common-law rule allowing punitive damages. Likewise, Congress has enacted no other legislation limiting the remedies available to Plaintiffs. Thus, as in *Atlantic Sounding,* this Court holds that the common-law rule allowing punitive damages applies, and Plaintiffs may seek them.

Defendant argues that, under *Batterton*, maritime negligence actions do not permit punitive damages. [327] at 17. In *Batterton*, the plaintiff sued his employer for failing to provide a seaworthy vessel. *The Dutra Group v. Batterton*, 139 S. Ct. 2275 (2019). The Court applied a three-prong framework to determine whether punitive damages were available in

---

[9] The Court noted that the Jones Act was the "only statute that could serve as a basis for overturning the common law rule." *Id.* at 415.

the maritime case: (1) whether punitive damages have traditionally been awarded for similar claims; (2) whether conformity with parallel statutory schemes require such damages; and (3) whether policy considerations nonetheless compel the Court to permit punitive damages. *Id.* at 2283.

In *Batterton*, the Court analyzed a claim for unseaworthiness, which transformed into a strict liability claim only after the implementation of the Jones Act. *See Batterton*, 139 S. Ct. at 2282. The Court considered the "overwhelming historical evidence" against the availability of a punitive damages in unseaworthiness actions "practically dispositive." *Id.* at 2284. Thus, "unless it is required to maintain uniformity with Congress's clearly expressed policies," the Court stated it would not recognize this "novel remedy." *Id.* Finding no basis to do so in the Jones Act,[10] which did not recognize punitive damages, the Court concluded that punitive damages were unavailable for an unseaworthiness claim. *Id.*

Application of the same *Batterton* framework, however, favors the availability of punitive damages in this case. Defendant argues that a historical review of maritime law "reflects a very narrow class of cases in which punitive remedies were considered available," which do not include "Plaintiff's garden-variety product liability claims." [327] at 13. But when the Court rejected the availability of punitive damages in *Batterton*, the Court considered that the plaintiff's unseaworthiness claim did not evolve "to remedy personal injury" until after "punitive damages were a well-established part of the common law." 139 S.Ct. at 2284. And the Court further emphasized "the importance of viewing each claim in its proper historical context" and that remedies "for negligence, unseaworthiness, and maintenance and cure have difference origins and may on occasion call for application of slightly different principles and procedures." *Id.*

---

[10] The Court considered the Jones Act because a claim of unseaworthiness "serves as a duplicate and substitute for a Jones Act claim." *Batterton*, S.Ct. at 2286.

While some district courts differ on whether negligence has historically permitted punitive damages under maritime law,[11] *Atlantic Sounding* addressed this question squarely, emphasizing that "general maritime law has recognized the tort of negligence for more than a century" and that "like negligence, the general maritime law has recognized . . . for more than a century the duty of maintenance and cure and the general availability of punitive damages." *Atl. Sounding*, 557 U.S. at 422 (citing *Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811 (2001) (cleaned up). Indeed, the Court in *Atlantic Sounding* explicitly held that the "general rule that punitive damages were available at common law extended to claims arising under federal maritime law," and that punitive damages "have long been an available remedy at common law for wanton, willful, or outrageous conduct." *Atl. Sounding*, 557 U.S. at 411.

Regarding the second prong, Defendant argues that the Jones Act prohibits the recognition of punitive damages under general maritime law. [327] at 15. But the Jones Act does not apply to claims against non-employer third parties, and thus it provides no basis to depart from the common-law rule. *See Miles*, 498 U.S. at 24 ("The Jones Act, 41 Stat. 1007, as amended, 46 U. S. C. App. § 688, through incorporation of the Federal Employers' Liability Act (FELA), 35 Stat. 65, as amended, 45 U. S. C. §§ 51−59, created a wrongful death action in favor of the personal representative of a seaman killed in the course of employment.").

---

[11] *Compare Morgan v. Almars Outboards, Inc.*, 316 F.Supp.3d 828, 840 (D. Del. 2018) (finding historic availability of punitive damages in negligence actions); *Thibodeaux v. T-H Marine Supplies, LLC*, No. 21-00443-BAJ-SDJ, 2023 WL 3576232, at *3 (M.D. La. May 19, 2023) (finding punitive damages available in products liability action brought under general maritime law); *Roberts v. Carnival Corp.*, No. 1:19-cv-25281-KMM, 2020 WL 10898036, at *3 (S.D. Fla. Oct. 19, 2020) (finding punitive damages available in negligence cases); *Archer v. Carnival Corp. and PLC*, No. 2:20-cv-04203-RGK-SK, 2020 WL 7314847, at *9 (C.D. Cal. Nov. 25, 2020) (declining to find punitive damages barred in negligence case) *with Mullinex v. John Crane Inc.*, No. 4:18-cv-00033, 2021 WL 8129699, at *2 (E.D. Va. Oct. 5, 2021) (finding punitive damages unavailable in negligence case); *Spurlin v. Air & Liquid Sys. Corp.*, 537 F.Supp.3d 1162, 1181 (S.D. Cal. 2021) (same); *Elorreaga v. Rockwell Automation, Inc.*, No. 21-cv-05696-HSG, 2022 WL 2528600, at *5 (N.D. Cal. 2022) (same).

Finally, Defendant argues that there is "no clearly expressed congressional policy favoring recognition of these novel remedies under maritime law." [327] at 24. But as the *Atlantic Sounding* court explained, the remedy requested here is not novel, but rather a long-established remedy at common law. *Atl. Sounding*, 557 U.S. at 422. Accordingly, Defendant's reading of *Batterton* fails to bar Plaintiffs from seeking punitive damages.

In sum, Defendant's motion is granted with respect to Count II. But punitive damages remain available to Plaintiffs in this maritime tort case since this remedy has been historically available, and no applicable law eliminates that availability. Plaintiffs' failure to specifically request punitive damages in their Complaint does not bar Plaintiffs from seeking this remedy at trial.

### D. Failure to Test

Defendant lastly argues that "failure to test" is not an independent cause of action under maritime law, and thus, "to the extent that Plaintiff is pursuing a claim against JCI solely based on a 'failure to test' theory, any such claim in not cognizable under maritime law." *Id.* But Plaintiffs do not assert "failure to test" as an independent cause of action or theory of liability for any of their claims. As a result, the Court denies summary judgment on this basis.

**IV.     Conclusion**

For the reasons explained above, the Court grants in part, and denies in part, Defendant's motion for summary judgment.  [316].  The Court grants Defendant's motion as to Plaintiffs' willful and wanton conduct claim (Count II) but notes the availability of punitive damages.  Plaintiffs may proceed on their negligence and strict liability claims (Counts I and III).

Dated:  1/31/2024                                    Entered:


                                                     John Robert Blakey
                                                     United States District Judge